# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN
## MILWAUKEE DIVISION

XU LUN, a pseudonym,
c/o Hawks Quindel, S.C.
409 East Main Street
P.O. Box 2155
Madison, WI 53701-2155

    Plaintiff,

  v.           Case No.: 24-cv-803


MILWAUKEE ELECTRIC TOOL
CORPORATION,
c/o Corporation Service Company
33 East Main Street, Suite 610
Madison, WI 53703

and

TECHTRONIC INDUSTRIES
COMPANY LIMITED,
29/F, Tower 2, Kowloon Commerce Centre
51 Kwai Cheong Road
Kwai Chung, Hong Kong, S.A.R.,

    Defendants.

## COMPLAINT

Xu Lun ("Plaintiff") seeks damages and injunctive relief against Milwaukee Electric

Tool Corporation ("Milwaukee Tool") and Techtronic Industries Company Limited ("TTI," and

together with Milwaukee Tool, "Defendants"), as follows:

1

# I. NATURE OF THE ACTION

1.      It is a well-documented fact that the manufacturing industry in the People's Republic of China ("PRC") is riddled with the use of forced prison labor. Companies, including American companies, who outsource their manufacturing to the PRC often say their products are not tainted by such practices by touting their companies' environmental, social, and governance ("ESG") practices.

2.      Defendants are one such company. Publicly, they say they have no tolerance for forced labor. They point to their internal policy against modern slavery and human trafficking. They claim to audit and investigate their suppliers thoroughly and regularly.

3.      But Defendants really did no such thing. They used and benefitted from forced labor, including that of Plaintiff, who were forced to make Milwaukee Tool work gloves while imprisoned at Hunan Chishan Prison ("Chishan Prison") in Hunan Province. Certainly, they recklessly disregarded that their gloves were made using forced labor at Chishan Prison.

4.      Defendants' representatives have all but admitted their recklessness to at least one member of Congress after being investigated by the Congressional-Executive Commission on China, in that Defendants' representatives admitted that they were unable to adequately audit their PRC suppliers, despite repeatedly claiming to the contrary in public, and to Plaintiff's representatives.[1] Yet, Defendants refuse to even meet with Plaintiff or Plaintiff's representatives, except through lawyers.

5.      That Defendants' gloves were made with forced prison labor at Chishan Prison has been all but confirmed by the U.S. government. On April 10, 2024, U.S. Customs and

---

[1] The Congressional-Executive Commission on China was created by Congress in October 2000 with the legislative mandate to monitor human rights and the development of the rule of law in China, and to submit an annual report to the President and the Congress. The Commission consists of nine Senators, nine Members of the House of Representatives, and five senior administration officials appointed by the President.

Border Protection blocked the importation of gloves made by the supplier who made the gloves at issue based on evidence "that reasonably indicates the use of convict labor" in violation of U.S. law.

6. Plaintiff brings this action under the Trafficking Victim Protection Act, which allows victims of forced labor to file a civil action against whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which that person knew or should have known was engaged in forced labor. Plaintiff is a victim of forced labor. Defendants knowingly benefited from Plaintiff's forced labor.

## II.     JURISDICTION AND VENUE

7. Jurisdiction is proper under 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States, namely 18 U.S.C. § 1581 *et seq.*, and because 18 U.S.C. § 1595(a) provides that such actions may be brought "in an appropriate district court of the United States[.]"

8. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district, including because Defendant Milwaukee Tool received a substantial part of the benefit giving rise to their liability in this district.

## III.     PARTIES AND RELEVANT NON-PARTIES

### A.     Plaintiff

9. Plaintiff is a former prisoner at Chishan Prison, where, in 2022, he was subjected to five months of forced labor for Defendants' benefit. Plaintiff is initiating this lawsuit under the pseudonym Xu Lun because he remains in the PRC and reasonably fears for his safety if his identity is revealed.

3

### B. Defendants

#### 1. TTI

10. TTI is a multinational corporation founded in 1985. TTI is headquartered in Hong Kong, S.A.R., and is traded on the Hong Kong Stock Exchange. It operates primarily in the power equipment and floor care appliance industry. Its largest and highest-margin business is Milwaukee Tool.

#### 2. Milwaukee Tool

11. Milwaukee Tool is a power tool corporation founded in 1924. It is headquartered in Brookfield, Wisconsin. In 2005, Milwaukee Tool became a wholly owned subsidiary of TTI. Milwaukee Tool's largest market is the United States and its largest customer is Home Depot.

### C. Relevant non-parties

#### 1. Shanghai Select Safety Products

12. Shanghai Select Safety Products ("Shanghai Select"), also known as SAFETY-INXS, is a PRC company that manufactures industrial protective gear, including hand protection products. Its Chinese name is 赛立特, which is pronounced Sài Lì Tè, to mimic the sound of the English word "Select." Shanghai Select is 80% owned by Coverguard, a French company based in Lyon. Shanghai Select is a supplier of Milwaukee Tool.

#### 2. Lee Ming-che

13. Lee Ming-che ("Lee") is a former prisoner at Chishan Prison. Between April 2020 and April 2021, he was subjected to forced labor for Defendants' benefit.

## IV. FACTS

14. Founded in 1924, Milwaukee Tool touts itself as a leading brand in the power tool industry. It markets its products to professional tradespeople based on its "unmatched durability," quality, and innovation.

4

15.    What consumers are not told is that Milwaukee Tool relies on the forced labor of Chinese prisoners, including political prisoners, in the creation of certain of its work gloves.

**A.    Chinese prisoners are forced to make Milwaukee Tool gloves at Chishan Prison.**

      **1.    Milwaukee Tool gloves are made at Chishan Prison.**

16.    Chishan Prison, also known as Hunan Provincial No. 1 Prison, is in Yuanjian City, Hunan Province. Chishan Prison has housed several high-profile prisoners who have publicly attested to having been subjected to forced labor and torture while imprisoned there.

17.    According to Plaintiff and Lee, the forced labor at Chishan Prison occurred in its manufacturing facilities, which were a short walk from the prison cell blocks. The manufacturing facilities were composed of eleven wards. Wards II and III were associated with the production of Milwaukee Tool gloves.



**Figure 1**

5

## 2. Plaintiff was forced to make Milwaukee Tool gloves at Chishan Prison.

18.     Plaintiff worked for a non-governmental organization that advocated for the rights of vulnerable groups in the PRC, including persons living with HIV/AIDS, hepatitis B, and people with disabilities. For that, Plaintiff was arrested on July 22, 2019.

19.     On July 20, 2021, Plaintiff was convicted of subversion of state power, a charge commonly used by the PRC government to target activists and human rights campaigners. Plaintiff was sentenced to five years imprisonment. He served part of that sentence at Chishan Prison. On or around February 23, 2022, Plaintiff began being subjected to forced labor. Specifically, he was forced to make a variety of textile goods, including work gloves bearing the distinct "Milwaukee" logo. He would continue to work on the Milwaukee Tool gloves until he was released from prison on July 21, 2022.

## 3. Lee Ming-che was forced to make Milwaukee Tool gloves at Chishan Prison.

20.     Lee is a Taiwanese pro-democracy activist. He worked for the Democratic Progressive Party in Taiwan. Lee was detained by PRC authorities in March 2017 while travelling to the PRC. In November 2017, he was sentenced to five years in prison for subversion of state power.

21.     Lee served his sentence at Chishan Prison where he was also subjected to forced labor. Between March 2020 and April 2021, Lee was forced to make work gloves bearing the distinct "Milwaukee" logo. Lee was later assigned to janitorial work. There, he gained knowledge of the supply chain for Milwaukee Tool gloves by looking through discarded packing slips and other documents. He was released from Chishan Prison on April 15, 2022 and returned to Taiwan where he currently resides.

6

### 4. The manufacturing process for Milwaukee Tool gloves at Chishan Prison.

22.     The production of Milwaukee Tool gloves started at Ward II, where various types of polyester fabric, including ones bearing the Milwaukee Tool logo, and other raw materials were shipped. Ward II was where the fabric was first cut into pieces. There were approximately fifty cutting machines in total at Ward II, and two or three cutting machines were specially designated to cut fabric to make Milwaukee Tool gloves. The cut fabric and other materials were then sent to Ward III, where it was assembled into gloves.

23.     The assembly process involved sorting the cut fabric, sewing, using resin glue to add protective non-slip features, embroidering, trimming excess thread, moulding the gloves with an iron, and correcting substandard outputs.

24.     Once the assembly was complete, the gloves were then sent back to Ward II for quality control inspection. After being inspected, the gloves were then packed.

25.     Each prisoner was subject to production quotas, depending on the task they were assigned. During his time working on Milwaukee Tool gloves, Plaintiff was assigned to sorting fabric, thread cutting, gluing, quality control, and ironing. Lee was assigned to cutting the fabric and sewing. The daily quota for cutting fabric was between 450-500 pairs. The daily quota sewing was approximately 200 pairs.

26.     It was well known among the prisoners and the prison guards that the client who had placed the order for Milwaukee Tool gloves was Shanghai Select. Shanghai Select was frequently mentioned by the prison guards as an important customer. Shanghai Select also sent representatives to the prison to monitor production and conduct quality control.

27.     There was a specific Shanghai Select employee, known to Plaintiff and Lee as Ms. Liu, who was responsible for overseeing the Milwaukee Tool product line. It was also

7

commonly known among the prisoners that the Milwaukee Tool gloves were ultimately being made for export to the U.S. and other markets, as they were subject to more stringent quality control standards than some of the other products being produced at Chishan Prison, and as they bore a label setting forth Milwaukee Tool's Brookfield, Wisconsin address.

<blockquote>

**5.      The nature of the forced labor at Chishan Prison used to make Milwaukee Tool gloves.**
</blockquote>

28.      All prisoners, criminal and political, at Chishan Prison were subjected to forced labor. The only people who were exempt were the elderly and the disabled. The workdays were 11-13 hours long. Prisoners were allowed a ten-minute break in the morning, a twenty-five-minute break for lunch, and a ten-minute break in the afternoon. Prisoners were only permitted 1-3 days off a month.

29.      The factories had no air conditioning or heating, and the prisoners were subjected to severe weather conditions. The summer months were particularly brutal, with extreme heat and humidity, and poor ventilation. Many prisoners developed eczema and other skin ailments in the hot and humid factories.

30.      The factories were also laden with fabric dust so severe that prisoners were required to wash off the dust before they were allowed to take showers. This constant exposure to dust caused respiratory health issues for many of the prisoners. Lee now has allergies which his doctor attributes to the clouds of dust he inhaled while working at Chishan Prison.

31.      The nature of the labor required sitting for long periods of time, which further impacted the prisoners' physical health. Some prisoners developed problems such as hemorrhoids and prostatitis from long periods of sitting without breaks.

32.      The facilities were also cramped. Each inmate had less than 2 square meters of individual workspace. This environment made it difficult for the prisoners to work comfortably

8

or safely. At the same time, prisoners were not allowed to talk freely to other inmates while working. They were also not permitted to freely use the bathroom.

33.    The prisoners were not provided any safety training, and there were frequent workplace injuries caused by the machinery. For instance, a common injury was getting their fingers punctured by the embroidering machine, and many prisoners lost their thumbnails due to repeated injuries. The prison administration strongly deterred prisoners from reporting workplace injuries by blaming the injuries on the prisoners' carelessness and punishing them for it.

34.    Prisoners at Chishan Prison had two accounts: one for their families to deposit money into and one to receive pay. The money could then be used to purchase necessities like underwear and soap, as well as consumables. Prisoners were paid between 10 RMB ($1.41 USD) and 300 RMB ($42.50) a month for their labor, depending on the tasks they were assigned. Most of the time, Plaintiff and Lee only received between 10 RMB to 20 RMB a month, as the prison officials always came up with excuses to deduct their pay, even when they met their production quotas.

35.    Plaintiff and Lee regularly witnessed fellow inmates being threatened and punished when they refused to work, did not work hard enough, or did not meet their production quotas. Punishment included being forced to stand or squat for long periods of time, being banned from visitation with family, being banned from buying goods with their money, and being forbidden to use the bathroom. More severe punishment included being sent to the high-security section of the prison, being placed in solitary confinement, being forced to walk while squatting, and being woken up every hour with a roll call. The most severe punishment included beatings and electric shocks with electric rods.

9

36.     Being subjected to forced labor had profound and enduring psychological effects on many of the prisoners, including Plaintiff and Lee. The experience of being exploited and forced into grueling work was humiliating and dehumanizing. The constant threat of physical harm and the loss of autonomy eroded their mental health. This is particularly true for Plaintiff and Lee, both of whom were imprisoned for their human rights activism. For them to be then subjected to forced labor for the ultimate benefit of a multibillion-dollar corporation was acutely depressing.

### 6.     The specific models of Milwaukee Tool gloves that were made at Chishan Prison.

37.     Plaintiff and Lee identified the specific models of Milwaukee Tool gloves that they were forced to make at Chishan Prison. They were the "Demolition" gloves, the "Winter Demolition" gloves, the "Performance" gloves, and the "FreeFlex" gloves.

38.     These glove models were introduced to the market by Milwaukee Tool between 2015 and 2016 and remain part of Milwaukee Tool's current product offerings. Each of these models are labelled as made in China, as are many other Milwaukee Tool products.

39.     When the gloves came on the market, Milwaukee Tool heavily touted the fact that, unlike other companies that might just use an original equipment manufacturer (OEM), Milwaukee Tool was different. Rather than rely on others for design and manufacturing, Milwaukee Tool differentiated its glove offerings by touting Milwaukee Tool's ownership of the design and manufacturing processes.

40.     For example, at a presentation given in or around 2016, Matthew Vargo, then a Milwaukee Tool product manager, and now a Vice President of Product Marketing, stated:

> Gloves in particular is a category where a lot of companies would go out, grab some products off the shelf, slap their logo on it, and say, 'We have gloves now.' Obviously at Milwaukee [Tool] that's not our approach and never will be our

10

approach. We want to deliver meaningful innovation and meaningful solutions to all of our core users at the end of the day with every product we do.

Last year, I introduced the Demolition work gloves, which are reinforced with ARMORTEX so you get five times longer life. . . . The success of this glove has allowed us to expand our gloves line up to three new SKUs that we're going to be launching this year.

First and foremost, we have our new FreeFlex glove. . . . One of the things we did is work to develop a new material for the palm of this which is going to be as or more durable than all the competition that's out there, but will also allow that Smart Swipe feature that's on the knuckle to also be on the palms and fingertips of all our gloves, across the board, so you have full access to all the different functionality of your smartphone or tablet.

. . .

In addition to the FreeFlex lineup, we're also going to have a new Performance glove, which is going to feature a hook and loop closure. One of the things that's on this glove, as well as the FreeFlex gloves, is the high-dexterity fingertip construction.



**Figure 2**

41.     Notably, as discussed above, each of the models discussed by Mr. Vargo—

Demolition, FreeFlex, and Performance—were manufactured at Chishan Prison.

11

**7. Defendants assert patent and other intellectual property protections over the gloves made at Chishan Prison.**

42. So innovative did Milwaukee Tool consider its gloves that Milwaukee Tool applied for a patent for the Demolition glove. On February 18, 2016, the same Matthew Vargo as in the above video, along with several other inventors, submitted a United States patent application for the Demolition glove on behalf of Milwaukee Tool.[2] That patent application was approved on May 4, 2021, resulting in U.S. Patent No. 10,993,489.[3] The '489 patent is currently assigned to Milwaukee Tool. Vargo and others also obtained a series of related design patents for the gloves in question, bearing patent numbers D812844, D812845, and D812312. An image from the patent is reproduced below:



**Figure 3**

---

[2] U.S. Patent Application Publication No. 2016/0235140 A1, Aug. 18, 2016, *available at* https://patents.justia.com/patent/20160235140.

[3] U.S. Patent No. 10,993,489 B2, May 4, 2021, *available at* https://patents.google.com/patent/US10993489B2/en.

43.     Along similar lines, Milwaukee Tool touts that its gloves are made with "proprietary knitting" to provide "outstanding durability."[4]

**B.  Defendants had unique reason to know of and either knew of or recklessly disregarded the forced labor.**

44.     Defendants knew or should have known that their gloves were made with forced labor. If they did not know, they were made aware of this fact no later than January 31, 2023, when Plaintiff's counsel sent them a demand letter. Defendants replied on February 14, 2023, claiming they conducted an internal investigation and found that there was no forced labor in their supply chain.

45.     Since then, several news outlets have reported on Defendants' use of forced labor. On July 11, 2023, the Congressional-Executive Committee on China sent the Defendants a letter inquiring about the Defendant's supply chain due diligence efforts and monitoring mechanisms. The Defendants' representatives responded to that inquiry by admitting to at least one member of Congress that it was aware that it was not able to adequately audit its suppliers in the PRC, and that it was planning to move its suppliers to Southeast Asia as a result. In other words, Defendants all but admitted they were reckless in failing to detect the forced labor at issue here.

46.     Thus, if Defendants were truly not aware of the use of forced labor prior to January 31, 2023, they were indeed reckless in failing to detect it given they had ample opportunity and the ability to do so.

---

[4] Milwaukee Tool, "Milwaukee Tool will introduce 3 ANSI/ISEA-rated cut-resistant gloves in November 2017," Dec. 14, 2017, *available at* https://www.milwaukeetool.com/News/Press-Releases/Hand-Tools/Dipped-Gloves.

1.    **The use of forced labor in the manufacturing industry in the PRC is widely known.**

47.    It is well known to the general public, and in the textile and manufacturing industries especially, that the use of forced labor in PRC prisons is widespread. Indeed, the PRC openly practices "reform through labor," whereby prisoners are forced to work as a means of punishment and rehabilitation. In these prisons, prisoners, including political dissidents and religious and ethnic minorities, are regularly forced to engage in physically demanding and hazardous work.

48.    Forced labor is not only used as a form of punishment but also contributes significantly to the PRC's economy, as products manufactured in these facilities are frequently exported worldwide.

49.    This phenomenon has been widely reported on by the media, government agencies, and international human rights organizations—for decades.

50.    For example, on May 21, 1997, the U.S. Senate Committee on Foreign Relations held a hearing on the topic of "U.S. Implementation of Prison Labor Agreements with China." [5]

51.    In opening remarks, Senator Craig Thomas of Wyoming stated that the purpose of the hearing was to "address the matter of U.S. enforcement of prison labor agreements with the People's Republic of China," in light of "continu[ing] . . . evidence of Chinese prison labor imports to the United States and a disturbing lack of cooperation from the Chinese government." He further noted that "China's penal system relies on an extensive system of forced labor camps, farms, and factories." More generally, at the hearing, the phrase "forced labor" was used nearly 100 times.

---

[5] Senate Hearing 105-253, "U.S. Implementation of Prison Labor Agreements with China," May 21, 1997, *available at* https://www.govinfo.gov/content/pkg/CHRG-105shrg47725/html/CHRG-105shrg47725.htm.

14

52.     Similarly, and also in 1997, then-President Bill Clinton gave a speech on the topic of "China and the National Interest" in which he stated that the United States would "continue to pursue the problem of prison labor" in the PRC.[6]

53.     As another example, in 1998, Human Rights Watch published a report entitled "Reeducation Through Labor in China."[7] That report described "a system of detention and punishment administratively imposed on those who are deemed to have committed minor offenses" which "conditions are harsh and the work load [is] heavy[,]" involving "work in mines and brick factories, for example, and . . . heavy agricultural labor."

54.     As another example, in 2010, Freedom House published a report entitled "The Global State of Workers' Rights."[8] One of its "Major Findings" was that "[f]orced or coerced labor is a matter of government policy in a number of the world's more repressive societies, including . . . China."

55.     As another example, in 2014, the U.S. China Economic and Security Review Commission released a report titled "Prison Labor Exports from China and Implication for U.S. Policy."[9] The report detailed the coercive labor practices in PRC prisons in various industries, including in the production of textile goods for export to, among other places, the U.S. The report also highlighted several high-profile allegations that from released prisoners about the

---

[6] The White House, "President Clinton's Remarks on China," Oct. 24, 1997, *available at* https://clintonwhitehouse4.archives.gov/WH/New/html/19971024-3863.html.

[7] Human Rights Watch, "Reeducation Through Labor in China," 1998, *available at* https://www.hrw.org/legacy/campaigns/china-98/laojiao.htm.

[8] Freedom House, "The Global State of Workers' Rights," Aug. 2010, *available at* https://www.freedomhouse.org/sites/default/files/inline_images/The%20Global%20State%20of%20Workers%20Rights.pdf.

[9] U.S.-China Economic and Security Review Commission, "Prison Labor Exports from China and Implications for U.S. Policy," July 9, 2014, *available at* https://www.uscc.gov/sites/default/files/Research/Staff%20Report_Prison%20Labor%20Exports%20from%20China_Final%20Report%20070914.pdf.

used of forced labor in PRC prisons on goods destined for export to, among other places, the U.S.

56.     Given how well documented these issues are, Defendants were well-aware of the risk that their supply chain would become tainted with the use forced labor before moving their production to the PRC. This is particularly the case given TTI's special knowledge of the PRC.

   2.     **TTI has deep and unique knowledge of labor and manufacturing issues in the PRC.**

57.     TTI was founded in 1985 in Hong Kong, S.A.R., and has deep roots and experience in the PRC and surrounding areas. For example, its website is available in just three languages, two of which are English and Chinese. Along similar lines, it has two different Chinese-language websites, one for international audiences and one for Chinese audiences:



**Figure 4**

16

58.     TTI opened its first factory in China in 1988 and has had a continuous manufacturing presence there since.[10] Its worldwide headquarters are also in the PRC, specifically Hong Kong, S.A.R., and from those headquarters, TTI manages "Manufacturing" and "Global Sourcing," including for Milwaukee Tool.[11]

59.     TTI's business model is in large part to match its expertise and experience in the PRC, including its ability to manufacture in the PRC at low-cost while maintaining quality, with the brand awareness of companies like Milwaukee Tool.

60.     TTI's 2016 Annual Report reveals a particular awareness of labor issues in the PRC. In that report, TTI noted that there are sometimes "labor shortage seasons in China," and that to deal with those shortages, "TTI hires college students over the age of 18" who "are not subject to" juvenile labor laws.[12]

61.     TTI's deep background in and knowledge of the PRC and its labor issues thus gave it and Milwaukee Tool unique reason to know of the forced labor in this case.

### 3.     Milwaukee Tool is TTI's most important subsidiary.

62.     Milwaukee Tool is extremely important to TTI's business.

63.     For example, in TTI's 2022 annual report, TTI describes Milwaukee Tool as its "flagship" brand and "the number one and fastest-growing global brand in the professional tool market." TTI's power equipment segment represents 93% of TTI's total sales, much of which can be attributed to Milwaukee Tool.[13]

---

[10] TTI Annual Report 2015 at 3, *available at* https://www.ttigroup.com/sites/default/files/2022-09/15ar_Print.pdf; TTI Annual Report 2007 at 39, *available at* https://www.ttigroup.com/sites/default/files/2022-09/07ar_Print.pdf.

[11] TTI Annual Report 2012 at 3, *available at* https://www.ttigroup.com/sites/default/files/2022-09/12ar_Print.pdf.

[12] TTI Annual Report 2016 at 75, *available at* https://www.ttigroup.com/sites/default/files/2022-09/16ar_Print.pdf.

[13] TTI Annual Report 2022 at 6, *available at* https://www.ttigroup.com/sites/default/files/2023-04/ar2022.pdf.

17

64.     This too gave Defendants extra incentive to monitor the suppliers of Milwaukee Tool products particularly closely.

### 4.     TTI and Milwaukee Tool closely coordinate.

65.     Additionally, Defendants closely coordinate on all matters relating to manufacturing, such that their knowledge can be imputed to each other.

66.     For example, Milwaukee Tool and TTI closely coordinate in U.S. litigation, and have jointly prosecuted patent infringement cases as plaintiffs in the United States. *E.g.*, *Milwaukee Elec. Tool Corp. v. Hitachi Koki Co.*, No. 09-C-948, 2012 WL 1952977, at *1 (E.D. Wis. May 29, 2012) ("On October 1, 2009, Milwaukee Electric Tool Corporation . . . [and] Techtronic Industries Co. Ltd. . . . filed their complaint against Hitachi Koki Co. Ltd. and Hitachi Koki USA Ltd. . . . asserting five counts of patent infringement."); *Milwaukee Elec. Tool Corp. v. Chervon N. Am. Inc.*, No. 14-CV-1289-JPS, 2017 WL 2929522 (E.D. Wis. July 10, 2017) (Milwaukee Tool and TTI jointly asserting patent infringement); *Milwaukee Elec. Tool Corp. v. Snap-On Inc.*, No. 14-CV-1296-JPS, 2018 WL 11413974 (E.D. Wis. Jan. 19, 2018) (same).

67.     As another example, Milwaukee Tool's website features an application page for suppliers.[14]

---

[14] Milwaukee Tool, "Become a Milwaukee Supplier," 2024, *available at* https://www.milwaukeetool.com/Support/supplier.

18



**Figure 5**

68. And when a supplier indicates they are from Asia by clicking on the link in the bottom-right corner of Figure 5, they are given access to *TTI's* online portal page:[15]



**Figure 6**

69. By contrast, if the supplier is from North America, they are led to a Milwaukee Tool portal page:[16]

---

[15] The URL is: https://ispportal.tti.com.hk:5576/OA_HTML/AppsLocalLogin.jsp.

[16] The URL is: https://supplierportal.milwaukeetool.com/Account/LogOn?ReturnUrl=%2f.

19



**Figure 7**

70.     As such, with respect to issues relating to labor and manufacturing in the PRC, TTI's knowledge can be imputed to Milwaukee Tool.

> **5.     TTI and Milwaukee Tool's business strategy depends explicitly on accessing cheap labor in the PRC.**

71.     TTI's 2005 acquisition of Milwaukee Tool (for USD $626.6 million) was specifically intended to take advantage of TTI's expertise in low-cost, high-quality manufacturing in the PRC and pair it with Milwaukee Tool's premium brand power to create a high-margin business.

72.     Indeed, around the time of the acquisition, TTI noted how "important" it was that "the powerful Milwaukee … high-end brand[] complement[ed] our Ryobi mid-range brand of consumer power tools and accessories." And later TTI touted how "[t]he move of Milwaukee production to China will yield significant cost savings in 2008 and beyond."[17]

73.     That strategy bore fruit.

---

[17] TTI Annual Report 2007 at 39, *available at* https://www.ttigroup.com/sites/default/files/2022-09/07ar_Print.pdf.

74.     In TTI's 2022 Annual Report, TTI boasted 14 consecutive years of gross margin improvement, which was driven the "market growth of Milwaukee [Tool]" and "manufacturing productivity," which necessarily entails lower manufacturing costs, including lower labor costs.[18] This improvement was made possible in part from the use of Plaintiff's forced labor and that of and other prisoners at Chishan Prison. More to the point, Defendants' explicit strategy of taking advantage of lower labor costs in the PRC also gave them unique reason to know of the forced labor. At the very least, it should have alerted the Defendants to the possibility of questionable labor practices in their supply chain requiring robust auditing mechanisms. As detailed further below, despite claiming to engage in such auditing, Defendants failed to detect the use of forced labor in their gloves.

> **6.     Defendants tout their detail-oriented approach to quality control, operations, and manufacturing.**

75.     Additionally, Defendants both hold themselves out as devoting more attention and care to the manufacturing process than their competitors.

76.     For example, TTI's company history page states:

In 1985, Mr. Horst Julius Pudwill and Prof Roy Chi Ping Chung GBS BBS JP founded Techtronic Industries (TTI) with the clear vision of owning and building a portfolio of globally recognized brands. Today, their passion and commitment has resulted in products that have become household names in the commercial construction, home improvement, and industrial power tool markets as well as the home maintenance and commercial floorcare markets.

Their steadfast dedication to unsurpassed quality and core strategies of driving continuous innovation, *operational improvement*,[19] and leadership development have propelled all of TTI's brands, *including Milwaukee Power Tool*, a 150-year-old company and now a billion dollar worldwide brand annually.

---

[18] TTI Annual Report 2022 at 3.

[19] All emphases added unless otherwise indicated.

TTI is proud of the history we are creating with our portfolio, knowing that our devotion to excellence will continue to lead us to greater heights.[20]

77.     Similarly, TTI claims that, "From Day One, Superior Quality has been the primary focus for TTI."[21] In particular, TTO asserts:

It is important for TTI employees to understand our holistic approach to quality; that it permeates *every element of our organization*, from product design to *manufacturing*, from hiring processes to continuous leadership development training, and from *supply chain execution* to day-to-day consumer and professional interactions. Quality is the DNA of the TTI culture.

78.     TTI also claims:

Operational excellence is the engine that provides the power to innovation.

It ensures that an idea becomes a reality; from products in the home or garage to the rugged family of products on construction jobsites and infrastructure projects. Operational Excellence means examining *every single aspect of bringing a product to market and questioning how to improve the efficiency of even the smallest detail*. This is a never-ending commitment by TTI.

We are process driven. The foundation for manufacturing dependable products rests with our *detailed, analytical processes* that focus on delivering the highest quality products through the most demanding, engineered measurement systems. We are proud of our global culture of never-ending improvement with *manufacturing footprints on several continents* providing the quality, speed-to-market, efficiency, and flexibility for each geographic market.

We have linked our new product development with operations. *We closely examine every detail* from design engineering to *supply chain logistics* in order to eliminate waste and improve productivity. Our operational teams have driven scalability utilizing our resources at a global level and are prepared for the future.[22]

79.     As for Milwaukee Tool, not only has it made similar general statements, as discussed above, it has *specifically touted the gloves at issue as embodying its hands-on approach to innovative and high-quality design and manufacturing*.

---

[20] TTI, "History," *available at* https://www.ttigroup.com/company/history.

[21] TTI, "About Us," *available at* https://www.ttigroup.com/company/about-us.

[22] TTI, "Operational Excellence," *available at* https://www.ttigroup.com/company/strategic-drivers/operation-excellence.

80.     This self-proclaimed emphasis on manufacturing excellence and detail to attention also gave Defendants unique reason to know of the forced labor.

**7.     Defendants say they carefully audit suppliers for forced labor.**

81.     Additionally, Defendants claim to carefully audit suppliers for forced labor. For example, on its supplier portal, Milwaukee Tool states that interested suppliers must agree "to be potentially audited, completing master service agreements, and submitting other documentation."[23]

82.     More generally, Defendants claim to require all their suppliers to comply with Defendants' ESG policies. In TTI's 2021 ESG Report, the company stated that they "place great emphasis on the ethical, environmental and social impact of our products and services throughout the value chain and in particular in our supply chain. From sourcing raw materials, to production, storage, delivery and transportation, we ensure our operations will be sustainable in the long-term. Addressing these impacts with our partners, helps us manage risk and enhance performance, while also maintaining stakeholder trust."[24]

83.     TTI claims that it specifically requires its suppliers to follow its "stringent standards on modern slavery and human trafficking, specifically no tolerance of child and forced labor."[25]

84.     TTI also claims that it audits suppliers before entering a supplier engagement with them. Audits then supposedly continue every 12-18 months for suppliers who have "been awarded an acceptable score," while suppliers who require "corrective measures" are subjected

---

[23] *See supra* at n. 16.

[24] TTI ESG Report 2021 at 20, *available at* https://www.ttigroup.com/sites/default/files/2023-07/TTI_ESG_2021_ENG_Final_0504.pdf.

[25] *Id.*

to more frequent audits and training. In addition to compliance audits, TTI also conducts investigations to mitigate the "risk of human rights violations . . . within the supply chain."[26]

85.    Defendants also have a Policy Against Modern Slavery and Human Trafficking, apparently published in 2016, specifically to combat forced labor, child labor, and human trafficking.[27] Defendants claim that "every TTI employee and supplier is responsible for confirming compliance with this policy."[28] The policy calls for "Anti-Slavery/Human Trafficking provisions in key Supplier Contracts" and "site visits/audits for high risk operations/Suppliers."[29]

86.    The foregoing demonstrates that Defendants were and remain well aware of the risk that their suppliers would engage in forced labor and other human rights violations. And given Defendants' auditing claims, combined with the fact that forced labor was actually used to make Milwaukee Tool gloves, the only possibilities are that Defendants' auditing claims were false, that the audits were sham audits, or that Defendants were reckless in failing to detect the forced labor that occurred.

### 8.    Defendants faced unique intellectual property and reputational risks.

87.    As mentioned above, Defendants held intellectual property rights in the gloves that were made with forced labor. Additionally, the gloves bore the Milwaukee Tool logo, and so would be easily associated with Defendants. As such, Defendants had uncommonly strong incentives to gain knowledge of the manufacturing conditions.

---

[26] *Id.*

[27] *See* TTI Policy Against Modern Slavery and Human Trafficking, *available at* https://www.ttigroup.com/sites/default/files/2023-03/trafficking_en.pdf.

[28] TTI ESG Report 2021 at 42.

[29] TTI Policy Against Modern Slavery and Human Trafficking at 5.

24

### 9. Shanghai Select publicly disclosed that it outsourced production to other factories.

88.     Publicly available information about Shanghai Select made clear that Shanghai Select was outsourcing to factories to lower the cost of production and improve profit margins.

89.     For example, Shanghai Select stated in a publicly available 2018 prospectus that it began single process outsourcing in 2015, which involves outsourcing the first step of textile processing to streamline manufacturing. Shanghai Select would then complete the semi-finished goods itself. Shanghai Select claimed this process "allowed larger cost benefits and better production efficiency in the process of outsourcing."[30,31] Shanghai Select publicly claimed that it used single process outsourcing specifically on work gloves.

90.     In addition, Shanghai Select stated in its publicly available 2018 semi-annual report that it also started multi-process outsourcing in 2016, contracting many stages of the production process to external suppliers. Shanghai Select claims that this practice enabled them to "capitalize on the cost savings and raise the production efficiency of outsourcing, resulting in a substantial rise in the gross profit margin."[32]

91.     While Shanghai Select was expanding its outsourcing, it was also touting its lower production costs compared to other competitors in the safety product manufacturing market. This claim corresponds with the company's publicly available financial statements. Shanghai Select's outsourcing costs for the fiscal years 2015, 2016, and the period from January to June 2017 were 18,498.88 million RMB, 30,158.84 million RMB, and 15,928.85 million RMB, respectively. These percentages constituted 10.48 percent, 22.94 percent, and 24.89

---

[30] Quotations in this section are translated from Chinese.

[31] Shanghai Select Safety Products Co., Ltd., Prospectus, Jan. 2018 at 1-1-239.

[32] Shanghai Select Safety Products Co., Ltd., Semi-Annual Report 2018 at 12.

percent of total operating costs for each quarter, indicating an upward trend. Meanwhile, during the same time periods, Shanghai Select's operational expenses declined. During the 2015, 2016, and January-June 2017 fiscal years, revenues were 176,596.1 million RMB, 131,467.0 million RMB, and 69,859.59 million RMB, respectively.[33]

92.    Also, Shanghai Select's public documents stated that outsourcing created a risk for quality control. For example, Shanghai Select stated that despite efforts to "strictly adhere to relevant regulations to control the quality of the outsourcing process and finished products," the use of external suppliers carries the risk of products "not being delivered according to the deadline, specifications, and quality" required.[34]

93.    Given how openly Shanghai Select discussed its practice of outsourcing and the challenges it faced in working with its suppliers, and the extensive due diligence that Defendants would have conducted on Shanghai Select before working with them, Defendants almost certainly knew that Shanghai Select outsourced a significant portion of its gloves manufacturing contract with Defendants. This, in turn, gave Defendants particular reason to know of the forced labor.

C.    **A consulting expert with deep industry experience confirms that Defendants could have detected the forced labor using commercially reasonable efforts.**

94.    Jill Tucker is a former Reebok executive with decades of experience in researching, investigating, and auditing supply chains for abusive labor practices, including supply chains in the PRC. Her resume is attached as Exhibit A.

95.    Based on her experience, as well as her analysis of the evidence available to date, Ms. Tucker's opinion is that, to the extent Defendants did not have actual knowledge of the

---

[33] Shanghai Select Safety Products Co., Ltd., Prospectus, Jan. 2018 at 1-1-90.

[34] Shanghai Select Safety Products Co., Ltd., Prospectus, Jan. 2018 at 1-1-4.

forced labor at Chishan Prison, they could have discovered the forced labor using commercially reasonable efforts.

96.     For example, in Ms. Tucker's opinion, it is a commercially reasonable practice to:

a.  ask suppliers for the specific locations of all the actual facilities in which products are being made;

b.  to visit those facilities;

c.  interview workers at those facilities;

d.  require that suppliers agree to unannounced audits of those facilities;

e.  have a process in place to detect unauthorized sub-contracting; and

f.  refuse to work with a supplier if they failed to cooperate with the foregoing.

97.     Indeed, such practices were routine when Ms. Tucker was at Reebok, and resulted in the detection and mitigation of abusive labor practices, including forced labor.

98.     Moreover, Ms. Tucker's opinion is that it would have been more likely for Defendants to detect the forced labor at issue because it involved gloves, as distinguished from, for example, t-shirts. While facilities for the manufacture of the latter are a dime a dozen, the machinery required to manufacture gloves is far more specialized, making it easier to conduct a meaningful investigation of a supply chain for gloves than for other kinds of apparel.

99.     Additionally, Ms. Tucker's opinion is that, given that Defendants had been operating manufacturing facilities in the PRC since the 1980s, they would have been more aware of the prevalence of abusive labor practices, including the widespread use of forced prison labor, compared to companies that did not have such experience in the PRC. Ms.

27

Tucker's opinion is that that is all the more reason Defendants should have known of the forced labor in their supply chain.

100. Additionally, due to the highly profitable nature of their business, as disclosed in publicly available financial information, Ms. Tucker's opinion is that there was no financial impediment to Defendants conducting a commercially reasonable investigation similar to the investigations she routinely conducted while at Reebok. And Ms. Tucker's opinion is that had they done so, they would have either detected that their gloves were being made at Chishan Prison, or they would have realized that suppliers like Shanghai Select were either unable or unwilling to disclose to them the locations of the actual facilities where such gloves were being made, in which case it would have been commercially reasonable to cease working with such suppliers.

101. Defendants had the necessary financial resources and could have deployed advanced monitoring and audit mechanisms across its supply chain, conducting thorough assessments of labor conditions and practices. Defendants are also sophisticated enough to understand that the existence of subcontracting relationships, and the need to investigate of its suppliers' suppliers when examining its supply chains for labor abuses.

102. Defendants also had the necessary understanding of the sociopolitical and economic system in PRC that would have enabled them to recognize the conditions that might foster forced labor, including the consequence of putting pressure on its suppliers to be price competitive.

103. Furthermore, Defendants had access to countless publicly available documents describing the prevalence of forced labor in the PRC, particularly in the manufacturing industry.

28

104.    Further, it is Ms. Tucker's opinion that it is not reasonable to rely on statements from suppliers in the PRC that the suppliers are in compliance with various labor standards or codes of conduct or the like. Rather, it is Ms. Tucker's opinion that industry standards—and certainly industry best practices—require companies like Defendants to conduct independent investigations like the ones she conducted for Reebok.

105.    Given the extent of the forced labor at Chishan Prison, and the accounts of Plaintiff and Mr. Lee, Ms. Tucker's opinion is that, if it is true Defendants did not have actual knowledge of that forced labor, the only conclusion is that Defendants were either wilfully blind or reckless in their professed ignorance.

**D.    Defendants, Shanghai Select, and Chishan Prison were part of the same venture with respect to the gloves manufactured with forced labor.**

106.    The Milwaukee Tool gloves made at Chishan Prison are not fungible because they bear the Milwaukee Tool logo and because they are made with Defendants' proprietary materials and intellectual property. As such, if there were defects, for example, each of Chishan Prison, Shanghai Select, TTI, and Milwaukee Tool shared in the risk of losses arising from such defects, such as by contracting for such risk sharing. Additionally, because the gloves bore the Milwaukee Tool logo, Chishan Prison and Shanghai Select could not sell them at full price to anyone but TTI and Milwaukee Tool.

107.    By the same token, each of Chishan Prison, Shanghai Select, TTI, and Milwaukee Tool shared in the upside of the gloves' success, including because the gloves carried a higher margin than gloves that did not bear the Milwaukee Tool logo and that were not protected by Defendants' intellectual property rights.

29

108.    Additionally, according to a Shanghai Select representative, the majority of Milwaukee Tool gloves in the relevant time period were manufactured by Shanghai Select. Thus, Defendants depended heavily on Shanghai Select and Chishan Prison for the gloves.

109.    Further, given the specific designs of the gloves and the propriety technologies involved in making Milwaukee tool gloves, Defendants likely worked, directly or indirectly, with Shanghai Select and Chishan Prison on bespoke manufacturing processes. Defendants also established a feedback loop with Shanghai Select and Chishan Prison to address quality control issues. Defendants also coordinated logistics with Shanghai Select and Chishan Prison. Throughout the endeavour, Defendants shared business risk of profit and loss with Shanghai Select and Chishan Prison.

### E.    The U.S. government blocks importation of gloves made by Shanghai Select and its subsidiaries "based on information that reasonably indicates the use of convict labor."

110.    On April 10, 2024, U.S. Customs and Border Protection issued a Withhold Release Order under 19 U.S.C. § 1307, which prohibits importation of goods "manufactured wholly or in part in any foreign country by convict labor or/and forced labor or/and indentured labor." According to CBP, the Order is "based on information that reasonably indicates the use of convict labor in violation of" that statute.[35]

111.    The Order covers "work gloves manufactured by Shanghai Select Safety Products Company, Limited and its two subsidiaries from China, Select (Nantong) Safety Products Co. Limited and Select Protective Technology (HK) Limited."

112.    The Order will result in the detention of such gloves "at all U.S. ports of entry."

---

[35] U.S. Customs and Border Protection, "CBP issues Withhold Release Order on Shanghai Select Safety Products and its subsidiaries," Apr. 10, 2014, *available at* https://www.cbp.gov/newsroom/announcements/cbp-issues-withhold-release-order-shanghai-select-safety-products-and-its.

## V. CLAIMS FOR RELIEF

### COUNT I
Violations of the Trafficking Victims Protection Reauthorization Act
18 U.S.C. §§ 1589 & 1595

113. Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

114. Under 18 U.S.C. § 1595(a), "[a]n individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator . . . and may recover damages and reasonable attorneys fees."

115. Meanwhile, under 18 U.S.C. § 1589(a), it is a violation of the TVPRA to "knowingly provide[] or obtain[] the labor or services of a person by any one of, or by any combination of, the following means—(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint[.]"

116. Here, Plaintiff "is a victim of a violation of" this section, and Defendants are "perpetrators" of the violation, in that Defendants "obtain[ed] the labor or services" of Plaintiff "by means of force, threats of force, physical restraint, or threats of physical restraint to" Plaintiff and other prisoners at Chishan Prison; "by means of serious harm or threats of serious harm to" Plaintiff and other prisoners at Chishan Prison; and "by means of [a] scheme, plan, or pattern intended to cause [Plaintiff] to believe that, if [Plaintiff] did not perform such labor or

31

services, [Plaintiff] or [other prisoners at Chishan Prison] would suffer serious harm or physical restraint[.]"

117.     Additionally, under 18 U.S.C. § 1589(b), it is a violation of the TVPRA "to knowingly benefit[], financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means[.]"

118.     Again, Plaintiff "is a victim of a violation of" this section, and Defendants are "perpetrators" of the violation, in that Defendants also "knowingly benefit[ted] . . . from participating in a venture which has engaged in the providing or obtaining of labor" in violation of 18 U.S.C. § 1589(a) while "knowing or in reckless disregard of" such violation.

119.     Additionally, even if Defendants are not "perpetrators" within the meaning of 18 U.S.C. § 1595(a), "[a]n individual who is a victim of a violation of this chapter may [also] bring a civil action against" not just "perpetrators," but also against "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter[.]"

120.     Here, even if either TTI or Milwaukee Tool are not themselves "perpetrators," they "knowingly benefit[ted], or attempt[ted] or conspire[d] to benefit, financially or by receiving anything of value from participation in a venture which [TTI or Milwaukee Tool or both] knew or should have known has engaged in an act in violation of this chapter" and are thus liable to Plaintiff for damages and reasonable attorneys' fees.

121.     For example, if TTI recklessly disregarded the forced labor at Chishan Prison, making it a "perpetrator" of a violation of 18 U.S.C. § 1589(b), and if Milwaukee Tool knowingly benefited from participating in a venture with TTI that Milwaukee Tool should have known was engaged in reckless disregard of forced labor, Milwaukee Tool is liable to Plaintiff, even if Milwaukee Tool itself is not a "perpetrator" within the meaning of 18 U.S.C. § 1595(a).

## VI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays this Court will enter an order:

122.     Entering judgment in favor of Plaintiff on all counts of the Complaint;

123.     Awarding Plaintiff monetary damages, subject to proof and in an amount to be determined at trial, including but not limited to unpaid wages;

124.     Awarding Plaintiff consequential damages as a result of Defendants' illegal conduct;

125.     Awarding Plaintiff damages for the mental anguish and pain and suffering they experienced as a result of being forced to labor against his will;

126.     Awarding Plaintiff punitive and exemplary damages;

127.     Awarding Plaintiff any and all other damages allowed by law according to proof to be determined at time of trial in this matter;

128.     Awarding Plaintiff's reasonable attorneys' fees and costs;

129.     Awarding such other relief as the Court deems just and equitable.

## VII.     JURY DEMAND

130.     Plaintiff respectfully demands a trial by jury of all issues for which he has a right to demand a trial by jury.

Dated: June 27, 2024                    Respectfully submitted,

                                        **HAWKS QUINDEL, S.C.**

                                        By: ___*/s/ Aaron J. Bibb*___
                                        William E. Parsons, State Bar No. 1048594
                                        Email: wparsons@hq-law.com
                                        Aaron J. Bibb, State Bar No. 1104662
                                        Email: abibb@hq-law.com
                                        409 East Main Street
                                        P.O. Box 2155
                                        Madison, Wisconsin 53701-2155
                                        Telephone: (608) 257-0040
                                        Facsimile: (608) 256-0236

                                        **FARRA & WANG PLLC**
                                        Times Wang (*pro hac vice* forthcoming)
                                        Email: twang@farrawang.com
                                        Adam Farra (*pro hac vice* forthcoming)
                                        Email: afarra@farrawang.com
                                        1300 I Street NW, Suite 400E
                                        Washington, D.C. 20005
                                        Telephone: (202) 505-6227

                                        *Counsel for Plaintiff*