## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN
## MILWAUKEE DIVISION

XU LUN, a pseudonym,                    §
                                        §
Plaintiff,                              §
                                        §
v.                                      §
                                        §     Case No. 2:24-cv-00803-BHL
MILWAUKEE ELECTRIC TOOL                 §
CORPORATION, and                        §
TECHTRONIC INDUSTRIES                   §
COMPANY LIMITED,                        §
                                        §
Defendants.                             §

## DEFENDANT MILWAUKEE ELECTRIC TOOL CORPORATION'S
## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

Paul J. Stockhausen (Bar No. 1034225)
pstockhausen@reinhartlaw.com
REINHART BOERNER VAN DEUREN, S.C.
22 East Mifflin Street, Suite 700
Madison, WI 53703
Tel.: 608-229-2200
Fax: 608-229-2100

Ellen E. Dew (*application for admission pending*)
William W. Reichart III (Bar No. 1812120078)
ellen.dew@us.dlapiper.com
wes.reichart@us.dlapiper.com
DLA Piper LLP (US)
650 S. Exeter Street, Suite 1100
Baltimore, MD 21202
Tel.: 410-580-3000
Fax.: 410-580-3001

*Attorneys for Defendant Milwaukee Electric Tool Corporation*

# TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................. 1

II.     RELEVANT BACKGROUND ............................................................................. 5

        A.      Plaintiff Was Allegedly Trafficked By Guards at the Chishan Prison. ....................... 5

        B.      Plaintiff's Scant Allegations About Milwaukee Tool. ................................................. 6

III.    LEGAL STANDARD ........................................................................................... 7

IV.     ARGUMENT ........................................................................................................ 8

        A.      Plaintiff's Claim Is Impermissibly Extraterritorial. ................................................... 8

                1.      Congress Did Not Clearly Give Section 1595 Extraterritorial Effect. ................. 8

                2.      Plaintiff's Claim Does Not Involve a Domestic Application of Section 1595 ... 11

        B.      The Complaint Does Not Plausibly Allege "Perpetrator" Liability Against Milwaukee Tool. ................................................................................................. 12

        C.      The "Beneficiary" Liability Claim Fails Because the Complaint Does Not Allege that Milwaukee Tool Participated in a Trafficking Venture. ............................................. 15

        D.      The Complaint Does Not Plausibly Allege that Milwaukee Tool Knew or Should Have Known of the Alleged Forced Labor. ............................................................. 22

        E.      The Complaint Relies on Impermissible Group Pleading. ......................................... 28

V.      CONCLUSION .................................................................................................... 29

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.B. v. H.K. Group of Co., Inc.*,
No. 1:21-cv-1344-TCB, 2022 WL 467786 (N.D. Ga. Feb. 9, 2022) .............................. 18, 19

*A.B. v. Marriott Int'l, Inc.*,
455 F. Supp. 3d 171 (E.D. Pa. 2020) ................................................................... 22

*A.B. v. Wyndham Hotels & Resorts, Inc.*,
532 F. Supp. 3d 1018 (D. Or. 2021) .................................................................... 21

*A.D. v Wyndham Hotels and Resorts, Inc.*,
2020 WL 8674205 (E.D. Va. July 22, 2020) ....................................................... 14

*Adhikari v. KBR*,
No. 4:16–CV–2478, 2017 4237923 (S.D. Tex. Sept. 25, 2017) ............................ 11

*Appvion, Inc. Retirement Savings and Employee Stock Ownership Plan v. Buth et al.*,
475 F. Supp. 3d 910 (E.D. Wisc. 2020) .......................................................... 7, 28

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................................................................................... 7, 13

*B.J. v. G6 Hosp. LLC*,
No. 22-cv-03765-MMC, 2023 WL 3569979 (N.D. Cal. May 19, 2023) ............................. 16

*B.J. v. G6 Hospitality LLC*,
No. 22–cv–03765–MMC, 2023 WL 6120682 (N.D. Cal. Sept. 18, 2023) ......................... 12

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................................ 7

*Bistline v. Parker*,
918 F.3d 849 (10th Cir. 2019) .......................................................................... 16

*Doe #1 v. Red Roof Inns, Inc.*,
21 F.4th 714 (11th Cir. 2021) ...................................................................... *passim*

*Doe 1 v. Apple, Inc.*,
No. 1:19–cv–03737, 2021 WL 5774224 (D. D.C. Nov. 2, 2021) ................................ *passim*

*Doe 1 v. Apple, Inc.*,
96 F.4th 403 (D.C. Cir. 2024) ....................................................................... *passim*

ii

*Doe et al. v. Reddit, Inc.*,
    51 F.4th 1137 (9th Cir. 2022) ....................................................................... 21, 28

*Doe (S.M.A.) v. Salesforce, Inc.*,
    2024 WL 1337370 (N.D. Tex. Mar. 28, 2024) ...................................................... 23

*Fin. Corp. Mortgage-Backed Sec. Litig.*,
    No. 2:11-CV-07166-MRP, 2012 WL 10731957 (C.D. Cal. June 29, 2012) ......................... 17

*Firestone Financial Corp. v. Meyer*,
    796 F.3d 822 (7th Cir. 2015) ............................................................................ 7

*G.G. v. Salesforce.com, Inc.*,
    76 F.4th 544 (7th Cir. 2023) ....................................................................*passim*

*Geiss v. Weinstein Co. Holdings LLC*,
    383 F. Supp. 3d 156 (S.D.N.Y. 2019) ............................................................ 19, 27

*H.G. v. Inter-Cont'l Hotels Corp.*,
    489 F. Supp. 3d 697 (E.D. Mich. 2020) .............................................................. 25

*Hollingsworth v. Perry*,
    570 U.S. 693 (2013) ....................................................................................... 5

*Lorillard v. Pons*,
    434 U.S. 575 (1978) ................................................................................. 10, 11

*Misko v. Speedway, LLC*,
    No. 16–cv–13360, 2018 WL 2431638 (E.D. Mich. May 29, 2018) ................................ 23

*Morrison v. Nat'l Australia Bank Ltd.*,
    561 U.S. 247 (2010) ................................................................................... 8, 10

*Nestlé USA, Inc. v. Doe*,
    593 U.S. 628 (2021) ................................................................................... 8, 11

*Peters v. Aetna, Inc.*,
    No. 1:15-CV-00109-MR, 2016 WL 4547151 (W.D.N.C. Aug. 31, 2016) ........................... 17

*Ratha v. Phatthana Seafood Co.*,
    35 F.4th 1159 (9th Cir. 2022) ....................................................................*passim*

*Ricchio v. McLean*,
    853 F.3d 553 ............................................................................................ 12

*Richardson v. Nw. Univ.*,
    No. 1:21–cv–00522, 2023 WL 6197447 ............................................................... 12

iii

*RJR Nabisco, Inc. v. European Cmty.*,
　579 U.S. 325 (2016) ................................................................................ 8, 10, 11

*Ruderman v. McHenry Cnty.*,
　No. 3:22–cv–50115, 2023 WL 130496 (N.D. Ill. Jan. 9, 2023) ........................... 12

*S.J. v. Choice Hotels Int'l, Inc.*,
　473 F. Supp. 3d 147 (E.D.N.Y. 2020) ............................................................ 25

*Sanchez v. Pereira-Castillo*,
　590 F.3d 31 (1st Cir. 2009) ......................................................................... 8

*Weir v. Cenlar FSB*,
　No. 16-CV-8650 (CS), 2018 WL 3443173 (S.D.N.Y. July 17, 2018) .................... 17

**Statutes**

18 U.S.C. § 1589 ....................................................................................... *passim*

18 U.S.C. § 1595 ....................................................................................... *passim*

18 U.S.C. § 1596 ....................................................................................... 9, 11

**Rules**

Fed. R. Civ. P. 8(a)(2) ................................................................................. 28

Fed. R. Civ. P. 12(b)(6) .............................................................................. *passim*

iv

Defendant Milwaukee Electric Tool Corporation ("Milwaukee Tool") hereby submits this Memorandum in support of its Motion to Dismiss Plaintiff Xu Lun's[1] Complaint (ECF No. 1) pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.

## I.       INTRODUCTION

The single claim against Milwaukee Tool under Section 1595 of the Trafficking Victims Protection Reauthorization Act of 2008 (the "TVPRA")[2] fails as a matter of law and should be dismissed, with prejudice, for at least five principal reasons.

*First*, Plaintiff's claim impermissibly seeks to apply Section 1595 extraterritorially. Plaintiff's claim rests entirely on allegations of forced labor trafficking that occurred at a prison in China at the hands of Chinese prison guards for a Chinese company (non-party Shanghai Select Safety Products ("Shanghai Select")).   And Plaintiff, a resident of China, seeks damages for injuries allegedly experienced in China.   Clearly, if any violation of the TVPRA occurred, it occurred in China.   However, there is nothing in Section 1595 that overcomes the strong presumption against extraterritorial application of federal laws.   Supreme Court precedent mandates that unless there is clear Congressional intent reflected in the statutory language, courts must construe federal laws as having only a domestic application.   Here, as other courts have held, there is no language in Section 1595 clearly giving that statute extraterritorial effect.   Thus, because

---

[1] "Xu Lun" is a pseudonym.   Plaintiff's Motion to Proceed Pseudonymously (Dkt. No. 7) is currently pending.   Plaintiff did not serve Milwaukee Tool with a copy of his Motion as required by Civil L.R. 10(c).   Milwaukee Tool reserves all rights to oppose the Motion and to seek appropriate relief from the Court in the event Plaintiff is permitted to proceed under a pseudonym. For purposes of this Motion to Dismiss only, Milwaukee Tool refers to Plaintiff by the pseudonym.

[2] Section 1595 of the TVPRA (18 U.S.C. § 1595) provides a civil cause of action for certain violations of the TVPRA.   Plaintiff's Complaint purports to assert a Section 1595 claim against Milwaukee Tool based on alleged violations of Section 1589 of the TVPRA (18 U.S.C. § 1589). Section 1589 does not itself provide a private cause of action.

1

Plaintiff's claim is not a domestic application of the statute, but rather an extraterritorial one, it fails as a matter of law.

*Second*, to the extent the Complaint purports to assert a claim against Milwaukee Tool for "perpetrator" liability under the TVPRA that claim fails because Plaintiff has not alleged a *single fact* regarding any forced labor at the hands of Milwaukee Tool. A plausible claim for perpetrator liability under the TVPRA requires allegations of both the defendant's actual knowledge of the Plaintiff's trafficking and its intent to further the wrongful nature of the trafficking venture. Far from pleading either of these requisite elements, Plaintiffs' Complaint *exclusively* alleges that he was forced to work by Chinese prison officials who carried out punishments if he failed to work or did not work hard enough. There is no allegation whatsoever establishing Milwaukee Tool's actual knowledge of Plaintiff's alleged trafficking, nor its intent to participate in any unlawful trafficking venture. Any attempt by Plaintiff to label Milwaukee Tool as a "perpetrator" of forced labor is baseless and finds no support in Plaintiff's allegations or in the relevant case law. To be sure, forced labor trafficking is an insidious crime which Milwaukee Tool condemns unequivocally. Far from being involved in any forced labor trafficking, Milwaukee Tool is committed to ethical labor practices. Plaintiff's "perpetrator" liability claim must be dismissed.

*Third*, Plaintiff's claim for "beneficiary" liability under the TVPRA against Milwaukee Tool fails because he has not adequately alleged a forced labor trafficking "venture" or "participation" in such a venture by Milwaukee Tool, as required. Courts have confirmed that an ordinary buyer-seller transaction is insufficient to establish beneficiary liability under the TVPRA. Here, other than alleging an arm's-length business transaction between Milwaukee Tool and Shanghai Select for the manufacturing of work gloves, Plaintiff's Complaint makes no factual

2

allegations showing that Milwaukee Tool and Shanghai Select had a common purpose, shared profits and risk, or that Milwaukee Tool, in any way, controlled Shanghai Select's labor decisions.

Moreover, there are no facts establishing that Milwaukee Tool participated in any alleged "venture" that committed a criminal violation of the TVPRA, as to Plaintiff. Indeed, the only connection between Milwaukee Tool and Plaintiff that the Complaint offers is that he was allegedly forced by Chinese prison officials (who were allegedly dealing with Shanghai Select) to make gloves bearing the Milwaukee Tool logo. Even assuming that the logo was authentic and not counterfeit, that is insufficient to establish that Milwaukee Tool *participated* in any trafficking venture because Shanghai Select's alleged decision to outsource production to inmates (if that was even the case) was its own and the Complaint is devoid of any factual allegation that Milwaukee Tool even knew or should have known where, how, or in what manner its gloves were being produced. Courts have uniformly confirmed that the TVPRA does not impose an affirmative obligation to police for forced labor, and the mere failure to prevent forced labor is not tantamount to an affirmative "participation" in it as required to state a claim. Absent any allegations "connecting the dots" between Milwaukee Tool and Plaintiff's trafficking (there are none), Plaintiff's claim must be dismissed.

*Fourth*, Plaintiff's "beneficiary" liability claim against Milwaukee Tool also fails because the Complaint fails to plead facts sufficient to establish that Milwaukee Tool had actual or constructive knowledge that Plaintiff was trafficked. Rather, the thrust of Plaintiff's Complaint is that forced labor is widely used in manufacturing in China. Based on this, Plaintiff makes conclusory allegations that Milwaukee Tool should have known that non-party Shanghai Select used forced labor because Shanghai Select was able to deliver goods to Milwaukee Tool at a low price and generally disclosed to its customers (notably, the Plaintiff does not specifically allege

disclosure to Milwaukee Tool) that it outsourced production (but did not identify to whom). Conspicuously absent from Plaintiff's Complaint, however, are any allegations that Milwaukee Tool had any knowledge (actual or constructive) that Shanghai Select used forced labor or, more importantly, that *Plaintiff* was trafficked. The law is clear that generalized knowledge about forced labor practices in a country is insufficient; knowledge of trafficking must be particular to at least the alleged trafficker at the time the Plaintiff was trafficked. Here there is none. As such, Plaintiff's claim fails as a matter of law.

To the extent that Plaintiff includes any specific allegations of knowledge on the part of Milwaukee Tool, those allegations are not only completely unrelated to *Plaintiff* (as explained above) but also *post-date* the time when Plaintiff was allegedly imprisoned in China. Allegations of *later-in-time* forced labor allegedly used by Shanghai Select and *later-in-time* knowledge of said forced labor cannot give rise to a claim by Plaintiff who was admittedly not imprisoned at that time. Instead, the only factual "allegation" of Milwaukee Tool's alleged knowledge of Plaintiff's trafficking is a reference to Plaintiff's counsel's own demand letter sent in 2023, well after Plaintiff was released.

*Fifth*, the Complaint is replete with impermissible group pleading allegations that do not satisfy the notice pleading requirements of the Federal Rules of Civil Procedure. The Complaint seeks to challenge the manufacturing industry in China, and U.S. purchasers that enter into business relationships with Chinese manufacturers, for failing to stop forced labor trafficking but does not allege facts that are specific to the actions of Milwaukee Tool. To be clear, Milwaukee Tool condemns all forms of forced labor trafficking. But this case is not about forced labor trafficking in China generally, which the Complaint alleges is driven by Chinese prison officials.

Rather, it is about Plaintiff and the specific claims he is asserting in this lawsuit, none of which, as set out above, state a cause of action under the TVPRA against Milwaukee Tool.

## II.    RELEVANT BACKGROUND[3]

### A.    Plaintiff Was Allegedly Trafficked By Guards at the Chishan Prison.

Plaintiff was imprisoned in China following his conviction for subversion of state power in July 2021. Compl., ¶ 19. Although originally "sentenced to five years imprisonment," Plaintiff was released from prison in July 2022, one year after his conviction. *Id.* Plaintiff served a portion of his time at Hunan Chishan Prison (a/k/a Hunan Provincial No. 1 Prison) in Yuanian City, Hunan Province, China (the "Chishan Prison"), which, according to Plaintiff, is known for forced labor and torture of prisoners. *Id.* at ¶¶ 6, 16, 19. While at the Chishan Prison, Plaintiff was allegedly "subjected to five months of forced labor" by prison guards starting "[o]n or around February 23, 2022" until his release on July 21, 2022. *Id.* at ¶¶ 9, 19.[4]

The trafficking of Plaintiff allegedly occurred at the Chishan Prison complex, which contains manufacturing facilities within its walls. *Id.* at ¶ 17. According to the Complaint, during Plaintiff's time at the Chishan Prison, "[a]ll prisoners, criminal and political, at Chishan Prison were subjected to forced labor" by prison officials under grueling conditions. *Id.* at ¶ 28. While inmates were compensated by prison officials for their work, the amount was minimal and "prison

---

[3] While Milwaukee Tool recognizes that the Court must accept the allegations pled in the Complaint for the purposes of this Motion to Dismiss under Fed. R. Civ. P. 12(b)(6), Milwaukee Tool contests many of the allegations in the Complaint and nothing in this Motion should be deemed a waiver or acceptance of the truth of the allegations.

[4] The Complaint also includes allegations regarding non-party Lee Ming-che. *See* Compl., ¶¶ 13, 20–21. Plaintiff does not have standing to assert a claim on behalf of Lee Ming-che. *See generally Hollingsworth v. Perry*, 570 U.S. 693, 710 (2013). Accordingly, those allegations are not relevant to this Motion.

5

officials always came up with excuses to deduct their pay." *Id.* at ¶ 34. And inmates that refused to work or did not work hard enough were threatened and punished by prison guards. *Id.* at ¶ 35.

Plaintiff alleges that while he was at the Chishan Prison in 2022 he was forced by prison guards "to make a variety of textile goods." *Id.* at ¶ 19. One of the goods he was allegedly forced to make was "work gloves bearing the distinct 'Milwaukee' logo." *Id.* Plaintiff does not allege that anyone affiliated with Milwaukee Tool ordered him to produce the gloves, let alone that he ever was in contact with anyone affiliated with Milwaukee Tool or that the gloves were even ordered by or sent to Milwaukee Tool, let alone authentic (as opposed to counterfeit), but rather that a "client" of the prison—Shanghai Select—had ordered the gloves. *Id.* at ¶ 26. Plaintiff also alleges that "Shanghai Select was frequently mentioned by the prison guards as an important customer" and that "Shanghai Select also sent representatives to the prison to monitor the production and conduct quality control" for the goods being produced. *Id.* Based on these tenuous allegations, he asks the Court to make an impermissible inference that merely because he recalls seeing gloves bearing a Milwaukee logo, that this necessarily means that the gloves were authentic and that Milwaukee Tool knew or should have known that its gloves were being made using forced labor.

**B.     Plaintiff's Scant Allegations About Milwaukee Tool.**

Milwaukee Tool, located in Brookfield, Wisconsin, is a long-standing and leading brand in the power tool industry. *Id.* at ¶¶ 11, 16. Among other things, Milwaukee Tool markets and sells work wear, including heavy-duty work gloves. *Id.* at ¶ 43. The sum total of Plaintiff's factual allegations regarding Milwaukee Tool's production of the work gloves is that Milwaukee Tool:

a)  designed certain models of gloves (*see id.* at ¶¶ 40, 42), and

b)  contracted with Shanghai Select to manufacture certain lines of work gloves (*see id.* at ¶ 93).

That is it.  Plaintiff does not allege, nor could he, that Milwaukee Tool directed Shanghai Select to outsource its production of the work gloves to prison officials at the Chishan Prison, let alone that Milwaukee Tool had any knowledge that Shanghai Select conspired with those officials to produce gloves through forced labor to sell them to Milwaukee Tool.  Moreover, Plaintiff does not allege that he has ever had any contact with Milwaukee Tool or any of its employees.  Nor does he allege that the gloves bearing the Milwaukee Tool logo were authentic or even actually sold to Milwaukee Tool.

## III.    LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  For a claim to be plausible, rather than merely conceivable, the complaint's "'factual content [must] allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Firestone Financial Corp. v. Meyer*, 796 F.3d 822, 826 (7th Cir. 2015) (quoting *Iqbal*, 556 U.S. at 678).  That is, the factual allegations must present "more than a sheer possibility" that the defendant's conduct is unlawful.  *Iqbal*, 556 U.S. at 678.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* (citing *Twombly*, 550 U.S. at 555).  And although factual allegations are accepted as true, "labels and conclusions" are given no deference.  *Twombly*, 550 U.S. at 555 (internal citations omitted).

Generic allegations made against multiple defendants, moreover, cannot withstand challenge under Rule 12(b)(6) because such allegations deprive each individual defendant of fair notice of what it is alleged to have done.  *See Appvion, Inc. Retirement Savings and Employee Stock Ownership Plan v. Buth et al.*, 475 F. Supp. 3d 910, 931–32 (E.D. Wisc. 2020) (dismissing

claims based on "conclusory group pleading allegations" as insufficient to state claims against the individual defendants); *see also Sanchez v. Pereira-Castillo*, 590 F.3d 31, 48 (1st Cir. 2009) ("In response to a motion to dismiss, we must determine whether, *as to each defendant*, a plaintiff's pleadings are sufficient to state a claim on which relief can be granted.") (emphasis in original).

## IV. ARGUMENT

### A. <u>Plaintiff's Claim Is Impermissibly Extraterritorial</u>.

Plaintiff's claim under Section 1595 of the TVPRA fails because it would impermissibly give extraterritorial application to that statute. The Supreme Court has confirmed that there is "'a two-step framework for analyzing extraterritoriality issues.'" *Nestlé USA, Inc. v. Doe*, 593 U.S. 628, 632 (2021) (quoting *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 337 (2016)). First, courts must "presume that a statute applies only domestically, and…ask 'whether the statute gives a clear, affirmative indication' that rebuts that presumption." *Id.* (quoting *RJR Nabisco*, 579 U.S. at 337). "Second, where the statute, as here, does not apply extraterritorially, plaintiffs must establish that 'the conduct relevant to the statute's focus occurred in the United States.'" *Id.* (quoting *RJR Nabisco*, 579 U.S. at 337). Here, as set forth further below, Plaintiff's claim improperly seeks to apply Section 1595 extraterritorially and thus must be dismissed with prejudice. *See id.* (affirming dismissal as a matter of law).

#### 1. <u>Congress Did Not Clearly Give Section 1595 Extraterritorial Effect</u>.

"Absent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." *RJR Nabisco*, 579 U.S. at 335. In order to apply extraterritorially, the statute must "give[] a clear, affirmative indication" that it does so. *Id.* "When a statute gives no clear indication of an extraterritorial application, it has none." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010). That is the case here. The plain statutory language

8

of Section 1595 says nothing about extraterritorial application. As relevant here, Section 1595 provides as follows:

> An individual who is a victim of a violation of this chapter may bring a civil cause of action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which the person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

18 U.S.C. § 1595(a).[5] Because Section 1595 does not include a clear, affirmative indication of extraterritorial application, at least one court that has squarely considered the issue has held that it cannot be applied outside the territorial boundaries of the United States. *See Doe 1 v. Apple, Inc.*, No. 1:19–cv–03737, 2021 WL 5774224, at *14–16 (D. D.C. Nov. 2, 2021), *aff'd on other grounds*, *Doe 1 v. Apple, Inc.*, 96 F.4th 403 (D.C. Cir. 2024).

In *Apple*, a federal district court in Washington, D.C. held that plaintiffs, who were allegedly trafficked for forced child labor in the Democratic Republic of the Congo, could not state a Section 1595 claim because the statute does not apply to "alleged violations [that] took place far from this country's shores." *Id.* at *1, *14. That court correctly found that there is no language in Section 1595 "rebut[ting] the presumption that it applies only domestically." *Id.* at *14. And the court rejected the plaintiffs' reliance on other sections of the TVPRA, namely Section 1596 (18 U.S.C. § 1596) concerning criminal liability to try to write in an otherwise absent affirmative indication of extraterritorial application. *Id.* at *15.

Specifically, the court in *Apple* held that Section 1596's grant of extraterritorial jurisdiction over criminal offenses was not only insufficient to expand the territorial scope of civil claims, but

---

[5] The plain language of Section 1589, which Plaintiff alleges that Milwaukee Tool violated and on which Plaintiff bases his Section 1595 claim, also does not include any clear, affirmative indication of extraterritorial application. *See* 18 U.S.C. § 1589.

9

rather the absence of the same language in Section 1595 evidenced "an intentional decision not to extend extraterritorially the reach of the statute's civil component." *Id.* at *16. As the court explained, "'when a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms.' Such is the case with § 1595." *Id.* (quoting *Morrison*, 561 U.S. at 265). Ultimately, the court concluded that it was "not for [it] to question that decision; especially as grants of extraterritorial jurisdiction are fraught with international-relations considerations, ones far outside the judicial role." *Id.* (citing *RJR Nabisco*, 579 U.S. at 337).

The Supreme Court's analysis in *RJR Nabisco* supports this reasoning. In that case, the Court considered whether the Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. §§ 1961–1968) has extraterritorial effect. Like the TVPRA, RICO contains both criminal prohibitions and a civil cause of action, with the civil cause of action available to persons injured by conduct that constitutes a criminal violation. In *RJR Nabisco*, the Supreme Court confirmed that "the presumption against extraterritoriality must be applied separately to both RICO's substantive provisions and its private right of action." *Id.* at 350. The Court explained that "[i]t is not enough to say that a private right of action must reach abroad because the underlying law governs conduct in foreign countries. Something more is needed" to establish that Congress affirmatively gave the civil cause of action extraterritorial reach. *Id.* As is the case with Section 1595, the civil cause of action under RICO does not contain such affirmative indication and thus the Court held that it does not apply extraterritorially, even if the criminal sections have a broader territorial scope. *Id.* The same result should be reached here.

The lack of Congressional intent for Section 1595 to apply extraterritorially as been further confirmed by Congressional inaction. *See Lorillard v. Pons*, 434 U.S. 575, 580 (1978) ("Congress

is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts the statute without change."). Congress amended Section 1595 in January of 2023 to add a right a private right of action against persons that attempt or conspire to benefit from forced labor trafficking. *See* Pub. L. 117–347 (January 5, 2023). Congress did not add any language to clearly and affirmatively indicate that the statute may be applied extraterritorially. Had Congress wished to do so, it could have easily imported language that it used in Section 1596 with respect to criminal offenses. Having declined to do so, this Court should not extend the territorial reach of the statute beyond that provided by the Legislature.

2. Plaintiff's Claim Does Not Involve a Domestic Application of Section 1595.

Because Section 1595 does not apply extraterritorially, Plaintiff's claim can only proceed if it involves a domestic application of Section 1595. *See Nestlé*, 593 U.S. at 633; *RJR Nabisco*, 579 U.S. at 337. In other words, "[t]he question…becomes whether this is a case seeking to hold Defendants responsible for overseas conduct." *Apple*, 2021 WL 5774224, at *16. To determine "whether the case involves a domestic application of the statute," courts "look[] to the statute's 'focus.'" *RJR Nabisco*, 579 U.S. at 337. "[I]f the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *Id.*

As the district court in *Apple* concluded, "the focus of the TVPRA will naturally fall where the violation occurred." 2021 WL 5774224, at *16; *accord Adhikari v. KBR*, No. 4:16–CV–2478, 2017 4237923, at *3 (S.D. Tex. Sept. 25, 2017) (the TVPRA's focus is "where the forced labor occurred and to where [the] victims were trafficked" (quotation marks and citations omitted)). Here, Plaintiff does not allege his injuries or the underlying TVPRA violations (the forced labor trafficking against him) "occurred anywhere other than in" China. *Apple*, 2021 WL 5774224, at

11

*16. Plaintiff alleges that he was forced to perform labor at the Chishan Prison, for the prison's manufacturing business, under threat of torture by Chinese prison officials. Compl., ¶¶ 19, 35. He does not allege that he had any connection with the United States, or any person or entity present in the United States and there is no allegation that Milwaukee Tool engaged in any conduct that violated the TVPRA from the United States. "Thus, seeking to hold Defendants liable for the TVPRA violations would amount to an extraterritorial application of [Section] 1595. Because Congress did not authorize that, [his] claim[] must fail." *Apple*, 2021 WL 5774224, at *16.

## B. The Complaint Does Not Plausibly Allege "Perpetrator" Liability Against Milwaukee Tool.

Even if this Court were to find that Plaintiff's claims did not exceed the limits of the TVPRA's reach, Plaintiff nonetheless fails to state a plausible claim under any liability theory of the TVPRA. "Section 1595 creates two kinds of civil liability: perpetrator liability and participant [a/k/a 'beneficiary'] liability." *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 552 (7th Cir. 2023); *see also Richardson v. Nw. Univ.*, No. 1:21–cv–00522, 2023 WL 6197447, at *7 (N.D. Ill. Sept. 21, 2023) (describing the difference between a "direct perpetrator" claim and a claim of beneficiary liability under the TVPRA); *Ruderman v. McHenry Cnty.*, No. 3:22–cv–50115, 2023 WL 130496, at *4 (N.D. Ill. Jan. 9, 2023). Here, the Complaint purports to assert claims against Milwaukee Tool for both kinds of liability. *See* Compl., ¶¶ 113–116 (perpetrator liability); 117–121 (beneficiary liability). As set out below, both fail as a matter of law.

"Perpetrator" liability may be available against the ***director perpetrators*** or "***street-level trafficker[s]***"—the persons or entities that coerced the plaintiff into providing their labor or services. *G.G.*, 76 F.4th at 552 (emphasis added); *see also Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159, 1175 (9th Cir. 2022); *cf. B.J. v. G6 Hospitality LLC*, No. 22–cv–03765–MMC, 2023 WL 6120682, at *11 (N.D. Cal. Sept. 18, 2023) ("'Civil perpetrator liability' under § 1595 adopts

§ 1591's 'elements for criminal liability'.") (quotations omitted). Under a perpetrator theory of liability for forced labor trafficking, the plaintiff must establish that the defendant:

> "***knowingly*** provide[d] or obtain[ed] the labor or services of a person by any one of, or by any combination of, the following—(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint…"

18 U.S.C. § 1589(a) (emphasis added).

Here, the Complaint does not allege *a single fact* regarding any threats of force, serious harm, abuse of process, or any other actions taken by ***Milwaukee Tool*** to force Plaintiff to work at the Chishan Prison. Instead, the Complaint admits that the alleged direct perpetrators are quite obviously the Chinese prison officials and guards at Chishan Prison that purportedly used threats of force and actual physical restraint against prisoners in order to force them to work when they otherwise would not have worked. *See* Compl., ¶¶ 34–35. Plaintiff does not allege a ***single instance of contact*** between Milwaukee Tool and himself, let alone some action by Milwaukee Tool forcing him to work in a Chinese prison. Rather, the only allegations Plaintiff makes regarding these elements with respect to Milwaukee Tool are conclusory recitations of the elements of his claim. *Id.* at ¶¶ 115–16. This is beyond threadbare and is plainly insufficient to state a claim against Milwaukee Tool for perpetrator liability. *See Iqbal*, 445 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" do not state a claim.).

To the extent Plaintiff attempts to assert its perpetrator liability theory against Milwaukee Tool pursuant to 18 U.S.C § 1589(b), that also fails. Section 1589(b) provides for "perpetrator" liability where a defendant:

knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection [1589] (a), *knowing* or *in reckless disregard* of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means.

18 U.S.C. § 1589(b) (emphasis added). Here, however, Plaintiff has not alleged that Milwaukee Tool acted "in reckless disregard" of the fact that he was trafficked by the Chinese prison officials. Courts have found "reckless disregard" in situations, not present here, where the defendant itself views conduct consistent with the trafficking of the plaintiff. For example, in *Ricchio v. McLean*, the First Circuit concluded that the defendants "acted, at least, in reckless disregard" when it was alleged by the plaintiff that "in plain daylight view of the front office of the motel," her trafficker "kick[ed] her and force[d] her back toward the rented quarters as she tried to escape," that a hotel owner had gone to her room and "shown indifference to [her] obvious physical deterioration," and that the trafficker and hotel owner "high-five[d]" and discussed "getting this thing going again." 853 F.3d 553, 555 (1st Cir. 2017). Nothing of the sort is alleged here.

Furthermore, even the "beneficiary" provision of Section 1589(b) requires that the defendant have actual knowledge of the forced labor to assert a plausible claim for perpetrator liability. *See A.D. v Wyndham Hotels and Resorts, Inc.*, 2020 WL 8674205, at 2 n.1 (E.D. Va. July 22, 2020) (analyzing perpetrator liability under analogous provision of TVPRA addressing sex trafficking). And Plaintiff's Complaint lacks any factual allegations establishing that Milwaukee Tool had actual knowledge that its gloves were even being manufactured at Chishan Prison, or that gloves bearing its logo were being produced using forced labor. Rather, the Complaint alleges that it was Shanghai Select, not Milwaukee Tool, that placed the order for gloves from Chishan Prison, and not Milwaukee Tool, but Shanghai Select who sent representatives to monitor the production of the gloves, which the Plaintiff never alleges were ordered by Milwaukee

14

Tool or even authentic (non-counterfeit). Compl. ¶ 26. Moreover, Plaintiff's allegations regarding knowledge of the manufacturing process in China and the alleged "strategy of taking advantage of lower labor costs" in China does not identify a single action or statement by Milwaukee Tool whatsoever, let alone any statement indicating that Milwaukee Tool had actual knowledge that its gloves were the product of forced labor. *See id.* at ¶¶ 57–64, 61–80. Finally, while Plaintiff's acknowledge Defendants' Policy Against Modern Slavery and Human Trafficking and Defendants' rights to audit their suppliers for compliance with that policy, there is no allegation that any audit by Milwaukee Tool ever revealed any indication of forced labor in its supply chain. *Id.* ¶¶ 44, 81–85. Without allegations that Milwaukee Tool had actual knowledge that its gloves were being produced through the use of forced labor, Plaintiff's perpetrator liability claim necessarily fails and must be dismissed.

### C. The "Beneficiary" Liability Claim Fails Because the Complaint Does Not Allege that Milwaukee Tool Participated in a Trafficking Venture.

Section 1595 provides a private right of action against "whoever knowingly benefits…financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of" the TVPRA. 18 U.S.C. § 1595(a). Accordingly, courts have held that in order to state a claim for "beneficiary" lability, a plaintiff must allege the following elements: "(1) a venture has engaged in an act in violation of [the TVPRA], (2) the defendant knew or should have known that the venture violated [the TVPRA], (3) the defendant participated in the venture, and (4) the defendant knowingly benefitted from its participation." *G.G.*, 76 F.4th at 553. Here, the Plaintiff fails to plausibly allege these elements and cannot make out a beneficiary liability claim against Milwaukee Tool.

As an initial matter, the Complaint fails to allege that there was any forced labor trafficking venture that trafficked Plaintiff and that Milwaukee Tool participated in that venture. "The

TVPRA does not define the terms 'participation' or 'venture' for purposes of section 1595(a)." *Apple*, 96 F.4th at 414. Thus, courts have applied the ordinary meaning of those terms. *See Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 724 (11th Cir. 2021). While courts have not agreed on a single definition, "venture" is generally defined as an agreed undertaking with a common purpose. *See id.* ("The ordinary meaning of 'venture' is an undertaking or enterprise involving risk and potential profit."); *Venture*, Black's Law Dictionary (11th ed. 2019) ("[a]n undertaking that involves risk; esp., a speculative commercial enterprise"); *Apple*, 96 F.4th at 414–15 ("A 'venture' is an 'undertaking that is dangerous, daring or of uncertain outcome,' or a 'business enterprise involving some risk in expectation of gain.'") (citations omitted); *Bistline v. Parker*, 918 F.3d 849, 874-75 (10th Cir. 2019) (requiring a common purpose). With respect to "participation," courts are in accord that the term means "to take part in or share with others in common or in association." *Red Roof*, 21 F.4th at 725; *G.G.*, 76 F.4th at 559 (requiring "assistance, support, or facilitation" with a "desire to promote the wrongful venture's success") (citations omitted); *Apple*, 96 F.4th at 415 ("taking part or sharing in something") (citations omitted). Taken together, courts interpret "participation in a venture" to mean "taking part or sharing in an enterprise undertaking that involves danger, uncertainty, or risk, and potential gain." *Apple*, 96 F.4th at 415; *see also Red Roof*, 21 F.4th at 725 (requires allegations that defendant "took part in a common undertaking or enterprise involving risk and potential profit"); *B.J. v. G6 Hosp. LLC*, No. 22-cv-03765-MMC, 2023 WL 3569979, at *4 (N.D. Cal. May 19, 2023) (same).

Courts have repeatedly made clear that the mere operation of a general business venture does not suffice to establish liability under the TVPRA. *See, e.g.*, *G.G.*, 76 F.4th at 559; *Apple*, 96 F.4th at 415. As the Seventh Circuit recently held in *G.G.*, although "a desire to promote the wrongful venture's success" can be inferred from a "continuous business relations" between the

16

venture and the defendant that allows for the inference of a "tacit agreement" between the two, such business relationship must be "more than providing off-the-shelf" products or services in "arms-length" transactions. 76 F.4th at 562; *cf.*, *e.g.*, *Weir v. Cenlar FSB*, No. 16-CV-8650 (CS), 2018 WL 3443173, at *6 (S.D.N.Y. July 17, 2018) ("Defendants allegedly used the mail in furtherance of the scheme, but that would not make the Postal Service…a member of the enterprise."); *Peters v. Aetna, Inc.*, No. 1:15-CV-00109-MR, 2016 WL 4547151, at *9 (W.D.N.C. Aug. 31, 2016) (where cooperation was no more than "that inherent in every commercial transaction, the Complaint provides no basis for inferring that the Defendants were conducting the enterprise's affairs.") (internal quotations omitted); *Fin. Corp. Mortgage-Backed Sec. Litig.*, No. 2:11-CV-07166-MRP, 2012 WL 10731957, at *9 (C.D. Cal. June 29, 2012) ("At the risk of being glib, this allegation amounts to one that 'Countrywide offered to buy something, and the lenders obliged.' Western and Southern [have] identified exactly the type of arms-length business transaction…that does not constitute a RICO enterprise.").

The D.C. Circuit's opinion in *Apple* is instructive as to the line between operation of a general business venture and participation in a *forced labor trafficking* venture. In that case, the court affirmed dismissal under Rule 12(b)(6) because the complaint "failed to plausibly allege 'participation in a venture.'" 96 F.4th at 415. At issue were allegations by victims (and their families) of alleged child labor and forced labor trafficking in the cobalt industry in the DRC. The plaintiffs sued a series of technology company defendants that purchased refined cobalt from suppliers and their subsidiaries, who allegedly obtained cobalt through forced labor. Dismissing the TVPRA claims, the court held that there was "no shared enterprise between" the technology company defendants and the cobalt "suppliers who facilitate[d] forced labor." *Id.* "The purported

17

agreement…was merely to buy and sell cobalt. And purchasing a commodity, without more, is not 'participation in a venture' with the seller." *Id.* at 416. The court explained:

> The Tech Companies own no interest in their suppliers. Nor do the Tech Companies share in the suppliers' profits and risks. Although a formal business relationship is not necessary to be a participant in a venture, something more than engaging in an ordinary buyer-seller transaction is required to establish 'participation' in an unlawful venture. The two groups here, by contrast, are on the opposite sides of an arms-length transaction: Glencore, Huayou, and Eurasian Resources sell cobalt, and the Tech Companies buy cobalt.

*Id.*

The same is true here. With respect to the alleged "relationship" between Milwaukee Tool and the traffickers (the Chinese prison officials and Shanghai Select), Plaintiff has alleged nothing more than a "formal business relationship" with "an ordinary buyer-seller transaction" between Milwaukee Tool and Shanghai Select—that Milwaukee Tool transacted with Shanghai Select for the production of work gloves. Compl., ¶ 93. Accordingly, Milwaukee Tool has not participated in the unlawful venture.

The fact that Shanghai Select allegedly manufactured gloves based on Milwaukee Tool's patented designs and specifications, including the Milwaukee Tool logo, does not alter the fact that the alleged relationship was purely an arm's-length transaction. *G.G.*, 76 F.4th at 562. Indeed, in almost all contractual relationships between a commercial entity and a manufacturer, the manufacturer produces the product requested by the buyer. Without "something more" than this common business conduct, there is no participation in a trafficking venture. *Apple*, 96 F.4th at 416.

This is especially true where the defendant is not alleged to have had any contact with the alleged traffickers or knowledge that the alleged traffickers were engaged in trafficking. *See id.*; *see also A.B. v. H.K. Group of Co., Inc.*, No. 1:21-cv-1344-TCB, 2022 WL 467786, at *4 (N.D.

Ga. Feb. 9, 2022) (applying *Red Roof* and holding that "Plaintiff has not alleged any interactions between Defendants or their employees and the alleged traffickers sufficient to establish that Defendants 'took part in a common undertaking' with the alleged traffickers."). It is axiomatic that without knowledge of the trafficking, Milwaukee Tool could not have "participated" by taking part in some "common undertaking" to traffic Plaintiff. *See Red Roof*, 21 F.4th at 727; s*ee also Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 159 (S.D.N.Y. 2019) ("The participation giving rise to the benefit must be participation in a [] trafficking venture, not participation in other activities.").

Milwaukee Tool anticipates that Plaintiff will attempt to rely on the Seventh Circuit's holding in *G.G.* but that case is factually distinguishable in many respects. In *G.G.*, the plaintiff alleged that she was sex-trafficked by a criminal sex trafficker who used Backpage.com to advertise her for sex. 76 F.4th at 548. The plaintiff brought a Section 1595 claim against Salesforce based on a beneficiary liability theory. As the D.C. Circuit explained in *Apple*, the Seventh Circuit concluded that the relationship was "more than just a purchasing agreement." 96 F.4th at 416. "Salesforce provided direct support, specific business advice, and productivity enhancing software to Backpage.com, which hosted prostitution ads, thereby facilitating the growth of a business whose business model was built upon systemic and widespread violations of federal sex trafficking law." *Id.* at 415 (cleaned up) (quotations omitted). Rather than simply working at arm's-length with Backpage.com, Salesforce "provided Backpage with targeted solutions addressed to the needs of Backpage's business, repeatedly assessed Backpage's operational needs, and provided active ongoing support that was tailored to those needs." *G.G.*, 76 F.4th at 560 (internal quotations omitted). Nothing of the sort is alleged to be present here as

19

between Milwaukee Tool and Shanghai Select concerning the arm's-length transaction for the production and purchase of work gloves.

What is more, the Seventh Circuit described how "Backpage…had violated federal criminal sex-trafficking laws," had entered into plea agreements for criminal charges, that "Backpage's business was substantially devoted to criminal sex trafficking," and that "Backpage generated more than 99% of its revenue from adult advertising." *Id.* at 553, n.6. Backpage was "the biggest and most notorious sex trafficking and pimping website in the United States" and Salesforce allegedly worked with them to provide bespoke support to build the site. *Id.* at 555. This, according to the Seventh Circuit, was sufficient to allege participation in a venture.

The allegations here are nowhere near what was alleged by the *G.G.* plaintiff. Far from working directly with Shanghai Select to further *Shanghai Select's* business, the only *fact* that Plaintiff alleges is that Milwaukee Tool transacted to buy manufactured gloves from Shanghai Select. The Complaint does not allege that Milwaukee Tool's relationship with Shanghai Select was anything more than that. What is more, here, the Complaint does not even plausibly allege that the gloves he produced were actually for Milwaukee Tool, authentic, or sold to Milwaukee Tool. While Plaintiff suggests that "Defendants likely worked, directly or indirectly, with Shanghai Select and Chishan Prison on bespoke manufacturing processes" (Compl., ¶ 109), that allegation is entirely conclusory and without factual support. What is more, the allegations say nothing as to how *Milwaukee Tool* did anything to *further* the business of Shanghai Select, but rather speaks of generic actions Shanghai Select would take to fulfill its alleged contract with Milwaukee Tool.

Moreover, the Complaint does not include any allegations, as required to state a claim, that Milwaukee Tool shared a common purpose with Shanghai Select related to trafficking or that

20

Milwaukee Tool shared in the profits of a trafficking venture. *See Doe et al. v. Reddit, Inc.*, 51 F.4th 1137, 1145 (9th Cir. 2022) ("Mere association with [] traffickers is insufficient absent some knowing 'participation' in the form of assistance, support, or facilitation."). Indeed, the Complaint does not allege any awareness on the part of Milwaukee Tool that Shanghai Select sought to improve its *own profit* margins by outsourcing labor to Chinese prison officials that were operating forced labor trafficking ventures, let alone that Milwaukee Tool somehow assisted with that effort. What is clear from the Complaint is that Milwaukee Tool had no idea that Shanghai Select sub-contracted the production of the gloves with the Milwaukee Tool logo on them (or, alternatively, that Shanghai Select produced counterfeit gloves bearing the Milwaukee Tool logo). And, as discussed more fully below, Milwaukee Tool had no knowledge that Shanghai Select was engaged in forced labor trafficking. Milwaukee Tool in no way participated in any alleged venture between Shanghai Select and the Chinese prison officials that trafficked Plaintiff.

Finally, any attempt by Plaintiff to rely on general allegations the Milwaukee Tool states that it can "potentially audit" suppliers (*see* Compl., ¶ 81) to make out a claim of participation is foreclosed by the D.C. Circuit's ruling in *Apple*. There, the court rejected allegations that a "right to inspect" a supplier constitutes the level of control required to show participation in a trafficking venture. 96 F.4th at 416. That court also found that allegations that suppliers were required to join industry-led labor compliance programs" also did not "establish a joint venture." *Id.* Here, Plaintiff cannot transform his lack of any factual allegations that Milwaukee Tool participated in a trafficking venture based into a claim based on some generic allegations that Milwaukee Tool generally states that it may audit suppliers.[6] To be sure, the plaintiff has made no allegation that

---

[6] Nor is Milwaukee Tool required by law to audit its suppliers. The law is clear that there is no such affirmative duty. *See, e.g.*, *A.B. v. Wyndham Hotels & Resorts, Inc.*, 532 F. Supp. 3d 1018, 1027 (D. Or. 2021) ("[T]he TVPRA does not impose an affirmative duty to police and

Milwaukee Tool undertook such an audit, much less that by undertaking that audit Milwaukee Tool directed Shanghai Select to engage in forced labor trafficking. Plaintiff's theory as to Milwaukee Tool is well too attenuated to state a claim. His Section 1595 claim must be dismissed.

## D. The Complaint Does Not Plausibly Allege that Milwaukee Tool Knew or Should Have Known of the Alleged Forced Labor.

In addition to failing to allege that Milwaukee Tool participated in a forced labor trafficking venture, Plaintiff also fails to adequately allege that Milwaukee Tool "knew or should have known that [the] venture had engage in acts in violation" of the TVPRA. *G.G.*, 76 F.4th at 555. To allege the requisite actual or constructive knowledge, courts have held that Plaintiff must allege that Milwaukee Tool knew or should have known of the specifically alleged TVPRA violations at the Chishan Prison. *Ratha,* 35 F.4th at 1177 (("Sweeping generalities about the Thai shrimp industry are too attenuated to support an inference that Wales knew or should have known of the specifically alleged TVPRA violations" that form the basis of the claim); *see also Red Roof*, 21 F.4th at 725–26. As to this element, the *Red Roof* Court explained:

> [T]he defendant must have either actual or constructive knowledge that the venture—in which it voluntarily participated and from which it knowingly benefitted—violated the TVPRA *as to the plaintiff*. Section 1595(a) requires that the defendant "knew or should have known [that the venture] has engaged in an act in violation of this chapter." Knowledge requires "[a]n awareness or understanding of a fact or circumstance." *Knowledge*, Black's Law Dictionary (11th ed. 2019). Constructive knowledge, on the other hand, is that knowledge which "one using reasonable care or diligence should have." *Constructive Knowledge*, Black's Law Dictionary (11th ed. 2019). Thus, the franchisors may be labile under the TVPRA if they have either actual or constructive knowledge that the venture in which they participated and from which they benefitted violated the TVRPA *as to the Does*.

---

prevent [] trafficking."); *A.B. v. Marriott Int'l, Inc.*, 455 F. Supp. 3d 171, 182 (E.D. Pa. 2020) ("We do not read the Act as requiring hotels (and other businesses or professions possibly earning money from trafficking) to affirmatively stop the trafficking.").

*Id.* at 725 (emphasis added). In other words, generalized knowledge about trafficking is insufficient; knowledge must be about Plaintiff in particular.

Plaintiff falls well short of pleading this element here. The Complaint does not allege any facts plausibly establishing that Milwaukee Tool had any knowledge that *he* was being trafficked at the Chishan Prison. Thus, his claims fail as a matter of law. *See id.*

Instead, Plaintiff relies entirely on generic and generalized allegations of the use of forced labor in China. This approach does not comport with the law. As one federal court recently explained, the knowledge element requires knowledge of the specific TVPRA violation. *Doe (S.M.A.) v. Salesforce, Inc.*, 2024 WL 1337370, at *15 (N.D. Tex. Mar. 28, 2024). In *S.M.A.*, the Court explained that "[i]f participant liability could attach without any knowledge the venture committed the specific violation sued upon, then § 1595(a) would impose strict liability for participants in the event that they have constructive knowledge of any violation…Such an interpretation would be inconsistent with the consensus among courts that § 1595 imposes a negligence standard." *Id.* Accordingly, Plaintiff must at least allege knowledge of trafficking by Shanghai Select in its manufacturing of work gloves. *See G.G.*, 76 F.4th at 544, 558 (a plaintiff must allege that the venture has violated the TVPRA to state a claim under Section 1595); *see also Misko v. Speedway, LLC*, No. 16–cv–13360, 2018 WL 2431638, at *10 (E.D. Mich. May 29, 2018) ("[G]eneral knowledge that a condition can materialize is not sufficient to create constructive knowledge of the existence of a particular condition at a specific time."). Here, Plaintiff has not done so.

*Ratha* is instructive. That case involved allegations of trafficking, including forced labor trafficking in the Thai shrimp industry, against a series of defendants. One such defendant— "Wales"—was a company that performed quality control, sales, and marketing for seafood

processing factories. 35 F.4th at 1166. The complaint in *Ratha* alleged that Wales "inspected the packaging of the fourteen containers of shrimp that [another defendant] ordered…from Phatthana." *Id.* The complaint alleged that Phatthana owned seafood processing factories in Thailand and engaged in forced labor trafficking at those factories. *Id.* at 1165. The district court granted Wales summary judgment. The Ninth Circuit affirmed, holding that no reasonable factfinder could infer from the evidence that Wales knew or should have known of the alleged labor abuses at Phatthana's Songkhla factory. *Id.* at 1177.

The evidence the *Ratha* plaintiffs presented on this point mirrors the allegations that Plaintiff asserts here. The plaintiffs in *Ratha* relied on "evidence generally establishing that abusive labor practices were common in Thailand, particularly in the shrimp industry" including general industry and news reports describing incidence of child and forced labor. *Id.* But the Court flatly rejected such reports as evidence sufficient to support a claim because they "shed[] little light on whether labor abuses were occurring at Phatthana's Songkhla factory, let alone whether [defendant] knew or should have known of such abuses." *Id.* Among other things, the reports "fail[ed] to identify company-specific information and d[id] not mention" the supplier that allegedly used forced labor. *Id.* at 1178. At bottom the court summarized that: "Plaintiffs' evidence suggests, at most, that [defendant] should have known of labor abuses in the Thai shrimp industry *generally*. Sweeping generalities about the Thai shrimp industry are too attenuated to support an inference that [defendant] knew or should have known specifically of alleged TVPRA violations at the Songkhla factor between 2010 and 2012." *Id.* at 1177.

So too here. Plaintiff devotes substantial space in his Complaint to generic allegations that "[i]t is well know to the general public, and in the textile and manufacturing industries especially, that the use of forced labor in PRC prisons is widespread." Compl., ¶ 47. Plaintiff lays out a

history of general reports regarding prison labor camps in China, including a 2014 "U.S. China Economic Security Review Commission…report titled 'Prison Labor Exports from China and Implication for U.S. Policy.'" *Id.* at ¶ 55; *see also id.* at ¶¶ 47–56. None of these allegations are specific to any knowledge on the part of Milwaukee Tool that Shanghai Select was engaged in forced labor trafficking in the production of gloves to sell to Milwaukee Tool. *See H.G. v. Inter-Cont'l Hotels Corp.*, 489 F. Supp. 3d 697, 706 (E.D. Mich. 2020) (allegations that defendants were generally aware of trafficking in the hotel property fell short of establishing knowledge and participation); *S.J. v. Choice Hotels Int'l, Inc.*, 473 F. Supp. 3d 147, 154 (E.D.N.Y. 2020) ("[T]o conclude that franchisors…like Choice Hotels are liable under the TVPRA simply because they were generally aware that sex trafficking sometimes occurred on their franchisees' properties unjustifiably bridges the scienter gap between 'should have known' and 'might have been able to guess.'"); *G.G.*, 76 F.4th at 557 (same).

Plaintiff's other generic allegations are also insufficient to establish the required knowledge. For example, Plaintiff bizarrely alleges that Milwaukee Tool somehow knew of forced labor because it sought to reduce manufacturing costs. *See id.* at ¶ 71. But that cannot possibly establish knowledge that any of its products—let alone the gloves allegedly made by Plaintiff—would be made with forced labor. By his theory, *any* of the hundreds of thousands of businesses that contract with Chinese manufacturers would be found to have knowledge of forced labor trafficking.

Without any facts to establish actual or constructive knowledge on the part of Milwaukee Tool, Plaintiff purportedly turns to a "consulting expert" with general knowledge about labor practices in China. *See id.* at ¶¶ 94–105. But all of the "expert's" "findings" are based on general studies and efforts that Milwaukee Tool was not required to undertake. For example, the expert

25

concludes that Defendants could "detect the forced labor at issue because it involved gloves" and that Defendants should be "aware of the prevalence of abusive labor practices" in China.  *Id.* at ¶¶ 98–99.  The expert also asserts that "Defendants had access to countless publicly available documents describing the prevalence of forced labor in the PRC."  *Id.* at ¶ 103.  But the purported expert does not, and cannot, opine or allege that Milwaukee Tool could or should have been aware that forced labor was being used to make *its* gloves, as opposed to being employed generally in China.

Again, *Ratha* is instructive.  There, the court also rejected the plaintiffs attempt to rely on reports from retained experts concluding that the defendant "negligently failed to investigate whether [the supplier] was engaging in labor abuses at the Songkhla factory given the prevalence of labor abuses in the Thai seafood industry."  *Id.* at 1178–79.  The court rejected one of the reports out of hand because it included only "conclusory allegations" that the defendant was "on notice" that Thailand was a "hot spot" for human trafficking.  *Id.* at 1179.  The court rejected others because "they rel[ied] on the same generalized evidence of country conditions that [the court] already determined is insufficient to create a triable issue of material fact."  *Id.*  At bottom, the court concluded: "[i]n sum, Plaintiffs' expert reports fail to bridge the gap between their generalized evidence of labor conditions in the Thai shrimp industry and the specific allegations that Wales knew or should have known of the alleged labor abuses" during the relevant time period.  *Id.*  That is the case here too.

In addition to relying on unavailing "expert" allegations, the Complaint also makes allegations of generic facts related to Shanghai Select's public disclosure of outsourcing production.  *See* Compl., ¶¶ 88–93.  Namely, the Complaint asserts that "Shanghai Select stated in a publicly available 2018 prospectus that it began single process outsourcing in 2015, which

involves outsourcing the first step of textile processing to streamline manufacturing." *Id.* at ¶ 89. According to the Complaint, this occurred at the same time Shanghai Select was "touting its lower production costs." *Id.* at ¶ 91. But generic information has nothing to do with Milwaukee Tool and ***nothing to do with forced labor***. Plaintiff's attempt to link them together is well beyond any stretch of the imagination: "Defendants almost certainly knew that Shanghai Select outsourced a significant portion of its gloves manufacturing contract with Defendants. This, in turn, gave Defendants particular reason to know of forced labor." *Id.* at ¶ 93. This Court must reject it.

Similarly, to the extent that Plaintiff tries to rely on allegations concerning actions taken by U.S. Customs and Border Protection in ***2024*** (*see* Compl., ¶¶ 110–12), those allegations cannot support knowledge during the time period when Plaintiff was allegedly trafficked in ***2022***. *See Ratha*, 35 F.4th at 1177 (addressing knowledge at time of alleged TVPRA violations). The same is true of Plaintiff's allegation that Milwaukee Tool knew of trafficking based on Plaintiff's own January 2023 demand letter. This ridiculous tautology that because Plaintiff sent a letter threatening a lawsuit in 2023, this necessarily meant that Milwaukee Tool had constructive knowledge of Plaintiff's alleged trafficking in 2022, cannot support a claim that Milwaukee Tool knew or should have known that Plaintiff was being trafficked at the time he was being trafficked. To hold otherwise would mean that any litigant could establish a plausible claim merely by sending a demand letter, regardless of the merits of the demand.

Finally, because Plaintiff has not adequately pled that Milwaukee Tool participated in the trafficking venture or even knew that Shanghai Select was engaged in forced labor trafficking, he certainly has not pled that Milwaukee Tool "knew it was receiving some value from participating in the venture." *Red Roof*, 21 F.4th at 724. Under the "knowing benefit" requirement, "there must be…knowledge of that causal relationship." *Geiss*, 383 F. Supp. 3d at 169. Plaintiff does not, and

cannot, allege that Milwaukee Tool knowingly benefitted specifically because of the alleged trafficking, much less specifically as part of a venture to traffic this Plaintiff. The only "benefit" that Milwaukee Tool could have possibly received is the profits on the gloves that it sold—the exact same benefit that Milwaukee Tool receives when selling gloves produced by other suppliers, and the exact same benefit Milwaukee Tool would have received absent Shanghai Select's alleged decision (unknown to Milwaukee Tool) to outsource production to the Chishan Prison. This is not a sufficient "benefit" to state and TVPRA claim. *See Reddit*, 1 F.4th at 1145–46. Plaintiff's claim fails for this reason also.

### E. The Complaint Relies on Impermissible Group Pleading.

Lastly, the Complaint should be dismissed because it fails to attribute specific factual allegations to specific defendants. *See Appvion*, 475 F. Supp. 3d at 931–32 (dismissing claims based on "conclusory group pleading allegations" as insufficient to state claims against the individual defendants). As discussed at length above, the Complaint contains many generalities regarding the state of forced labor in China, but very few specific allegations against Milwaukee Tool. Furthermore, to the extent that the Complaint makes generic, conclusory allegations against the "Defendants" those allegations are insufficient to support a claim, let alone put Milwaukee Tool on notice of what *it* is alleged to have done. *See* Fed. R. Civ. P. 8(a)(2) (requiring "[a] pleading that states a claim for relief" to contain "a short and plain statement of the claim showing that the pleader is entitled to relief."). Plaintiff's Complaint must be dismissed for this reason too. *Appvion*, 475 F. Supp. 3d at 931–32.

## V.    CONCLUSION

For the foregoing reasons, Milwaukee Tool respectfully requests that this Court dismiss the Plaintiff's claims against Milwaukee Tool with prejudice, and to grant such other and further relief as the Court deems just and proper.

Dated: September 13, 2024

*/s/ Paul J. Stockhausen*
Paul J. Stockhausen
pstockhausen@reinhartlaw.com
REINHART BOERNER VAN DEUREN, S.C.
22 East Mifflin Street, Suite 700
Madison, WI 53703
Tel.: 608-229-2200
Fax: 608-229-2100

Ellen E. Dew (*application for admission forthcoming*)
William W. Reichart III (Bar No. 1812120078)
ellen.dew@us.dlapiper.com
wes.reichart@us.dlapiper.com
DLA Piper LLP (US)
650 S. Exeter Street, Suite 1100
Baltimore, MD 21202
Tel.: 410-580-3000
Fax.: 410-580-3001

*Attorneys for Defendant Milwaukee Electric Tool Corporation*

29

<u>**CERTIFICATE OF SERVICE**</u>

       The undersigned certifies that on September 13, 2024, the foregoing Milwaukee Tool's Memorandum of Law in Support of Motion to Dismiss was electronically filed with the Clerk of Court using the CM/ECF system and thereby served on the following counsel of record:

Aaron Bibb
William E. Parsons
Hawks Quindel SC
409 E. Main Street
P.O. Box. 2155
Madison, Wisconsin 53701
abibb@hq-law.com
wparsons@hq-law.com

Adam Farra
Times Wang
Farra & Wang PLLC
1300 I Street, N.W.
Suite 400e
Washington, D.C. 20005
afarra@farrawang.com
twang@farrawang.com

*Counsel for Plaintiff*

Jason C. White
Morgan Lewis & Bockius LLP
110 N. Wacker Dr.
Chicago, Illinois 60606
jason.white@morganlewis.com

*Counsel for Defendant Techtronic Industries Company Limited*

                          */s/ Paul J. Stockhausen*
                          Paul J. Stockhausen