**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION**

| | | |
|---|---|---|
| XU LUN, a pseudonym, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | Case No. 2:24-cv-00803-BHL |
| MILWAUKEE ELECTRIC TOOL | § | |
| CORPORATION, and | § | |
| TECHTRONIC INDUSTRIES | § | |
| COMPANY LIMITED, | § | |
| | § | |
| Defendants. | | |

**DEFENDANT MILWAUKEE ELECTRIC TOOL CORPORATION'S
MEMORANDUM OF LAW IN SUPPORT OF
<u>MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT</u>**

Paul J. Stockhausen (Bar No. 1034225)
pstockhausen@reinhartlaw.com
REINHART BOERNER VAN DEUREN, S.C.
22 East Mifflin Street, Suite 700
Madison, WI 53703
Tel.: 608-229-2200
Fax: 608-229-2100

Ellen E. Dew (Bar No. 081218015)
William W. Reichart III (Bar No. 1812120078)
ellen.dew@us.dlapiper.com
wes.reichart@us.dlapiper.com
DLA Piper LLP (US)
650 S. Exeter Street, Suite 1100
Baltimore, MD 21202
Tel.: 410-580-3000
Fax.: 410-580-3001

*Attorneys for Defendant Milwaukee Electric Tool Corporation*

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................... 1

II.   RELEVANT BACKGROUND ............................................................................... 5

      A.    Plaintiff Was Allegedly Trafficked By Guards at the Chishan Prison. ....................... 5

      B.    Plaintiff's Scant Allegations About Milwaukee Tool. ................................................ 6

III.  LEGAL STANDARD ............................................................................................. 7

      1.    Congress Did Not Clearly Give Section 1595 Extraterritorial Effect. ................. 9

      2.    Plaintiff's Claim Does Not Involve a Domestic Application of Section 1595 ... 11

      B.    The Amended Complaint Does Not Plausibly Allege "Perpetrator" Liability Against Milwaukee Tool. .................................................................................................... 12

      C.    Plaintiff's Alter Ego Theory Fails. ........................................................................ 15

      D.    The "Beneficiary" Liability Claim Fails Because the Amended Complaint Does Not Allege that Milwaukee Tool Participated in a Trafficking Venture. ........................... 17

      E.    The Amended Complaint Does Not Plausibly Allege that Milwaukee Tool Knew or Should Have Known of the Alleged Forced Labor. .................................................. 24

            1.    Generalized Allegations Regarding Forced Labor In China Cannot Establish Milwaukee Tool's Knowledge of Plaintiff's Alleged Trafficking. .................. 24

            2.    Plaintiff's Purported "Expert" Relies on the Same Insufficient Bases. ............. 27

            3.    Generic Information Regarding Shanghai Select Does Not Establish that Milwaukee Tool Knew Plaintiff Was Trafficked. ............................................. 28

            4.    Allegations that Post-Date Plaintiff's Time at Chishan Prison Cannot Serve as a Basis for Knowledge of Plaintiff's Alleged Trafficking. .................................. 29

            5.    Without Knowledge, Milwaukee Tool Did Not Knowingly Benefit. ............... 29

      F.    The Amended Complaint Relies on Impermissible Group Pleading. ......................... 30

V.    CONCLUSION ................................................................................................... 30

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.B. v. Hilton Worldwide Holdings, Inc.*,
 484 F. Supp. 3d 921, 943 (D. Or. 2020) ............................................................................17

*A.B. v. H.K. Group of Co., Inc.*,
 No. 1:21-cv-1344-TCB, 2022 WL 467786 (N.D. Ga. Feb. 9, 2022) ....................................21

*A.B. v. Marriott Int'l, Inc.*,
 455 F. Supp. 3d 171 (E.D. Pa. 2020) ..................................................................................24

*A.B. v. Wyndham Hotels & Resorts, Inc.*,
 532 F. Supp. 3d 1018 (D. Or. 2021) ...................................................................................23

*A.D. v Wyndham Hotels and Resorts, Inc.*,
 2020 WL 8674205 (E.D. Va. July 22, 2020) .......................................................................15

*Adhikari v. KBR*,
 No. 4:16–CV–2478, 2017 4237923 (S.D. Tex. Sept. 25, 2017) ..........................................12

*Appvion, Inc. Retirement Savings and Employee Stock Ownership Plan v. Buth et al.*,
 475 F. Supp. 3d 910 (E.D. Wisc. 2020) ..........................................................................8, 30

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) .............................................................................................................7

*B.J. v. G6 Hosp. LLC*,
 No. 22-cv-03765-MMC, 2023 WL 3569979 (N.D. Cal. May 19, 2023) ..............................18

*Bell Atlantic Corp. v. Twombly*,
 550 U.S. 544 (2007) .............................................................................................................7

*Bistline v. Parker*,
 918 F.3d 849 (10th Cir. 2019) ...........................................................................................18

*Doe #1 v. Red Roof Inns, Inc.*,
 21 F.4th 714 (11th Cir. 2021) .....................................................................................*passim*

*Doe 1 v. Apple, Inc.*,
 No. 1:19–cv–03737, 2021 WL 5774224 (D. D.C. Nov. 2, 2021) ...................................*passim*

ii

*Doe 1 v. Apple, Inc.*,
  96 F.4th 403 (D.C. Cir. 2024) ........................................................................................*passim*

*Doe et al. v. Reddit, Inc.*,
  51 F.4th 1137 (9th Cir. 2022) ................................................................................ 23, 30

*Doe (S.M.A.) v. Salesforce, Inc.*,
  2024 WL 1337370 (N.D. Tex. Mar. 28, 2024) .................................................................. 25

*Fin. Corp. Mortgage-Backed Sec. Litig.*,
  No. 2:11-CV-07166-MRP, 2012 WL 10731957 (C.D. Cal. June 29, 2012) ........................ 19

*Firestone Financial Corp. v. Meyer*,
  796 F.3d 822 (7th Cir. 2015) ........................................................................................... 7

*G.G. v. Salesforce.com, Inc.*,
  76 F.4th 544 (7th Cir. 2023) ....................................................................................*passim*

*Geiss v. Weinstein Co. Holdings LLC*,
  383 F. Supp. 3d 156 (S.D.N.Y. 2019) ..................................................................... 21, 29

*Henry Tech. Holdings, LLC v. Giordano*,
  2014 WL 3845870 (W.D. Wisc. Aug. 5, 2014) ............................................................... 16

*H.G. v. Inter-Cont'l Hotels Corp.*,
  489 F. Supp. 3d 697 (E.D. Mich. 2020) ....................................................................... 27

*Hollingsworth v. Perry*,
  570 U.S. 693 (2013) ........................................................................................................ 5

*Lorillard v. Pons*,
  434 U.S. 575 (1978) ...................................................................................................... 11

*Misko v. Speedway, LLC*,
  No. 16–cv–13360, 2018 WL 2431638 (E.D. Mich. May 29, 2018) ................................... 25

*Morrison v. Nat'l Australia Bank Ltd.*,
  561 U.S. 247 (2010) ................................................................................................... 9, 10

*Nestlé USA, Inc. v. Doe*,
  593 U.S. 628 (2021) ................................................................................................... 8, 11

*Peters v. Aetna, Inc.*,
  No. 1:15-CV-00109-MR, 2016 WL 4547151 (W.D.N.C. Aug. 31, 2016) ........................... 18

*Pearson v. Compontent Tech. Corp.*,
  247 F.3d 471 (3d Cir. 2001) .......................................................................................... 16

iii

*Ramsbottom v. Ashton*,
   2022 WL 106733 (M.D. Tenn. Jan. 11, 2022) ..................................................................16

*Ratha v. Phatthana Seafood Co.*,
   35 F.4th 1159 (9th Cir. 2022) .......................................................................*passim*

*Ricchio v. McLean*,
   853 F.3d 553 ..........................................................................................................14

*Richardson v. Nw. Univ.*,
   No. 1:21–cv–00522, 2023 WL 6197447 ..........................................................................13

*RJR Nabisco, Inc. v. European Cmty.*,
   579 U.S. 325 (2016) ......................................................................................*passim*

*Ruderman v. McHenry Cnty.*,
   No. 3:22–cv–50115, 2023 WL 130496 (N.D. Ill. Jan. 9, 2023) ............................................13

*S.J. v. Choice Hotels Int'l, Inc.*,
   473 F. Supp. 3d 147 (E.D.N.Y. 2020) ................................................................................27

*Sanchez v. Pereira-Castillo*,
   590 F.3d 31 (1st Cir. 2009) ...........................................................................................8

*U.S. ex rel. Hawkins v. ManTech Int'l Corp.*,
   2024 WL 4332117 (D.D.C. Sept. 27, 2024) .......................................................................11

*Weir v. Cenlar FSB*,
   No. 16-CV-8650 (CS), 2018 WL 3443173 (S.D.N.Y. July 17, 2018) ...................................18

**Statutes**

18 U.S.C. § 1589 ...................................................................................................*passim*

18 U.S.C. § 1595 ...................................................................................................*passim*

18 U.S.C. § 1596 ............................................................................................... 9, 10, 11

**Rules**

Fed. R. Civ. P. 8(a)(2) ...............................................................................................30

Fed. R. Civ. P. 12(b)(6) .......................................................................................*passim*

Case 2:24-cv-00803-BHL     Filed 11/13/24     Page 5 of 38     Document 30

Defendant Milwaukee Electric Tool Corporation ("Milwaukee Tool") submits this Memorandum in support of its Motion to Dismiss Plaintiff Xu Lun's[1] First Amended Complaint (ECF No. 28) ("Amended Complaint") pursuant to Federal Rule of Civil Procedure 12(b)(6).

## I.   INTRODUCTION

Plaintiff's Amended Complaint, which asserts a single cause of action under Section 1595 of the Trafficking Victims Protection Reauthorization Act of 2008 (the "TVPRA")[2], fares no better than his Original Complaint and should be dismissed for all the same reasons.  Despite having the opportunity to re-assess his claim after seeing Milwaukee Tool's well-established arguments in favor of dismissal—including that he did not (and still cannot) plead any *facts* linking his alleged labor in a Chinese prison to Milwaukee Tool—Plaintiff's amendment does not remedy the fundamental flaws in his theory of liability.  Instead, the limited allegations Plaintiff added only further confirm that there is no basis for any claim against Milwaukee Tool as Plaintiff admits that there was no relationship between Milwaukee Tool and the alleged traffickers.  The Amended Complaint must be dismissed with prejudice for multiple reasons.

*First*, Plaintiff's claim still impermissibly seeks to apply Section 1595 extraterritorially. Plaintiff's claim rests entirely on allegations of forced labor trafficking that occurred at a prison in China at the hands of Chinese prison guards for a Chinese company (non-party Shanghai Select Safety Products ("Shanghai Select")).  And Plaintiff, a resident of China, seeks damages for injuries allegedly experienced in China.  Clearly, if any violation of the TVPRA occurred, it

---

[1] "Xu Lun" is a pseudonym.  Milwaukee Tool reserves all rights to oppose Plaintiff's request to proceed pseudonymously in the event the case proceeds to trial.  For purposes of this Motion to Dismiss only, Milwaukee Tool refers to Plaintiff by the pseudonym.

[2] Section 1595 of the TVPRA (18 U.S.C. § 1595) provides a civil cause of action for certain violations of the TVPRA.  Plaintiff's Complaint purports to assert a Section 1595 claim against Milwaukee Tool based on alleged violations of Section 1589 of the TVPRA (18 U.S.C. § 1589), which concerns forced labor and does not itself provide a private cause of action.

1

occurred in China.  Plaintiff's amendment does not add any facts altering this conclusion.  There is nothing in Section 1595 that overcomes the strong presumption against extraterritorial application of federal laws.  Supreme Court precedent mandates that unless there is clear Congressional intent reflected in the statutory language, courts must construe federal laws as having only a domestic application.  Here, as other courts have held, there is no such language.  Thus, because Plaintiff's claim is not a domestic application of the statute, but rather an extraterritorial one, it fails as a matter of law.

*Second*, to the extent the Amended Complaint purports to assert a claim against Milwaukee Tool for "perpetrator" liability under the TVPRA that claim fails because Plaintiff still has not alleged a *single fact* regarding any forced labor at the hands of Milwaukee Tool.  A plausible claim for perpetrator liability requires allegations of both the defendant's actual knowledge of the Plaintiff's trafficking and its intent to further the wrongful nature of the trafficking venture.  Far from pleading either of these elements, Plaintiffs' Amended Complaint *exclusively* alleges that he was forced to work by Chinese prison officials who carried out punishments if he failed to work or did not work hard enough.  The Amended Complaint does not allege a *single fact* establishing Milwaukee Tool's actual knowledge of Plaintiff's alleged trafficking, nor its intent to participate in any trafficking venture.  Plaintiff's attempt to label Milwaukee Tool as a "perpetrator" of forced labor is baseless.  Forced labor trafficking is an insidious crime which Milwaukee Tool condemns unequivocally.  Far from being involved in any trafficking, Milwaukee Tool is committed to ethical labor practices.  Plaintiff's "perpetrator" liability claim must be dismissed.

*Third*, Plaintiff's attempt to avoid dismissal through conclusory allegations that the alleged actions and knowledge of others can be "imputed" to Milwaukee Tool fails.  In a misguided attempt to save his claim, Plaintiff asserts baseless allegations suggesting that the corporate forms

of Milwaukee Tool, its parent company (Defendant Techtronic Industries Company Limited ("TTI") (an entity based in Hong Kong)), and non-party Techtronic Trading Ltd. (a separate subsidiary of TTI and also based in Hong Kong) should be disregarded. This is little more than an attempted distraction from the weakness of Plaintiff's claim, as Plaintiff has not sufficiently alleged a trafficking claim against any entity. But, in any event, he has not come anywhere close to meeting the high burden required for this Court to view the entities as alter egos.

*Fourth*, Plaintiff's claim for "beneficiary" liability under the TVPRA fails because he has not adequately alleged a forced labor trafficking "venture" or "participation" in such a venture by Milwaukee Tool. Courts have confirmed that an ordinary buyer-seller transaction (which Milwaukee Tool was not even part of here) is insufficient to establish beneficiary liability under the TVPRA. And Plaintiff's Amended Complaint does not allege any facts showing that Milwaukee Tool and Shanghai Select had a common purpose, shared profits and risk, or that Milwaukee Tool, in any way, controlled Shanghai Select's labor decisions.

Moreover, there are no facts establishing that Milwaukee Tool participated in any alleged "venture" that committed a criminal violation of the TVPRA as to Plaintiff. Indeed, the only connection between Milwaukee Tool and Plaintiff that the Amended Complaint offers is that he was allegedly forced by Chinese prison officials (who were allegedly dealing with Shanghai Select) to make gloves bearing the Milwaukee logo. Even assuming that the logo was authentic and not counterfeit, that allegation is insufficient to establish that Milwaukee Tool *participated* in any trafficking venture because Shanghai Select's alleged decision to outsource production to inmates (if that was even the case) was its own. The Amended Complaint remains devoid of any factual allegation that Milwaukee Tool even knew or should have known where, how, or in what manner its gloves were being produced. Courts have uniformly confirmed that the TVPRA does

3

not impose an affirmative obligation to police for forced labor, and the mere failure to prevent forced labor is not tantamount to an affirmative "participation" in it as required to state a claim.

*Fifth*, Plaintiff's "beneficiary" liability claim also fails because the Amended Complaint does not plead facts sufficient to establish that Milwaukee Tool had actual or constructive knowledge that Plaintiff was trafficked. Rather, the thrust of Plaintiff's Amended Complaint is that forced labor is widely used in manufacturing in China. Plaintiff makes conclusory allegations that Milwaukee Tool should have known that non-party Shanghai Select used forced labor because Shanghai Select was able to deliver goods bearing the Milwaukee logo to Milwaukee Tool's supplier (non-party Techtronic Trading Ltd.) at a low price. Conspicuously absent from Plaintiff's Amended Complaint, however, are any allegations that Milwaukee Tool had any knowledge (actual or constructive) that Shanghai Select used forced labor or, more importantly, that *Plaintiff* was trafficked. The law is clear that generalized knowledge about forced labor practices in a country is insufficient; knowledge of trafficking must be particular to at least the alleged trafficker at the time the Plaintiff was trafficked. Here there is none. Thus, Plaintiff's claim fails.

To the extent Plaintiff includes any allegations of knowledge on the part of Milwaukee Tool, those allegations are not only completely unrelated to *Plaintiff* but also *post-date* the time when Plaintiff was allegedly imprisoned in China. Allegations of *later-in-time* forced labor allegedly used by Shanghai Select and *later-in-time* knowledge of said forced labor cannot give rise to a claim by Plaintiff who was admittedly not imprisoned at that time. Instead, the only factual "allegation" of Milwaukee Tool's alleged knowledge of Plaintiff's trafficking is a reference to Plaintiff's counsel's own demand letter sent in 2023, well after Plaintiff was released.

*Sixth*, despite amending the allegations in response to Milwaukee Tool's prior Motion to Dismiss, the Amended Complaint remains replete with impermissible group pleading allegations

that do not satisfy Rule 8's notice pleading requirements.  The Amended Complaint seeks to challenge the manufacturing industry in China, and U.S. purchasers that enter into business relationships with Chinese manufacturers, for failing to stop forced labor trafficking but does not allege facts that are specific to the actions of Milwaukee Tool.  To be clear, Milwaukee Tool condemns all forms of forced labor trafficking.  But this case is not about forced labor trafficking in China generally, which the Amended Complaint alleges is driven by Chinese prison officials.  Rather, it is about Plaintiff and the specific claims he is asserting in this lawsuit, none of which, as set out above, state a cause of action under the TVPRA against Milwaukee Tool.

## II.    RELEVANT BACKGROUND[3]

### A.    Plaintiff Was Allegedly Trafficked By Guards at the Chishan Prison.

Plaintiff, a resident of China, was imprisoned in China following his conviction for subversion of state power in July 2021.  Amend. Compl., ¶¶ 12, 37.  Although originally "sentenced to five years imprisonment," Plaintiff was released in July 2022, one year after his conviction.  *Id.*  Plaintiff served a portion of his time at Hunan Chishan Prison in Yuanian City, Hunan Province, China ("Chishan Prison"), which, according to Plaintiff, is known for forced labor and torture of prisoners.  *Id.* at ¶¶ 12, 34, 37.  While at the Chishan Prison, Plaintiff was allegedly "subjected to five months of forced labor" by prison guards starting "[o]n or around February 23, 2022" until his release on July 21, 2022.  *Id.* at ¶¶ 12, 37.[4]

---

[3] While Milwaukee Tool recognizes that the Court must accept the allegations pled in the Amended Complaint for the purposes of this Motion, Milwaukee Tool contests many of them and nothing in this Motion should be deemed a waiver or acceptance of the truth of the allegations.

[4] The Amended Complaint continues to include irrelevant allegations regarding non-party Lee Ming-che.  *See* Amend. Compl., ¶¶ 31, 38–39.  As Milwaukee Tool pointed out in its prior motion, Plaintiff does not have standing to assert a claim on behalf of Lee Ming-che.  *See generally Hollingsworth v. Perry*, 570 U.S. 693, 710 (2013).  Thus, they have no bearing on this motion.

The trafficking of Plaintiff allegedly occurred at the Chishan Prison, which contains manufacturing facilities within its walls. *Id.* at ¶ 35. According to the Amended Complaint, during Plaintiff's time at the Chishan Prison, "[a]ll prisoners, criminal and political, at Chishan Prison were subjected to forced labor" by prison officials under grueling conditions. *Id.* at ¶ 47. While inmates were compensated by prison officials for their work, the amount was minimal and "prison officials always came up with excuses to deduct their pay." *Id.* at ¶ 53. And inmates that refused to work or did not work hard enough were threatened and punished by prison guards. *Id.* at ¶ 54.

Plaintiff alleges that while at the Chishan Prison in 2022 he was forced by prison guards "to make a variety of textile goods." *Id.* at ¶ 37. One of the goods he was allegedly forced to make was "work gloves bearing the distinct 'Milwaukee' logo." *Id.* Plaintiff does not allege that anyone affiliated with Milwaukee Tool ordered him to produce the gloves, let alone that he ever was in contact with anyone affiliated with Milwaukee Tool or that the gloves were even ordered by or sent to Milwaukee Tool or even authentic (as opposed to counterfeit). Rather, he alleges that a "client" of the prison—Shanghai Select—had ordered the gloves. *Id.* at ¶ 44. He alleges that "Shanghai Select was frequently mentioned by the prison guards as an important customer" and that "Shanghai Select also sent representatives to the prison to monitor the production and conduct quality control" for the goods being produced. *Id.* Based on these tenuous allegations, Plaintiff asks the Court to make an impermissible inference that merely because he recalls seeing gloves bearing a Milwaukee logo, that this necessarily means that the gloves were authentic and that Milwaukee Tool knew or should have known that its gloves were being made using forced labor.

**B.  Plaintiff's Scant Allegations About Milwaukee Tool.**

Milwaukee Tool, located in Brookfield, Wisconsin, is a long-standing and leading brand in the power tool industry. *Id.* at ¶¶ 20, 32. Among other things, Milwaukee Tool markets and

sells work wear, including heavy-duty work gloves. *Id.* at ¶ 59. On amendment, the sum total of Plaintiff's factual allegations regarding Milwaukee Tool's production of the work gloves remains that Milwaukee Tool:

a) designed certain models of gloves (*see id.* at ¶¶ 57, 59, 61), and

b) contracted with non-party Techtronic Trading Ltd., who in turn allegedly contracted with Shanghai Select for the manufacture of certain lines of work gloves (*see id.* at ¶¶ 46, 112).

That is it. Plaintiff does not allege, nor could he, that Milwaukee Tool had a direct relationship with Shanghai Select, let alone that Milwaukee Tool directed Shanghai Select to outsource its production to prison officials at the Chishan Prison or that Milwaukee Tool had any knowledge that Shanghai Select conspired with those officials to produce gloves through forced labor to sell them to Techtronic Trading Ltd. Moreover, Plaintiff does not allege that he has ever had any contact with Milwaukee Tool or any of its employees. Nor does he allege that the gloves bearing the Milwaukee logo were authentic or even actually sold to Milwaukee Tool.

## III.    LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). For a claim to be plausible, rather than merely conceivable, the complaint's "'factual content [must] allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Firestone Financial Corp. v. Meyer*, 796 F.3d 822, 826 (7th Cir. 2015) (quoting *Iqbal*, 556 U.S. at 678). That is, the factual allegations must present "more than a sheer possibility" that the defendant's conduct is unlawful. *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

7

(citing *Twombly*, 550 U.S. at 555).  And although factual allegations are accepted as true, "labels and conclusions" are given no deference.  *Twombly*, 550 U.S. at 555 (internal citations omitted).

Generic allegations made against multiple defendants, moreover, cannot withstand challenge under Rule 12(b)(6) because such allegations deprive each individual defendant of fair notice of what it is alleged to have done.  *See Appvion, Inc. Retirement Savings and Employee Stock Ownership Plan v. Buth et al.*, 475 F. Supp. 3d 910, 931–32 (E.D. Wisc. 2020) (dismissing claims based on "conclusory group pleading allegations" as insufficient to state claims against the individual defendants); *see also Sanchez v. Pereira-Castillo*, 590 F.3d 31, 48 (1st Cir. 2009) ("In response to a motion to dismiss, we must determine whether, *as to each defendant*, a plaintiff's pleadings are sufficient to state a claim on which relief can be granted.") (emphasis in original).

## IV.  ARGUMENT

### A.  <u>Plaintiff's Claim Is Impermissibly Extraterritorial</u>.

Plaintiff's claim under Section 1595 of the TVPRA fails because it would impermissibly give extraterritorial application to that statute.  The Supreme Court has confirmed that there is "'a two-step framework for analyzing extraterritoriality issues.'"  *Nestlé USA, Inc. v. Doe*, 593 U.S. 628, 632 (2021) (quoting *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 337 (2016)).  First, courts must "presume that a statute applies only domestically, and…ask 'whether the statute gives a clear, affirmative indication' that rebuts that presumption."  *Id.* (quoting *RJR Nabisco*, 579 U.S. at 337).  "Second, where the statute, as here, does not apply extraterritorially, plaintiffs must establish that 'the conduct relevant to the statute's focus occurred in the United States.'"  *Id.* (quoting *RJR Nabisco*, 579 U.S. at 337).  Here, as set forth further below, Plaintiff's claim improperly seeks to apply Section 1595 extraterritorially and thus must be dismissed with prejudice.  *See id.* (affirming dismissal as a matter of law).

8

1.     Congress Did Not Clearly Give Section 1595 Extraterritorial Effect.

"Absent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." *RJR Nabisco*, 579 U.S. at 335. To apply extraterritorially, the statute must "give[] a clear, affirmative indication" that it does. *Id.* "When a statute gives no clear indication of an extraterritorial application, it has none." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010). That is the case here. The plain language of Section 1595 says nothing about extraterritorial application. That section provides in relevant part:

> An individual who is a victim of a violation of this chapter may bring a civil cause of action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which the person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

18 U.S.C. § 1595(a).[5] Because Section 1595 does not include a clear, affirmative indication of extraterritorial application, at least one court that has squarely considered the issue has held that it cannot be applied outside the territorial boundaries of the United States. *See Doe 1 v. Apple, Inc.*, No. 1:19–cv–03737, 2021 WL 5774224, at *14–16 (D. D.C. Nov. 2, 2021), *aff'd on other grounds*, *Doe 1 v. Apple, Inc.*, 96 F.4th 403 (D.C. Cir. 2024).

In *Apple*, a federal district court in Washington, D.C. held that plaintiffs, who were allegedly trafficked for forced child labor in the Democratic Republic of the Congo, could not state a Section 1595 claim because the statute does not apply to "alleged violations [that] took place far from this country's shores." *Id.* at *1, *14. That court correctly found that there is no language in Section 1595 "rebut[ting] the presumption that it applies only domestically." *Id.* at *14. And the court rejected the plaintiffs' reliance on other sections of the TVPRA, namely Section 1596 (18

---

[5] The plain language of Section 1589 also does not include any clear, affirmative indication of extraterritorial application. *See* 18 U.S.C. § 1589.

9

U.S.C. § 1596) concerning criminal liability to try to write in an otherwise absent affirmative indication of extraterritorial application. *Id.* at *15.

Specifically, the court in *Apple* held that Section 1596's grant of extraterritorial jurisdiction over criminal offenses was not only insufficient to expand the territorial scope of civil claims, but rather the absence of the same language in Section 1595 evidenced "an intentional decision not to extend extraterritorially the reach of the statute's civil component." *Id.* at *16. As the court explained, "'when a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms.' Such is the case with § 1595." *Id.* (quoting *Morrison*, 561 U.S. at 265). The court concluded that it was "not for [it] to question that decision; especially as grants of extraterritorial jurisdiction are fraught with international-relations considerations, ones far outside the judicial role." *Id.* (citing *RJR Nabisco*, 579 U.S. at 337).

The Supreme Court's analysis in *RJR Nabisco* supports this reasoning. In that case, the Court considered whether the Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. §§ 1961–1968) has extraterritorial effect. Like the TVPRA, RICO contains both criminal prohibitions and a civil cause of action, with the civil cause of action available to persons injured by conduct that constitutes a criminal violation. In *RJR Nabisco*, the Supreme Court confirmed that "the presumption against extraterritoriality must be applied separately to both RICO's substantive provisions and its private right of action." *Id.* at 350. The Court explained that "[i]t is not enough to say that a private right of action must reach abroad because the underlying law governs conduct in foreign countries. Something more is needed" to establish that Congress affirmatively gave the civil cause of action extraterritorial reach. *Id.* As is the case with Section 1595, the civil cause of action under RICO does not contain such affirmative indication and thus

the Court held that it does not apply extraterritorially, even if the criminal sections have a broader territorial scope. *Id.* The same result should be reached here.

The lack of Congressional intent for Section 1595 to apply extraterritorially has been further confirmed by Congressional inaction. *See Lorillard v. Pons*, 434 U.S. 575, 580 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts the statute without change."). Congress amended Section 1595 in January of 2023 to add a right a private right of action against persons that attempt or conspire to benefit from forced labor trafficking. *See* Pub. L. 117–347 (January 5, 2023). Congress did not add any language to clearly and affirmatively indicate that the statute may be applied extraterritorially. Had Congress wished to do so, it could have easily imported language that it used in Section 1596 with respect to criminal offenses. Having declined to do so, this Court should not extend the territorial reach of the statute beyond that provided by the legislature.[6]

        2.    <u>Plaintiff's Claim Does Not Involve a Domestic Application of Section 1595</u>.

Because Section 1595 does not apply extraterritorially, Plaintiff's claim can only proceed if it involves a domestic application of Section 1595. *See Nestlé*, 593 U.S. at 633; *RJR Nabisco*, 579 U.S. at 337. In other words, "[t]he question…becomes whether this is a case seeking to hold Defendants responsible for overseas conduct." *Apple*, 2021 WL 5774224, at \*16. To determine "whether the case involves a domestic application of the statute," courts "look[] to the statute's

---

[6] A federal district court outside this Circuit recently reached a different conclusion in the case of *U.S. ex rel. Hawkins v. ManTech Int'l Corp.*, 2024 WL 4332117, at \*7 (D.D.C. Sept. 27, 2024). Not only is that case not controlling here, but the court's analysis in that case is flawed as it violates the Supreme Court's instruction in *RJR Nabisco* that a statute must include "clearly expressed congressional intent" for extraterritorial application. *Hawkins* is also plainly distinguishable as it involved a claim against government contractors, which the court noted are "essentially an extension of the United States government abroad" and, under a separate section of the TVPRA, "Congress explicitly stated its intention in section 3271 that the TVPRA would cover government contractors operating beyond our shores…." *Id.* at \*12.

11

'focus.'" *RJR Nabisco*, 579 U.S. at 337. "[I]f the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *Id.*

As the district court in *Apple* concluded, "the focus of the TVPRA will naturally fall where the violation occurred." 2021 WL 5774224, at *16; *accord Adhikari v. KBR*, No. 4:16–CV–2478, 2017 4237923, at *3 (S.D. Tex. Sept. 25, 2017) (the TVPRA's focus is "where the forced labor occurred and to where [the] victims were trafficked" (quotation marks and citations omitted)). Here, Plaintiff does not allege his injuries or the underlying TVPRA violations (the forced labor trafficking against him) "occurred anywhere other than in" China. *Apple*, 2021 WL 5774224, at *16. Plaintiff alleges that he was forced to perform labor at the Chishan Prison, for the prison's manufacturing business, under threat of torture by Chinese prison officials. Amend. Compl., ¶¶ 37, 54. He does not allege that he had any connection with the United States (in fact, he remains in China today, *see id.* at ¶ 12), or any person or entity present in the United States and there is no allegation that Milwaukee Tool engaged in any conduct that violated the TVPRA in the United States. To be sure, on amendment, Plaintiff admits that Milwaukee Tool had no relationship with Shanghai Select, the entity that allegedly outsourced its production to the Chishan prison. "Thus, seeking to hold Defendants liable for the TVPRA violations would amount to an extraterritorial application of [Section] 1595. Because Congress did not authorize that, [his] claim[] must fail." *Apple*, 2021 WL 5774224, at *16.

### B. The Amended Complaint Does Not Plausibly Allege "Perpetrator" Liability Against Milwaukee Tool.

Even if this Court were to find that Plaintiff's claims did not exceed the limits of the TVPRA's reach, Plaintiff nonetheless fails to state a plausible claim under any liability theory of the TVPRA. "Section 1595 creates two kinds of civil liability: perpetrator liability and participant

[a/k/a 'beneficiary'] liability." *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 552 (7th Cir. 2023); *see also Richardson v. Nw. Univ.*, No. 1:21–cv–00522, 2023 WL 6197447, at *7 (N.D. Ill. Sept. 21, 2023) (describing the difference between a "direct perpetrator" claim and a claim of beneficiary liability under the TVPRA); *Ruderman v. McHenry Cnty.*, No. 3:22–cv–50115, 2023 WL 130496, at *4 (N.D. Ill. Jan. 9, 2023). Here, the Amended Complaint purports to assert claims against Milwaukee Tool for both kinds of liability. *See* Amend. Compl., ¶¶ 134–137 (perpetrator liability); 138–142 (beneficiary liability). Both fail as a matter of law.

"Perpetrator" liability may be available against the ***director perpetrators*** or "***street-level trafficker[s]***"—the persons or entities that coerced the plaintiff into providing their labor or services. *G.G.*, 76 F.4th at 552 (emphasis added); *see also Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159, 1175 (9th Cir. 2022). Under a perpetrator theory of liability for forced labor trafficking, the plaintiff must establish that the defendant:

> "***knowingly*** provide[d] or obtain[ed] the labor or services of a person by any one of, or by any combination of, the following—(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint…"

18 U.S.C. § 1589(a) (emphasis added).

Here, none of the allegations added to the Amended Complaint address the fatal pleading deficiencies identified in Milwaukee Tool's prior Motion. Again, the Amended Complaint does not allege ***a single fact*** regarding any threats of force, serious harm, abuse of process, or any other actions taken by ***Milwaukee Tool*** to force Plaintiff to work at the Chishan Prison. Instead, the Amended Complaint admits that the alleged direct perpetrators are quite obviously the Chinese prison officials and guards at Chishan Prison that purportedly used threats of force and actual

13

physical restraint against prisoners in order to force them to work when they otherwise would not have worked. *See* Amend. Compl., ¶¶ 53–54. Plaintiff does not allege a ***single instance of contact*** between Milwaukee Tool and himself, let alone some action by Milwaukee Tool forcing him to work in a Chinese prison. Rather, the only allegations Plaintiff makes regarding these elements with respect to Milwaukee Tool are conclusory recitations of the elements of his claim. *Id.* at ¶¶ 136–37. This is beyond threadbare and is plainly insufficient to state a claim against Milwaukee Tool for perpetrator liability.

To the extent Plaintiff attempts to assert its perpetrator liability theory against Milwaukee Tool pursuant to 18 U.S.C § 1589(b), that also fails. Section 1589(b) provides for "perpetrator" liability where a defendant:

> knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection [1589] (a), ***knowing*** or ***in reckless disregard*** of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means.

18 U.S.C. § 1589(b) (emphasis added). Here, however, Plaintiff has not alleged that Milwaukee Tool acted "in reckless disregard" of the fact that he was trafficked by the Chinese prison officials. Courts have found "reckless disregard" in situations, not present here, where the defendant itself views conduct consistent with the trafficking of the plaintiff. For example, in *Ricchio v. McLean*, the First Circuit concluded that the defendants "acted, at least, in reckless disregard" when it was alleged by the plaintiff that "in plain daylight view of the front office of the motel," her trafficker "kick[ed] her and force[d] her back toward the rented quarters as she tried to escape," that a hotel owner had gone to her room and "shown indifference to [her] obvious physical deterioration," and that the trafficker and hotel owner "high-five[d]" and discussed "getting this thing going again." 853 F.3d 553, 555 (1st Cir. 2017). Nothing of the sort is alleged here and none of the allegations

added in Plaintiff's Amended Complaint correct the fatal pleading defects in Plaintiff's attempt to allege a perpetrator liability claim under Section 1589(b).

Furthermore, even the "beneficiary" provision of Section 1589(b) requires that the defendant have actual knowledge of the forced labor to assert a plausible claim for perpetrator liability. *See A.D. v Wyndham Hotels and Resorts, Inc.*, 2020 WL 8674205, at 2 n.1 (E.D. Va. July 22, 2020) (analyzing perpetrator liability under analogous provision of TVPRA addressing sex trafficking). Plaintiff's Amended Complaint lacks any factual allegations establishing that Milwaukee Tool had actual knowledge that its gloves were even being manufactured at Chishan Prison. Rather, the Amended Complaint alleges that it was Shanghai Select, not Milwaukee Tool, that placed the order for gloves from Chishan Prison and sent representatives to monitor the production of the gloves, which the Plaintiff never alleges were ordered by Milwaukee Tool or even authentic (non-counterfeit). Amend. Compl., ¶ 44. Moreover, Plaintiff's allegations regarding knowledge of the manufacturing process in China and the alleged "strategy of taking advantage of lower labor costs" in China does not identify a single action or statement by Milwaukee Tool. *See id.* at ¶ 93. Finally, while Plaintiff acknowledges Defendants' Policy Against Modern Slavery and Human Trafficking and Defendants' rights to audit their suppliers for compliance with that policy, there is no allegation that any audit by Milwaukee Tool ever revealed any indication of forced labor in its supply chain. *Id.* ¶¶ 63, 100–05. Without allegations that Milwaukee Tool had actual knowledge that its gloves were being produced through the use of forced labor, Plaintiff's perpetrator liability claim necessarily fails and must be dismissed.

### C.     <u>Plaintiff's Alter Ego Theory Fails.</u>

Acknowledging that he has not alleged any factual basis for knowledge by Milwaukee Tool that the gloves were produced with his forced labor, Plaintiff suggests that knowledge can be

imputed to Milwaukee Tool based on its status as a subsidiary of TTI and the alleged coordination between the two companies. *See* Amend. Compl., ¶ 84. Plaintiff's attempt at imputation fails because it rests on a flawed alter ego theory seeking to set aside the fact that Milwaukee Tool and TTI are separate corporate entities.

"Federal common law applies when a court assesses alter-ego liability under a federal statutory scheme." *Ramsbottom v. Ashton*, 2022 WL 106733, at *18 (M.D. Tenn. Jan. 11, 2022) (applying federal common law on alter ego to TVPRA claim). The corporate form will only be disregarded if it is "little more than a legal fiction." *Pearson v. Component Technology Corp.*, 247 F.3d 471, 484–85 (3d. Cir. 2001). Courts under both federal common law and Delaware law (the place of Milwaukee Tool's incorporation),[7] look at the following factors:

> gross undercapitalization, failure to observe corporate formalities, nonpayment of dividends, insolvency of debtor corporation, siphoning of funds from the debtor corporation by the dominant stockholder, nonfunctioning of officers and directors, absence of corporate records, and whether the corporation is merely a façade for the operations of the dominant stockholder.

*Id.* This is a "notoriously difficult" burden as "courts have refused to pierce the veil even when subsidiary corporations…accept administrative support from the parent, and have a significant economic relationship with the parent." *Id.* Rather, the plaintiff "must essentially demonstrate that in all aspects of business, the two corporations actually functioned as a single entity and should be treated as such." *Id.*

Here, Plaintiff has not (and cannot) allege anything close to complete domination over Milwaukee Tool's activities on the part of TTI (or anyone else), inadequate capitalization of Milwaukee Tool, or any other indicia of failure to respect the corporate form. Instead, all Plaintiff

---

[7] Under Wisconsin's choice of law rules, courts apply the law of the state where the business is organized to alter ego claims. *See Henry Technologies Holdings, LLC v. Giordano*, 2014 WL 3845870, at *6 (W.D. Wisc. Aug. 5, 2014).

16

alleges is that Milwaukee Tool is "important to TTI's business" and that efforts of certain employes are shared. This is plainly insufficient to justify application of the alter ego doctrine. Accordingly, Plaintiff's attempt to impute allegations against different defendants for his trafficking claim fails. *See A.B. v. Hilton Worldwide Holdings, Inc.*, 484 F. Supp. 3d 921, 943 (D. Or. 2020) (dismissing complaint; rejecting alter ego theory based on similarly scant allegations).

### D. The "Beneficiary" Liability Claim Fails Because the Amended Complaint Does Not Allege that Milwaukee Tool Participated in a Trafficking Venture.

Section 1595 provides a private right of action against "whoever knowingly benefits…financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of" the TVPRA. 18 U.S.C. § 1595(a). Accordingly, courts have held that in order to state a claim for "beneficiary" lability, a plaintiff must allege the following elements: "(1) a venture has engaged in an act in violation of [the TVPRA], (2) the defendant knew or should have known that the venture violated [the TVPRA], (3) the defendant participated in the venture, and (4) the defendant knowingly benefitted from its participation." *G.G.*, 76 F.4th at 553. Here, the Plaintiff fails to plausibly allege these elements and cannot make out a beneficiary liability claim against Milwaukee Tool.

As an initial matter, the Amended Complaint fails to allege that there was any forced labor trafficking venture that trafficked Plaintiff and that Milwaukee Tool participated in that venture. "The TVPRA does not define the terms 'participation' or 'venture' for purposes of section 1595(a)." *Apple*, 96 F.4th at 414. Thus, courts have applied the ordinary meaning of those terms. *See Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 724 (11th Cir. 2021). While courts have not agreed on a single definition, "venture" is generally defined as an agreed undertaking with a common purpose. *See id.* ("The ordinary meaning of 'venture' is an undertaking or enterprise involving risk and potential profit."); *Venture*, Black's Law Dictionary (11th ed. 2019) ("[a]n

17

undertaking that involves risk; esp., a speculative commercial enterprise"); *Apple*, 96 F.4th at 414–15 ("A 'venture' is an 'undertaking that is dangerous, daring or of uncertain outcome,' or a 'business enterprise involving some risk in expectation of gain.'") (citations omitted); *Bistline v. Parker*, 918 F.3d 849, 874-75 (10th Cir. 2019) (requiring a common purpose). With respect to "participation," courts are in accord that the term means "to take part in or share with others in common or in association." *Red Roof*, 21 F.4th at 725; *G.G.*, 76 F.4th at 559 (requiring "assistance, support, or facilitation" with a "desire to promote the wrongful venture's success") (citations omitted); *Apple*, 96 F.4th at 415 ("taking part or sharing in something") (citations omitted). Taken together, courts interpret "participation in a venture" to mean "taking part or sharing in an enterprise undertaking that involves danger, uncertainty, or risk, and potential gain." *Apple*, 96 F.4th at 415; *see also Red Roof*, 21 F.4th at 725 (requires allegations that defendant "took part in a common undertaking or enterprise involving risk and potential profit"); *B.J. v. G6 Hosp. LLC*, No. 22-cv-03765-MMC, 2023 WL 3569979, at *4 (N.D. Cal. May 19, 2023) (same).

Courts have repeatedly made clear that the mere operation of a general business venture does not suffice to establish liability under the TVPRA. *See, e.g.*, *G.G.*, 76 F.4th at 559; *Apple*, 96 F.4th at 415. As the Seventh Circuit recently held in *G.G.*, although "a desire to promote the wrongful venture's success" can be inferred from a "continuous business relations" between the venture and the defendant that allows for the inference of a "tacit agreement" between the two, such business relationship must be "more than providing off-the-shelf" products or services in "arms-length" transactions. 76 F.4th at 562; *cf.*, *e.g.*, *Weir v. Cenlar FSB*, No. 16-CV-8650 (CS), 2018 WL 3443173, at *6 (S.D.N.Y. July 17, 2018) ("Defendants allegedly used the mail in furtherance of the scheme, but that would not make the Postal Service…a member of the enterprise."); *Peters v. Aetna, Inc.*, No. 1:15-CV-00109-MR, 2016 WL 4547151, at *9 (W.D.N.C.

18

Aug. 31, 2016) (where cooperation was no more than "that inherent in every commercial transaction, the Complaint provides no basis for inferring that the Defendants were conducting the enterprise's affairs.") (internal quotations omitted); *Fin. Corp. Mortgage-Backed Sec. Litig.*, No. 2:11-CV-07166-MRP, 2012 WL 10731957, at *9 (C.D. Cal. June 29, 2012) ("At the risk of being glib, this allegation amounts to one that 'Countrywide offered to buy something, and the lenders obliged.' Western and Southern [have] identified exactly the type of arms-length business transaction...that does not constitute a RICO enterprise.").

The D.C. Circuit's opinion in *Apple* is instructive as to the line between operation of a general business venture and participation in a *forced labor trafficking* venture. In that case, the court affirmed dismissal under Rule 12(b)(6) because the complaint "failed to plausibly allege 'participation in a venture.'" 96 F.4th at 415. At issue were allegations by victims (and their families) of alleged child labor and forced labor trafficking in the cobalt industry in the DRC. The plaintiffs sued a series of technology company defendants that purchased refined cobalt from suppliers and their subsidiaries, who allegedly obtained cobalt through forced labor. Dismissing the TVPRA claims, the court held that there was "no shared enterprise between" the technology company defendants and the cobalt "suppliers who facilitate[d] forced labor." *Id.* "The purported agreement...was merely to buy and sell cobalt. And purchasing a commodity, without more, is not 'participation in a venture' with the seller." *Id.* at 416. The court explained:

> The Tech Companies own no interest in their suppliers. Nor do the Tech Companies share in the suppliers' profits and risks. Although a formal business relationship is not necessary to be a participant in a venture, something more than engaging in an ordinary buyer-seller transaction is required to establish 'participation' in an unlawful venture. The two groups here, by contrast, are on the opposite sides of an arms-length transaction: Glencore, Huayou, and Eurasian Resources sell cobalt, and the Tech Companies buy cobalt.

*Id.*

The same is true here. With respect to the alleged "relationship" between Milwaukee Tool and the traffickers (the Chinese prison officials and Shanghai Select), Plaintiff has alleged, at most, a non-actionable "formal business relationship" with "an ordinary buyer-seller transaction." Ostensibly recognizing that he lacks any facts to support any relationship between Milwaukee Tool and Shanghai Select, on amendment, Plaintiff now alleges that the only connection between Milwaukee Tool and Shanghai Select is that Milwaukee Tool's supplier (non-party Techtronic Trading Ltd.) contracted with Shanghai Select.

Indeed, Plaintiff concedes that Milwaukee Tool had no direct participation in the alleged venture that forms the basis of Plaintiff's claims. Rather, Plaintiff concedes that "Milwaukee Tool's entanglement with forced labor is a function of its entanglement with TTI, its parent company." Amend. Comp. ¶ 7. This alleged entanglement is insufficient to establish that Milwaukee Tool participated in a venture that violated the TVPRA as to the Plaintiff. And, as set out above, Plaintiff's alter ego theory attempting to treat Milwaukee Tool and Techtronic Trading Ltd. as the same entity fails. Plaintiff has not alleged that Milwaukee Tool participated in any unlawful venture.

That Shanghai Select allegedly manufactured gloves based on Milwaukee Tool's patented designs and specifications, including the Milwaukee logo, does not alter the fact that any alleged relationship was purely an arm's-length transaction. *G.G.*, 76 F.4th at 562. Indeed, in almost all contractual relationships between a commercial entity and a manufacturer, the manufacturer produces the product requested by the buyer. Without "something more" than this common business conduct, there is no participation in a trafficking venture. *Apple*, 96 F.4th at 416.

This is especially true where the defendant is not alleged to have had any contact with the alleged traffickers or knowledge that the alleged traffickers were engaged in trafficking. *See id.*;

*see also A.B. v. H.K. Group of Co., Inc.*, No. 1:21-cv-1344-TCB, 2022 WL 467786, at *4 (N.D. Ga. Feb. 9, 2022) (applying *Red Roof* and holding that "Plaintiff has not alleged any interactions between Defendants or their employees and the alleged traffickers sufficient to establish that Defendants 'took part in a common undertaking' with the alleged traffickers."). It is axiomatic that without knowledge of the trafficking, Milwaukee Tool could not have "participated" by taking part in some "common undertaking" to traffic Plaintiff. *See Red Roof*, 21 F.4th at 727; s*ee also Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 159 (S.D.N.Y. 2019) ("The participation giving rise to the benefit must be participation in a [] trafficking venture, not participation in other activities.").

Milwaukee Tool anticipates that Plaintiff will attempt to rely on the Seventh Circuit's holding in *G.G.* but that case is factually distinguishable in many respects. In *G.G.*, the plaintiff alleged that she was sex-trafficked by a criminal sex trafficker who used Backpage.com to advertise her for sex. 76 F.4th at 548. The plaintiff brought a Section 1595 claim against Salesforce based on a beneficiary liability theory. As the D.C. Circuit explained in *Apple*, the Seventh Circuit concluded that the relationship was "more than just a purchasing agreement." 96 F.4th at 416. "Salesforce provided direct support, specific business advice, and productivity enhancing software to Backpage.com, which hosted prostitution ads, thereby facilitating the growth of a business whose business model was built upon systemic and widespread violations of federal sex trafficking law." *Id.* at 415 (cleaned up) (quotations omitted). Rather than simply working at arm's-length with Backpage.com, Salesforce "provided Backpage with targeted solutions addressed to the needs of Backpage's business, repeatedly assessed Backpage's operational needs, and provided active ongoing support that was tailored to those needs." *G.G.*, 76 F.4th at 560 (internal quotations omitted). Nothing of the sort is alleged to be present here as

between Milwaukee Tool and Shanghai Select concerning the further than arm's-length transaction for the production and purchase of work gloves.

What is more, the Seventh Circuit described how "Backpage…had violated federal criminal sex-trafficking laws," had entered into plea agreements for criminal charges, that "Backpage's business was substantially devoted to criminal sex trafficking," and that "Backpage generated more than 99% of its revenue from adult advertising." *Id.* at 553, n.6. Backpage was "the biggest and most notorious sex trafficking and pimping website in the United States" and Salesforce allegedly worked with them to provide bespoke support to build the site. *Id.* at 555. This, according to the Seventh Circuit, was sufficient to allege participation in a venture.

The allegations here are nowhere near what was alleged by the *G.G.* plaintiff. Far from working directly with Shanghai Select to further *Shanghai Select's* business, the only *fact* that Plaintiff alleges is that Milwaukee Tool transacted with another non-party to buy gloves manufactured by Shanghai Select. The Amended Complaint does not allege that Milwaukee Tool's relationship with Shanghai Select was anything more than that. What is more, here, the Complaint does not even plausibly allege that the gloves he produced were actually for Milwaukee Tool, authentic, or sold to Milwaukee Tool. While Plaintiff suggests that "Defendants likely worked, directly or indirectly, with Shanghai Select and Chishan Prison on bespoke manufacturing processes" (Amend. Compl., ¶ 129), that allegation is entirely conclusory and without factual support. The allegations say nothing as to how *Milwaukee Tool* did anything to *further* the business of Shanghai Select, but rather speaks of generic actions Shanghai Select would take to fulfill its alleged contract to make gloves with the Milwaukee Tool design.

Moreover, the Amended Complaint does not include any allegations, as required to state a claim, that Milwaukee Tool shared a common purpose with Shanghai Select related to trafficking

22

or that Milwaukee Tool shared in the profits of a trafficking venture. *See Doe et al. v. Reddit, Inc.*, 51 F.4th 1137, 1145 (9th Cir. 2022) ("Mere association with [] traffickers is insufficient absent some knowing 'participation' in the form of assistance, support, or facilitation."). The Amended Complaint does not allege any awareness on the part of Milwaukee Tool (or any other entity for that matter) that Shanghai Select sought to improve its *own profit* margins by outsourcing labor to Chinese prison officials that were operating forced labor trafficking ventures, let alone that Milwaukee Tool somehow assisted with that effort. What is clear from the Amended Complaint is that Milwaukee Tool had no idea that the downstream sub-contractor Shanghai Select itself sub-contracted the production of the gloves with the Milwaukee logo on them (or, alternatively, that Shanghai Select produced counterfeit gloves bearing the Milwaukee logo). Milwaukee Tool in no way participated in any alleged venture between Shanghai Select and the Chinese prison officials that trafficked Plaintiff.

Finally, any attempt by Plaintiff to rely on general allegations the Milwaukee Tool states that it can "potentially audit" suppliers (*see* Amend. Compl., ¶ 81) to make out a claim of participation is foreclosed by the D.C. Circuit's ruling in *Apple*. There, the court rejected allegations that a "right to inspect" a supplier constitutes the level of control required to show participation in a trafficking venture. 96 F.4th at 416. That court also found that allegations that suppliers were required to join industry-led labor compliance programs" also did not "establish a joint venture." *Id.* Here, Plaintiff cannot transform his lack of any factual allegations that Milwaukee Tool participated in a trafficking venture based into a claim based on some generic allegations that Milwaukee Tool generally states that it may audit suppliers.[8] To be sure, the

---

[8] Nor is Milwaukee Tool required by law to audit its suppliers. The law is clear that there is no such affirmative duty. *See, e.g.*, *A.B. v. Wyndham Hotels & Resorts, Inc.*, 532 F. Supp. 3d 1018, 1027 (D. Or. 2021) ("[T]he TVPRA does not impose an affirmative duty to police and

plaintiff has not alleged that Milwaukee Tool undertook such an audit, much less that by undertaking that audit it directed Shanghai Select to engage in forced labor trafficking. Plaintiff's theory is well too attenuated to state a claim. His Section 1595 claim must be dismissed.

E. **The Amended Complaint Does Not Plausibly Allege that Milwaukee Tool Knew or Should Have Known of the Alleged Forced Labor.**

1. Generalized Allegations Regarding Forced Labor In China Cannot Establish Milwaukee Tool's Knowledge of Plaintiff's Alleged Trafficking.

In addition to failing to allege that Milwaukee Tool participated in a forced labor trafficking venture, Plaintiff also fails to adequately allege that Milwaukee Tool "knew or should have known that [the] venture had engage in acts in violation" of the TVPRA. *G.G.*, 76 F.4th at 555. To allege the requisite actual or constructive knowledge, courts have held that Plaintiff must allege that Milwaukee Tool knew or should have known of the specifically alleged TVPRA violations at the Chishan Prison. *Ratha,* 35 F.4th at 1177; *Red Roof*, 21 F.4th at 725–26. As to this element, the *Red Roof* Court explained:

> [T]he defendant must have either actual or constructive knowledge that the venture—in which it voluntarily participated and from which it knowingly benefitted—violated the TVPRA *as to the plaintiff*. Section 1595(a) requires that the defendant "knew or should have known [that the venture] has engaged in an act in violation of this chapter." Knowledge requires "[a]n awareness or understanding of a fact or circumstance." *Knowledge*, Black's Law Dictionary (11th ed. 2019). Constructive knowledge, on the other hand, is that knowledge which "one using reasonable care or diligence should have." *Constructive Knowledge*, Black's Law Dictionary (11th ed. 2019). Thus, the franchisors may be labile under the TVPRA if they have either actual or constructive knowledge that the venture in which they participated and from which they benefitted violated the TVRPA *as to the Does*.

*Id.* at 725 (emphasis added). In other words, generalized knowledge about trafficking is insufficient; knowledge must be about Plaintiff in particular.

_____

prevent [] trafficking."); *A.B. v. Marriott Int'l, Inc.*, 455 F. Supp. 3d 171, 182 (E.D. Pa. 2020) ("We do not read the Act as requiring hotels (and other businesses or professions possibly earning money from trafficking) to affirmatively stop the trafficking.").

Plaintiff falls well short of pleading this element here. The Amended Complaint does not allege any facts plausibly establishing that Milwaukee Tool knew or should have known that *he* was being trafficked at the Chishan Prison. Thus, his claims fail as a matter of law. *See id.*

Instead, Plaintiff relies entirely on generic and generalized allegations of forced labor in China. This approach does not comport with the law. As one federal court recently explained, the knowledge element requires knowledge of the specific TVPRA violation. *Doe (S.M.A.) v. Salesforce, Inc.*, 2024 WL 1337370, at *15 (N.D. Tex. Mar. 28, 2024). In *S.M.A.*, the Court explained that "[i]f participant liability could attach without any knowledge the venture committed the specific violation sued upon, then § 1595(a) would impose strict liability for participants in the event that they have constructive knowledge of any violation…Such an interpretation would be inconsistent with the consensus among courts that § 1595 imposes a negligence standard." *Id.* Accordingly, Plaintiff must at least allege knowledge of trafficking by Shanghai Select in its manufacturing of work gloves. *See G.G.*, 76 F.4th at 544, 558 (a plaintiff must allege that the venture has violated the TVPRA to state a claim under Section 1595); *see also Misko v. Speedway, LLC*, No. 16–cv–13360, 2018 WL 2431638, at *10 (E.D. Mich. May 29, 2018) ("[G]eneral knowledge that a condition can materialize is not sufficient to create constructive knowledge of the existence of a particular condition at a specific time."). Here, Plaintiff has not done so.

*Ratha* is instructive. That case involved allegations of trafficking, including forced labor trafficking in the Thai shrimp industry, against a series of defendants. One such defendant— "Wales"—was a company that performed quality control, sales, and marketing for seafood processing factories. 35 F.4th at 1166. The complaint in *Ratha* alleged that Wales "inspected the packaging of the fourteen containers of shrimp that [another defendant] ordered…from Phatthana." *Id.* The complaint alleged that Phatthana owned seafood processing factories in

Thailand and engaged in forced labor trafficking at those factories. *Id.* at 1165. The district court granted Wales summary judgment. The Ninth Circuit affirmed, holding that no reasonable factfinder could infer from the evidence that Wales knew or should have known of the alleged labor abuses at Phatthana's Songkhla factory. *Id.* at 1177.

The evidence the *Ratha* plaintiffs presented on this point mirrors the allegations that Plaintiff asserts here. The plaintiffs in *Ratha* relied on "evidence generally establishing that abusive labor practices were common in Thailand, particularly in the shrimp industry" including general industry and news reports describing incidence of child and forced labor. *Id.* But the Court flatly rejected such reports as evidence sufficient to support a claim because they "shed[] little light on whether labor abuses were occurring at Phatthana's Songkhla factory, let alone whether [defendant] knew or should have known of such abuses." *Id.* At bottom the court summarized that: "Plaintiffs' evidence suggests, at most, that [defendant] should have known of labor abuses in the Thai shrimp industry *generally*. Sweeping generalities about the Thai shrimp industry are too attenuated to support an inference that [defendant] knew or should have known specifically of alleged TVPRA violations at the Songkhla factor between 2010 and 2012." *Id.*

So too here. Plaintiff devotes substantial space in his Amended Complaint to generic allegations that "[i]t is well know to the general public, and in the textile and manufacturing industries especially, that the use of forced labor in PRC prisons is widespread." Amend. Compl., ¶ 66. Plaintiff lays out a history of general reports regarding prison labor camps in China, including a 2014 "U.S. China Economic Security Review Commission…report titled 'Prison Labor Exports from China and Implication for U.S. Policy.'" *Id.* at ¶ 74; *see also id.* at ¶¶ 66–75. None of these allegations are specific to any knowledge on the part of Milwaukee Tool that Shanghai Select was engaged in forced labor trafficking in the production of gloves to sell to Milwaukee Tool. *See*

*H.G. v. Inter-Cont'l Hotels Corp.*, 489 F. Supp. 3d 697, 706 (E.D. Mich. 2020) (allegations that defendants were generally aware of trafficking in the hotel property fell short of establishing knowledge and participation); *S.J. v. Choice Hotels Int'l, Inc.*, 473 F. Supp. 3d 147, 154 (E.D.N.Y. 2020) ("[T]o conclude that franchisors…like Choice Hotels are liable under the TVPRA simply because they were generally aware that sex trafficking sometimes occurred on their franchisees' properties unjustifiably bridges the scienter gap between 'should have known' and 'might have been able to guess.'"); *G.G.*, 76 F.4th at 557 (same).

Plaintiff's other generic allegations are also insufficient to establish knowledge. For example, Plaintiff bizarrely alleges that Milwaukee Tool somehow knew of forced labor because it sought to reduce manufacturing costs. *See id.* at ¶ 93. But that cannot possibly establish knowledge that any of its products—let alone the gloves allegedly made by Plaintiff—would be made with forced labor. By his theory, *any* of the hundreds of thousands of businesses that contract with Chinese manufacturers would be found to have knowledge of forced labor trafficking.

2.    Plaintiff's Purported "Expert" Relies on the Same Insufficient Bases.

Without any facts to establish actual or constructive knowledge on the part of Milwaukee Tool, Plaintiff purportedly turns to a "consulting expert" with general knowledge about labor practices in China. *See id.* at ¶¶ 113–125. But all of the "expert's" "findings" are based on general studies and efforts that Milwaukee Tool was not required to undertake. For example, the expert concludes that Defendants could "detect the forced labor at issue because it involved gloves" and should be "aware of the prevalence of abusive labor practices" in China. *Id.* at ¶¶ 117–18. The expert also asserts that "Defendants had access to countless publicly available documents describing the prevalence of forced labor in the PRC." *Id.* at ¶ 122. But the purported expert does not, and cannot, opine or allege that Milwaukee Tool could or should have been aware that forced

27

labor was being used to make *its* gloves, as opposed to being employed generally in China.

Again, *Ratha* is instructive. There, the court also rejected the plaintiffs attempt to rely on purported expert reports concluding that the defendant "negligently failed to investigate whether [the supplier] was engaging in labor abuses at the Songkhla factory given the prevalence of labor abuses in the Thai seafood industry." 35 F.4th at 1178–79. The court rejected one of the reports out of hand because it made only "conclusory allegations" that the defendant was "on notice" that Thailand was a "hot spot" for human trafficking. *Id.* at 1179. The court rejected others because "they rel[ied] on the same generalized evidence of country conditions that [the court] already determined is insufficient to create a triable issue of material fact." *Id.* The court concluded: "[i]n sum, Plaintiffs' expert reports fail to bridge the gap between their generalized evidence of labor conditions in the Thai shrimp industry and the specific allegations that Wales knew or should have known of the alleged labor abuses" during the relevant time period. *Id.* That is the case here too.

### 3. Generic Information Regarding Shanghai Select Does Not Establish that Milwaukee Tool Knew Plaintiff Was Trafficked.

In addition to relying on unavailing "expert" allegations, the Amended Complaint also makes allegations of generic facts related to Shanghai Select's public disclosure of outsourcing production. *See* Amend. Compl., ¶¶ 107–112. Namely, the Amended Complaint asserts that "Shanghai Select stated in a publicly available 2018 prospectus that it began single process outsourcing in 2015, which involves outsourcing the first step of textile processing to streamline manufacturing." *Id.* at ¶ 108. According to the Amended Complaint, this occurred at the same time Shanghai Select was "touting its lower production costs." *Id.* at ¶ 110. But generic information has nothing to do with Milwaukee Tool and **nothing to do with forced labor**. Plaintiff's attempt to link them together is well beyond any stretch of the imagination: "Defendants almost certainly knew that Shanghai Select outsourced a significant portion of its gloves

28

manufacturing contract with Defendants. This, in turn, gave Defendants particular reason to know of forced labor." *Id.* at ¶ 112. This Court must reject it.

        4.    <u>Allegations that Post-Date Plaintiff's Time at Chishan Prison Cannot Serve as a Basis for Knowledge of Plaintiff's Alleged Trafficking.</u>

Similarly, to the extent that Plaintiff tries to rely on allegations concerning actions taken by U.S. Customs and Border Protection in *2024* (*see* Amend. Compl., ¶¶ 130–32) or Walmart (*see id.* at ¶ 125), those allegations cannot support knowledge during the time period when Plaintiff was allegedly trafficked in *2022*. *See Ratha*, 35 F.4th at 1177 (addressing knowledge at time of alleged TVPRA violations). The same is true of Plaintiff's allegation that Milwaukee Tool knew of trafficking based on Plaintiff's own January 2023 demand letter (*see id.* at ¶ 63). This ridiculous tautology that because Plaintiff sent a letter threatening a lawsuit in 2023 necessarily meant that Milwaukee Tool had constructive knowledge of Plaintiff's alleged trafficking in 2022, cannot support a claim that Milwaukee Tool knew or should have known that Plaintiff was being trafficked at the time he was being trafficked. To hold otherwise would mean that any litigant could establish a plausible claim merely by sending a demand letter, regardless of the merits.

        5.    <u>Without Knowledge, Milwaukee Tool Did Not Knowingly Benefit.</u>

Finally, because Plaintiff has not adequately pled that Milwaukee Tool participated in a venture or even knew that Shanghai Select was engaged in forced labor trafficking, he certainly has not pled that Milwaukee Tool "knew it was receiving some value from participating in the venture." *Red Roof*, 21 F.4th at 724. Under the "knowing benefit" requirement, "there must be…knowledge of that causal relationship." *Geiss*, 383 F. Supp. 3d at 169. Plaintiff does not, and cannot, allege that Milwaukee Tool knowingly benefitted specifically from the alleged trafficking, much less specifically as part of a venture to traffic this Plaintiff. The only "benefit" that Milwaukee Tool could have possibly received is the profits on the gloves that it sold—the exact

same benefit that Milwaukee Tool receives when selling gloves produced by other suppliers, and the exact same benefit Milwaukee Tool would have received absent Shanghai Select's alleged decision (unknown to Milwaukee Tool) to outsource production to the Chishan Prison. This is not a sufficient "benefit" to state and TVPRA claim. *See Reddit*, 1 F.4th at 1145–46.

## F. **The Amended Complaint Relies on Impermissible Group Pleading**.

Lastly, the Amended Complaint should also be dismissed because, despite amendment, it *still* fails to attribute specific factual allegations to specific defendants and Plaintiff has not made any attempt to remedy this deficiency. *See Appvion*, 475 F. Supp. 3d at 931–32 (dismissing claims based on "conclusory group pleading allegations" as insufficient to state claims against the individual defendants). As discussed at length above, the Amended Complaint contains many generalities regarding the state of forced labor in China, but very few specific allegations against Milwaukee Tool. Furthermore, to the extent that the Amended Complaint makes generic, conclusory allegations against the "Defendants" those allegations are insufficient to support a claim, let alone put Milwaukee Tool on notice of what *it* is alleged to have done. *See* Fed. R. Civ. P. 8(a)(2) (requiring "[a] pleading that states a claim for relief" to contain "a short and plain statement of the claim showing that the pleader is entitled to relief."). And Plaintiff's attempt to save these allegations through a baseless attempt to set aside the corporate forms of Defendants fails. *See supra* Section IV.C. Accordingly, Plaintiff's Amended Complaint must be dismissed for this reason too. *Appvion*, 475 F. Supp. 3d at 931–32.

## V. CONCLUSION

For the foregoing reasons, Milwaukee Tool respectfully requests that this Court dismiss Plaintiff's claims against Milwaukee Tool with prejudice, and to grant such other and further relief as the Court deems just and proper.

30

Dated: November 13, 2024

*/s/ Paul J. Stockhausen*
Paul J. Stockhausen
pstockhausen@reinhartlaw.com
REINHART BOERNER VAN DEUREN, S.C.
22 East Mifflin Street, Suite 700
Madison, WI 53703
Tel.: 608-229-2200
Fax: 608-229-2100

Ellen E. Dew (Bar No. 081218015)
William W. Reichart III (Bar No. 1812120078)
ellen.dew@us.dlapiper.com
wes.reichart@us.dlapiper.com
DLA Piper LLP (US)
650 S. Exeter Street, Suite 1100
Baltimore, MD 21202
Tel.: 410-580-3000
Fax.: 410-580-3001

*Attorneys for Defendant Milwaukee Electric Tool Corporation*

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned certifies that on November 13, 2024, the foregoing Milwaukee Tool's Memorandum of Law in Support of Motion to Dismiss Plaintiff's First Amended Complaint was electronically filed with the Clerk of Court using the CM/ECF system and thereby served on the following counsel of record:

Aaron Bibb
William E. Parsons
Hawks Quindel SC
409 E. Main Street
P.O. Box. 2155
Madison, Wisconsin 53701
abibb@hq-law.com
wparsons@hq-law.com

Adam Farra
Times Wang
Farra & Wang PLLC
1300 I Street, N.W.
Suite 400e
Washington, D.C. 20005
afarra@farrawang.com
twang@farrawang.com

*Counsel for Plaintiff*

Jason C. White
Morgan Lewis & Bockius LLP
110 N. Wacker Dr.
Chicago, Illinois 60606
jason.white@morganlewis.com

Zane D. Memeger
Morgan Lewis & Bockius LLP
1701 Market Street
Philadelphia, Pennsylvania 19103
Zane.memeger@morganlewis.com

Angelo J. Calfo
Andrew DeCarlow
Morgan Lewis & Bockius LLP
1301 2nd Ave, Suite 3000
Seattle, Washington 98101

angelo.calfo@morganlewis.com
andrew.decarlow@morganlewis.com
*Counsel for Defendant Techtronic Industries Company Limited*


                    */s/ Paul J. Stockhausen*
                    Paul J. Stockhausen