**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

XU LUN, a pseudonym,

              Plaintiff,

   v.

MILWAUKEE ELECTRIC TOOL
CORPORATION., et al.,

              Defendants.

Case No.  2:24-cv-00803-BHL

**PLAINTIFF'S OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

Introduction ........................................................................................................... 1

Background ............................................................................................................. 2

    A.    Statutory background ........................................................................... 2

    B.    Factual background .............................................................................. 5

Legal standard ....................................................................................................... 8

Argument ............................................................................................................... 8

    I.    The TVPA, a statute that targets the transnational phenomenon of human trafficking and forced labor, does not stop at the Nation's borders. ........................... 8

        A.    Congress clearly indicated that the TVPA—including its civil cause of action—applies extraterritorially. ........................... 9

        B.    This suit seeks only to hold the defendants accountable for their domestic conduct as beneficiaries of forced labor. ........................... 16

    II.    Mr. Xu has sufficiently pleaded that the defendants are liable under the TVPA. ........................... 20

        A.    Mr. Xu has sufficiently pleaded that the defendants participated in a venture. ........................... 21

        B.    The defendants' arguments that they did not "knowingly benefit" from the venture are foreclosed by Seventh Circuit precedent. ........................... 25

        C.    Mr. Xu has plausibly alleged that the defendants acted recklessly, or at the very least negligently, as to the risk of forced labor. ........................... 25

            1.    Legal standard ........................... 26

            2.    Mr. Xu has plausibly alleged that TTI acted at least negligently as to the risk of forced labor in its supply chain. ........................... 28

            3.    Mr. Xu has also plausibly alleged that Milwaukee Tool acted at least negligently. ........................... 31

            4.    The defendants' contrary arguments are foreclosed by Seventh Circuit case law. ........................... 34

    III.    TTI's specific attempts to exit this case are unavailing. ........................... 37

        A.    This Court has personal jurisdiction over TTI. ........................... 37

1. Because it supplies Milwaukee Tool gloves for sale in the United States, TTI is subject to personal jurisdiction for claims based on those gloves...................................................37

2. If there is any doubt, Mr. Xu is entitled to jurisdictional discovery...........................................................................47

B. TTI is present in the United States, even under its own definition. ..............48

Conclusion.....................................................................................................................49

# TABLE OF AUTHORITIES

**Cases**

*AAA Max 1 Ltd. v. Boeing Co.*,
  2023 WL 4760587 (N.D. Ill. 2023) ................................................................ 49

*Abafita v. Aldukhan*,
  2019 WL 6735148 (S.D.N.Y. 2019) .............................................................. 11

*Adhikari v. Daoud & Partners*,
  697 F. Supp. 2d 674 (S.D. Tex. 2009) .......................................................... 11

*Adhikari v. KBR Inc.*,
  2017 WL 4237923 (S.D. Tex. 2017) ........................................................ 19, 25

*Adhikari v. Kellogg Brown & Root, Inc.*,
  845 F.3d 184 (5th Cir. 2017) .......................................................................... 11

*Aguilera v. Aegis Communications Group, LLC*,
  72 F. Supp. 3d 975 (W.D. Mo. 2014) ........................................................... 11

*Appvion, Inc. Retirement Savings & Employee Stock Ownership Plan*
  475 F. Supp. 3d 910 (E.D. Wis. 2020) .......................................................... 34

*Asahi Metal Industry Co. v. Superior Court of California*,
  480 U.S. 102 (1987) ....................................................................................... 44

*Atchley v. AstraZeneca UK Ltd.*,
  22 F.4th 204 (D.C. Cir. 2022) ........................................................................ 44

*B.D. v. Samsung SDI Co.*,
  91 F.4th 856 (7th Cir. 2024) ............................................................ 38, 44, 47

*Bausch v. Stryker Corp.*,
  630 F.3d 546 (7th Cir. 2010) ............................................................................ 8

*Bayer HealthCare LLC v. Aeropres Corp.*,
  727 F. Supp. 3d 738 (N.D. Ill. 2024) ........................................................... 29

*Bilek v. Federal Insurance Co.*,
  8 F.4th 581 (7th Cir. 2021) ............................................................................ 44

*Borden v. United States*,
  593 U.S. 420 (2021) ....................................................................................... 27

*Boyland Auto Group III LLC v. Boyland*,
  691 F. Supp. 3d 917 (E.D. Wis. 2023) ...................................................... 8, 21

Case 2:24-cv-00803-BHL    Filed 12/16/24    Page 4 of 59    Document 41

*Burger King Corp. v. Rudzewicz,*
 471 U.S. 462 (1985) ................................................................................................ 37

*C.T. v. Red Roof Inns, Inc.,*
 2021 WL 602578 (S.D. Ohio 2021) ......................................................................... 11

*Calder v. Jones,*
 465 U.S. 783 (1984) ................................................................................................ 45

*Carrier Corp. v. Outokumpu Oyj,*
 673 F.3d 430 (6th Cir. 2012) .................................................................................. 44

*Curry v. Revolution Laboratories, LLC,*
 949 F.3d 385 (7th Cir. 2020) ............................................................................ *passim*

*Daimler AG v. Bauman,*
 571 U.S. 117 (2014) ................................................................................................ 44

*Doe #1 v. Red Roof Inns, Inc.,*
 21 F.4th 714 (11th Cir. 2021) ................................................................................. 24

*Doe 1 v. Apple Inc.,*
 96 F.4th 403 (D.C. Cir. 2024) ................................................................................. 23

*Doe I v. Apple Inc.,*
 2021 WL 5774224 (D.D.C. 2021) ................................................................ 11, 12, 13

*Doss v. Clearwater Title Co.,*
 551 F.3d 634 (7th Cir. 2008) .................................................................................. 34

*Esquivel v. Airbus Americas, Inc.,*
 2021 WL 4395815 (N.D. Ill. 2021) ......................................................................... 47

*Federal Bureau of Investigation v. Fikre,*
 601 U.S. 234 (2024) ................................................................................................ 42

*Ford Motor Co. v. Montana Eighth Judicial District Court,*
 592 U.S. 351 (2021) ...................................................................................... 38, 40, 41

*Foren v. LBC Optics Inc.,*
 2023 WL 3752187 (E.D. Wis. 2023) ..................................................... 8, 26, 34, 35

*G.G. v. Salesforce.com, Inc.,*
 76 F.4th 544 (7th Cir. 2023) .............................................................................. *passim*

*Geiss v. Weinstein Co. Holdings LLC,*
 383 F. Supp. 3d 156 (S.D.N.Y. 2019) ..................................................................... 25

iv

*In re Chinese-Manufactured Drywall Product Liability Litigation,*
    753 F.3d 521 (5th Cir. 2014) ................................................................................................ 44

*International Shoe Co. v. State of Washington, Office of Unemployment Compensation & Placement,*
    326 U.S. 310 (1945) ................................................................................................................ 48

*ISI International, Inc. v. Borden Ladner Gervais LLP,*
    256 F.3d 548 (7th Cir. 2001) ...................................................................................... 38, 42, 43

*J.G. v. Northbrook Industries, Inc.,*
    619 F. Supp. 3d 1228 (N.D. Ga. 2022) ............................................................................26, 34

*J.S.T. Corp. v. Foxconn Interconnect Technology Ltd.,*
    965 F.3d 571 (7th Cir. 2020) ...........................................................................................45, 46

*Johnson v. Edward Orton, Jr. Ceramic Foundation,*
    71 F.4th 601 (7th Cir. 2023) ....................................................................................... 27, 33, 36

*Ledalite Architectural Products v. Pinnacle Architectural Lighting, Inc.,*
    2009 WL 54239 (W.D. Wis. 2009) ........................................................................................ 44

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL,*
    732 F.3d 161 (2d Cir. 2013) .................................................................................................. 46

*Logan Products, Inc. v. Optibase, Inc.,*
    103 F.3d 49 (7th Cir. 1996) .................................................................................................. 41

*Louis Vuitton Malletier, S.A. v. Mosseri,*
    736 F.3d 1339 (11th Cir. 2013) ............................................................................................. 46

*Menke v. Southern Railway Co.,*
    603 F.2d 1281 (7th Cir. 1979) ............................................................................................... 36

*Motorola Solutions, Inc. v. Hytera Communications Corp.,*
    108 F.4th 458 (7th Cir. 2024) .......................................................................................*passim*

*NBA Properties, Inc. v. HANWJH,*
    46 F.4th 614 (7th Cir. 2022) ................................................................................................. 40

*Nicks v. Koch Meat Co.,*
    260 F. Supp. 3d 942 (N.D. Ill. 2017) ................................................................................47, 48

*Ratha v. Phatthana Seafood Co.,*
    2016 WL 11020222 (C.D. Cal. 2016) ............................................................................*passim*

*Ratha v. Phatthana Seafood Co.,*
    35 F.4th 1159 (9th Cir. 2022) ..................................................................................... 35, 45, 48

*Receivership Management, Inc. v. AEU Holdings, LLC*,
2019 WL 4189466 (N.D. Ill. 2019) ............................................................. 44

*RJR Nabisco v. European Community*,
579 U.S. 325 (2016) ...................................................................... *passim*

*Rodriguez v. Pan American Health Organization*,
29 F.4th 706 (D.C. Cir. 2022) ................................................... 4, 18, 45

*Roe v. Howard*,
917 F.3d 229 (4th Cir. 2019) ...................................................... *passim*

*Smartsignal Corp. v. Bickford*,
2006 WL 8461603 (N.D. Ill. 2006) ............................................................. 48

*Tamburo v. Dworkin*,
601 F.3d 693 (7th Cir. 2010) ............................................................. 38

*TRW Title Insurance Co. v. Security Union Title Insurance Co.*,
153 F.3d 822 (7th Cir. 1998) .................................................. 31, 33, 36

*uBID, Inc. v. GoDaddy Group*,
623 F.3d 421 (7th Cir. 2010) ............................................................. 46

*United States ex rel. Hawkins v. ManTech Intelligence Corp.*,
--- F. Supp. 3d ----, 2024 WL 4332117 (D.D.C. 2024) ....................11, 12, 13, 15

*United States Securities & Exchange Commission v. Winemaster*,
529 F. Supp. 3d 880 (N.D. Ill. 2021) ............................................................. 26

*United States v. Hansen*,
599 U.S. 762 (2023) ............................................................. 27

*United States v. Litos*,
847 F.3d 906 (7th Cir. 2017) ..........................................................27, 31

*Voisine v. United States*,
579 U.S. 686 (2016) ..........................................................27, 29

*Walden v. Fiore*,
571 U.S. 277 (2014) ............................................................. 45

*WesternGeco LLC v. ION Geophysical Corp.*,
585 U.S. 407 (2018) ..........................................................16, 18

**Statutes**

Pub. L. No. 117-78, 135 Stat. 1525 ............................................................. 33

vi

Trafficking Victims Protection Act of 2000,
    Pub. L. No. 106-386, 114 Stat. 1464 .................................................................. *passim*

Trafficking Victims Protection Reauthorization Act of 2003,
    Pub. L. No. 108-193, 117 Stat. 2875 ........................................................................ 3

Victims Protection Reauthorization Act of 2008,
    Pub. L. No. 110–457, 122 Stat. 5044 ....................................................... 4, 15, 18, 49

18 U.S.C. § 1583 ............................................................................................................ 14

18 U.S.C. § 1585 ............................................................................................................ 10

18 U.S.C. § 1589 ...................................................................................................... *passim*

18 U.S.C. § 1594 ............................................................................................................ 14

18 U.S.C. § 1595 ...................................................................................................... *passim*

18 U.S.C. § 1596 ...................................................................................................... *passim*

18 U.S.C. § 3271 ............................................................................................................ 10

19 U.S.C. § 1307 ............................................................................................................ 32

19 U.S.C. § 1484 ............................................................................................................ 32

22 U.S.C. § 7104 ............................................................................................................ 14

22 U.S.C. § 7105 ............................................................................................................ 14

28 U.S.C. § 2072 ............................................................................................................ 43

35 U.S.C. § 271 .............................................................................................................. 17

**Rules**

Fed. R. Civ. P. 4 ....................................................................................................... 42, 43

**Other Authorities**

*Black's Law Dictionary* (12th ed. 2024) ................................................................... 28, 36

Congressional-Executive Commission on China,
    *Hearing: Corporate Complicity: Subsidizing the PRC's Human Rights Violations* ........................................... 6

H.R. Rep. No. 108-264, pt. 2 (2003) .............................................................................. 3

TTI,
    *Environmental, Social and Governance Report 2021* ........................................................................ 29

TTI,
*Policy Against Modern Slavery and Human Trafficking* ................................................. 29, 31, 32

U.S. Customs and Border Protection,
*Preparing for an Audit-Partnership in Responsible Trade* ......................................... 32

U.S. Customs and Border Protection,
*Reasonable Care* ................................................................................................................. 32

Wayne R. LaFave,
*Substantive Criminal Law* § 5.4 (3d ed. 2024) ...................................................... 27

## INTRODUCTION

Congress enacted the Trafficking Victims Protection Act to combat the scourge of modern slavery in its many forms, from forced labor to sex trafficking. Congress understood that trafficking is a transnational problem with serious domestic consequences—and that to eliminate forced labor, the statute must target the companies that benefit from it, not just the individuals that hold the prod.

This is precisely the kind of case Congress had in mind. Milwaukee Tool, an American company headquartered in Wisconsin, and its parent company, Techtronic Industries Company Limited, wanted to sell gloves to Americans at American prices, but they did not want to pay American labor costs. So they moved production overseas, where they could take advantage of cheap, forced labor in a Chinese prison. As a result, Xu Lun, a political prisoner, was forced to work 11–13 hours a day, every day, making Milwaukee Tool gloves. He and many others risked brutal punishments, including beatings and electronic shocks, if they did not meet grueling quotas. In profiting from the use of forced labor, the defendants violated the TVPA's express prohibition on "benefit[ting] financially … from participation in a venture which has engaged in" forced labor. 18 U.S.C. § 1589(b).

To avoid this application of the plain text of the statute, the defendants raise a flurry of objections, but none have merit. *First*, they argue the TVPA's civil cause of action does not apply extraterritorially. But that runs counter to the statute's language and structure, which clearly indicate that courts have extraterritorial jurisdiction over any forced labor offense—whether criminally or civilly enforced. The TVPA's context, purpose, and history all strongly support this conclusion: The whole point of the statute is to target the quintessentially international phenomenon of human trafficking and forced labor.

*Second*, the defendants argue that Mr. Xu has not sufficiently alleged that their conduct violated the TVPA. But most of their arguments on this score are directly foreclosed by recent Seventh Circuit

precedent, *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 554 (7th Cir. 2023). The defendants implausibly contend that they were entirely unaware that forced labor was used to obtain their exceedingly cheap manufacturing. But all that's necessary to state a TVPA claim is negligence. Drawing all reasonable inferences in Mr. Xu's favor at this stage of the litigation, he has easily pleaded, at the very least, that the defendants should have known of the risk of forced labor. The defendants tout their expertise in manufacturing and labor in China—as well as their control over their supply chain and manufacturing, including strict quality control, specialized machines, and proprietary production techniques. They also tell the public that they conduct detailed audits of their supply chain because they are aware of the serious risk of forced labor in Chinese manufacturing. Either the defendants performed these audits, which would have alerted them to the forced labor or raised red flags a reasonable company wouldn't ignore. Or they did not, and they failed to exercise the care that even they recognize is due.

*Finally*, TTI tries to extricate itself by claiming that this Court lacks personal jurisdiction. But the production of goods for United States markets is the paradigmatic example of an activity that subjects a company to personal jurisdiction in the United States.

The defendants' motions to dismiss should be denied.

## BACKGROUND

### A.    Statutory background

**1.** At the dawn of the 21st century, Congress recognized that despite the many advances society had made over the past centuries, "slavery continue[d] throughout the world." Trafficking Victims Protection Act of 2000, Pub. L. No. 106-386, § 102(b)(2), 114 Stat. 1464, 1466.[1] Trafficking—both sex trafficking and forced labor—Congress explained, "is a modern form of slavery," imposed

---

[1] Unless otherwise specified, all internal citations, quotation marks, and alterations are omitted from quotations throughout this brief. All references to exhibits are exhibits to the Wang Declaration, submitted along with this response.

on hundreds of thousands of people a year. *Id.* § 102(b)(1). To combat this, Congress enacted the Trafficking Victims Protection Act with widespread bipartisan support.

Congress explained the purposes of the Act in the text of the statute itself. It explained that "[t]rafficking ... is not limited to the sex industry." *Id.* § 102(b)(3). Rather, "[t]his growing transnational crime also includes forced labor and involves significant violations of labor, public health, and human rights standards worldwide." *Id.* Congress stressed that while these are "transnational crime[s]" that often occur abroad, they have "national implications." *Id.* § 102(b)(3), (24). "[F]orced labor has an impact on the nationwide employment network and labor market." *Id.* § 102 (b)(12). If companies can use forced labor abroad to make goods sold in the United States, they will not hire American workers. And businesses that refrain from using forced labor will be unable to compete. Congress recognized that fighting this international blight required action at home and abroad. In enacting the TVPA, therefore, Congress not only established international initiatives to deter trafficking and aid its victims abroad; it also codified new criminal offenses prohibiting trafficking—including forced labor—to be enforced in American courts. *See, e.g.*, *id.* §§ 104, 106–107, 112; *see also id.* § 103(8) (defining "severe forms of trafficking" to include forced labor).

**2.** Since the TVPA's enactment, Congress has repeatedly expanded the offenses barred by the statute and victims' ability to enforce its prohibitions. In 2003, President George W. Bush signed into law the Trafficking Victims Protection Reauthorization Act of 2003. Pub. L. No. 108-193, 117 Stat. 2875. In the statute itself, Congress explained that "trafficking in persons continue[d] to victimize countless men, women, and children in the United States and abroad." *Id.* § 2(1). And efforts to combat trafficking abroad were stymied by "[c]orruption among foreign law enforcement authorities." *Id.* § 2(5). Among the "most important of the [statute's] provisions" was thus an amendment to the TVPA, authorizing victims of specified offenses (including forced labor) to bring

civil suits in United States courts. H.R. Rep. No. 108-264, pt. 2, at 11 (2003); Pub. L. No. 108–193, § 4(a)(4)(A), 117 Stat. 2875, 2878.

A few years later, Congress expanded the statute yet again. William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110–457, 122 Stat. 5044. Congress added an additional forced labor offense, specifically targeted at "Punishing Financial Gain from Trafficked Labor." *Id.* § 222(b)(3). While the statute has always prohibited forced labor, it now also prohibits "knowingly benefit[ting] … from participation in a venture which has engaged in the providing or obtaining of [forced labor]." *Id.* (codified at 18 U.S.C. § 1589(b)). Congress also amended the private right of action to explicitly state that victims of TVPA offenses may sue not only those who perpetrated the offense, but also those who benefited. *Id.* § 221(2)(a)(ii) (codified at 18 U.S.C. § 1595). These provisions deter forced labor by seeking to minimize the market for it, while at the same time "protect[ing] commercial entities that decline to benefit from forced labor and may be harmed by competition from products or services garnering implicit subsidies from forced labor." *Rodriguez v. Pan Am. Health Org.*, 29 F.4th 706, 716 n.5 (D.C. Cir. 2022).

At the same time, Congress amended the private right of action to allow victims of *any* criminal offense codified in the TVPA to bring suit. *Id.* (codified at 18 U.S.C. § 1595). And, as part of this same set of amendments, Congress expressly granted courts "extra-territorial jurisdiction over" most TVPA offenses, including forced labor, when "an alleged offender is a national of the United States" or "present in the United States." Pub. L. No. 110–457, § 1596, 122 Stat. 5044, 5071. This explicit grant of extraterritorial jurisdiction followed cases in which courts had dismissed civil TVPA suits on the ground that the statute required such a grant to apply extraterritorially. *Ratha v. Phatthana Seafood Co.*, 2016 WL 11020222, at *5 (C.D. Cal. 2016).

**3.** As it stands today, the TVPA not only bars forced labor, 18 U.S.C § 1589(a); section 1589(b) bars "knowingly benefit[ing] ... from participation in a venture which has engaged in [forced labor],

knowing or in reckless disregard of the fact that the venture has" done so. Section 1596 provides courts "extraterritorial jurisdiction" over these offenses if the offender is a U.S. national or "present in the United States." And section 1595 authorizes the victims of forced labor to "bring a civil action against the perpetrator []or whoever knowingly benefits ... from participation in a venture which that person knew or should have known" used forced labor.[2]

### B. Factual background

**1.** Milwaukee Tool is a well-known American power tool company headquartered in Brookfield, Wisconsin. Compl. ¶ 20. In addition to tools, Milwaukee Tool also sells work gloves. *Id.* ¶¶ 58–59. And while the company's competitors often "grab some [gloves] off the shelf, slap their logo on it, and say 'We have gloves now,'" Milwaukee Tool takes pride in controlling the design and manufacture of its gloves. *Id.* ¶ 59.

In 2005, Techtronic Industries Company Limited bought Milwaukee Tool. *Id.* ¶ 20. Although TTI is headquartered in Hong Kong, it has substantial United States operations. *Id.* ¶¶ 13, 21, 24–25. And, following the acquisition, Milwaukee Tool—although it is technically a subsidiary—no longer operates as an independent company, but instead as a division of TTI. *Id.* ¶ 26. "Both inside and outside of the United States, TTI and Milwaukee Tool are entangled in a way that blurs the line between where one company ends and the other begins, particularly with respect to Milwaukee Tool's supply chain and sourcing." *Id.*

When TTI acquired Milwaukee Tool, it sought to "deeply cut" the production costs on Milwaukee Tool gloves. *Id.* ¶ 7. It did so by shifting production to China—and once there, using forced labor. *Id.* ¶¶ 7, 63, 93. Laborers imprisoned at Chishan Prison in Hunan Province, China were

---

[2] At this stage, Mr. Xu does not rely on an argument that the defendants themselves engaged in forced labor (though he reserves the right to do so later if discovery shows that they did). Instead, he argues that he has plausibly alleged that they benefited from a venture engaged in forced labor.

forced to work seven days a week, 12 hours a day making Milwaukee Tool gloves. *Id.* ¶ 47. Because of this forced labor, U.S. Customs and Border Protection has now blocked the importation of Milwaukee Tool gloves manufactured by Shanghai Select, the Chinese company TTI and Milwaukee Tool work with to produce the gloves. *Id.* ¶ 6. Walmart stopped selling them. *Id.* ¶ 125. And TTI and Milwaukee Tool were investigated by the bipartisan Congressional-Executive Commission on China. *Id.* ¶¶ 5, 64; *see* Congressional-Executive Commission on China, *Hearing: Corporate Complicity: Subsidizing the PRC's Human Rights Violations*, https://perma.cc/3V7W-5DWQ, at 32 mins (Rep. Chris Smith describing the evidence of forced labor as "very, very damaging"). But before they were caught, using forced labor was tremendously profitable for TTI and Milwaukee Tool, allowing them to "deeply cut costs" by paying the workers who made their gloves almost nothing. *Id.* ¶¶ 7, 53.

**2.** Before their labor practices were subject to scrutiny, TTI and Milwaukee Tool "touted" their "ownership of the design and manufacturing processes." *Id.* ¶ 58. They pride themselves on "devoting more attention and care to the manufacturing process than [their] competitors," which includes "closely examin[ing] every detail [of] supply chain logistics." *Id.* ¶¶ 59, 94, 97–98. The defendants have policies that require them to ensure that forced labor is not being employed, and they "claim to carefully audit suppliers for forced labor." *Id.* ¶¶ 2, 100–04. Audits and investigations, they say, include risk assessments, site visits, and requiring documentation from suppliers. *Id.*

Here, the defendants' hands-on approach also included: "coordinat[ing] logistics with Shanghai Select and Chishan Prison"—including to export the gloves to the United States—as well as "establish[ing] a feedback loop with Shanghai Select and Chishan Prison to address quality control issues." *Id.* ¶¶ 46, 129. And because of the proprietary technology involved in making Milwaukee Tool gloves, the defendants "likely worked, directly or indirectly, with Shanghai Select and Chishan Prison on bespoke manufacturing processes." *Id.* ¶ 129.

**3.** Plaintiff Xu Lun was one of the workers forced to make Milwaukee Tool gloves at Chishan Prison. Mr. Xu was targeted by the Chinese government because he worked for a non-governmental organization that advocated for vulnerable populations within China, such as people with disabilities. *Id.* ¶ 36. He was convicted of "subversion of state power" and served part of his sentence at Chishan Prison. *Id.* ¶ 37.

Chishan Prison has its own manufacturing facilities, where prisoners are forced to make Milwaukee Tool gloves. *Id.* ¶ 35; *see also id.* ¶ 38 (detailing experience of another political prisoner sentenced to Chishan Prison and forced to labor making Milwaukee Tool gloves because of his pro-democracy advocacy). The prison has machines that are "specially designated to cut" Milwaukee Tool glove fabric. *Id.* ¶ 40. The gloves are emblazoned with the Milwaukee Tool logo, and their label lists Milwaukee Tool's Brookfield, Wisconsin address. *Id.* ¶¶ 40, 45. It was widely known among prisoners that the gloves were being made for export to the United States. *Id.* ¶ 45.

The conditions in the manufacturing facilities were grueling. The factories were cramped, lacked ventilation, and had no heating or air conditioning, which was particularly brutal in the hot, humid summers. *Id.* ¶¶ 48, 51. And they were constantly filled with fabric dust, which led many of the prisoners to develop respiratory problems. *Id.* ¶ 49. The prisoners were forced to work 11–13 hour days, every day, with only 1–3 days off per month. *Id.* ¶ 47. They were not allowed to talk freely or even use the bathroom whenever they needed to. *Id.* ¶ 51. And despite operating dangerous machinery, they were not given any safety training, so workplace injuries were common. *Id.* ¶ 52.

Each laborer had to meet a daily production quota. *Id.* ¶ 43. For example, workers cutting fabric had a daily quota of 450–500 pairs; those sewing gloves were required to make 200 pairs a day. *Id.* Prisoners who refused to work, did not work hard enough, or did not meet their daily quota, were punished. *Id.* ¶ 54. Some of the lightest punishments included being forced to squat for long periods of time, banned from family visitation, or forbidden to use the bathroom. *Id.* More severe punishment

included solitary confinement, beatings, and electric shocks. *Id.*

Once he was finally released, Mr. Xu filed this lawsuit against Milwaukee Tool and TTI, alleging that the companies' use of forced labor violates the Trafficking Victims Protection Act.

## LEGAL STANDARD

"When deciding a Rule 12(b)(6) motion to dismiss, the Court must accept all well-pleaded facts as true and draw reasonable inferences in the non-movant's favor" to determine if the claims are "plausible." *Boyland Auto Grp. III LLC v. Boyland*, 691 F. Supp. 3d 917, 920 (E.D. Wis. 2023). "In deciding whether a complaint can survive a motion to dismiss, [the Seventh Circuit] ha[s] consistently said: As a general rule ... notice pleading remains the standard." *Bausch v. Stryker Corp.*, 630 F.3d 546, 559 (7th Cir. 2010). "Pursuant to Rule 8, pleading is meant to focus litigation on the merits of a claim rather than on technicalities that might keep plaintiffs out of court." *Id.*

"Under [this] liberal notice pleading regime embraced by the federal rules, a civil complaint should not become a dissertation"; it is sufficient if "the operative complaint alerts the defendants to the nature of that claim and alleges enough to render it plausible." *Boyland*, 691 F. Supp. 3d at 921; *see also Foren v. LBC Optics Inc.*, No. 23-cv-00095 (BHL), 2023 WL 3752187, at *2–3 (E.D. Wis. 2023). And "Rule 8 does not require [a plaintiff] to detail proof she does not yet have." *Foren*, 2023 WL 3752187, at *2–3.

## ARGUMENT

### I.  The TVPA, a statute that targets the transnational phenomenon of human trafficking and forced labor, does not stop at the Nation's borders.

The defendants claim that they cannot be held accountable for profiting from Mr. Xu's forced labor because it took place in China. But as the vast majority of courts to address this question have concluded, the TVPA—a statute that expressly targets forced labor both at home and abroad—does not immunize companies from civil liability just because they outsource their forced labor overseas.

In evaluating extraterritoriality, courts apply a "two-step framework." *Motorola Sols., Inc. v. Hytera Commc'ns Corp.*, 108 F.4th 458, 480 (7th Cir. 2024). "At the first step, courts should ask ... whether the statute gives a clear, affirmative indication that it applies extraterritorially." *Id.* If it does, that ends the inquiry; the statute applies extraterritorially. But if not, "courts should proceed to the second step: determining whether the conduct relevant to the statute's focus occurred in the United States or in a foreign country." *Id.* at 473. If conduct relevant to the statute's focus occurred in the United States, then the claim is not extraterritorial—even if the suit also relies on conduct committed abroad. *Id.*

Here, Mr. Xu's claim may proceed under either step. At step one, the TVPA clearly indicates that its civil cause of action for a wide range of transnational trafficking offenses does not stop at the Nation's borders. But even if that were not the case, under step two, Mr. Xu's claim is not extraterritorial. He seeks to hold the defendants accountable for the *domestic* benefit they received from their *United States-based* venture to profit off their forced-labor-made gloves by selling them in the United States. Either way, this suit should proceed.

### A. Congress clearly indicated that the TVPA—including its civil cause of action—applies extraterritorially.

At the first step of the extraterritoriality analysis, courts employ "the usual tools of statutory interpretation" to determine whether there is "a clear, affirmative indication that [the statute] applies extraterritorially." *Motorola Sols., Inc.*, 108 F.4th at 480–82. That includes text, "statutory context," and "[c]ongressionally enacted legislative purposes and findings." *Id.* at 482–83. Here, there is no real dispute that the TVPA's prohibitions on forced labor and on benefitting from that forced labor apply extraterritorially. After all, section 1596 says so. 18 U.S.C. § 1596 (providing "extraterritorial jurisdiction" over the forced labor offenses in § 1589). Instead, the defendants argue that section 1596 only applies when the forced labor offenses are criminally enforced, not when a victim brings a civil

enforcement action. Most courts have rejected this argument. And with good reason: The text, context, purpose, and history of the statute all confirm that courts have extraterritorial jurisdiction over forced-labor claims, regardless of whether they are criminal or civil.

**1.** Start with the text. The TVPA's private right of action states: "An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator" or beneficiaries of the violation. 18 U.S.C. § 1595(a). "[T]his chapter" means chapter 77, the chapter setting forth the trafficking offenses criminalized by the TVPA. And these offenses all apply extraterritorially. For example, one predicate offense prohibits seizing persons "on any foreign shore" with "intent to make that person a slave." 18 U.S.C. § 1585. Another TVPA provision authorizes the extraterritorial application of any predicate offense committed abroad by a federal employee. 18 U.S.C. § 3271(a). And, most relevant here, section 1596 provides "extraterritorial jurisdiction" over several offenses, including forced labor, when "an alleged offender" is a U.S. national or "present in the United States."

By providing victims a right to sue for the violation of any of the TVPA's offenses, the TVPA's private right of action "clearly and directly incorporates" extraterritorial predicates. *Roe v. Howard*, 917 F.3d 229, 242 (4th Cir. 2019). As the Supreme Court has explained, that is "a clear, affirmative indication that [a statute] applies to foreign conduct." *RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325, 339 (2016). In *RJR*, for example, the Court considered whether RICO's criminal prohibition on employing a pattern of racketeering activity is extraterritorial. *Id.* at 331, 338. Although the prohibition does not explicitly state that it applies extraterritorially, it defines racketeering activity to "include a number of predicates that plainly apply to at least some foreign conduct." *Id.* at 338. The Court held that this direct incorporation of extraterritorial predicates is an "obvious textual" indication that where the underlying predicate applies extraterritorially, so too does the prohibition on racketeering activity that incorporates it. *Id.*

The same is true here. As the Fourth Circuit has held, "pursuant to *RJR Nabisco*, Congress's incorporation of ... extraterritorial predicates into § 1595"—the TVPA's private right of action— "gives a clear, affirmative indication that § 1595 provides a civil remedy for the foreign conduct" the statute prohibits. *Roe*, 917 F.3d at 242. The Fifth Circuit has come to the same conclusion. *Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184, 204–05 (5th Cir. 2017). So too have "the overwhelming majority" of lower courts. *Ratha v. Phatthana Seafood Co.*, 2016 WL 11020222, at *6 (C.D. Cal. 2016) (citing cases); *United States ex rel. Hawkins v. ManTech Int'l Corp.*, --- F. Supp. 3d ----, 2024 WL 4332117, at *10 (D.D.C. 2024); *C.T. v. Red Roof Inns, Inc.*, 2021 WL 602578, at *4 (S.D. Ohio 2021); *Abafita v. Aldukhan*, 2019 WL 6735148, at *5 (S.D.N.Y. 2019); *Aguilera v. Aegis Commc'ns Grp., LLC*, 72 F. Supp. 3d 975, 978–79 (W.D. Mo. 2014); *Adhikari v. Daoud & Partners*, 697 F. Supp. 2d 674, 683 (S.D. Tex. 2009).[3]

**2.** In the face of this broad consensus, the defendants rely entirely on a single unpublished district court case that opined on extraterritoriality only after it had already concluded that it did not have jurisdiction to reach the question. *See Doe I v. Apple Inc.*, 2021 WL 5774224, at *1, *5 (D.D.C. 2021), *aff'd on other grounds*, 96 F.4th 403 (D.C. Cir. 2024). That case, *Doe I*, has been rejected even in its own circuit, *Hawkins*, 2024 WL 4332117, at *10—and no court of appeals (or any other court) has ever adopted its reasoning. That's because it, and the defendants' arguments relying on it, misconstrue both the text of the TVPA and Supreme Court case law. *See id.* at *11–12.

As an initial matter, *Doe I*, and the defendants relying on it, assert that the private cause of action in section 1595 does not itself explicitly mention extraterritoriality. But as both the Supreme Court and the Seventh Circuit have explained, "an express statement of extraterritoriality is not

---

[3] The only one of these cases that the defendants even mention is *Hawkins*, which Milwaukee Tool (at 11 n.6) tries to distinguish because it involved a claim against government contractors. But civil claims involving government contractors are brought using the private right of action in § 1595, just like every other civil TVPA claim.

essential." *RJR*, 579 U.S. at 340; *Motorola*, 108 F.4th at 481. And, in any event, Congress expressly granted courts extraterritorial jurisdiction over the TVPA's forced labor offenses, without limiting that express grant of authority to criminal actions. 18 U.S.C. § 1596. The private right of action enforces those offenses.

The defendants, again relying on *Doe I*, argue that section 1596's grant of extraterritorial jurisdiction applies only to criminal enforcement. In reaching that conclusion, *Doe I* emphasized that section 1596 provides jurisdiction over TVPA "offenses," which the court concluded must mean only criminal offenses. 2021 WL 5774224, at *15. The district court's argument is nearly word-for-word the argument that the Seventh Circuit recently rejected in *Motorola*. 108 F.4th at 485–86. The question in that case was whether the private right of action that Congress added to the Defend Trade Secrets Act—which had previously contained only criminal prohibitions—applied extraterritorially. As here, the provision authorizing a private right of action did not itself mention extraterritoriality. *Id.* at 481. But a separate provision, enacted well before the statute contained a private right of action, stated that "[t]his chapter ... applies to conduct occurring outside the United States if … an act in furtherance of the offense was committed in the United States." *Id.* at 482.

Like the defendants here (and *Doe I*), the defendant in *Motorola* argued that the use of the word "offense" meant that the statute granted extraterritorial jurisdiction only for criminal enforcement. *Id.* at 485. The Seventh Circuit held otherwise. The term "offense," the court explained, can "denote a civil violation." *Id.* And nothing in the statutory text or context indicated that the extraterritoriality provision should not be read in accordance with its text. *See id.*

Here, there is even stronger evidence that Congress did not intend to hide a limitation of its express grant of extraterritorial jurisdiction in the word "offense." The TVPA's "*civil* provision" itself "uses the term[ ] 'offense'" to refer to the basis for *civil* claims. *Hawkins*, 2024 WL 4332117, at *12 n.16 (emphasis added); *see* 18 U.S.C. § 1595(c) (providing that the statute of limitations for a *civil* suit

is "10 years after the victim reaches 18 years of age, if the victim was a minor at the time of the alleged *offense*" (emphasis added)); *see also id.* §1595(a) (referring to civil suits against "the perpetrator")). That makes sense, given the structure of the TVPA: It provides a series of predicate "offenses" that are both criminally and civilly enforceable.

This structure also explains why *Doe I* was wrong to conclude that because the TVPA's extraterritoriality provision does not explicitly call out section 1595, the private right of action must not be extraterritorial. *See* 2021 WL 5774224, at *15. Again, the extraterritoriality provision grants extraterritorial jurisdiction over a list of predicate offenses. 18 U.S.C. § 1596. It does not limit that jurisdiction based on how those offenses are brought into court. Therefore, it didn't need—and it "would not have made sense"—to *also* grant extraterritorial jurisdiction over section 1595. *Hawkins*, 2024 WL 4332117, at *11 (explaining that section 1596 "listed 'offenses' over which courts would have extraterritorial jurisdiction, and section 1595 is not an 'offense'"—it's a cause of action). By its terms, it authorizes extraterritorial jurisdiction over the listed offenses, regardless of whether the cause of action is civil or criminal. *See id.*; *Ratha*, 2016 WL 11020222, at *6 ("To hold that the jurisdictional grant of Section 1596 excludes the remedies provided in Section 1595 would be … illogical.").

Finally, the defendants contend that their argument is supported by the Supreme Court's decision in *RJR*. But this contention, too, runs headlong into binding Seventh Circuit precedent rejecting a nearly identical argument for "misreading[ ]" the Supreme Court's decision. *Motorola*, 108 F.4th at 484. In *RJR*, the Supreme Court held that although RICO's criminal racketeering provision is extraterritorial, its civil cause of action is not. *RJR*, 579 U.S. at 349. Unlike the criminal provision, RICO's civil cause of action "does not *directly* incorporate any extraterritorial predicates"—it references the racketeering provision, which in turn incorporates other statutes, some of which are extraterritorial—and "makes no reference to any extraterritorial provision whatsoever." *Roe*, 917 F.3d at 243 (emphasis added). RICO's civil cause of action contained "limiting language as to the types of

damages available for civil claims" that "limited [its] extraterritorial reach ... as compared to its criminal provisions." *Motorola*, 108 F.4th at 483. And the statute contained no other language "that could sustain its extraterritorial application." *Roe*, 917 F.3d at 243.

As the Seventh Circuit made clear in *Motorola*, 108 F.4th at 483–84, *RJR* stands for the proposition that *under those circumstances*, "something more" is required, *RJR*, 579 U.S. at 350. As in *Motorola*, none of those circumstances are true here. Unlike RICO, but similar to the statute in *Motorola*, the TVPA expressly grants courts extraterritorial jurisdiction over "offense[s]" under the statute. 18 U.S.C. § 1596. The TVPA's private cause of action *directly* incorporates its extraterritorial predicates. *Roe*, 917 F.3d at 242–43. And it contains no language limiting the remedies available when offenses are civilly enforced. Under *Motorola*, and *RJR* itself, that's sufficient to render it extraterritorial. *See id.*; *Motorola*, 108 F.4th at 483–84.

**3.** But even if something more were needed, "the purpose, structure, history, and context of the TVPA all support" the conclusion that it authorizes courts to hear civil suits for extraterritorial offenses. *Roe*, 917 F.3d at 242. That starts with the private right of action itself. Not only does it directly incorporate extraterritorial offenses, it authorizes "victim[s]" of those offenses to bring suit. 18 U.S.C. § 1595. Throughout the statute, the word "victim" is used to mean both domestic and foreign victims of both domestic and foreign trafficking. *See, e.g.*, 18 U.S.C. §§ 1583(b)(1), 1594(f), 1595; *see also* Pub. L. No. 106–386 § 103(14), 114 Stat. 1464, 1471.

That accords with Congress's express findings and statements of purpose, enacted into the text of the statute itself. *See Motorola*, 108 F.4th at 482 ("Congressionally enacted legislative purposes and findings are part of a statute's text, and thus are one permissible indicator of meaning for courts."). "The TVPA's stated purpose and accompanying congressional findings demonstrate that Congress enacted it to address the problem of human trafficking 'throughout the world.'" *Roe*, 917 F.3d at 242 (quoting Pub. L. No. 106-386, §§ 101–102, 114 Stat. 1464, 1466–69). The TVPA also

"contains numerous provisions authorizing funds and programs to support international efforts to address [this] global problem." *Id.* (citing 22 U.S.C. §§ 7104(c), 7105). And when Congress expanded the civil cause of action in 2008, it further expanded such programs. *See* Pub. L. No. 110–457, § 103(i), 122 Stat. 5044, 5046 (adding "additional measures to prevent and deter trafficking" "in foreign countries," more "assistance for *victims* of trafficking in other countries" (emphasis added)). Thus, "it is clear that Congress was concerned with actions taking place outside of the United States." *Motorola*, 108 F.4th at 483. Extraterritorial reach makes sense for a statute Congress expressly enacted to combat the "significant violations of labor, public health, and human rights standards worldwide." Pub. L. No. 106–386, § 102(b)(3), 114 Stat. 1464, 1466.

The TVPA's statutory history also shows Congress repeatedly amending it to ensure that courts would apply it extraterritorially. After courts in civil cases had construed the statute to only apply to domestic conduct, Congress enacted section 1596 to expressly grant courts "extra-territorial jurisdiction over" a wide range of predicate offenses, including forced labor. 18 U.S.C. § 1596(a). Congress simultaneously expanded the civil cause of action to cover several of those predicates for the first time. Pub. L. No. 110–457, § 221, 122 Stat. 5044, 5067 ("Enhancement of Civil Action" extending the cause of action to all violations of Chapter 77). Congress also amended both section 1589's prohibition on forced labor and section 1595's cause of action to make clear that the statute applied not just to direct perpetrators but also to beneficiaries of TVPA violations. *Id.*; *see also supra* 4–5. This "detailed line-editing … indicates that Congress carefully" crafted the statute to ensure that all of the provisions—including the extraterritoriality provision and the private right of action— worked together as part of a unified scheme to deter and punish what it had recognized was a transnational affliction. *Motorola*, 108 F.4th at 485.

The Seventh Circuit recently cautioned courts evaluating extraterritoriality not to "interpret federal statutes to negate their own stated purposes." *Id.* at 482. "Viewed as a whole, the TVPA

represents a far-reaching congressional effort to combat transnational human trafficking on numerous fronts, including by expanding the civil claims and remedies available to its victims." *Roe*, 917 F.3d at 242; *see also Hawkins*, 2024 WL 4332117, at *10; *Ratha*, 2016 WL 11020222, at *5–6. Because "Congress was clearly concerned with international rather than purely domestic matters," "unduly limiting" victims' ability to bring extraterritorial civil suits "risks frustrating its animating purpose"—not to mention violating its textual command. *Roe*, 917 F.3d at 242.[4]

**B.  This suit seeks only to hold the defendants accountable for their domestic conduct as beneficiaries of forced labor.**

Even if the TVPA's extraterritoriality provision could be atextually limited to criminal suits, Mr. Xu's claim here could nevertheless proceed because he does not seek to apply the statute extraterritorially.[5] A statutory claim is not extraterritorial where "conduct relevant to the statute's focus occurred in the United States." *Motorola*, 108 F.4th at 473. This does not require that *all* the conduct occur in the United States, just "conduct relevant to the statute's focus." *RJR Nabisco*, 579 U.S. at 337. Here, Mr. Xu seeks to enforce provisions of the TVPA focused on prohibiting *benefitting from a venture* that uses forced labor. He has plausibly alleged that conduct relevant to that focus occurred in the United States.

**1.** "The focus of a statute is the object of its solicitude, which can include the conduct it seeks to regulate, as well as the parties and interests it seeks to protect or vindicate." *WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407, 414 (2018). In making this determination, courts "do not analyze

---

[4] Milwaukee Tool argues (at 11) that Congress has somehow acquiesced to *Doe I*'s interpretation because Congress could have amended the TVPA. But Congress didn't need to amend the statute to add an extraterritoriality provision that—as every other court has recognized—was already there, particularly not in response to dictum in an unpublished district court opinion.

[5] Courts also have "discretion" to begin with the second step of the analysis, if this would result in a more limited holding. *WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407, 413 (2018).

the provision at issue in a vacuum." *Id.* "If the statutory provision ... works in tandem with other provisions, it must be assessed in concert with those other provisions." *Id.*

The Supreme Court's decision in *WesternGeco* illustrates this analysis. There, the plaintiff sought to enforce the damages provision of the Patent Act, which provides that "the court shall award the claimant damages adequate to compensate for the infringement." *Id.* at 414. The Court explained that the "overriding purpose" of this provision "is to afford patent owners complete compensation for infringements." *Id.* It concluded, therefore, that the "focus" of the provision is "the infringement." *Id.* But that conclusion did not "fully resolve th[e] case," because "the Patent Act identifies several ways that a patent can be infringed." *Id.* at 415.

"To determine the focus of [the damages provision] in a given case," the Court held, "we must look to the type of infringement that occurred." *Id.* at 415. The Court explained that without consulting the underlying source of liability, "it would be impossible to accurately determine whether the application of the statute in the case is a domestic application." *Id.* at 414. There, the underlying infringement was supplying components "in or from the United States" to be combined into an infringing product outside of the United States. *Id.* at 415 (quoting 35 U.S.C. § 271(f)(2)). So, although the plaintiff sued for damages incurred from lost foreign sales, the Court held that it sought a domestic application of the statute. *Id.* at 412. The conduct relevant to the statute's focus—to the substantive liability the plaintiff sought to enforce—occurred in the United States.

**2.** So too here. Mr. Xu brings his claim under section 1595, the TVPA's private right of action. But like the damages provision in *WesternGeco*, section 1595 is "merely the means by which the [TVPA] achieves its end of remedying" substantive violations of the statute. *Id.* at 416. So "[t]o determine the focus of [section 1595] in a given case, we must look to the type of [predicate violation] that occurred." *Id.* at 415.

The predicate violation here comes from section 1589, which contains two subsections. Subsection (a) prohibits engaging in forced labor, such as by "obtain[ing] the labor or services of a person … by means of force." 18 U.S.C. § 1589(a). The focus of that section is obtaining forced labor. Subsection (b), however, has a different focus: It is centered not on obtaining forced labor, but on *benefitting* from it. It applies to "[w]hoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in" forced labor. 18 U.S.C. § 1589(b). Here, Mr. Xu relies on subsection (b). In that provision, "benefits" is the operative verb that makes out a violation. *Id.*; *see Rodriguez*, 29 F.4th at 716 (concluding that the "financial benefit" is the "gravamen" of suit under section 1589(b)). As a result, the focus of the provision is benefiting from participation in a venture engaged in forced labor. *See WesternGeco*, 585 U.S. at 414.

This is confirmed by the statutory history. The original version of section 1589 only included what is now subsection (a), the prohibition on obtaining forced labor. But in 2008, in an amendment titled "Punishing Financial Gain from Trafficked Labor," Congress added subsection (b), the prohibition on benefiting from a venture that uses forced labor, Pub. L. No. 110–457, § 1583(b)(3) 122 Stat. 5044, 5068. This amendment was part of a concerted effort by Congress to deter trafficking by punishing its beneficiaries. The same statute also extended the TVPA's private right of action beyond direct perpetrators to "whoever knowingly benefits, or attempts or conspires to benefit" from "a venture" involved in TVPA violations, 18 U.S.C. § 1595(a). This focus on the beneficiaries of forced labor gives effect to Congress's concern that "forced labor has an impact on the nationwide employment network and labor market." Pub. L. No. 106–386, § 102(b)(12), 114 Stat. 1464, 1467. As the D.C. Circuit explained, Section 1589(b) "protects commercial entities that decline to benefit from forced labor and may be harmed by competition from products or services garnering implicit subsidies from forced labor." *Rodriguez*, 29 F.4th at 716 n.5.

The defendants acknowledge that the relevant "focus" of the statute, for purposes of determining whether Mr. Xu's claim is extraterritorial, is dictated by the alleged statutory violation. MT Br. 12. But they seem to assume that the violation is forcing Mr. Xu to labor. The violation Mr. Xu relies on here, however, is benefiting from a venture that uses forced labor. Under the Supreme Court's decision in *WesternGeco*, then, Mr. Xu's claim is a domestic application of the statute if he alleges that conduct related to benefiting from a venture occurred domestically.[6]

**3.** Applying that proper focus here, Mr. Xu has sufficiently alleged that "the conduct relevant to the statute's focus occurred in the United States," and therefore "the case involves a permissible domestic application even if other conduct occurred abroad." *RJR*, 579 U.S. at 337. Milwaukee Tool is a U.S. company headquartered in Wisconsin. Compl. ¶ 20. After its gloves were produced with forced labor, they were shipped "to Milwaukee Tool in the United States." *Id.* ¶ 46. After receiving those shipments, Milwaukee Tool sold the gloves into its "largest market": "the United States." *Id.* ¶ 20. By selling into this large, domestic market, Milwaukee Tool reaped the benefits of its "lower labor costs" from forced labor. *Id.* ¶¶ 91–93. It was therefore in the United States that Milwaukee Tool "benefit[ted] financially" *and* "by receiving anything of value, from participation in a venture which has engaged in" forced labor. 18 U.S.C. § 1589(b). Even the defendants admit as much. MT Br. 29 ("The only 'benefit' that Milwaukee Tool could have possibly received is the profits on the gloves that it sold.").

Similarly, TTI benefitted from these reduced labor costs through domestic sales of Milwaukee Tool's products. Milwaukee Tool is TTI's "largest and highest-margin business" and its "flagship

---

[6] The defendants cite a couple of unpublished district court cases, but neither case analyzed 1589(b). And even the defendants' own case recognized that for other TVPA predicates "a domestic actor may participate so substantially in a trafficking scheme abroad that its activities come within the focus of Congress's concern" and constitute a domestic application. *Adhikari v. KBR Inc.*, 2017 WL 4237923, at *4 (S.D. Tex. 2017). "To hold otherwise would be to reward the scheme's mastermind for constructing layers of legal and organizational insulation." *Id.*

brand." Compl. ¶¶ 13, 82. The companies are so closely intertwined that Milwaukee Tool effectively operates as a division of TTI. *Id.* ¶ 26. Indeed, TTI bought Milwaukee Tool in order to profit from the American sales of goods made cheaply overseas. *Id.* ¶¶ 7, 20, 90–91. TTI reaped the profits of forced labor in the same places and in the same manner as Milwaukee Tool: through shipments of Milwaukee Tool gloves to the United States and sales of those gloves into the large, domestic market. *See id.* ¶¶ 20, 45, 91–93. Accordingly, TTI domestically "benefit[ted], financially or by receiving anything of value, from participation in a venture which has engaged in" forced labor. 18 U.S.C. § 1589(b).

## II. Mr. Xu has sufficiently pleaded that the defendants are liable under the TVPA.

Turning to the merits of Mr. Xu's claim, at this early stage of the litigation, he has more than sufficiently pleaded that the defendants are liable as beneficiaries of a venture that engaged in forced labor. TTI and Milwaukee Tool worked together to profit by manufacturing Milwaukee Tool gloves overseas for sale in the United States. And the defendants cannot seriously dispute that the complaint adequately alleges their glove production relied on forced labor. Compl. ¶¶ 3, 6, 33, 35, 37, 39, 40–60, 126–29.[7]

As explained above, the TVPA imposes liability on the beneficiaries of forced labor in two ways: First, it specifically prohibits—as an offense under the statute—benefitting from a venture that engages in forced labor, 18 U.S.C. § 1589(b). And, second, the TVPA's private cause of action authorizes victims to sue anyone who benefits from a venture that commits *any* TVPA violation, including forced labor. 18 U.S.C. § 1595(a). Either way, a defendant is liable if it: (A) "participat[ed]"

---

[7] The closest the defendants come to disputing this is their invocation of the possibility that the gloves Mr. Xu was forced to produce were "counterfeit." MT Br. 6, 15, 23. But Mr. Xu provided allegations supporting the inference that the gloves were shipped to Milwaukee Tool, *see, e.g.*, Compl. ¶ 46, and the defendants are effectively requesting an inference *against* Mr. Xu with no basis the complaint.

in a "venture" that engaged in forced labor; (B) "knowingly benefit[ted]" from its participation in that venture; and (C) either recklessly disregarded the risk of forced labor (under 1589(b)) or was negligent with respect to that risk (under 1595(a)).

Taking "all well-pleaded facts as true and draw[ing] reasonable inferences in [Mr. Xu's] favor," his detailed allegations as to each element of a TVPA claim are more than sufficient to "alert[] the defendants to the nature of that claim and allege[] enough to render it plausible." *Boyland*, 691 F. Supp. 3d at 921. Many of the defendants' arguments to the contrary are expressly foreclosed by recent Seventh Circuit precedent. And all of them are contrary to how both the Seventh Circuit and this Court have articulated the standard for a motion to dismiss.

### A.      Mr. Xu has sufficiently pleaded that the defendants participated in a venture.

**1.** As the Seventh Circuit recently explained, the TVPA's venture requirement is not demanding. *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 554 (7th Cir. 2023). At most, it requires a "group of two or more individuals associated in fact, whether or not a legal entity." *Id.* Although Milwaukee Tool suggests (at 17, 19) that the venture must specifically be a "trafficking venture," the Seventh Circuit has squarely held otherwise. *Id.* As the court explained, while an international trafficking ring is certainly a venture, a venture can also be an ordinary "*commercial* venture like running or expanding a business." *Id.* There can be little doubt that this definition is met here. Milwaukee Tool, TTI, their Chinese contractor Shanghai Select, and Chishan Prison were all "associated in fact" (and through a series of contracts) in the "commercial venture" of manufacturing Milwaukee Tool gloves in China to be sold in the United States. *Id.*; *see* Compl. ¶ 3, 34–60, 81–89, 126–28.[8]

---

[8] The defendants rely heavily on the Eleventh Circuit's decision in *Red Roof*, but the Seventh Circuit distinguished that case, explaining that in *Red Roof* "the plaintiffs had *chosen* to define the alleged venture … as a 'sex trafficking' venture." *G.G.*, 76 F.4th at 561–62 (emphasis added).

**2.** Mr. Xu has adequately alleged that the defendants participated in this venture. The Seventh Circuit instructs that participation "requires only a desire to promote the wrongful venture's success." *Id.* at 559. Because "the venture in question need not be primarily" a forced labor venture, it is sufficient that the defendants seek to promote the success of the broader "commercial venture." *Id.* at 554, 559. And "[t]o survive a motion to dismiss, *all that is necessary* is for a plaintiff to allege … a continuous business relationship, which gives rise to an inference, drawn in the plaintiff's favor, that the civil defendant facilitated the venture's success." *Id.* at 560 (emphasis added).

Mr. Xu has amply alleged "a continuous business relationship." TTI purchased Milwaukee Tool "to take advantage of TTI's expertise in low-cost, high-quality manufacturing in [China] and pair it with Milwaukee Tool's premium brand power to create a high-margin business." Compl. ¶ 90. The defendants then "sought out a partner"—Shanghai Select—to assist them in cheaply producing their gloves, *G.G.*, 76 F.4th at 559–60, which arranged for their production at Chishan Prison. Compl. ¶¶ 44-46, 128. The "[d]efendants depended heavily on Shanghai Select and Chishan Prison for the gloves." *Id.* ¶ 128. And, in turn, Shanghai Select and Chishan Prison depended heavily on the defendants for their business. *Id.* ¶¶ 46, 128.

Contrary to the defendants' assertions, Mr. Xu does not allege that they simply purchased off-the-shelf goods in an "arm's length, passive" transaction, *G.G.*, 76 F.4th at 563. MT Br. 20; TTI Br. 26. From start to finish, the defendants were highly involved with the venture of producing Milwaukee Tool gloves in China for sale in the United States. Unlike an off-the-shelf product, "the gloves bore the Milwaukee Tool logo." Compl. ¶¶ 37, 39, 106. In the words of a Milwaukee Tool executive: "A lot of companies would go out, grab some products off the shelf, slap their logo on it, and say, 'We have gloves now.' Obviously at Milwaukee [Tool] that's not our approach and never will be our approach." *Id.* ¶ 59. Instead, Milwaukee Tool "tout[s]" their "ownership of the design and manufacturing processes." *Id.* ¶ 58. Mr. Xu and other political prisoners were forced to produce

gloves using designs patented by Milwaukee Tool, "proprietary knitting" techniques, and machines "specially designated to cut fabric to make Milwaukee Tool gloves." *Id.* ¶¶ 40, 61–62. "[G]iven the specific designs of the gloves and the propriety technologies involved in making Milwaukee tool gloves, Defendants likely worked, directly or indirectly, with Shanghai Select and Chishan Prison on bespoke manufacturing processes." *Id.* ¶ 129.

TTI also "closely examine[s] every detail from design engineering to supply chain logistics," and Milwaukee Tool takes a "hands-on approach to innovative and high-quality … manufacturing." *Id.* ¶¶ 97–98. To that end, the defendants "established a feedback loop with Shanghai Select and Chishan Prison to address quality control issues." *Id.* ¶ 129. Reflecting this, "the Milwaukee Tool gloves … were subject to more stringent quality control standards than some of the other products being produced at Chishan Prison." *Id.* ¶ 45. Finally, the "[d]efendants also coordinated logistics with Shanghai Select and Chishan Prison," including to export the gloves to Milwaukee Tool in the United States. *Id.* ¶¶ 46, 129.

**2.** This degree of the defendants' involvement and control easily refutes their arguments. In the primary case on which they rely, the defendant was just "purchasing a commodity, without more" by buying cobalt on the open market. *Doe 1 v. Apple Inc.*, 96 F.4th 403, 416 (D.C. Cir. 2024). Indeed, the D.C. Circuit emphasized that there were no allegations that the companies in that case had "a contractual right to inspect and control [their] suppliers." *Id.* That is the opposite of this case, where the defendants not only have such a right but claim to act on it. Compl. ¶¶ 100–105. Nor was the defendants' involvement here akin to the "Postal Service" delivering "mail." MT Br. 18–19.

Instead, the facts here are more akin to the facts in *G.G.* where the defendant software company, Salesforce, provided assistance to a website involved in sex trafficking, Backpage. 76 F.4th at 560. Salesforce engaged in "targeted" assistance reflecting "the needs of Backpage's business" and

"provided active, ongoing support that was tailored to those needs." *Id.* The same kind of continuing relationship, interdependence, support, and feedback loop existed here.

The defendants argue that participation requires "a common undertaking or enterprise involving risk and potential profit." MT Br. 21 (quoting *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 725 (11th Cir. 2021)). While the Seventh Circuit did not adopt this standard, *G.G.*, 76 F.4th at 562, it would be easily met here. The defendants "shared business risk of profit and loss with Shanghai Select and Chishan Prison." Compl. ¶ 129. This venture was "lucrative" for the participants. *G.G.*, 76 F.4th at 560. Milwaukee Tool, TTI's "flagship brand" and primary source of revenue, was able to "deeply cut costs." Compl. ¶¶ 7, 29, 53, 82, 93. Shanghai Select received contracts for producing large quantities of valuable Milwaukee Tool products. *Id.* ¶¶ 44–46, 127–28. For Chishan Prison, Shanghai Select was "an important customer." *Id.* ¶ 44. And the participants in this venture also bore shared risks. If the outsourcing was unable to maintain high quality standards, Milwaukee Tool's and TTI's brand and sales would be in danger. *Id.* ¶ 126. Shanghai Select and the prison would be at risk of losing their customer. It is no wonder that the defendants "established a feedback loop … to address quality control issues," causing "Shanghai Select [to send] representatives to the prison to monitor production and conduct quality control." *Id.* ¶¶ 44, 129.

**3.** Finally, the defendants claim that they cannot have participated in the venture because TTI contracted with Shanghai Select through its subsidiary, TTI Trading. TTI Br. 17; MT Br. 20. But a venture often involves "two or more individuals," which need only be "associated in fact, whether or not a legal entity." *G.G.*, 76 F.4th at 554. Nor must there be a direct connection between every participant— "a company [that] helped a drug kingpin" need not be connected to "pushing drugs in a particular market," much less the dealers themselves. *Id.* at 561. "'[P]articipation' does not require getting your hands dirty." *Id.* A defendant need only participate in the unlawful "venture *as a whole.*" *Id.* Further, "TTI Trading is a company on paper" only: "[I]t has no separate facilities or operations

or personnel or business from TTI," "it has a mere two Hong Kong Dollars (or 26 cents, in USD) in registered capital," "[i]t shares an address and phone number with TTI, and it has overlapping officers and directors with TTI." Compl. ¶¶ 14–19. If contracting for forced labor through such a wholly owned subsidiary were sufficient to defeat TVPA liability, that would "reward the scheme's mastermind for constructing layers of legal and organizational insulation." *Adhikari*, 2017 WL 4237923, at *4.

### B. The defendants' arguments that they did not "knowingly benefit" from the venture are foreclosed by Seventh Circuit precedent.

The defendants do not dispute that they knowingly benefited from producing gloves in China for sale in the United States. Instead, relying on a single out-of-circuit district court decision, they argue that this element also requires that they specifically knew of the "causal relationship" between the venture's use of forced labor and their profit. MT Br. 29 (quoting *Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 169 (S.D.N.Y. 2019)). This exact argument is—once again—foreclosed by the Seventh Circuit, which held that it has "no footing in the statutory text." *G.G.*, 76 F.4th at 564–65. Rather, a defendant need only be "aware that it was benefitting in some way from its participation in the *venture*." *Id.* at 564 (emphasis added); *see id.* at 565 (holding that benefiting from business contracts is sufficient). The defendants do not—and could not—contest that they were.

### C. Mr. Xu has plausibly alleged that the defendants acted recklessly, or at the very least negligently, as to the risk of forced labor.

Drawing all reasonable inferences in his favor, Mr. Xu has also sufficiently alleged that the defendants acted with reckless disregard—or at the very least negligence—of the risk that forced labor was being used to produce their gloves. In arguing to the contrary, the defendants portray Mr. Xu's 40-page complaint with detailed allegations about TTI and Milwaukee Tool's supply chain and labor practices as if it contained just a single allegation: that everyone knows that manufacturing in China is risky because of the widespread use of forced labor. But that is not all the complaint says. It

is certainly true that corporations have known for decades that textile manufacturing in China has a rampant forced labor problem. *See* Compl. ¶¶ 69–74. So the defendants were undoubtedly aware that outsourcing their glove manufacturing to China meant entering a heightened risk environment for forced labor. That's why they needed to publicly claim that they don't use forced labor—and that they carefully audit their supply chain to avoid it.

But the complaint does not rely solely on the widespread knowledge of Chinese manufacturing's forced labor problem. It relies on allegations about the defendants' special knowledge of Chinese labor and manufacturing issues. *Id.* ¶¶ 21, 77, 78, 91. It relies on the defendants' self-proclaimed close involvement in a specialized manufacturing and production process. *Id.* ¶¶ 100–04. And it relies on their public claims that they conduct detailed supply chain audits. *Id.* If the defendants actually performed these audits, they would have known about the forced labor in their own supply chain—or at least would have seen significant red flags. Continuing to produce gloves under those circumstances is at least negligent. Alternatively, if the defendants didn't conduct the due diligence their own policies require, that, too, was reckless, or at the very least negligent.

### 1. Legal standard

Federal Rule of Civil Procedure 9(b) "allows plaintiffs to plead knowledge generally." *G.G.*, 76 F.4th at 555. As this Court has recognized, at this stage, a plaintiff is not "require[d] … to detail proof she does not yet have." *Foren*, 2023 WL 3752187, at *3; *see also J.G. v. Northbrook Indus., Inc.*, 619 F. Supp. 3d 1228, 1237 (N.D. Ga. 2022) (holding in TVPA context that claim should not be dismissed when facts relevant to mental state "are peculiarly within the possession and control of the defendant" rather than the victim). And "[t]ypically, scienter is a question of fact and is therefore usually best decided by the trier of fact," such that at the motion to dismiss stage, a plaintiff need only provide "some basis for believing the plaintiff could prove scienter." *United States Sec. & Exch. Comm'n v. Winemaster*, 529 F. Supp. 3d 880, 910 (N.D. Ill. 2021).

As explained above, there are two paths to holding the defendants liable here—each with its own scienter requirement. That's because the TVPA provides a civil cause of action against anyone who personally violates one of the TVPA's predicate offenses *and* anyone who benefits from others' TVPA violations. The defendants here check both boxes. They are liable for their own violations of section 1589(b)—the statute's specific prohibition on benefiting from a venture that uses forced labor. That offense requires that the defendant acted "knowing or in reckless disregard of the fact that the venture ... engaged in" forced labor. Benefiting from a venture that used forced labor also makes the defendants liable as beneficiaries of *others*' TVPA violations. Liability under that route requires only that the defendants "should have known" that the venture was engaged in forced labor, 18 U.S.C. § 1595(a)—that is, it requires "negligence." *G.G.*, 76 F.4th at 555 & n.9. Together, these sections authorize victims of forced labor to sue beneficiaries of a venture that used forced labor if they were *either* reckless or negligent.

 "Recklessness and negligence" do not require actual knowledge; they require only "insufficient concern with a risk." *Borden v. United States*, 593 U.S. 420, 427 (2021) (plurality). An individual acts "recklessly" if they "consciously disregard a substantial risk" of harm. *Voisine v. United States*, 579 U.S. 686, 691 (2016). And "[t]hat risk need not come anywhere close to a likelihood." *Borden*, 593 U.S. at 427 (plurality); *see* 1 Wayne R. LaFave, *Substantive Criminal Law* § 5.4(f) (3d ed. 2024) ("[R]ecklessness requires a consciousness of something far less than certainty or even probability.").

Negligence, a lower standard, does not even require awareness of the risk. "Negligence is merely failure to exercise due care; often it is unconscious." *United States v. Litos*, 847 F.3d 906, 908 (7th Cir. 2017). To impose a negligence standard, section 1595(a) uses the expression "should have known," language that has a "well established [meaning] in American tort law," *Johnson v. Edward Orton, Jr. Ceramic Found.*, 71 F.4th 601, 612–13 (7th Cir. 2023); *see also United States v. Hansen*, 599 U.S. 762, 778 (2023) ("When Congress transplants a common-law term, the 'old soil' comes with it.").

Under longstanding tort principles, "'[s]hould know' indicates that the actor is under a duty to another to use reasonable diligence to ascertain the existence or non-existence of the fact in question." *Johnson*, 71 F.4th at 612–13 (quoting Restatement (Second) of Torts § 12 cmt. a (1965)). That "constructive knowledge" standard, *G.G.*, 76 F.4th at 555 & n.9, requires only "[k]nowledge that one using reasonable care or diligence should have," Knowledge, *Black's Law Dictionary* (12th ed. 2024). And in that inquiry, courts look not just to what "a reasonable man" should know, but require the defendant to exercise "such superior attention, perception, memory, knowledge, intelligence, and judgment as the actor himself has." Restatement § 289.

Thus, at this stage, Mr. Xu need only plausibly allege that if the defendants had exercised reasonable diligence, they would have uncovered either the forced labor itself or the substantial risk of forced labor in the venture from which they both profited. He has easily met this standard.

## 2. Mr. Xu has plausibly alleged that TTI acted at least negligently as to the risk of forced labor in its supply chain.

Mr. Xu has more than adequately alleged that a reasonable company in TTI's position, acting with reasonable care and diligence, would either have discovered that its gloves were being made with forced labor or turned up significant red flags (that a reasonable company would not have ignored).

**a.** TTI prides itself on "devoting more attention and care to the manufacturing process than [its] competitors." Compl. ¶ 94. It "examin[es] every single aspect of bringing a product to market" including "even the smallest detail." *Id.* ¶ 97. It uses "detailed, analytical processes" to "closely examine every detail from design engineering to *supply chain logistics*." *Id.* (emphasis added). To that end, TTI "claims that it audits suppliers before entering a supplier engagement with them." *Id.* ¶ 103. These audits then "continue every 12-18 months for suppliers who have been awarded an acceptable score, while suppliers who require corrective measures are subjected to more frequent audits and training." *Id.* And in evaluating, establishing, and auditing its supply chain, TTI draws on its "intimate

familiarity with manufacturing in [China]"—including supply chains and "labor issues"—where it has maintained a "continuous manufacturing presence" since 1988. *Id.* ¶¶ 7, 77, 79–80. Indeed, its "business model" revolves around using "its expertise and experience in [China], including its ability to manufacture in [China] at low-cost while maintaining quality." *Id.* ¶¶ 7, 78.

The company also publicly asserts that it "conducts investigations to mitigate the 'risk of human rights violations within the supply chain.'" *Id.* ¶ 103 (quoting TTI, *Environmental, Social and Governance Report 2021* ("*ESG Report*") 37, https://perma.cc/DXS9-RJBH). It claims to "continuously verify, evaluate and address concerns" around forced labor, including "by auditing." TTI, *ESG Report* at 80. The company's policies also call for "site visits/audits for high risk operations/Suppliers." Compl. ¶ 104 (quoting TTI, *Policy Against Modern Slavery and Human Trafficking* ("*Policy Against Modern Slavery*") 4, https://perma.cc/77MC-DNVJ). It says that it does so because "[a]s a manufacturing company" it "appreciates the risks associated with and takes [these] steps to verify, evaluate and address slavery and human trafficking … in our Supplier operations," including through a "Risk Assessment" and site visits. TTI, *Policy Against Modern Slavery* at 4; *see* Compl. ¶ 105 (alleging that TTI was "well aware of the risk that [its] suppliers would engage in forced labor and other human rights violations").[9]

**b.** Viewing the above in the light most favorable to Mr. Xu, it is more than sufficient to draw a reasonable inference that TTI "consciously disregard[ed] a substantial risk" that forced labor would be used in the production of Milwaukee Tool gloves—or, at the very least, failed to exercise due care. *Voisine*, 579 U.S. at 691.

---

[9] In his complaint, Mr. Xu cites, quotes, and "hyperlinks" to TTI's policies, and they are accordingly "incorporated by reference." *Bayer HealthCare LLC v. Aeropres Corp.*, 727 F. Supp. 3d 738, 745 n.4 (N.D. Ill. 2024).

If TTI's public claims about the detailed audits and investigations it performs are true, it would have been aware that its Milwaukee Tool gloves were being made with forced prison labor—or, at the very least, would have discovered red flags alerting it to a substantial risk. Compl. ¶¶ 101–105. At a bare minimum, it is plausible that TTI would have learned something as basic as the *location* where the products of its flagship brand were being manufactured, whether to prevent forced labor or just as a matter of quality control and logistics. That location was a Chinese prison. And if TTI was aware the gloves were being made in a prison, it's reasonable to infer that it was aware of a substantial risk that forced labor was involved. That's especially true given the decades of public reporting that "in the textile and manufacturing industries especially, the use of forced labor in [Chinese] prisons" to make goods for U.S. export "is widespread." *Id.* ¶¶ 66, 74.

This reasonable inference is further supported by the expert opinion of "a former Reebok executive with decades of experience in researching, investigating, and auditing supply chains for abusive labor practices, including supply chains in [China]." *Id.* ¶ 113. The expert—Jill Tucker—drew on her "experience," "analysis of the evidence available to date," TTI's deep expertise in Chinese supply chains, and specific features about the manufacturing of gloves. *Id.* ¶¶ 114–117. She concluded that if TTI had conducted reasonable investigations in accordance with industry standards, it "would have either detected that their gloves were being made at Chishan Prison, or they would have realized that suppliers like Shanghai Select were either unable or unwilling to disclose to them the locations of the actual facilities where such gloves were being made"—which would have put them on notice of a substantial risk that forced labor was occurring. *Id.* ¶ 119.

Ms. Tucker's conclusion is borne out by still more evidence: When other companies and the government conducted investigations of this supply chain—without all TTI's internal information—they came to the conclusion that there was, at the very least, a substantial risk that forced labor was being used. *Id.* ¶¶ 4, 125, 130–32. This was so serious that Walmart stopped carrying the products

and the federal government wouldn't let them into the country. *Id.* If TTI conducted the audits it claims, this would have revealed a substantial risk of forced labor that a reasonable company would not have ignored.[10]

**c.** However, if TTI did not actually carry out the audits that the company itself recognizes are crucial to avoid forced labor, that in itself would be reckless—or at the very least, negligent. The Seventh Circuit's decision in *TRW Title Insurance Co. v. Security Union Title Insurance Co.*, is instructive. 153 F.3d 822, 825, 829 (7th Cir. 1998). That case also involved an "industry rife with risk." *Id.* at 829. Yet, motivated by profit, the company entered a business contract without conducting a "sensible … audit" to avoid these risks. *Id.* at 825. The court concluded that "[t]his failure to investigate" was not just negligent; in the context of a risky industry, it constituted "recklessness." *Id.* at 829; *see also Litos*, 847 F.3d at 908 (failure to conduct meaningful investigations in risky industry "was reckless").

That is just the case here. Not only is the risk of forced labor in Chinese manufacturing well-established, TTI's own policies say that it "appreciates the risks associated with … slavery and human trafficking" in its industry. TTI, *Policy Against Modern Slavery* at 4. In that context, failure to conduct reasonable, industry-standard investigations is reckless. At the very least, it was negligent not to use the basic reasonable care TTI itself recognizes is necessary.

### 3. Mr. Xu has also plausibly alleged that Milwaukee Tool acted at least negligently.

The same goes for Milwaukee Tool. Like TTI, if Milwaukee Tool actually exercised reasonable diligence, it would have either known about the forced labor or at least learned of significant red flags that a reasonable company would not have ignored. And if it did not perform the due diligence that its own policies recognize is necessary, that, too, would be reckless or at the very least negligent.

---

[10] To be clear, Mr. Xu isn't claiming that the announcements by Walmart and CBP were the source of the defendants' awareness of the risk. They are evidence that industry-standard practices would have revealed the risk of forced labor.

Like TTI, Milwaukee Tool trumpets its "hands-on approach to" and ownership over "the design and manufacturing processes." Compl. ¶ 58–62, 98. As discussed above, that involvement included "a feedback loop with Shanghai Select and Chishan Prison to address quality control issues," causing "Shanghai Select [to send] representatives to the prison to monitor production and conduct quality control"; "coordinat[ing] logistics with Shanghai Select and Chishan Prison" to ship gloves to the United States; and "likely work[ing], directly or indirectly, with Shanghai Select and Chishan Prison on bespoke manufacturing processes." *Id.* ¶¶ 44, 46, 98, 129.

Milwaukee Tool is also governed by the same policies for preventing forced labor as TTI. Compl. ¶¶ 2, 100–04. "[E]very TTI employee and supplier is responsible for confirming compliance with this policy." *Id.* ¶ 104. And "employees" encompasses "all of [TTI's] subsidiaries, owned in whole or in part, and all of their employees." TTI, *Policy Against Modern Slavery* at 3. Thus, like TTI, Milwaukee Tool's own governing documents recognize the risk of forced labor, and require the company to ensure that forced labor is not used in its supply chain—in turn, like TTI, Milwaukee Tool claims to conduct the audits necessary to fulfill this responsibility. Compl. ¶¶ 2, 100, 103, 104.

In addition, federal law itself prohibits the importation of goods "manufactured … in any foreign country by convict labor or/and forced labor," 19 U.S.C. § 1307, and requires companies to exercise "reasonable care" in importing goods, 19 U.S.C. § 1484(a)(1); U.S. Customs and Border Prot., *Preparing for an Audit-Partnership in Responsible Trade* 2, https://perma.cc/4UCW-U9M9 ("Organizations have an obligation to be aware of their supply chain activities."); U.S. Customs and Border Prot., *Reasonable Care* 7, 14, https://perma.cc/P9WQ-T3W8 (guidance on how importers can fulfill their duty of "reasonable care in importing into the United States," including measures such as risk assessments and audits to detect forced labor). Congress has emphasized in particular the importance of enforcing this prohibition to prevent the "importation into the United States of goods … manufactured wholly or in part with forced labor in the People's Republic of China"—and the

need for companies to exercise "due diligence" and "effective supply chain management" to prevent such importation. Pub. L. No. 117-78, §§ 2(c), 2(d)(6)(A), 135 Stat. 1525, 1526.

Like TTI, if Milwaukee Tool actually performed the required due diligence it claims to undertake or was as involved in the manufacturing process as it claims, it is plausible to infer that the company would have been aware of the substantial risk that forced labor was being used—and thus by continuing on anyway, recklessly (or, at least, negligently) disregarded that risk. Alternatively, if Milwaukee Tool failed to conduct any "sensible … audit" of the kind prudent in an "industry rife with risk," it was "reckless[]." *TRW*, 153 F.3d at 825, 829. At a minimum, this is enough to plausibly allege negligence. A reasonable company using "reasonable diligence" would not have turned a blind eye to the serious risk of forced labor in its supply chain. *Johnson*, 71 F.4th at 612–13. In the face of extensive allegations and an expert concluding that such diligence would have either turned up the truth or serious red flags, that is enough at this stage to plausibly allege negligence.

Milwaukee Tool protests (at 30) that Mr. Xu does not allege the specific extent to which Milwaukee Tool, TTI, or both were involved in monitoring their supply chain, and that this constitutes "group pleading." This ignores the paragraphs after paragraphs where Mr. Xu spells out the specific allegations against Milwaukee Tool in particular. Compl. ¶¶ 2, 57–59, 61–62, 98, 100, 126–27. Further, Mr. Xu has gone above and beyond by providing details of significant overlap between the two companies that "blurs the line between where one company ends and the other begins, particularly with respect to Milwaukee Tool's supply chain and sourcing." *Id.* ¶ 26. That includes a "Senior Director" of "'Supply Chain Management' for Milwaukee Tool"; "a 'Senior Director—Milwaukee Outsource Supply Chain'"; the "Director of Purchasing for Milwaukee Tool"; the "'purchasing manager' for Milwaukee Tool"; and the "Sourcing Manager of Milwaukee Electric Tool." *Id.* ¶¶ 8, 26–29. To be clear, the question is not whether Milwaukee Tool and TTI are formally alter egos. Rather, the close coordination on supply chain issues permits the reasonable inference that

Milwaukee Tool was plausibly involved in or privy to TTI's knowledge and expertise about its supply chain.[11]

To the extent the defendants would require Mr. Xu to provide even more details about how they structured and operated their supply chains, internal corporate communications and logistics are a quintessential example of facts "peculiarly within the possession and control of the defendant" rather than the victim of trafficking. *J.G.*, 619 F. Supp. 3d at 1237. Civil plaintiffs will rarely have "detailed facts" as to "how … corporations share or interchange employees" or manage responsibilities. *Foren*, 2023 WL 3752187, at *3. As this Court recognized: "It would be far too high a bar to require a plaintiff to plead detailed facts supporting such allegations in order to proceed to discovery. This is a motion to dismiss, not one for summary judgment." *Id.*[12]

Taking the above together and drawing all reasonable inferences in Mr. Xu's favor, he has sufficiently alleged that Milwaukee Tool was at least negligent as to the risk of forced labor in its supply chain.

### 4. The defendants' contrary arguments are foreclosed by Seventh Circuit case law.

**a.** The defendants' lead argument is that Mr. Xu must "plausibly establish[] that Milwaukee Tool knew or should have known that *he* was being trafficked" because the defendants' "knowledge must be about Plaintiff in particular." MT Br. 24–25. *G.G.* rejected exactly this argument: "Knowledge of the specific victim, let alone knowledge of her identity, is not required." 76 F.4th at 558. Instead, "a plaintiff needs to allege plausibly that the defendant had constructive knowledge"—that is, that

---

[11] While TTI submitted declarations as to its interrelationship with Milwaukee Tool, these documents are "outside the pleadings" and may only be considered for purposes of TTI's personal jurisdiction argument, not its Rule 12(b)(6) motion. *Doss v. Clearwater Title Co.*, 551 F.3d 634, 639 (7th Cir. 2008). And in any event, these disputes would not change the outcome of this analysis.

[12] And tellingly, the only case the defendants cite on this point, MT Br. 30, is applying "the heightened pleading standards required by Rule 9(b)," *Apprion, Inc. Ret. Sav. & Emp. Stock Ownership Plan*, 475 F. Supp. 3d 910, 932 (E.D. Wis. 2020).

the defendant should have known—"that a venture *generally* has violated [the TVPA]" by using forced labor. *Id.*

**b.** The defendants then argue at great length that Mr. Xu cannot rely "entirely on generic and generalized allegations of forced labor in China." MT Br. 25–29; TTI Br. 27–28. This is puzzling, because Mr. Xu has never sought to rely on country conditions alone. To be sure, the "decades" of public reporting on the "widespread" use of forced labor in the Chinese "textile and manufacturing industries" further supports the conclusion that sophisticated actors like the defendants were aware of this risk. Compl. ¶¶ 68–74. But the complaint contains paragraphs detailing the defendants' own statements, policies, and practices regarding careful auditing, control over the details of their manufacturing process, and expertise in Chinese labor and supply chain issues. *Id.* ¶¶ 58–60, 76–80, 94–97, 100–04, 129. Mr. Xu further supported this with expert analysis concluding that if the defendants had conducted the audits they claim to, they would have uncovered the risk of forced labor—further supported by the results of investigations by other companies and the government. *Id.* ¶¶ 114–117, 125, 130–32.[13]

And while the defendants argue that the allegations here are different from those in *G.G.*, that merely reflects the fact-bound nature of this inquiry, which will necessarily vary case-by-case and industry-by-industry. *G.G.* itself recognized that the facts in that case did not set the bar, but rather that the plaintiffs there "*more* than met their burden under this standard, alleging facts tending to show

---

[13] The defendants ask this Court to ignore Ms. Tucker's expert opinion based on *Ratha*, 35 F.4th 1159. But *Ratha* was at the summary judgment stage. *Id.* at 1164. And this Court has emphasized the difference between a plaintiff's burden on a motion to dismiss and on summary judgment. *Foren*, 2023 WL 3752187, at *3. Further, in *Ratha* the declarations "never opine[d] that … audits were even necessary under the circumstances or that a business's failure to conduct such audits would be negligent" and "d[id] not offer any factual basis" for their conclusions about "industry standards." 35 F.4th at 1179. In contrast, Ms. Tucker provided extensive facts supporting her opinion that these audits were needed, including decades of industry, the specific defendants in this case, and the nature of glove manufacturing specifically. Compl. ¶¶ 113–125.

with greater specificity than is required at this stage." 76 F.4th at 555 (emphasis added). But even looking to *G.G.*, that case involved a software company (Salesforce) providing assistance to a website (Backpage). *G.G.*, 76 F.4th at 560. Salesforce is a massive corporation, and Backpage was only one of the "over 150,000 companies" to which Salesforce provides software and assistance, including some of the biggest companies in the world. Salesforce, *What is Salesforce?*, https://perma.cc/5LPQ-LA8W. The operation of a manufacturing venture involving TTI's "flagship brand" and the source of most of its revenue was far more important to the defendants than the relationship in *G.G.* Compl. ¶¶ 29, 82.

**c.** Relying on out-of-circuit district court decisions, the defendants also claim that the TVPA does not create any "affirmative duty" and therefore they were not required to exercise even reasonable care to ensure their supply chain does not involve forced labor. TTI Br. at 28–29. As an initial matter, that glosses over the defendants' own assertions that they *do* conduct supply-chain audits. Compl. ¶¶ 100–04. Unless the defendants wish to take the position that their own statements were false (which in any event would be improper at this stage), Mr. Xu has put forward allegations explaining why these investigations would at the very least plausibly have uncovered a substantial risk of forced labor. Ignoring this risk is reckless, or at least negligent.

Further, this argument ignores the well-settled definitions of recklessness and negligence, which the Seventh Circuit has long recognized require at least reasonable care. If defendants did not actually conduct the investigations that they themselves recognized were needed in this "industry rife with risk," that is the definition of reckless. *TRW*, 153 F.3d at 825, 829. At the very least, they were required to exercise "reasonable diligence to ascertain the existence or non-existence of the fact in question." *Johnson*, 71 F.4th at 612–13; *see also, e.g.*, Knowledge, *Black's Law Dictionary* ("constructive knowledge" is "[k]nowledge that one using reasonable care or diligence should have"); *Menke v. S. Ry. Co.*, 603 F.2d 1281, 1286 (7th Cir. 1979) (under negligence standard, defendant "may be held

responsible not only for what it knew, but also for what in the exercise of reasonable diligence it should have known" and failure to "exercise due care in inspecti[ons]" supported finding of "constructive knowledge").

## III. TTI's specific attempts to exit this case are unavailing.

TTI argues that regardless of whether it violated the TVPA, this Court cannot hear Mr. Xu's claims against it. According to TTI, although it entered a venture with its American subsidiary to make gloves for an American market, this Court lacks personal jurisdiction over claims those gloves were made with forced labor. And it argues that although the complaint alleges TTI has offices in the United States, it has somehow not adequately pled U.S. presence. Neither claim withstands scrutiny.

### A. This Court has personal jurisdiction over TTI.

Contrary to TTI's contention, the Constitution does not bar personal jurisdiction over Mr. Xu's claim that the company illegally profited by selling goods into the United States made with forced labor. The production of goods for United States markets is the paradigmatic example of an activity that subjects a company to personal jurisdiction in the United States. Indeed, TTI itself has previously acknowledged that it would be subject to jurisdiction in an American court. This Court should deny TTI's effort to take advantage of American markets while shielding itself from American courts.

#### 1. Because it supplies Milwaukee Tool gloves for sale in the United States, TTI is subject to personal jurisdiction for claims based on those gloves.

**a.** Although nothing in the Constitution explicitly limits personal jurisdiction, the Supreme Court has held that the Due Process Clause provides an unwritten limitation: It "protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful contacts, ties, or relations." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985). Whether a court may exercise personal jurisdiction depends on whether the defendant has sufficient "contacts, ties, or relations" with the forum, such that it comports with "fair play and substantial justice" to require it to answer for its conduct in the forum's courts. *Id.* at 464, 472.

Because Mr. Xu brings a federal claim in federal court, the relevant forum is the United States. *See ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 551 (7th Cir. 2001). And because TTI's challenge is based on documents—rather than an evidentiary hearing—Mr. Xu "need only make a prima facie showing" that TTI has sufficient United States contacts. *Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010). Unlike the defendants' arguments on the merits, in evaluating personal jurisdiction, this Court may consider evidence beyond the complaint. *Curry v. Revolution Lab'ys, LLC*, 949 F.3d 385, 393 (7th Cir. 2020). But the Court must still "take as true all well-pleaded facts alleged in the complaint." *Tamburo*, 601 F.3d at 700. The facts in TTI's affidavits, on the other hand, may only be accepted as true if they "do not conflict with anything in the record, either by way of [the] complaint or [Mr. Xu's] other submissions." *Curry*, 949 F.3d at 393. Any "conflict" between TTI's factual assertions and Mr. Xu's must be "resolve[d]" in Mr. Xu's "favor." *Id.*

Particularly when taken in the light most favorable to Mr. Xu, the evidence and allegations here make a "prima facie showing of jurisdictional facts," *Tamburo*, 601 F.3d at 700. TTI focuses primarily on general jurisdiction: jurisdiction that allows a court to hear any claim brought against a company that is "essentially at home in the [forum]." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 352 (2021). TTI's contacts with the United States may very well be sufficient to subject it to general jurisdiction here. *See infra* 47–48. But regardless of whether American courts have *general* jurisdiction over TTI, this Court has specific personal jurisdiction over the claim in this case.

"Specific personal jurisdiction rests on an affiliation between the forum and the underlying controversy." *B.D. v. Samsung SDI Co.*, 91 F.4th 856, 861 (7th Cir. 2024). There are "three essential requirements for ... specific jurisdiction." *Curry*, 949 F.3d at 398. *First*, the defendant "must have purposefully directed [its] activities at the forum" or "purposefully availed [itself] of the privilege of conducting business in the forum." *B.D.*, 91 F.4th at 861. *Second*, the suit "must arise out of or relate to the defendant's" contacts with the forum." *Id.* And, *third*, "the exercise of personal jurisdiction

must comport with traditional notions of fair play and substantial justice." *Id.* TTI has not challenged the third requirement, so only the first two are at issue here.

   **b. *Purposeful availment.*** It's well-established that a company that intentionally places products in the stream of commerce, knowing that they will be sold in the forum, has purposefully availed itself of the forum. *See, e.g., id.* (collecting cases). After all, a company that takes advantage of American markets may not claim surprise at being subject to American courts. Here, TTI did just that. It entered a venture with its American subsidiary for the purpose of selling goods into U.S. markets. And pursuant to that venture, it knowingly supplied Milwaukee Tool gloves for sale in the United States. That's purposeful availment.

   Not only does Mr. Xu allege that TTI distributes Milwaukee Tool gloves to the United States, he has evidence: U.S. customs data shows thousands of shipments from TTI to the United States, including shipments of Milwaukee Tool gloves. Wang Decl. ¶¶ 3–5; Ex. A. While many of those shipments are in the name of TTI itself, others list the shipper as TTI Trading Co. *Id.* But as the complaint alleges—and TTI does not dispute—TTI Trading is merely a shell company through which TTI does business. *See* Compl. ¶¶ 14–19; Wang Decl. ¶¶ 6–7; Exs. E, F.

   TTI does not deny that it knowingly produces Milwaukee Tool gloves for distribution in the United States. To the contrary, following this lawsuit, TTI issued a press release claiming that "TTI and Milwaukee Tool ha[ve] found no evidence of forced labor in the production of *our gloves*." Wang Decl., Ex. G (emphasis added). And it claimed that "*we*"—TTI and Milwaukee Tool—"maintain an unwavering commitment to . . . ethical labor standards" in the production of Milwaukee Tool goods "for tradespeople *across America.*" *Id.* (emphasis added). In other words, the company itself acknowledges that it produces the Milwaukee Tool gloves that Mr. Xu alleges are made with forced labor and knows that its Milwaukee Tool products are sold in the United States. Under longstanding precedent, TTI's production of goods for sale in the United States is itself sufficient for purposeful

availment. *See, e.g.*, *Ford Motor Co.*, 592 U.S. at 359 ("exploiting a market in the forum" constitutes purposeful availment); *Curry*, 949 F.3d at 398 (purposeful availment is established when a defendant "cause[s] its product to be distributed in the forum state"); *NBA Properties, Inc. v. HANWJH*, 46 F.4th 614, 624–25 (7th Cir. 2022) (purposeful availment by intentionally shipping goods into the forum).

But those are not the only contacts TTI has with the United States. TTI bought Milwaukee Tool in order to profit by manufacturing products cheaply in China to be sold in the United States under a well-established American brand name. *See* Compl. ¶¶ 21, 90; Wang Decl. ¶¶ 26–28; Exs. BB–DD, & H, at 37. And, in fact, 70% of the company's revenue comes from its American Milwaukee Tool brand—including the gloves at issue here. Compl. ¶ 29.

As befits a company producing goods for sale in the United States, TTI's CEO is based in the United States—and, in fact, was formerly the head of Milwaukee Tool. Compl. ¶ 25; Ex. X. The company boasts of an American headquarters. *See* Ex. V, at 8 (identifying "Head Quarter offices in Hong Kong and Florida" and a "regional HQ office[]" in Milwaukee); Ex. Z (quoting TTI CEO thanking Florida for "helping" TTI's new "U.S. corporate headquarters" in Fort Lauderdale "come to fruition"). And it has other offices in the United States. *See* Compl. ¶ 24 (Brookfield, WI office); Ex. L (screenshot of a profile of an employee listed as leading the "TTI Training Team out of the Brookfield, WI office"); Ex. R (listing "TTI Offices" in the United States); Ex. AA (announcing that TTI was "expanding operations" in South Carolina).

It also has employees in the United States. Ex. S (TTI's website stating that "TTI offers exceptional career opportunities across the United States"); Ex. L (TTI website identifying an employee as "lead[ing] our TTI Training Team out of the Brookfield, WI office"); Ex. Q (LinkedIn profiles of several TTI employees listing their place of employment as in the United States); Ex. T (TTI press release following its receipt of the Home Depot Partner of the Year Award, stating that

the award is "tribute to all the TTI employees in the United States and worldwide"); Ex. AA (announcing that TTI's expansion would create hundreds of jobs in South Carolina).

And TTI routinely holds itself out as doing business in the United States. *See, e.g.*, *supra* 40 (describing TTI's statements about U.S. headquarters, offices, and employees); Ex. U (TTI announcing that it received a Home Depot Partner of the Year Award for the United States); Ex. D, at 4 (TTI chairman's statement in annual report highlighting "investments in new product, manufacturing capacity, automation, and productivity initiatives" in the United States); Ex. H, at 13 (annual report describing TTI's business in the United States).

Of course, "physical presence is not necessary for a defendant to have sufficient minimum contacts with a forum." *Curry*, 949 F.3d at 398–400. Supplying gloves that TTI knows are destined for United States markets is sufficient for purposeful availment—even if it had no U.S. offices or U.S. employees. *See id.* But its widespread footprint in this country only further demonstrates its intent to purposefully avail itself of the privilege of doing business here. *See Logan Prods., Inc. v. Optibase, Inc.*, 103 F.3d 49, 53 (7th Cir. 1996) (considering additional forum contacts to determine whether a defendant "intended to serve the [forum's] market"). It cannot take advantage of U.S. markets, while escaping U.S jurisdiction for claims related to those activities. *See Ford*, 592 U.S. at 362.

**Relatedness.** And Mr. Xu's claim is, at the very least, "relate[d] to" TTI's contacts with the United States. *Id.* (explaining that causation is not required); *see Curry*, 949 F.3d at 400 (requiring only a "connection between the forum and the ... claims"). He claims that TTI violated the TVPA by benefiting from a venture that used forced labor. *See* 18 U.S.C. §§ 1589(b), 1595(a). That venture is producing gloves for sale in the United States; and the benefit was realized by those sales in the United States. In other words, TTI's primary relevant contact with the United States—its production of gloves for sale to American customers—is the core element of the claim against it. That renders it subject to this Court's jurisdiction. *See Curry*, 949 F.3d at 401–02.

*Fair play and substantial justice.* TTI has not even attempted to "present[] a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id.* at 402. Nor could it. TTI has "structured its" business to serve American markets. *Id.* It "has held itself as conducting business nationwide." *Id.* It files lawsuits in American courts. *See* Compl. ¶ 85. And, when it believes it is in its interest to do so, it even concedes that it is subject to jurisdiction in American courts. Mot. Transfer Venue, *Wise v. Techtronic Indus. Co., Ltd.*, 2010 WL 4930275 (W.D. Wash. Sept. 27, 2010) (successfully advocating for transfer of venue to the District of South Carolina by asserting that it "would have personal jurisdiction over TTi"). TTI "wants to have its cake and eat it, too: it wants the benefit of" serving American markets "with none of the exposure." *Curry,* 949 F.3d at 401–02. Nothing in the Constitution authorizes—let alone requires—granting that request. *See Fed. Bureau of Investigation v. Fikre*, 601 U.S. 234, 240 (2024) ("A court with jurisdiction has a virtually unflagging obligation to hear and resolve questions properly before it.").

**c.** TTI's arguments ignore the standard this Court must apply, controlling case law, and the facts. *First*, TTI assumes that the only contacts relevant to this Court's exercise of jurisdiction are those with the State of Wisconsin. TTI Br. 8–19 & n.3. "That premise is false." *ISI*, 256 F.3d at 551. "The jurisdiction whose power federal courts exercise is the United States of America, not the State of [Wisconsin]." *Id.* "So far as the Constitution is concerned," therefore, "the right question is whether [TTI] has contacts with the United States" as a whole, not Wisconsin specifically. *Id.*

TTI never explains its assertion to the contrary. Its focus on Wisconsin may arise from confusion about the Federal Rules of Civil Procedure, which in some cases, seem to limit federal courts' authority to exercise the full scope of constitutionally permissible jurisdiction. *See id.* at 552 (describing Rule 4(k)(1)(A)). But here, as the Seventh Circuit has explained, where a defendant "contends that he cannot be sued in the forum state and refuses to identify any other where suit is possible, then the federal court is entitled to use Rule 4(k)(2)." *Id.* And that rule authorizes a federal

court to exercise personal jurisdiction over any "claims arising under federal law" as long as the exercise of jurisdiction is "consistent with the Constitution." Fed. R. Civ. P. 4(k)(2); *accord ISI,* 256 F.3d at 551. That's precisely the case here, as TTI has not identified any state in which suit is possible. *See* TTI Br. 18.[14]

*Next*, TTI asserts—and its CFO swears under penalty of perjury—that the company "does not design, manufacture, distribute, sell, import, or market any products in Wisconsin or any other U.S. jurisdiction." Chan Decl. ¶ 15. "Nor," he claims, "does TTI Co. Ltd. ship, send, or export any products to Wisconsin or any other U.S. jurisdiction." *Id.* This assertion is contradicted by customs data, as well as the company's own assertions in other litigation. Just this year, for example, TTI alleged in a complaint—filed in an American court against an American stock researcher—that it sells products "[i]n the United States ... through a contract with Home Depot." Compl. ¶ 21, *Techtronic Indus. Co. v. Bonilla*, 2024 WL 4355747 (M.D. Fla. July 1, 2024). And TTI has previously admitted that it "design[s], market[s], manufacture[s], and supplie[s]" goods under the brand name "Milwaukee." *Compare* Answer ¶ 5, *Hitachi Koki Co., v. Techtronic Indus. Co.*, 2013 WL 2430895 (N.D. Ga. Feb. 6, 2013) (admitting allegation in Second Am. Compl. ¶ 5), *with* Second Am. Compl. ¶ 5, 2013 WL 3058683 (N.D. Ga. Mar. 15, 2013).

Given that the company cannot seriously dispute that it supplies products for sale in the United States, presumably it only means to assert here that it does not *directly* distribute products into the country. Again, customs data shows otherwise. But in any event, it doesn't matter. TTI does not

---

[14] Because Rule 4(k)(2) applies here, this Court need not decide whether any limitation purportedly established by any other rule violates the Rules Enabling Act, which states that "rules shall not abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b). And even if this Court were solely to consider TTI's contacts with Wisconsin, there is enough here for a prima facie showing: Among other things, it entered a venture with Milwaukee Tool, a Wisconsin company; customs data shows that TTI ships goods, including gloves, to Milwaukee Tool, Ex. A; TTI has stated that it has a regional headquarters in Wisconsin, Ex. V, at 8; and it has offices and employees in Wisconsin, Wang Decl. ¶¶ 12, 15; Exs. L, M, Q. At the very least, this is sufficient to allow discovery. *See infra* 47–48.

dispute that, at the very least, it supplies goods into the U.S. through TTI Trading. And it's well established that a company need not *directly* ship goods into the United States; as long as it knowingly puts goods into the stream of commerce for ultimate sale here, it has purposefully availed itself of U.S. markets sufficient for jurisdiction. *See, e.g.*, *B.D.*, 91 F.4th at 861; *see also Asahi Metal Indus. Co. v. Superior Ct. of Cal.*, 480 U.S. 102, 112 (1987) (selling products in the forum "through a distributor" sufficient); *Ledalite Architectural Prods. v. Pinnacle Architectural Lighting, Inc.*, 2009 WL 54239, at *2 (W.D. Wis. 2009) (selling goods through independent local representative is sufficient, even where the exact "role" of the local company was "unclear").

It is therefore irrelevant if, as TTI complains, some of the offices and employees that hold themselves out as belonging to TTI are in fact technically associated with one of its subsidiaries. TTI's exploitation of the U.S. market through its glove venture is sufficient for personal jurisdiction, even if had no other U.S. contacts. Further, any dispute of fact must be "resolve[d]" in Mr. Xu's "favor"— and there is at least a dispute of fact about whether TTI itself has U.S. offices and employees. *Curry*, 949 F.3d at 392. And although jurisdiction is not proper over a principal merely because it has subsidiaries in the forum, if a company works with closely interrelated affiliates in the forum, that is a contact with the forum—as TTI has itself previously recognized. *See* Mot. Transfer, *Wise*, 2010 WL 4930275; *see also, e.g.*, *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 231 (D.C. Cir. 2022), *vacated on other grounds,* 144 S. Ct. 2675 (2024) (relying on foreign suppliers' agreements with U.S. manufacturers); *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 450–51 (6th Cir. 2012); *Receivership Mgmt., Inc. v. AEU Holdings, LLC*, 2019 WL 4189466, at *9 (N.D. Ill. 2019) (attributing contacts of joint venturers).[15]

---

[15] TTI emphasizes that for purposes of general jurisdiction, the contacts of one company may be attributed to another only in limited circumstances. But it is well-established that in considering *specific* jurisdiction, courts may consider the contacts of affiliates with which the defendant worked to effectuate suit-related activities. *See, e.g.*, *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 753 F.3d 521, 531 (5th Cir. 2014) (discussing *Daimler AG v. Bauman*, 571 U.S. 117 (2014)); *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 591 (7th Cir. 2021).

*Third*, TTI argues that its forced labor solely caused harm in China, not in the United States. As an initial matter, that's not true. Mr. Xu was injured in China. But U.S. workers, less able to find well-paying jobs, and U.S. companies, less able to compete on price without using forced labor, suffered harm in the U.S. *See Rodriguez*, 29 F.4th at 716 n.5. And in any event, "it is the *defendant's* conduct, not the plaintiff's injury, that must form the necessary connection with the forum." *J.S.T. Corp. v. Foxconn Interconnect Tech. Ltd.*, 965 F.3d 571, 577 (7th Cir. 2020). In arguing to the contrary, TTI relies on the Ninth Circuit's decision in *Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159 (9th Cir. 2022). But that decision conflicts with Seventh Circuit and Supreme Court precedent.

*Ratha* relies on a Ninth Circuit rule that personal jurisdiction over tort claims must satisfy a "purposeful direction test" ostensibly "derived from *Calder v. Jones*, 465 U.S. 783 (1984)." *Ratha*, 35 F.4th at 1171. *Calder* held that California courts had personal jurisdiction over a Florida writer and editor who allegedly libeled a California entertainer because they "expressly aimed" their conduct at California, knowing the brunt of the injury would be felt there. 465 U.S. at 789–90. *Calder* provides an *additional* path to personal jurisdiction, where the forum effects of a defendant's conduct are sufficient to connect the *defendant* to the forum. *See Walden v. Fiore*, 571 U.S. 277, 288 (2014). But the Ninth Circuit interpreted *Calder* as *limiting* personal jurisdiction to cases in which the *plaintiff* was injured in the forum. *See Ratha*, 35 F.4th at 1172.

The Supreme Court and the Seventh Circuit have explicitly rejected this plaintiff-centric approach: "The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Walden*, 571 U.S. at 290; *accord J.S.T.*, 965 F.3d at 577. "[A]n injury is jurisdictionally relevant," the Court has warned, "only insofar as it shows that the defendant has formed a contact with the forum." *Id.* In accordance with this guidance, the Seventh Circuit has emphasized that "the contacts supporting specific jurisdiction can take many different forms." *uBID, Inc. v. GoDaddy Grp.*, 623 F.3d 421, 426 (7th Cir.

2010). And, in tort cases, the Seventh Circuit has held that personal jurisdiction is proper where a defendant "exploited" the forum's market. *Id.* at 427 & n.1 (explaining that because the defendant satisfied traditional purposeful availment test, the Court need not examine whether it would also satisfy the *Calder* test). That's precisely the case here.[16]

*Finally*, TTI argues that its contacts with the United States are insufficiently related to Mr. Xu's claim under the Seventh Circuit's decision in *J.S.T. Corp.*, 965 F.3d at 571. There, the Court held that Illinois lacked personal jurisdiction over defendants that were alleged to have stolen the plaintiff's trade secrets because there was no connection between Illinois and any element of the plaintiff's trade secret claim. *Id.* at 577. The trade secrets were neither acquired, disclosed, or used in Illinois. *Id.* The plaintiff argued that it suffered damages in Illinois because the companies that misappropriated its designs sold a product incorporating those designs to Bosch, which then used that product as a component of a larger product Bosch sold to GM, which GM eventually incorporated into its cars, some of which were ultimately sold in Illinois. *Id.* at 577–78. The problem with this theory, the court held, is that the damages the plaintiff suffered occurred when the component containing the misappropriated designs was sold to Bosch. *Id.* The eventual sale of cars to Illinois consumers that happened to contain a component that itself contained a component that incorporated the plaintiff's designs, therefore, had "virtually nothing to do" with the plaintiff's claims. *Id.* at 578.

That is a far cry from this case. TTI's venture to sell gloves in the United States "forms the very basis of this action." *Curry*, 949 F.3d at 401–02. And it is its distribution of gloves to Milwaukee Tool in the United States from which the company derived an illegal benefit. That is sufficient.

---

[16] The Seventh Circuit's rule is how courts ordinarily understand personal jurisdiction—the Ninth Circuit is an outlier. *See, e.g.*, *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1356 (11th Cir. 2013); *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 173 (2d Cir. 2013).

## 2. If there is any doubt, Mr. Xu is entitled to jurisdictional discovery.

At the very least, Mr. Xu has made a sufficient showing for jurisdictional discovery. Discovery is "proper if a plaintiff established" even "a colorable" showing of jurisdiction. *B.D.*, 91 F.4th at 864. "To decide whether a plaintiff has satisfied that minimal burden," the Court "considers the record in its entirety and draws all inferences in the plaintiff's favor, while bearing in mind the fact that," in many cases, "without discovery, it is not surprising that the plaintiff can do little more than suggest that a defendant currently has minimum contacts." *Id.*

Mr. Xu has at the very least made out a colorable claim that jurisdiction "might exist" based on several theories. *Esquivel v. Airbus Americas, Inc.*, 2021 WL 4395815, at *2 (N.D. Ill. 2021). First, as explained above, the record demonstrates that TTI entered a venture to sell gloves made with forced labor into the United States—and did, in fact, repeatedly ship gloves into the country. If this Court believes more is required for stream-of-commerce jurisdiction, Mr. Xu should be permitted to take discovery on TTI's role in producing, distributing, and selling gloves into the United States. Second, TTI's participation in a venture with Milwaukee Tool, an American company that provides TTI the majority of its revenue, is itself an independent basis on which to exercise specific jurisdiction. *See supra* 44. So Mr. Xu should be permitted to take discovery related to the formation of the venture, TTI's role in it, and its relationship with Milwaukee Tool.

Finally, Mr. Xu has at least colorably shown that general jurisdiction might exist over TTI. TTI admits that a company is subject to general jurisdiction where it is headquartered. TTI Br. 9. And though it now claims otherwise, the company has publicly boasted that it has an American headquarters. Ex. V, at 8. In addition, Mr. Xu has alleged—and provided evidence to support the allegation—that TTI and its American subsidiaries "h[o]ld themselves out as one integrated system and operate[] as such," *Nicks v. Koch Meat Co.*, 260 F. Supp. 3d 942, 961 (N.D. Ill. 2017) (St. Eve, J.). *See, e.g., supra* 40–41; Compl. ¶¶ 26, 29; Exs. G, J, N–P, W, Y. That's sufficient at this stage to warrant

jurisdictional discovery into the corporate structure of TTI and its American affiliates, and the relationship between them. *See Nicks*, 260 F. Supp. 3d at 946 (noting that court had ordered similar jurisdictional discovery); *see also Smartsignal Corp. v. Bickford*, 2006 WL 8461603, at *4 (N.D. Ill. 2006).

While Mr. Xu has made a sufficient prima facie showing of specific jurisdiction, if this Court disagrees, he should be permitted to take the discovery to satisfy this Court that jurisdiction exists.

### B. TTI is present in the United States, even under its own definition.

As explained above, the TVPA reaches extraterritorial conduct where "an alleged offender is present in the United States." 18 U.S.C. § 1596(a)(2). In a last ditch effort to avoid this Court's reach, TTI argues that Mr. Xu has not sufficiently alleged that it has a U.S presence. That argument fails several times over. As an initial matter, the presence requirement only applies for an extraterritorial application of the TVPA. *Id.* And, as we explained above, although the statute *does* apply extraterritorially, Mr. Xu's claim is actually a domestic application.

TTI also wrongly argues that presence means *physical* presence. But even if that were required, Mr. Xu has adequately alleged it. On TTI's own telling, this could be shown by showing "any address, employees, or physical presence in the United States." TTI Br. 21 (quoting dictum from *Ratha*, 35 F.4th at 1169). Here, the complaint alleges that TTI has offices and employees in the United States. And TTI admits (at 5) that its CEO is based here.

Moreover, section 1596(b) only requires that a defendant be "present," not physically present. In the context of corporations, it's well-settled that they can be present without being physically present: Corporate presence includes "those activities of the corporation's agent within the state which courts will deem to be sufficient to satisfy the demands of due process." *Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 317 (1945). Indeed, the same statute that added the extraterritoriality provision—and its presence requirement—to the TVPA expressly used the term "physical presence" in another provision, making clear that when Congress wanted to require

physical presence, it knew how to do so. Pub. Law 110–457, § 201(a)(1)(C), 122 Stat. 5044, 5052. TTI, therefore, is present in the United States because it has minimum contacts. Similarly, TTI's participation in a "joint venture" with Milwaukee Tool would also support a finding of presence. *See, e.g.*, *AAA Max 1 Ltd. v. Boeing Co.*, 2023 WL 4760587, at *5 (N.D. Ill. 2023).

But this Court need not decide the outer limits of presence for the purpose of deciding this motion. Even on TTI's own view that physical presence is required, Mr. Xu's complaint is sufficient.

## CONCLUSION

For the reasons above, the defendants' motions should be denied.

Dated: December 16, 2024                    Respectfully submitted,

**GUPTA WESSLER LLP**
*/s/ Jennifer Bennett*
Jennifer Bennett
Attorney Bar Number: 296726
Attorney for Plaintiff
Email: jennifer@guptawessler.com
505 Montgomery Street, Suite 625
San Francisco, CA 94111
Telephone: (202) 888-1741
Facsimile: (202) 888-7792

Thomas Scott-Railton
Attorney Bar Number: 5687330
Attorney for Plaintiff
Email: thomas@guptawessler.com
2001 K Street NW, Suite 850 North
Washington, DC 20001
Telephone: (202) 888-1741
Facsimile: (202) 888-7792

**HAWKS QUINDEL, S.C.**

William E. Parsons
Attorney Bar Number: 1048594
Attorney for Plaintiff
Email: wparsons@hq-law.com
409 East Main Street
P.O. Box 2155
Madison, Wisconsin 53701-2155

Telephone: (608) 257-0040
Facsimile: (608) 256-0236

**FARRA & WANG PLLC**

Times Wang
Attorney Bar Number: 281077
Email: twang@farrawang.com
Adam Farra (application for admission forthcoming)
Email: afarra@farrawang.com
1300 I Street NW, Suite 400E
Washington, D.C. 20005
Telephone: (202) 505-6227

*Counsel for Plaintiff*