# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

Xu Lun, a pseudonym,    )
           )
    Plaintiff,    )
           )
    v.      )   Civil Action No. 2:24-cv-00803-BHL
           )
Milwaukee Electric Tool Corporation et al., )
           )
    Defendant.   )
           )

**CONSOLIDATED REPLY IN SUPPORT OF TECHTRONIC INDUSTRIES CO. LTD.'S MOTION TO DISMISS PURSUANT TO RULES 12(b)(2) AND 12(b)(6) AND RESPONSE IN OPPOSITION TO PLAINTIFF'S CONDITIONAL MOTION FOR <u>JURISDICTIONAL DISCOVERY</u>**

# TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................. 1

II.   ARGUMENT ....................................................................................................... 5

      A.   Plaintiff Cannot Substantiate Personal Jurisdiction Over TTI And No
           Discovery Is Warranted. ........................................................................... 5

           1.   Plaintiff's Arguments Concede That This Court Lacks General
                Jurisdiction Over TTI............................................................................ 5

           2.   Plaintiff's Pivot To Specific Jurisdiction Fails As A Matter Of Law ........ 6

                a.   Plaintiff's "Stream of Commerce" Theory Is Too
                     Attenuated To Show Purposeful Availment. ................................ 7

                b.   Plaintiff Cannot Show a Requisite Connection To This
                     Forum. ..................................................................................... 11

                c.   Fairness Dictates That This Court Lacks Specific
                     Jurisdiction .............................................................................. 14

           3.   Jurisdictional Discovery Will Not Potentially Save Plaintiff's
                Deficient Allegations ......................................................................... 16

                a.   No Amount of Additional Discovery Can Save Plaintiff's
                     Faulty Specific Jurisdiction Argument. ...................................... 16

                b.   Plaintiff Presents No Basis For Further Discovery On
                     General Jurisdiction ................................................................. 19

                c.   Plaintiff's Requested Discovery Is Premature Merits
                     Discovery ................................................................................. 21

      B.   Plaintiff's Opposition Shows That He Fails To Allege A Valid TVPRA
           Claim. ...................................................................................................... 24

           1.   This Court Should Find That 18 U.S.C. § 1595 Does Apply
                Extraterritorially .............................................................................. 24

           2.   This Case Presents a Straightforward Extraterritorial Application
                of the TVPRA .................................................................................... 28

           3.   Plaintiff's TVPRA Claim Also Fails Because TTI Is Not "Present
                in the United States" As Required By § 1596(a)(2) .............................. 30

           4.   Plaintiff Fails To Justify That He Has Stated A Claim For
                Violation Of 18 U.S.C §§ 1589 and 1595................................................ 32

                a.   Plaintiff Fails To Allege Participation In A Venture. ................... 33

                b.   Plaintiff Fails To Show How The Allegations Satisfy The
                     "Knowledge" Requirements Of Beneficiary Liability................. 34

III.  CONCLUSION................................................................................................... 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.B. v. Marriott Int'l, Inc.*,
455 F. Supp. 3d 171 (E.D. Pa. 2020) .......................................................................................36

*A.B. v. Wyndham Hotels & Resorts, Inc.*,
532 F. Supp. 3d 1018 (D. Or. 2021) ........................................................................................36

*Abafita v. Aldukhan*,
No. 16-cv-06072, 2019 WL 6735148 (S.D.N.Y. Apr. 4, 2019) .............................................27

*Abelesz v. OTP Bank*,
692 F.3d 638 (7th Cir. 2012) ...................................................................................................21

*Adhikari v. Kellogg Brown & Root, Inc.*,
845 F.3d 184, 201 (5th Cir. 2017) ...........................................................................................27

*Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*,
751 F.3d 796 (7th Cir. 2014) ...................................................................................................20

*Aguilera v. Aegis Commc'ns Grp., LLC*,
72 F. Supp. 3d 975 (W.D. Mo. 2014) .....................................................................................27

*Asahi Metal Indus. Co. v. Superior Court of California, Solano County*,
480 U.S. 102, 112 (1987) .........................................................................................................15

*B.D. by & through Myer v. Samsung SDI Co.*,
91 F.4th 856 (7th Cir. 2024) ............................................................................................ *passim*

*B.M. v. Wyndham Hotels & Resorts, Inc.*,
No. 20-cv-00656-BLF, 2020 WL 4368214 (N.D. Cal. July 30, 2020)...................................36

*Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco County*,
582 U.S. 255 (2017)...........................................................................................................13, 14

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985).........................................................................................................15, 16

*C.T. v. Red Roof Inns, Inc.*,
No. 19-CV-5384, 2021 WL 602578 (S.D. Ohio Feb. 16, 2021) .............................................27

*Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*,
230 F.3d 934 (7th Cir. 2000) .......................................................................................9, 19, 22

*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*,
   753 F.3d 521 (5th Cir. 2014) ................................................................10

*Collazo v. Enter. Holdings, Inc.*,
   823 F. Supp. 2d 865 (N.D. Ind. 2011) ..................................................18

*Curry v. Revolution Laboratories, LLC*,
   949 F.3d 385 (7th Cir. 2020) ............................................................9, 13

*Daimler AG v. Bauman*,
   571 U.S. 117 (2014) .........................................................5, 19, 20, 21

*Doe I v. Apple Inc.*,
   No. 1:19-CV-03737 (CJN), 2021 WL 5774224 (D.D.C. Nov. 2, 2021), *aff'd
   on other grounds*, 96 F.4th 403 (D.C. Cir. 2024) ........................... *passim*

*Douglass v. Nippon Yusen Kabushiki Kaisha*,
   46 F.4th 226 (5th Cir. 2022) ........................................................6, 19, 21

*E.I. du Pont de Nemours & Co. v. Agfa-Gavaert NV*,
   335 F. Supp. 3d 657 (D. Del. 2018) ......................................................17

*Ellis v. Fortune Seas, Ltd.*,
   175 F.R.D. 308 (S.D. Ind. 1997) ..........................................................16

*Endo Ventures Unlimited Co. v. Nexus Pharms. Inc.*,
   No. 23-cv-0299-bhl, 2024 WL 1254358 (E.D. Wis. Mar. 25, 2024) ......................21

*Esquivel v. Airbus Ams., Inc.*,
   No. 1:20-CV-07525, 2021 WL 4395815 (N.D. Ill. May 3, 2021)....................16, 23

*Felland v. Clifton*,
   682 F.3d 665 (7th Cir. 2012) ................................................................5

*G.G. v. Salesforce.com, Inc.*,
   76 F.4th 544 (7th Cir. 2023) ..........................................................32, 33

*Gay v. Chandra*,
   682 F.3d 590 (7th Cir. 2012) ...............................................................24

*Goodyear Dunlop Tires Ops., S.A. v. Brown*,
   564 U.S. 915 (2011)....................................................................19, 20, 21

*United States ex rel. Hawkins v. ManTech Intel. Corp.*,
   No. 15-2105, 2024 WL 4332117 (D.D.C. Sep. 27, 2024)............................. *passim*

*IDS Life Ins. Co. v. SunAmerica Life Ins. Co.*,
   136 F.3d 537 (7th Cir. 1998) ...............................................................18

-iii-

*Insolia v. Philip Morris Inc.*,
    31 F. Supp. 2d 660 (W.D. Wis. 1998) ...................................................17, 18

*ISI Int'l, Inc. v. Borden Ladner Gervais LLP*,
    256 F.3d 548 (7th Cir. 2001) .....................................................................6

*J.S.T. Corp. v. Foxconn Interconnect Tech. Ltd.*,
    965 F.3d 571 (7th Cir. 2020) .............................................11, 12, 13, 23

*Jensen v. U.S. Tennis Ass'n*,
    No. 20-2422-JWL, 2020 WL 6445117 (D. Kan. Oct. 30, 2020).................36

*Jolly Grp., Ltd. v. Medline Indus., Inc.*,
    435 F.3d 717 (7th Cir. 2006) ...................................................................23

*Kipp v. Ski Enter. Corp. of Wis. Inc.*,
    783 F.3d 695 (7th Cir. 2015) ...................................................................20

*Knepfle v. J-Tech Corp.*,
    48 F.4th 1282 (11th Cir. 2022) .................................................................7

*LG Elecs., Inc. v. Quanta Comput. Inc.*,
    520 F. Supp. 2d 1061 (W.D. Wis. 2007) ................................................16

*Logan Products, Inc. v. Optibase, Inc.*,
    103 F.3d 49 (7th Cir. 1996) ....................................................................10

*Milwaukee Ctr. for Indep., Inc. v. Milwaukee Health Care, LLC*,
    No. 15-C-1479, 2017 WL 11489876 (E.D. Wis. Dec. 8, 2017) ..............17

*Motorola Solutions, Inc. v. Hytera Communications Corp. Ltd.*,
    108 F.4th 458 (7th Cir. 2024), *reh'g and reh'g en banc dismissed*, No. 22-
    2370, 2024 WL 4416886 (7th Cir. Oct. 4, 2024).....................................28

*Nestle USA, Inc. v. Doe*,
    593 U.S. 628 (2021)................................................................................25

*Neterval-Quiel v. CMC SRL*,
    No. 21-CV-1279-BHL, 2022 WL 4131921 (E.D. Wis. Sept. 12, 2022) ......9, 10, 22

*Nicks v. Koch Meat Co.*,
    260 F. Supp. 3d 942, 959–62 (N.D. Ill. 2017) .......................................20

*Precision Dynamics Corp. v. Typenex Med., L.L.C.*,
    No. 13-CV-860, 2014 WL 12656904 (E.D. Wis. Feb. 13, 2014)............16

*Ratha v. Phatthana Seafood Co.*,
    2016 WL 11020222, at *5 (C.D. Cal. Nov. 9, 2016)..................... *passim*

*Ratha v. Phatthana Seafood Co.*,
35 F.4th 1159 (9th Cir.), *cert. denied sub nom. Ratha v. Phatthana Seafood Co.*, 143 S. Ct. 491, 214 L. Ed. 2d 280 (2022) ............................................... *passim*

*Ratha v. Phatthana Seafood Co.*,
No. CV 16-4271-JFW, 2017 WL 8293174 (C.D. Cal. Dec. 21, 2017) .................................. 34

*RJR Nabisco, Inc. v. European Cmty.*,
579 U.S. 325 (2016) ............................................................................................. 24

*Roe v. Howard*,
917 F.3d 229 (4th Cir. 2019) ............................................................. 25, 26, 27, 28

*Rush v. Savchuk*,
444 U.S. 320 (1980) ............................................................................................. 17

*In re S. White Transp., Inc.*,
725 F.3d 494 (5th Cir. 2013) ............................................................................. 34

*Smartsignal Corp. v. Bickford*,
2006 WL 8461603, at *2-5 (N.D. Ill. May 16, 2006) ........................................ 20

*Tamburo v. Dworkin*,
601 F.3d 693 (7th Cir. 2010) ........................................................................ 11, 12

*Techtronic Industries Co. Ltd. v. Bonilla*,
No. 23-cv-01734, 2024 WL 4355747 (M.D. Fla.) .............................................. 8

*Walden v. Fiore*,
571 U.S. 277 (2014) ..................................................................................... 2, 11, 12

**Statutes**

Trafficking Victims Protection Reauthorization Action, 18 U.S.C.
§ 1581 ............................................................................................... *passim*
§ 1583 ........................................................................................................ 26
§ 1584 ........................................................................................................ 26
§ 1589 ................................................................................... 4, 26, 32, 33
§ 1589(b) .................................................................................................. 32
§ 1590 ........................................................................................................ 26
§ 1595 ............................................................................................... *passim*
§ 1595(a) ........................................................................... 4, 32, 34, 37
§ 1596 ............................................................................................... *passim*
§ 1596(a) .................................................................................................. 26
§ 1596(a)(2) ....................................................................... 3, 30, 31, 37

**Other Authorities**

Federal Rules of Civil Procedure

4(k)(1)(A)................................................................................................5
4(k)(2).........................................................................................5, 6, 19
4(k)(2)(a)..............................................................................................6
12(b)(2)............................................................................................1, 36
12(b)(6).......................................................................................... *passim*
54........................................................................................................24

Defendant Techtronic Industries Co. Ltd. ("TTI" or "TTI Co. Ltd.") hereby submits the following consolidated reply in support of its Motion to Dismiss the First Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6), Dkts. 31 & 32 ("Motion" or "Mot."), and in opposition to Plaintiff's Conditional Motion for Leave to Conduct Jurisdictional Discovery From TTI, Dkt. 42, and its supporting brief, Dkt. 43 ("Mot. for Jurs. Disc."). Both Plaintiff's Consolidated Opposition to Defendants' Motions to Dismiss (Dkt. 41) ("Opposition" or "Opp.") and his Motion for Jurisdiction Discovery raise interlocking arguments on the jurisdictional questions in this case, and the merits of Plaintiff's request for jurisdictional discovery hinge on the legal theories Plaintiff advances against dismissal of TTI under Rule 12(b)(2). Therefore, TTI responds to the merits of the jurisdictional issues raised in both of Plaintiff's submissions below, *infra* § II.A, and responds to Plaintiff's Opposition brief in strict reply in support of TTI's request to dismiss Plaintiff's substantive claims under Rule 12(b)(6), *infra* § II.B. *See* Dkt. 45.

## I.    <u>INTRODUCTION</u>

In its Motion to Dismiss, TTI moves for immediate dismissal due to lack of jurisdiction. On the record before the Court, there can be no question that TTI should be dismissed on jurisdictional grounds pursuant to Rule 12(b)(2). Plaintiff does not dispute that TTI is a Hong Kong corporation with its offices, headquarters, and principal place of business located outside the United States. Plaintiff's Opposition brief and related Motion for Jurisdictional Discovery fail to overcome fundamental jurisdictional hurdles that are grounded in due process, relying on the incorrect premise—supported by only conclusory allegations—that TTI essentially operates in the United States through its legally distinct subsidiaries. Plaintiff's arguments are based on mere speculation—not allegations of fact—and repeatedly ignore blackletter law that the jurisdictional contacts of TTI's subsidiaries cannot be attributed to it. Plaintiff cannot point to any concrete

1

allegations or evidence that comes close to showing TTI controls or treats these subsidiaries as shell companies or "alter egos." Having failed to do so, Plaintiff asks this Court to simply ignore basic legal principles about the parent/subsidiary relationship. The Court should not do so, and thereby open foreign companies such as TTI to a floodgate of oppressive lawsuits of dubious merit, that really target subsidiary entities doing business in the United States.

Moreover, Plaintiff's Opposition brief only further underscores the fact that this Court unquestionably lacks jurisdiction over TTI. Rather than even attempting to justify general jurisdiction, Plaintiff pivots and focuses exclusively on trying to establish *specific jurisdiction*, based on two specious arguments: (1) that TTI's actions in coordinating the production of Milwaukee Tool gloves in China establish jurisdiction under a "stream-of-commerce" theory, and (2) that TTI's purported "continuing business relationship with Milwaukee Tool" suffices to establish jurisdiction. Opp. at 42-46. Even accepting Plaintiff's factual assertions as true, both arguments for specific jurisdiction are legally deficient. While it is not disputed that TTI's subsidiary Milwaukee Tool is subject to personal jurisdiction in this forum, it is TTI's contacts (or lack thereof) that must be examined to determine personal jurisdiction over TTI, not Milwaukee Tool's contacts. Plaintiff can obviously pursue his claims against Milwaukee Tool in its U.S. forum, but the First Amended Complaint ("FAC") alleges no basis on which it would comport with Due Process to do so for its foreign parent. Quite simply, Milwaukee Tool's alleged sale of work gloves in the United States does not constitute availment of the United States as a forum *by TTI*. Nor does the presence of TTI's subsidiaries. The law requires a "substantial connection" between Plaintiff's claims and the forum, *Walden v. Fiore*, 571 U.S. 277, 284 (2014), and here, the needed connection for specific jurisdiction is clearly absent in light of the FAC's own allegations that Plaintiff's injury and TTI's alleged injury-causing conduct exclusively occurred

*in China*. Notwithstanding Plaintiff's "stream of commerce" claims, Plaintiff "[can]not change the fact that the **harm** caused by Defendants' alleged TVPRA violations was **not suffered in the United States**." *Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159, 1172 n.13 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 491, 214 L. Ed. 2d 280 (2022) (emphasis added). Plaintiff's attempt to pull a foreign company into a lawsuit in the United States over alleged actions and related harm occurring overseas contravenes the essential elements Plaintiff must establish to claim specific jurisdiction in any U.S. forum.

In a final attempt to retain TTI in this case, Plaintiff requests jurisdictional discovery. The request, however, is effectively an improper effort to seek full-blown merits discovery and a wide-ranging fishing expedition into every aspect of the "manufacture" and "venture" alleged in this litigation. Opp. at 47. For a foreign company, such discovery would be invasive and a prejudicial undue burden, especially so where Plaintiff's claims implicating TTI are nothing more than wild speculation. Overbreadth aside, the Court should deny this request, because Plaintiff fails to demonstrate that the jurisdictional deficiencies in the FAC can be remedied through discovery. Based on the facts alleged, there are fundamental **legal** defects to Plaintiff's attempt to assert jurisdiction over TTI that discovery would not overcome.

Nor need the Court entertain jurisdictional discovery at all, because Plaintiff's Opposition again demonstrates how Plaintiff cannot show that he has a valid TVPRA claim under Rule 12(b)(6). Even if the Court were to temporarily put the issue of jurisdiction aside to address the TVPRA claims, the FAC still inherently fails to allege that TTI is "present in the United States," as mandated by 18 U.S.C. § 1596(a)(2). And Plaintiff's TVPRA claim is fundamentally flawed because it seeks to apply the TVPRA's civil remedy provision, 18 U.S.C. § 1595, to

unquestionably extraterritorial conduct, which a proper interpretation of the TVPRA should not allow. These pleading defects are uncurable.

Finally, the Opposition brief concedes that neither Defendant substantively violated the TVPRA. Relying solely on alleged "beneficiary" liability, Plaintiff argues for what amounts to a de facto "strict liability" standard, holding Defendants accountable for ***any*** third-party forced labor within their supply chain, irrespective of whether Defendants knew or should have known about it. Essentially vitiating the "knowing benefit" requirement at the core of any theory of beneficiary liability, Plaintiff claims that he need only allege Defendants "worked together to profit by manufacturing Milwaukee Tool gloves" that were tainted by forced labor. *See* Opp. at 20.

Unfortunately for Plaintiff, the TVPRA requires Plaintiff to allege that Defendants ***knowingly*** benefited from forced labor and ***knowingly*** participated in ventures resulting in the alleged violations, as outlined in 18 U.S.C. §§ 1589 and 1595(a). Plaintiff's attempt to avoid these requirements is legally unsound, as Plaintiff cannot hide the fact that the FAC offers nothing more than a conclusory assertion that "Defendants must have known" about a third party's complicit use of prison labor, without pleading any ***facts*** to show that they did or should have. Such assumptions, which are not supported by any cogent evidence or concrete allegations of fact, do not suffice at this stage and cannot substantiate a claim for beneficiary liability under the TVPRA.

Thus, as set forth further below and in Defendants' Motions to Dismiss, the Court should dismiss Plaintiff's claims against TTI in its entirety and deny jurisdictional discovery.

4

## II.    ARGUMENT

### A.    Plaintiff Cannot Substantiate Personal Jurisdiction Over TTI And No Discovery Is Warranted.

#### 1.    Plaintiff's Arguments Concede That This Court Lacks General Jurisdiction Over TTI.

Plaintiff's Opposition and the related Motion for Jurisdictional Discovery make no effort to substantiate TTI's contacts with Wisconsin or to argue for general jurisdiction in any U.S. court. *See* Opp. at 37-39; Mot. for Jurs. Disc. at 1-3. Instead, Plaintiff argues that since TTI is not subject to general jurisdiction in any state court, the appropriate "forum" for his sole federal TVPRA claim is the United States as a whole. Opp. at 38; Mot. for Jurs. Disc. at 3-4. Plaintiff's underlying argument—although not articulated by the allegations in the FAC (*see* ¶¶ 10-11)—is that jurisdiction is available through Rule 4(k)(2) of the Federal Rules of Civil Procedure, the so-called federal "long-arm statute" that pertains to federal claims in federal courts. Opp. at 42-43.

By shifting to an argument based on "nationwide" contacts under Rule 4(k)(2), Plaintiff in effect concedes that Due Process does not support general jurisdiction over TTI in Wisconsin or any other U.S. forum. As the Court is aware, personal jurisdiction, even in federal cases, is typically determined by the law of the forum state. *See, e.g.*, *Felland v. Clifton*, 682 F.3d 665, 672 (7th Cir. 2012) (citing Fed. R. Civ. P. 4(k)(1)(A)); *Daimler AG v. Bauman*, 571 U.S. 117 (2014) ("Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons."). Abandoning any genuine attempt to argue that TTI's contacts with Wisconsin are sufficient, Opp. at 42, Plaintiff now argues that the Court should look to TTI's connection to the United States, primarily "[t]he production of goods for United States markets," Opp. at 37, which Plaintiff argues gives rise to "specific jurisdiction" anywhere in the United States, Opp at 38-44. *See also* Mot. for Jurs. Disc. 2-4.

Here, TTI's Motion already addressed how TTI's contacts with both the United States, as well as Wisconsin specifically, were necessarily lacking in this case, *see* Mot. at 8-11, and Plaintiff's Rule 4(k)(2) argument is premised on the same factually baseless conflation of "TTI" with its distinct subsidiaries operating in North America. Accordingly, Plaintiff's argument under Rule 4(k)(2) equally fails. *See* Mot. at 12-15.

Plaintiff's shift to reliance on Rule 4(k)(2) is telling in another respect. Reliance on Rule 4(k)(2) concedes that Plaintiff cannot show ***general*** jurisdiction over TTI. As the Opposition recognizes, Opp. at 43, a prerequisite to the application of Rule 4(k)(2) is the requirement that "the defendant is not subject to jurisdiction in ***any*** state's courts of general jurisdiction." Fed. R. Civ. P. 4(k)(2)(a) (emphasis added). Thus, Rule 4(k)(2) cannot apply if there exists a U.S. forum with general jurisdiction, which here is lacking. In fact, as Courts have recognized, "*Daimler's* 'at home' [for general jurisdiction] requirement would render Rule 4(k)(2) inapplicable in general personal jurisdiction cases." *Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F.4th 226, 240 (5th Cir. 2022). Rather, Rule 4(k)(2) cases "have arisen and continue to arise" in specific jurisdiction cases. *Id.* (collecting cases). Tellingly, Plaintiff's argument in the Opposition shifts entirely to justifying specific jurisdiction in this case, the only type of jurisdiction consistent with reliance on Rule 4(k)(2).

Even when proceeding under Rule 4(k)(2), Plaintiff bears the burden to show that jurisdiction satisfies Constitutional Due Process under the traditional test for specific jurisdiction. *See ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548 (7th Cir. 2001). As argued in TTI's Motion (at 16-17), and as set forth in further detail below, Plaintiff cannot do so.

### 2. Plaintiff's Pivot To Specific Jurisdiction Fails As A Matter Of Law.

The Opposition and Motion for Jurisdictional Discovery only really attempt to argue that this Court supposedly has specific jurisdiction over TTI. *See* Opp. at 38-39; Mot. for Jurs. Disc. 1-

6

2 . While the standard for specific jurisdiction is not in dispute, it requires three essential elements: (1) purposeful availment—the defendant must have purposefully directed activities at the forum or availed itself of conducting business there; (2) relatedness—the alleged injury must arise out of or relate to these forum-related activities; and (3) fairness—the exercise of jurisdiction must align with traditional notions of fair play and substantial justice. *See B.D. by & through Myer v. Samsung SDI Co.*, 91 F.4th 856, 861 (7th Cir. 2024). A failure to satisfy any of the three elements means jurisdiction is lacking. *Id*.

Here, extending specific jurisdiction to cover alleged misconduct and injury that occurs exclusively overseas would contravene due process. *See* Mot. at 16.

### a. Plaintiff's "Stream of Commerce" Theory Is Too Attenuated To Show Purposeful Availment.

Plaintiff contends that "[i]t's well-established that a company that intentionally places products in the stream of commerce, knowing that they will be sold in the forum, has purposefully availed itself." Opp. at 39; *see also* Mot. for Jurs. Disc. at 3. While this principle may be true in cases involving product liability, the principle does not universally extend to cases involving foreign parent companies whose products are simply sold by a subsidiary operating in the forum. *See, e.g.*, *Knepfle v. J-Tech Corp.*, 48 F.4th 1282, 1291–92 (11th Cir. 2022) (court lacked specific jurisdiction over Korean parent company that designed and manufactured motorcycle helmets leading to injury in the forum, where the parent did not market or sell the helmets in the United States, as the helmets were marketed through a separate U.S. subsidiary).

Here, Plaintiff does not even argue that TTI marketed or sold anything in the United States. Opp. at 43 (conceding that TTI did not "directly" import or sell good in the United States). Instead, the Opposition argues that TTI's alleged role in a "venture" with its separate U.S. subsidiary to supply Milwaukee Tool gloves "that TTI knows are destined for United States markets is sufficient

for purposeful availment" on its own. Opp. at 41; Mot. for Jurs. Disc. at 2. This argument fails to rise to the level of "availment" of the United States for several reasons.

First, Plaintiff's argument that TTI "sells" or "imports" gloves into a U.S. market misstates unrebutted facts, Mot. at 3-6 (citing evidence),[1] and, in any event, is contrary to the allegations in the FAC. The FAC does not allege that TTI Co. Ltd. manufactured, sold, or imported any products into the United States at all.[2] Rather, the FAC alleges that "Milwaukee Tool gloves in the relevant time period were **manufactured by Shanghai Select**," FAC ¶ 128 (emphasis added), and that "Shanghai Select **is a supplier of Milwaukee Tool**," FAC ¶ 30 (emphasis added). If there were any doubt, "Milwaukee Tool's largest market is the United States," FAC ¶ 20, Milwaukee Tool imported the gloves into the United States, FAC ¶ 46 (TTI Trading Co. allegedly "shipped" them), and the gloves were manufactured based on "Milwaukee Tool's ownership of the design and manufacturing processes," FAC ¶ 58. Even Plaintiff's own allegations in the FAC cannot escape the fact that the "availment" he seeks to attribute to TTI is really the sales and marketing efforts of a separate company and co-Defendant, Milwaukee Tool. *See B.D. by & through Myer*, 91 F.4th at 863 (where the "record does not show that Samsung SDI advertised, sold, or serviced 18650 batteries [causing Plaintiff's injury] in Indiana," there was not purposeful availment of that forum,

---

[1] Plaintiff claims "he has evidence" that TTI "distributes" gloves in the U.S., but what he submits shows no such thing. Plaintiff submits that unverified U.S. "customs data… shows that there were [thousands of] shipments from TTI to… the United States." Wang Decl. ¶¶ 3–5; Ex. A. Firstly, this unauthenticated document is not evidence. But even as an allegation, on its own face, it does not show that TTI was ever an "importer" of gloves to the United States. The "TTI" entities listed in the document appear as "shippers," and the company in fact importing the shipments is listed as Milwaukee Tool. Moreover, the records only go through 2019, almost three years before Plaintiff's alleged injury, and thus show nothing about any products potentially connected to Plaintiff's alleged forced labor. In addition, an unnamed entity in the case—TTI Trading Co.—is listed as the shipper for anything from 2011 until the records end in 2019. While being a mere "shipper" in this case fails to satisfy the purposeful availment on its own, the records in any event do not even establish that as to TTI from the relevant timeperiod.

[2] The Opposition claims TTI has admitted in litigation that it sells products in the United States. Although not alleged in the FAC and not specific to gloves at issue in this case, Plaintiff's citations are inaccurate. For example, pleading in *Techtronic Industries Co. Ltd. v. Bonilla,* No. 23-cv-01734, 2024 WL 4355747 (M.D. Fla.), involves the sales of unrelated products by the TTI subsidiary Ryobi.

notwithstanding the allegation that Samsung SDI sold through websites and vendors that could reach Indiana).

Second, rather than pointing to any sale or marketing of goods in the United States *by TTI*, Plaintiff argues in a conclusory fashion that TTI "entered a venture with its American subsidiary for the purpose of selling goods into U.S. markets." Opp. at 39; Mot. for Jurs. Disc. at 2. At best, the FAC alleges that TTI provided some operations support to its subsidiary related to the procurement or sourcing process *in China*, because TTI's "headquarters are also in [China]" and "from those [Chinese] headquarters," TTI assists in "'Global Sourcing,'" including for Milwaukee Tool. FAC ¶ 77. While the Opposition now claims that Plaintiff alleges TTI "knowingly supplied Milwaukee Tool gloves for sale in the United States" and "distributes Milwaukee Tool gloves to the United States," those assertions are not supported by the FAC or any factual evidence in the record. As alleged in the FAC, Plaintiff's only claims about TTI's support in the process, if anything, involve coordination activities with its subsidiary that were geographically limited to China. As such, TTI did not engage in any activities directed at this forum. *Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 945 (7th Cir. 2000) (rejecting plaintiff's claim that a foreign parent company's conduct related to "administrative services that [it] provided" to its in-forum subsidiary was sufficient to show purposeful availment even though the alleged conduct actually occurred in the forum); *Neterval-Quiel v. CMC SRL*, No. 21-CV-1279-BHL, 2022 WL 4131921, at *6 (E.D. Wis. Sept. 12, 2022) ("[A] parent company is not subject to personal jurisdiction because of the acts of its subsidiaries unless the parent dominates the subsidiary and corporate formalities are not substantially observed.").

Tellingly, Plaintiff relies on a number of specific jurisdiction cases that refute his arguments under the facts alleged in the FAC. For example, *Curry v. Revolution Laboratories,*

*LLC*, 949 F.3d 385 (7th Cir. 2020), and *Logan Products, Inc. v. Optibase, Inc.*, 103 F.3d 49 (7th Cir. 1996), Opp. at 41, both involved out-of-state defendants who ***directly*** advertised and sold products in the forum state, unlike the allegations against TTI.

In fact, Plaintiff's argument that TTI can be said to have placed the gloves at issue in the "stream of commerce" itself relies on the mistaken presumption that Milwaukee Tool's actions are attributable to TTI. When analyzing issues related to jurisdiction, purposeful availment based on a subsidiary's sale of products in a forum can only be attributed to a parent such as TTI where "parental control" so "pervades" the subsidiary's "dealings with the forum" that the subsidiary qualifies as an "alter ego." *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 753 F.3d 521, 532 (5th Cir. 2014). Plaintiff's Opposition and Motion for Jurisdictional Discovery do not even seek to rebut TTI's Motion on this issue, or address the showing needed to establish such an "alter ego," and as such concedes TTI's argument in the Motion to Dismiss that there is no legal basis to "pierce the corporate veil" here and attribute Milwaukee Tool's alleged action equally to TTI. *See* Mot. at 12-13.

By the same token, Plaintiff also argues that further discovery may develop facts to show that TTI's own connections with Milwaukee Tool or its other subsidiaries are so substantial as to independently create "availment" in this forum. Opp. at 47; Mot. for Jurs. Disc. at 4-5. Such an argument—unmoored as it is from the specific injury Plaintiff suffered here—could never satisfy the second element of "connectedness" (*see infra* § II.A.2.b). But also, Plaintiff again assumes, without adequate allegations to support such a finding, that Milwaukee Tool is a "shell company," which it clearly is not. *See* Mot. at 13. Absent such a showing of "veil piercing," TTI's connections with its subsidiary cannot satisfy the purposeful availment element on their own. *Neterval-Quiel*, 2022 WL 4131921, at *6 (no jurisdiction where allegations fail to meet the standard for imputing

in-forum contacts based on the foreign insurer's "knowledge of [the in-forum co-defendant's] business dealings").

The Court cannot find purposeful availment without disregarding the distinct legal identities of TTI and Milwaukee Tool, for which the current allegations and facts before the Court provide no justification. The Court should therefore reject Plaintiff's attempt to collapse the legal distinction between TTI and Milwaukee Tool based on unsupported assumptions.

### b.    Plaintiff Cannot Show a Requisite Connection To This Forum.

Regardless of whether TTI could be said to have "availed" itself of the United States as a forum, Plaintiff's argument for specific jurisdiction necessarily fails due to the lack of the second element— ***relatedness***. *B.D. by & through Myer*, 91 F.4th at 862 ("when there is no such connection [between the forum and the particular claims at issue], specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State.") (quotation omitted). A central requirement of specific jurisdiction is a showing that "the defendant's ***suit-related conduct*** must create a ***substantial connection*** with the forum[.]" *Walden*, 571 U.S. at 284 (emphasis added). The FAC's allegations and arguments advanced in Plaintiff's Opposition fail to show such a "substantial connection" here.

First, Plaintiff asserts that the mere sale of gloves by Milwaukee Tool in the United States suffices to establish a connection, because the production of those gloves (in China) with alleged forced labor is at the core of Plaintiff's TVPRA claim. Opp. at 41; Mot. for Jurs. Disc. at 1-2. Plaintiff's argument misapplies the "stream of commerce" theory, which is primarily relevant to product liability cases and requires a direct link between the defendant's conduct and the forum. *See J.S.T. Corp. v. Foxconn Interconnect Tech. Ltd.*, 965 F.3d 571, 576 (7th Cir. 2020). The key focus of any specific jurisdiction analysis is "whether the conduct ***underlying the claims*** was purposely directed at the forum state." *Tamburo v. Dworkin*, 601 F.3d 693, 702 (7th Cir. 2010)

(emphasis added). According to the Seventh Circuit's application of Supreme Court precedent, this at least requires "express aiming," such that a defendant knew or could expect the conduct would result in an injury to "a resident of the forum state" or to an injury in the forum. *Id.* at 704. Here, even if TTI could be said to have placed work gloves "in the stream of commerce," it had no expectation that the type of injury alleged here (forced labor) would create an injury in the United States. Nor did it, as all the actions that caused Plaintiff's alleged injury happened outside of the United States. *See* FAC ¶ 12.

Plaintiff acknowledges as much when he admits that "Mr. Xu was injured in China," but that "U.S. workers" and "U.S. companies" supposedly suffered harm in the United States. Opp. at 45. It remains unclear to TTI how this assertion could possibly support Plaintiff's connection to this forum. Undisputedly, any alleged injury occurred in China.[3]

Second, Plaintiff fails to allege that any of TTI's conduct causing his injury took place in the United States. Instead, Plaintiff claims TTI's business dealings and procurement activities were confined to China, orchestrated from Hong Kong, with its alleged "recklessness" related to forced labor occurring entirely in supply chains abroad. FAC ¶¶ 3, 63-65, 76-93, 112.

In its Motion, TTI noted that the Seventh Circuit, in cases like *J.S.T. Corp.*, has clarified that specific jurisdiction is inappropriate where both a plaintiff's injury (here, alleged forced labor) and the conduct directly causing that injury (TTI's alleged involvement with Shanghai Select) occur outside the forum. Plaintiff's attempt to distinguish *J.S.T. Corp.* is unconvincing, as Plaintiff

---

[3] Plaintiff misconstrues *Walden* to suggest that the location of Plaintiff's injury is irrelevant. Opp. at 45. Not so. *Walden* found that the location of the plaintiff at the time of the injury was on its own not *sufficient* for jurisdiction absent additional contacts with the forum. 571 U.S. at 290. In *Walden*, the defendant had improperly seized funds from the plaintiff in Georgia, but the effects of that seizure were alleged to harm the plaintiff only later in Nevada. The Court found no jurisdiction in Nevada notwithstanding the continued effect of the injury there, when the actions that first caused the injury occurred in another state. In doing so, *Walden* reaffirmed that the "*effects* of [defendant]'s conduct" on the plaintiff must be directly "connected to the forum," such as Plaintiff experiencing injury in the forum. *Id.*

similarly "fails to acknowledge that there is a reason why the stream of commerce theory is typically associated only with products liability suits," and at a minimum where the alleged injury is closely connected to the forum. *J.S.T. Corp.*, 965 F.3d at 576. In fact, in *J.S.T. Corp.*, the court rejected similar attempts to use "downstream" sales to establish jurisdiction, where the injury at issue (trade secret misappropriation) occurred prior to those sales, even if the sales themselves were a downstream "benefit" of the misappropriation. *Id*. Plaintiff's argument is nothing more than the same type of "attenuated" and "downstream" benefit that *J.S.T. Corp.* rejected.

The additional cases cited in the Opposition and Motion for Jurisdictional Discovery further undercut Plaintiff's arguments. In *B.D. by & through Myer*, 91 F.4th at 862, a typical product liability "stream of commerce" case, the court found that the plaintiff could potentially show relatedness where the defendant introduced products into the forum ***and plaintiff was injured*** in the forum. Similarly, Plaintiff cites *Curry*, 949 F.3d 385, a trademark infringement case, where the defendant actively marketed and sold its dietary supplements in the forum state. Again, the court held that specific jurisdiction was warranted because defendant's actions caused the harm to the competitive position of plaintiff in that very market, and thus alleged infringement was linked to injury within the forum. *Id.* Those same facts are precisely what is missing in the FAC's allegations.

Rather, this case is more similar to the Supreme Court's decision in *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco County*, 582 U.S. 255 (2017). In that case, nonresident plaintiffs brought claims in California court against Bristol-Myers Squibb, the manufacturer of a nationally marketed prescription drug, Plavix. *Id.* at 265-66. The California Supreme Court thought it could exercise jurisdiction because Bristol-Myers Squibb sold Plavix in California and was defending there against identical claims brought by the state's residents. *Id.*

The Supreme Court disagreed, however, because "nonresident[ plaintiffs] were not prescribed Plavix in California, did not purchase Plavix in California, did not ingest Plavix in California, and were not injured by Plavix in California." *Id.* at 264. In short, the plaintiffs and the injuries were not in the forum, which failed to create the "connection" specific jurisdiction would require.

Again, Plaintiff argues here that Milwaukee Tool's sale of gloves in the U.S. alone shows that TTI sought to "benefit" by the sale of gloves in the U.S. allegedly tainted by forced labor. Opp. at 41; Mot. for Jurs. Disc. at 2. Aside from impermissibly attributing Milwaukee Tool's actions and conduct in the U.S. to TTI, none of the cases cited by Plaintiff support such an extension of specific jurisdiction to cases where a plaintiff's injury has such an attenuated connection to the present forum. In the TVPRA context specifically, *Ratha* itself rejected a similar argument about an alleged scheme to ship seafood (connected with forced labor) to the United States, as it "would not change the fact that the ***harm*** caused by Defendants' alleged TVPRA violations was ***not suffered in the United States***." 35 F.4th at 1172 n.13 (emphasis added); *see also id.* at 1172 (even if the sale of products sourced in violation of the TVPRA "constituted intentional acts expressly aimed at the United States," it is still insufficient to show that foreign corporate defendants "purposefully directed their activities to the United States.").

The relevant focus of the TVPRA is the underlying forced labor and Plaintiff's alleged injury from it. Mot. at 19. All of TTI's alleged conduct related to his injury, as well as Plaintiff's injury itself, happened outside of the United States. Thus, there is simply no "substantial connection" to this forum arising from TTI's allegedly suit-related conduct.

      **c.**    **Fairness Dictates That This Court Lacks Specific Jurisdiction.**

The third element of "fairness" also cannot support specific jurisdiction in this case, for the similar reason that all the alleged actions by TTI occurred overseas, and the only injury in question occurred outside the United States. The Supreme Court has noted that a forum "generally has a

'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985). But that analysis presumes that the out-of-state defendant's actions had the "consequence" of causing an injury to a plaintiff either from or in that forum. *Id.* Where the defendant's alleged actions are all limited to conduct outside the United States, the forum state has no such interest, and there is no "foreseeability of causing injury" in the forum so as to be "sufficient to establish such contacts there." *Id.* at 474. When the alleged injury-causing conduct and injuries exclusively occurred abroad, a defendant such as TTI cannot "reasonably anticipate being haled into court" in a U.S. forum. *Id.* Moreover, while Milwaukee Tool, a subsidiary, may have sold gloves for profit in the U.S., TTI, as a Hong Kong entity, would logically perceive any benefit from actions in China as accruing in Hong Kong. Disregarding the distinction between the entities absent a scenario of "veil piercing" to justify jurisdiction also violates fundamental principles of due process. *Infra* at 17-18.

The unfairness here is shown by considering that Plaintiff's argument implies that anyone worldwide could sue a foreign company in the United States over any product that at any point may have the taint of forced labor in its supply chain. Such a sweeping consequence would render constitutional limitations on due process meaningless, turning the U.S. into a forum for litigating labor practices anywhere on earth. This broad assertion has long been deemed constitutionally unsound. As the Supreme Court noted in *Asahi Metal Indus. Co. v. Superior Court of California, Solano County*, "a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State." 480 U.S. 102, 112 (1987). Plaintiff's injury and all actions leading to it allegedly occurred outside this forum, and as such TTI would

not have "fair warning" that its action abroad could "render them liable to suit" here. *Burger King Corp*, 471 U.S. at 472 (quotations omitted).

### 3. Jurisdictional Discovery Will Not Potentially Save Plaintiff's Deficient Allegations.

As the FAC fails on its face to allege "specific jurisdiction" – which cannot be cured by the insufficient arguments set forth in Plaintiff's Opposition brief – jurisdictional discovery in this case is unnecessary. *See Ellis v. Fortune Seas, Ltd.*, 175 F.R.D. 308, 312 (S.D. Ind. 1997) ("courts have properly limited or denied discovery on jurisdictional issues where the plaintiff failed to make some threshold showing—sometimes called a 'prima facie' showing, other times called a 'colorable' showing—of a plausible basis for exercising jurisdiction over the defendant" in its allegation) (collecting cases).

Jurisdictional discovery is only "appropriate when the existing record does not support personal jurisdiction and a party shows it can enhance its jurisdictional claims through discovery." *LG Elecs., Inc. v. Quanta Comput. Inc.*, 520 F. Supp. 2d 1061, 1072 (W.D. Wis. 2007) (internal quotations and citations omitted). However, "a court should deny jurisdictional discovery when a plaintiff's request is based solely on bare, attenuated, or unsupported assertions of personal jurisdiction." *Esquivel v. Airbus Ams., Inc*., No. 1:20-CV-07525, 2021 WL 4395815, at *1 (N.D. Ill. May 3, 2021) (quoting *Precision Dynamics Corp. v. Typenex Med., L.L.C.*, No. 13-CV-860, 2014 WL 12656904, at *2 (E.D. Wis. Feb. 13, 2014)). The arguments advanced by Plaintiff here amount to just such "bare, attenuated, or unsupported assertions" that do not warrant opening a foreign Defendant to discovery in a forum in which it does not operate or do business.

### a. No Amount of Additional Discovery Can Save Plaintiff's Faulty Specific Jurisdiction Argument.

As to specific jurisdiction, Plaintiff's attenuated "stream of commerce" theory—the only theory advanced by Plaintiff that tries to connect anything remotely related to the allegation in this

case to the United States—fails as a matter of law, even if all of Plaintiff's allegations that TTI coordinates sourcing and shipping of Milwaukee Tool gloves are taken as true. *Supra*, § II.A.2. Thus, no discovery is needed for the Court to rule on this theory, and there are no factual issues that Plaintiff could investigate that would change the outcome.

To the extent Plaintiff argues for discovery due to "TTI's continuing business relationship with Milwaukee Tool," Mot. for Jurs. Disc. at 2, this argument is also wrong. Plaintiff has not provided any evidence that Milwaukee Tool is an "alter ego" of TTI, and the FAC's allegations, even taken in a light most favorable to Plaintiff, do not substantiate a credible claim for veil piercing to support this theory. *See* Mot. at 12-14. The FAC only vaguely claims that TTI and Milwaukee Tool share a "symbiotic" relationship (see, e.g., FAC ¶¶ 7-8, 21, 29), but such conclusory, collective allegations do not constitute factual assertions and are inadequate as a matter of pleading. *See, e.g., Rush v. Savchuk*, 444 U.S. 320, 331-32 (1980) (aggregating the forum contacts of multiple defendants in determining jurisdiction is "plainly unconstitutional"). Plaintiff should not be allowed discovery on a theory of jurisdiction he wholly fails to plead.

Further, Plaintiff ignores the fact that, "the Court of Appeals for the Seventh Circuit has emphasized that . . . ***anything less than the degree of control necessary to <u>pierce the parent corporation's veil</u> of liability is insufficient*** to establish personal jurisdiction over the parent." *Insolia v. Philip Morris Inc.*, 31 F. Supp. 2d 660, 669 (W.D. Wis. 1998) (emphasis added). In other words, "[t]o prevail under the alter-ego theory of piercing the veil, a plaintiff must generally establish two elements: (1) that the entities in question operated as a single economic entity, and (2) that it would be inequitable for the court to uphold a legal distinction between the two entities." *Milwaukee Ctr. for Indep., Inc. v. Milwaukee Health Care, LLC*, No. 15-C-1479, 2017 WL 11489876, at *4 (E.D. Wis. Dec. 8, 2017); *see also E.I. du Pont de Nemours & Co. v. Agfa-Gavaert*

*NV*, 335 F. Supp. 3d 657, 675 (D. Del. 2018) ("To state a veil-piercing claim under Delaware law, a plaintiff must plead facts supporting an inference that the corporation, through its alter-ego, has created a sham entity designed to defraud investors or creditors."). Here, although Plaintiff asserts that there is some "coordinat[ion]" and overlap in employees, nothing in the FAC comes close to asserting the showing necessary to establish an "alter ego" or veil piercing, such that Milwaukee Tool is just a "façade" or shell company. *See* FAC ¶¶ 7, 90, 95; Mot. at 12-14. The Court should not give Plaintiff carte blanche to take discovery of TTI based sole on the argumentative assertion that somehow—and exactly how, Plaintiff cannot say— TTI's various subsidiaries are simple "alter egos," which is demonstrably false.

Unsurprisingly, courts routinely reject attempts—and Plaintiff does not even attempt to distinguish the many cases—to assert jurisdiction over a foreign corporate parent such as that made here. *See IDS Life Ins. Co. v. SunAmerica Life Ins. Co.*, 136 F.3d 537, 540 (7th Cir. 1998) (no personal jurisdiction over an out-of-state parent company that allegedly "controlled, directed, and supervised the three subsidiaries that" committed in-state tortious acts because "[p]arents of wholly owned subsidiaries necessarily control, direct, and supervise the subsidiaries to some extent, but unless there is a basis for piercing the corporate veil and thus attributing the subsidiaries' torts to the parent, the parent is not liable for those torts" making jurisdiction inappropriate); *Insolia*, 31 F. Supp. 2d at 670 (rejecting plaintiff's alter-ego theory of general jurisdiction despite plaintiff's evidence showing that the parent company regularly dictated broad policies for the subsidiary regarding "anticipated profits and sales, brand strength and product quality" and colluded in the underlying "conspiracy to spread misinformation about the adverse health effects of smoking," among other allegations); *Collazo v. Enter. Holdings, Inc.*, 823 F. Supp. 2d 865, 872 (N.D. Ind. 2011) (plaintiff could not make out "a prima facie case for general

jurisdiction based on an alter ego theory" despite presenting evidence from the internet that indicated the defendant entities shared a common website for marketing purposes, centralized contact information and customer support services, and failed to disclose the "separate corporate/ownership structures" of the numerous branches operated by a number of separate subsidiaries); *see also Reimer*, 230 F.3d at 945 ("We adopt the rule that a corporate parent may provide administrative services for its subsidiary in the ordinary course of business without calling into question the separateness of the two entities for purposes of personal jurisdiction.").

Plaintiff should not be allowed discovery where he cannot genuinely allege facts supporting a viable veil-piercing claim. As such, no jurisdictional discovery is necessary to adjudicate Plaintiff's attempts to improperly shoehorn specific jurisdiction into this case.

### b. Plaintiff Presents No Basis For Further Discovery On General Jurisdiction.

At this stage, it is clear Plaintiff cannot establish a prima facie basis for general personal jurisdiction. As discussed above, Plaintiff's exclusive reliance on "nationwide" contacts under Rule 4(k)(2) can only legally support a claim for *specific* jurisdiction. *Supra*, § II.A.2. Courts have recognized that Rule 4(k)(2)'s analysis is logically incompatible with the due process required for "general jurisdiction." *Douglass*, 46 F.4th at 241. And in any event, TTI does not have "continuous and systematic" contacts "as to render them essentially at home" anywhere in the United States, as due process inherently requires. *Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915, 919–20 (2011).

Any theory of general jurisdiction requires that TTI's connections with Wisconsin or the United States be "so 'continuous and systematic' as to render [the foreign corporation] ***essentially at home*** in the forum State . . ., *i.e.*, comparable to a ***domestic enterprise*** in that State." *Daimler AG*, 571 at 133 n.11 (emphasis added) (internal quotation marks and citation omitted). Nor does

Plaintiff dispute that a defendant's maintenance of "a substantial, continuous, and systematic course of business" in a state is insufficient to establish general personal jurisdiction, absent a showing that it is "at home." *Daimler AG*, 571 U.S. at 138.

Nothing Plaintiff proposes to inquire into could come close to establishing general jurisdiction here. For example, Plaintiff claims that "TTI" may have a "headquarters" in the United States, but ignores that TTI has shown these references refer to separate subsidiaries, and not TTI Co. Ltd. *See.* Mot at 4-6. Moreover, a corporation is at home in its place of incorporation and where its principal place of business, or corporate headquarters, is located. *Goodyear*, 564 U.S. at 919–29 (citations omitted); *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 800 (7th Cir. 2014), as corrected (May 12, 2014); *see also Kipp v. Ski Enter. Corp. of Wis. Inc.*, 783 F.3d 695, 698 (7th Cir. 2015). Here, there is no real dispute that TTI is a limited liability company organized under the laws of Hong Kong with its principal place of business in Hong Kong. FAC ¶¶ 13, 76-77.[4] Thus, TTI is not, and cannot, be "at home" anywhere in the United States, and this alone shows that no general jurisdiction could possibly be asserted over TTI.

Nor can Plaintiff explain how a few supposed connections to Wisconsin or the United States alleged in the FAC—which at best amount to a few overlapping employees and coordination with its subsidiary—could come close to general jurisdiction, even if they were accurate.[5]

---

[4] Tellingly, the only cases Plaintiff cites in relation to his request for discovery as to general jurisdiction are two cases that involve the alter ego or veil-piercing analysis, which Plaintiff's allegations in the FAC undercut. *Nicks v. Koch Meat Co.* does not address personal jurisdiction at all. 260 F. Supp. 3d 942, 959–62 (N.D. Ill. 2017). More importantly, it analyzes the applicable alter ego standard under Rule 12(b)(6) and, as the Court should do here, rejects the plaintiff's implausibly pled allegation that sought to impute the subsidiary's actions to the parent. *Id.* Similarly, *Smartsignal Corp. v. Bickford* was the reverse, but equally inapplicable, situation, involving undisputable evidence that an individual defendant in a patent infringement case was attempting to utilize shell corporations established for the express purpose of fraudulently avoiding liability. No. 05 C 4608, 2006 WL 8461603, at *2-5 (N.D. Ill. May 16, 2006). There, the court correctly applies the alter ego analysis to impute the individual defendant's contacts with the forum to the sham out-of-state corporations he asserted owned and utilized the patents at issue. *Id.*

[5] As TTI's Motion shows, Plaintiff's many "factual" allegations are simply a confusion about reference to "TTI" as a global brand and a misleading effort to suggest that employees, locations, and activities of TTI subsidiaries are attributable to the entity here, TTI Co. Ltd. *See* Mot. at 11-15.

20

*Douglass*, 46 F.4th at 242–43 (even U.S. contacts that "are, in absolute terms, substantial," do not render a foreign company amenable to general jurisdiction in the United States, including a business operation whose "ships call on at least fifty U.S. ports" and that operates "twenty-seven shipping terminals and six air-cargo terminals in the United States . . . generat[ing] about $1.47 billion in [] revenue every year."). And, as discussed at length, vague assertions about "symbotic" relationship between TTI and Milwaukee Tool fall short of the type of veil piercing needed to attribute Milwaukee Tool's jurisdictional contacts to TTI. *See Abelesz v. OTP Bank,* 692 F.3d 638, 654–60 (7th Cir. 2012); *Daimler AG*, 571 U.S. 133–39; *Goodyear*, 564 U.S. at 919–29; *Endo Ventures Unlimited Co. v. Nexus Pharms. Inc.*, No. 23-cv-0299-bhl, 2024 WL 1254358, at *4 (E.D. Wis. Mar. 25, 2024).

In short, the FAC's own allegations make clear that TTI cannot be "at home" in the United States. *See* FAC ¶¶ 76–77 ("TTI was founded in 1985 in Hong Kong, S.A.R. . . .  Its worldwide headquarters are also in the PRC, specifically Hong Kong, S.A.R., and from those headquarters, TTI manages 'Manufacturing' and 'Global Sourcing,' including for Milwaukee Tool" in China); The Court can decide against general jurisdiction on the alleged facts alone, and no discovery will change that outcome. Accordingly, general personal jurisdiction over TTI does not exist, and no discovery will change that fact.

### c.    Plaintiff's Requested Discovery Is Premature Merits Discovery.

There is ample reason to deny jurisdictional discovery in this case. But if there were any doubt, the type of discovery Plaintiff proposes here is not limited "jurisdictional" discovery, but rather a premature array of merits discovery. Specifically, he seeks information on "TTI's role in designing, manufacturing, shipping, and marketing Milwaukee Tool gloves" (Mot. for Jurs.  Disc. at 3), which encompasses far more than the type of discovery possibly relevant to the Court's jurisdiction and pertains instead to the merits of his TVPRA claim. Additionally, Plaintiff requests

discovery related to the "formation of the venture between TTI and Milwaukee Tool" (*id.*) including "each company's role" and "their ongoing relationship," (*id.*) not to mention all connections by TTI and U.S. subsidiary none of whom (other than Milwaukee Tool) are named or have any connection with this case. *See also* Opp. at 47–48. In essence, Plaintiff requests permission to embark on a fishing expedition in a manner broad enough to impact nearly every aspect of their claim in this case as to both Milwaukee Tool and TTI, and even much more (TTI's other subsidiaries in the United States are not alleged to be involved in the "venture"). Allowing such discovery would make any gatekeeping effect of appropriately pled jurisdiction meaningless.

This Court has previously rejected requests for jurisdictional discovery from a foreign corporate parent in similar circumstances. In *Neterval-Quiel,* the Court expressly recognized that "[f]oreign nationals usually should not be subjected to extensive discovery in order to determine whether personal jurisdiction over them exists," 2022 WL 4131921, at *6 (alteration in original) (quoting *Reimer Express*, 230 F.3d at 946), and especially so where (as here and in *Neterval-Quiel*) such discovery would be nothing more than a fishing expedition for facts from which to argue that Milwaukee Tool or any other valid U.S. subsidiary is anything less than a distinct legal company. *Id.* ("[A] parent company is not subject to personal jurisdiction because of the acts of its subsidiaries unless the parent dominates the subsidiary and corporate formalities are not substantially observed… In other words, a parent's mere knowledge of its subsidiary's business in a particular jurisdiction does not render the parent amenable to suit there.").

Plaintiff's overreach is further demonstrated by the fact that all the cases Plaintiff relies upon to support his request for discovery arose under very different circumstances than the facts alleged in this case. For example, *B.D. by & through Myer* is a prototypical product liability case brought under the stream-of-commerce theory of specific personal jurisdiction. There, unlike here,

the plaintiff was specifically injured in the target forum, thus the defendant's potential general market contacts with the forum were considered related for purposes of establishing specific personal jurisdiction under the stream-of-commerce theory. 91 F.4th at 862.

Similarly in *Esquivel*, the Court specifically premised its grant of jurisdictional discovery on "ambiguities in the record" as to whether the defendants "cultivated a market for their product in" the forum state to establish specific jurisdiction under a stream-of-commerce theory in a product liability case. 2021 WL 4395815, at *2. Once again, that case is inapposite to Plaintiff's specific-jurisdiction claims here. Even if Plaintiff were to be allowed to further develop the record about TTI's general knowledge or activity or down-stream forum-related contacts for the Milwaukee Tool branded gloves, it would still be insufficient, because none of those contacts are relevant to the relationship among the defendant, the forum, and the statutory injury at issue in this litigation. *See J.S.T. Corp.*, 965 F.3d at 576.

The fact that Plaintiff cannot overcome the legal deficiencies in his jurisdictional allegations is only highlighted by the obvious overreach in his request for premature "merits" as opposed to jurisdictional discovery. The Court should not endorse efforts to circumvent the gatekeeping role of jurisdictional requirements by subjecting TTI to wide-ranging discovery about the merits of the case, when Plaintiff cannot even allege a valid theory under which TTI is amenable to suit in this Court.

Faced with a failure to make a "prima facie" showing at this stage, Plaintiff merely hopes discovery will turn up facts to substantiate his conclusory assertions of jurisdiction. Should the Court allow discovery that only proves Plaintiff's assertions are meritless, TTI should be entitled to the fees and costs of that discovery. *See Jolly Grp., Ltd. v. Medline Indus., Inc.*, 435 F.3d 717, 720 (7th Cir. 2006). However, Plaintiff is himself problematically beyond the reach of this Court.

Not only is Plaintiff proceeding anonymously, he is also a foreign national, and to the degree Plaintiff could satisfy a fee and cost award, any resource he has are beyond the reach of any U.S. Court. Accordingly, before indulging in any jurisdictional discovery, the Court should also require Plaintiff to post a bond.[6]

**B.** **Plaintiff's Opposition Shows That He Fails To Allege A Valid TVPRA Claim.**

Irrespective of the jurisdictional deficiencies, Plaintiff also fails to state a valid TVPRA claim against either Defendant. Accordingly, there is no need to decide at this stage whether to allow jurisdictional discovery, because the Court should dismiss Plaintiff's claims under Rule 12(b)(6).

### 1. This Court Should Find That 18 U.S.C. § 1595 Does Not Apply Extraterritorially.

Plaintiff's Opposition goes to great lengths to justify the supposed extraterritorial application of § 1595. Opp. at 8-20. Although courts have split on the issue, there are good reasons this Court should adopt the holding of *Doe I v. Apple Inc.*, No. 1:19-CV-03737 (CJN), 2021 WL 5774224, at *14-15 (D.D.C. Nov. 2, 2021), *aff'd on other grounds*, 96 F.4th 403 (D.C. Cir. 2024) ("*Doe I*"), and find that the TVPRA's civil remedy provision does not apply extraterritorially.

To start with, Plaintiff attempts to undercut the burden of statutory interpretation applicable to § 1595 by ignoring the principle that there is a *presumption* against extraterritoriality applicable to all federal statutes, starting from the assumption that "United States law governs domestically but does not rule the world." *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 335 (2016).

---

[6] The Court should grant Defendants leave to request the amount of such a bond by later motion before this Court, so as to provide reasonable protection to secure TTI (and any of its subsidiaries forced to undergo costs of discovery) eligible recovery on its subsequent fee petition. Fed. R. Civ. Pro. 54.; *see also Gay v. Chandra*, 682 F.3d 590, 594 (7th Cir. 2012) (where a party may be entitled to fees, bonds are intended to enable collection of a potential award by ensuring that the party's assets are not dissipated or otherwise unreachable by the Court). Plaintiff has no case for jurisdiction on the merits, and the prejudice to TTI if discovery is allowed in terms of the burden and costs it must undergo, compared to the minimal burden on Plaintiff, clearly weigh in favor of a bond.

Thus, the first step requires an analysis of whether Congress gave a "clear, affirmative" indication that "rebuts this presumption." *Nestle USA, Inc. v. Doe*, 593 U.S. 628, 632 (2021) (citation omitted).

It is not surprising that Plaintiff neglects the significance of the presumption against the extraterritorial application of the TVPRA. Although two courts have found that § 1595 applies extraterritorially— *Roe v. Howard*, 917 F.3d 229 (4th Cir. 2019) ("*Howard*"), and *United States ex rel. Hawkins v. ManTech Intel. Corp.*, No. 15-2105, 2024 WL 4332117 (D.D.C. Sep. 27, 2024) ("*Hawkins*")—those two courts similarly failed to adequately consider this presumption and quickly jumped to assumptions about what Congress intended, unmoored from the actual language Congress used to extend criminal portions of the TVPRA extraterritorially in enacting § 1596. When the presumption is properly applied, as the *Doe I* court did, it becomes evident that Plaintiff misinterprets the civil remedy provision of the TVPRA, because there is no affirmative indication within the statute that rebuts the presumption against extraterritorial application.

First, Plaintiff advises to "[s]tart with the text." Opp. at 10. But Plaintiff cannot—and does not—dispute that *nothing* in the civil remedy provision provides a cause of action for harm occurring exclusively overseas. *See Doe I* at *14. Indeed, the plain statutory text of the civil remedy provision on its own fails to rebut the presumption against extraterritorial application. *Id.*

Instead of looking at and confronting the text of the civil remedy provision, Plaintiff really skips to the criminal portions of the TVPRA, pointing out that those criminal provisions do apply extraterritorially through Congress's 2008 amendment to add § 1596, which did extend extraterritorial application to certain predicate "offenses." But as *Doe I* points out (at *15), "the text and structure of § 1596 suggest that it was focused on criminal, not civil, applications," and there is no question § 1596 did not expressly state that it applied to "civil" claims as well or

expressly include any reference to the pre-existing § 1595. Plaintiff's arguments, and those cases holding that § 1596 nevertheless applies to § 1595, while admittedly presenting debatable issues, are ultimately unpersuasive. *Doe I* addressed specifically Plaintiff's argument—based on the assumptions in *Howard* and *Hawkins*—that by creating a private right of action based on predicate criminal offenses elsewhere in the statute, § 1595 "clearly and directly incorporates" extraterritorial predicates. *See* Opp. at 10. As *Doe I* pointed out, "at first glance, this is a compelling argument. But closer scrutiny reveals potential flaws." *See Doe I* at *14.

As *Doe I* points out—and *Howard* and *Hawkins* fail to address—while § 1596 explicitly grants extraterritorial application to many criminal statutes, it does not mention their civil analogue, § 1595. *Id.* at *15. Thus, *Howard* and *Hawkins* ignore that "Congress could have easily included § 1595 in § 1596, but it did not. (Indeed, in that very same Act, Congress amended the text of § 1595 itself." *Id.* (comparing Pub. L. 110–457, title II, § 221(2), Dec. 23, 2008 with Pub. L. 110–457, title II, § 223(a), Dec. 23, 2008.). On the pivotal issue, *Doe I* properly applied the presumption at issue here that "when a statute provides for some extraterritorial application, ***the presumption against extraterritoriality operates to limit that provision to its terms***." *Id.* (emphasis added). By actually looking at the statutes' language in light of this presumption, and Congress's failure to address § 1595 through enacting § 1596, *Doe I* rightly concluded:

> It thus seems likely that when in § 1596(a) Congress granted extraterritorial jurisdiction over "any offense (or any attempt or conspiracy to commit an offence) under section 1581, 1583, 1584, 1589, 1590, or 1591," ***its omission of § 1595 was not mistaken, but was an intentional decision not to extend extraterritorially the reach of the statute's civil component***. It is not for this Court to question that decision; especially as grants of extraterritorial jurisdiction are fraught with international-relations considerations, ones far outside the judicial role.

*Id.* at *16 (emphasis added).

The only subsequent case to decide the issue contrary to *Doe I* is *Hawkins*. *Hawkins* expressly disagreed with *Doe I* on the grounds that the history of amendment seemed to suggest

that Congress did not intend to "limit" extraterritorial application. *Hawkins* at *11. But *Hawkins* does not address the omission of reference to § 1595 in § 1596, and gets the statutory analysis backwards. Prior to the 2008 amendments, there was no civil extraterritorial application to the TVPRA, as several courts had ruled. *Doe I* at *14-15. And Congress did not positively give indication that in expanding the TVPRA's scope, the civil remedy provision would be included. *Id.*[7]

Plaintiff wrongly asserts that compared to Defendants' reliance on *Doe I* there is a "broad consensus" in favor of extending § 1595 extraterritorially. *See* Opp. at 11-16. While several courts have assumed extraterritorial application of §1595 for unrelated reasons, few have analyzed the issue directly or reached holdings on it, other than *Doe I*, *Howard*, and *Hawkins*.[8] None are controlling authority and, TTI submits, *Doe I* has the better of the argument.

This Court should follow the reasoning of *Doe I* and find that there is no extraterritorial application to the TVPRA's civil remedy provision. Neither *Howard* nor *Hawkins* can explain

---

[7] *Hawkins*' incorrect reasoning, however, might be forgiven because it faced a very different scenario than the facts alleged here. *Hawkins* is a realtor action brought on behalf of the United States and, while the conduct at issue happened overseas, the alleged TVPRA violation involved U.S.-based defense contractors working for the Defendant Defense Department on U.S. bases in Kuwait. Even if technically extraterritorial, the domestic concerns of the *Hawkins* case are obvious, and not like the action here alleged against a Hong Kong (not U.S.) defendant over conduct alleged to have occurred in Chinese-run prisons (not U.S. military bases).

[8] In *Adhikari v. Kellogg Brown & Root, Inc*., the Fifth Circuit reasoned that "[i]n light of the well-established presumption against extraterritoriality, we conclude that § 1595 unambiguously did not apply extraterritorially," discussing only that § 1596 could bring that into question, but that it ultimately did not need to decide the issue. 845 F.3d 184, 201 (5th Cir. 2017) (finding instead that § 1596 could, in any event, not be retroactive and thus the TVPRA had no extraterritorial application in the case). *Adhikari* does not support extraterritorial application. Likewise in the District Court decision in *Ratha v. Phatthana Seafood Co*., also cited by Plaintiff, the parties did not dispute—and the court therefore did not need to analyze—whether the civil remedy provision properly applied to extraterritorial conduct. No. CV 16-4271-JFW (ASX), 2016 WL 11020222, at *5 (C.D. Cal. Nov. 9, 2016). The Ninth Circuit likewise reached no holding on the issue. 35 F.4th at 1167-68. The other cases cited by Plaintiff similarly did not reach holdings. *C.T. v. Red Roof Inns, Inc*., No. 19-CV-5384, 2021 WL 602578, at *4 (S.D. Ohio Feb. 16, 2021) (analyzing jurisdiction with respect to "conduct within the United States"); *Abafita v. Aldukhan*, No. 16-cv-06072, 2019 WL 6735148, at *3 (S.D.N.Y. Apr. 4, 2019) (plaintiff's alleged forced labor occurred while both defendant and plaintiff were in the United States, including that in "both New York and New Jersey, Abafita worked 19 to 22-hour days with no days off, performing domestic tasks for Defendants and caring for the child or children of Defendants"); *Aguilera v. Aegis Commc'ns Grp., LLC*, 72 F. Supp. 3d 975, 978–79 (W.D. Mo. 2014) (alleged trafficking originated in the United States while in Joplin, Missouri).

how, in enacting § 1596, Congress still used the criminal language of "offense" and did not clarify that § 1595 would be expanded as well.[9] And as *Doe I* cautioned, "assuming" an intent to apply § 1595 extraterritorially raises a "policy concern" only Congress can address. *Id.* Those concerns are on display in this case, where Plaintiff is seeking to hold a foreign company, not operating in the United States, liable for actions and injuries that occurred exclusively overseas.

### 2. This Case Presents a Straightforward Extraterritorial Application of the TVPRA.

Next, Plaintiff tries to argue that this case does not actually involve extraterritorial application of the TVPRA at all, but only "domestic" conduct. Opp. at 16. Plaintiff's fanciful argument is without merit in a case where Plaintiff's alleged forced labor occurred exclusively overseas. While the TVPRA prohibits "knowingly benefitting" from forced labor, there is no question that the "conduct relevant to the statute's focus," Opp. at 16 (citing *Motorola*, 108 F.4th at 473), is the forced labor itself, which forms the predicate offense on which any TVPRA action could exist.

Undisputedly, Plaintiff alleges that all the forced labor at issue occurred in China and any injury to Plaintiff occurred in China. *See, e.g.*, FAC ¶¶ 32-39. Indeed, it is precisely TTI's presence in China that allegedly made it part of the venture to begin with. FAC ¶ 7. Every court to have looked at the TVPRA has concluded that where the underlying violation occurred overseas, an extraterritorial application of the statute was at issue, irrespective of whether certain "benefits" may have been directed to or occurred in the United States, just as the courts in *Ratha*, *Doe I*, *Howard*, and *Hawkins* all did. For example, the court in *Ratha* recognized that despite allegations

---

[9] In arguing that "offense" incorporates "civil offense," Plaintiff relies on an inapposite decision in *Motorola Solutions, Inc. v. Hytera Communications Corp. Ltd.*, 108 F.4th 458, 486 (7th Cir. 2024), *reh'g and reh'g en banc dismissed*, No. 22-2370, 2024 WL 4416886 (7th Cir. Oct. 4, 2024), which did not address the use of "offense" in the TVPRA. As *Motorola Solutions, Inc.* recognizes, "offense" typically does connote a criminal violation, but the analysis in that case turned on its specific use within the statute. Here, as *Doe I* found, nothing in the TVPRA suggests that Congress intended "offense" to have a broader meaning than its usual "criminal" connotation.

the fish at issue were intended for U.S. markets, because the injury and actions causing the injury occurred overseas, the claims at issue were an extraterritorial application of the TVPRA. 35 F.4th at 1167. Just as here, *Ratha* "involv[ed] allegations by foreign Plaintiffs, against foreign Defendants, based on conduct occurring and injuries suffered in a foreign country." *Id.* (plaintiffs alleged that two Thai companies subjected the Cambodian fisherman to forced labor "at their seafood processing factories" in Thailand).

While the *Hawkins* case on which Plaintiff relies erred on the issue of the TVPRA's extraterritorial scope, it did not err in rejecting the argument that alleged forced labor occurring— even on U.S. army bases—in Kuwait would be "domestic." 2024 WL 4332117 at *4. In *Hawkins*, the victims were American residents. The perpetrators—U.S. defense contractors—who allegedly engaged in forced labor were also based in the United States, although acting overseas. *Id.* The victims' families, moreover, suffered effects in the U.S. Notwithstanding all these connections, it was the location of the injury (Kuwait), where the harm allegedly occurred (Kuwait) and where the alleged injury arose (Kuwait) that led the court to conclude that "the alleged conduct giving rise to the claim was undertaken almost exclusively abroad." *Id* at *5. Indeed, it did not matter that Plaintiff argued defendants had "planned, set into motion, ratified, and committed violations of the TVPRA and set in motion a prohibited money laundering scheme to further its TVPRA violations" all in the United States to benefit American companies, as "this does not tip the balance since the plan [of forced labor] was carried out abroad and directed at Kuwait." *Id.* at *5–7.

There is no real question here that an extraterritorial application of the statute is at issue in this case. As such, § 1595 affords no civil remedy.

### 3. Plaintiff's TVPRA Claim Also Fails Because TTI Is Not "Present in the United States" As Required By § 1596(a)(2).

Setting aside the jurisdictional defects presented in this case, the TVPRA requires that TTI be *present in the United States* for any liability to attach. 18 U.S.C. § 1596(a)(2). Here, Plaintiff is unable to make requisite showing for several reasons based on the facts alleged in the FAC.

*First*, Plaintiff unceremoniously dismisses the statute's plain language requiring actual *physical presence*, without engaging in any analysis of the most detailed discussion of the TVPRA's application to non-U.S. companies through § 1596(a)(2) set forth in *Ratha*, which found that Thai companies were not subject to the TVPRA, because they were not "present" in the United States. Following the Ninth Circuit's reasoning in *Ratha*, TTI is not "present" in the United States under § 1596(a)(2). 35 F.4th at 1169-70 (noting that "physical presence" is closer to the plain meaning of §1596 and caselaw cited by plaintiff "supports the conclusion that § 1596's use of the term 'present in' requires physical presence, not merely the types of minimum contacts that satisfy due process[.]").

Plaintiff only points to TTI's CEO's residence as an indication that TTI is "physically present" in the United States, alongside the erroneous and conclusory allegations that TTI may have some offices and other employees in the United States. Opp. at 40; *see* Mot. at 5. Even if a few limited employees were present (TTI has presented evidence refuting these allegations, Mot. at 4-6), the FAC itself alleges (at ¶ 13) that TTI is a Hong Kong company with its headquarters and principal place of business in Hong Kong. Indeed, as discussed above, Plaintiff cannot justify general jurisdiction over TTI, which clearly does not exist. *Supra*, § II.A.1. If physical presence means anything with respect to a corporation, then the lack of any real connection to the United States (other than subsidiaries) leads only to one result: TTI lacks a "physical presence" in the

United States and thus the allegations facially fail to meet a basic requirement of the statute. *Ratha*, 35 F.4th at 1170-72.

*Second*, Plaintiff cannot allege any other plausible basis that could satisfy the threshold "presence" requirement of § 1596(a)(2). Plaintiff's only argument is that presence is satisfied either by the presence of an "agent" or because TTI participated in a venture with "Milwaukee Tool." *Ratha* rejected just such an argument. 35 F.4th at 1172-74. Moreover, both are nothing more than the same conclusory allegations that Milwaukee Tool could be just a "façade," despite the fact that Plaintiff alleges it to be its own company with hundreds of millions in independent revenue. FAC ¶ 90. As a matter of law Milwaukee Tool's jurisdictional contacts cannot be attributed to TTI. *See* Mot. at 12.

Simply by alleging a venture that involved Milwaukee Tool in the United States does nothing to show that TTI was "present" here. An alleged "venture" with U.S. companies in *Ratha* did not satisfy any definition of "minimum contacts" with the United States where the Thai companies were alleged to have violated the TVPRA overseas. 35 F.4th at 1170. Because the harm alleged against the foreign companies took place outside the United States and was directed to individuals in Thailand and in Cambodia, there were no "continuous contacts" from which to claim "presence" in the United States, notwithstanding an alleged scheme to import products. *Id.* at 1170-72.

It is undisputed here that TTI is a Hong Kong entity and that the acts all occurred in China. Even under a "minimum contacts" analysis, Plaintiff has not alleged facts to show that the physical "presence" requirement in § 1596(a)(2) has been satisfied. TTI cannot be said to be "present" in the United States.

### 4. Plaintiff Fails To Justify That He Has Stated A Claim For Violation Of 18 U.S.C. §§ 1589 and 1595.

The civil remedy provision in § 1595(a) authorizes "two kinds of civil liability: perpetrator liability and participant [a/k/a 'beneficiary'] liability." *G.G. v. Salesforce.com, Inc*., 76 F.4th 544, 552 (7th Cir. 2023). While the FAC alleges both, FAC ¶¶ 44-54, Plaintiff essentially abandons any attempt to defend a claim for "perpetrator" liability in his Opposition. Opp. at 20-21.[10] Plaintiff only argues that he has stated a claim for "beneficiary" liability, i.e., violation of the prohibition against "knowingly benefit[ing], financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of" forced labor (§ 1589(b)). But the arguments in Opposition still fail to justify a beneficiary claim under § 1589(b) and § 1595(a).

At its core, the Opposition argues that it is sufficient to allege that Defendants "knowingly benefited from producing gloves in China for sale in the United States." Opp. at 25. According to Plaintiff, "a defendant need only be aware that it was benefitting in some way from its participation in the venture," but not necessarily that the venture involved —at some point—forced labor. *Id.* Under Plaintiff's theory, Defendants can be liable whether they knew or had reason to know about that forced labor or not. *Id.* The premise of Plaintiff's argument sets too low a bar to state a beneficiary liability claim and has no grounding in law.

Plaintiff's entire argument is refuted by § 1589(b) itself, which requires that a defendant must either be "knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means." If the Court were to follow Plaintiff's reasoning, the statute would essentially impose strict liability on any entity engaged in otherwise arm's-length and legitimate contracts to produce products if at any point in the supply

---

[10] Because the Opposition abandons any argument for direct "perpetrator" liability, the Court should dismiss that claim.

chain another entity benefited from forced labor. It is no surprise, however, that Plaintiff has been forced to offer such an impermissibly broad reading of § 1589. Plaintiff simply has no facts from which to specifically allege that any Defendant had knowledge of the alleged forced labor perpetrated by Shanghai Select, or even facts from which to allege genuine recklessness or negligence by any Defendant about that forced labor.

### a. Plaintiff Fails To Allege *Participation* In A Venture.

First, while Plaintiff relies on the Seventh Circuit's *G.G.* case to show that a "venture" can include a commercial enterprise, a "venture" is only half of the first element. A defendant must also "participate" in the venture, and Plaintiff ignores that *G.G.* also stated that participation requires "***knowingly assisting, supporting, or facilitating*** a violation" of the TVPRA, *see* 76 F.4th at 558 (emphasis added), which it defined as a type of "culpable assistance" by a showing that the alleged "participant provides assistance, support, or facilitation to the [direct violator]" amounting to a "tacit agreement" in the forced labor at issue, *id.* at 559. The Opposition does not explain how Defendants could be said to have actually "participated" in any venture with Chishan Prison and Shanghai Select, the alleged perpetrators. In fact, Plaintiff's allegation that it is only "likely" Defendants were involved, FAC ¶ 129, implicitly demonstrates that Plaintiff cannot allege concrete facts to support such a claim. That is not surprising, when the only individuals Plaintiff ever interacted with allegedly worked for Shanghai Select or the prison itself. FAC ¶ 45.

In essence, Plaintiff still only alleges that Defendants should have been "well-aware of the risk" that forced labor might exist in Chinese supply chains. FAC ¶ 75. And the Opposition does nothing to hide the fact that Plaintiff can only make generic allegations that he *assumes* Defendants must have known of and approved the violations, again relying on generalized conditions, but no facts at all suggesting that they actually did. *E.g.*, FAC ¶ 93 (Defendants sourced manufacturing in China to lower costs), ¶¶ 94-99 (Defendants market their attention to "manufacturing

excellence" and "quality control"), ¶¶ 100-105 (TTI audits suppliers and requires them to ensure compliance with policies against forced labor), ¶¶ 107-112 (Shanghai Select stated it could lower costs of production through its outsourcing of supply). Since the FAC does not allege any *facts* to show that TTI "assisted, supported, or facilitated" the use of prison labor in any way, he cannot allege participation in the venture that supposedly used forced labor. *See In re S. White Transp., Inc.*, 725 F.3d 494, 497–98 (5th Cir. 2013); *Ratha v. Phatthana Seafood Co.*, No. CV 16-4271-JFW (ASx), 2017 WL 8293174, at *4 (C.D. Cal. Dec. 21, 2017).

### b. Plaintiff Fails To Show How The Allegations Satisfy The "Knowledge" Requirements Of Beneficiary Liability.

Even more glaringly, the Opposition does nothing more to improve on Plaintiff's faulty, and conclusory, assertion that TTI "knew or should have known [that the alleged venture] has engaged in an act in violation of this chapter," *Ratha*, 35 F.4th at 1165 (quoting 18 U.S.C. § 1595(a)), let alone that it could have "knowingly" benefited from it. Plaintiff concedes that he does not allege that Defendants had *actual knowledge* of Mr. Xu's alleged forced labor.[11] Rather, Plaintiff argues that it was enough that Defendants knowingly benefitted from the sale of Milwaukee Tool gloves, or sought to lower costs by sourcing production in China. Opp. at 25. According to Plaintiff, either Defendants audited their suppliers, in which case they were supposedly negligent in not uncovering forced labor in the Milwaukee Tool supply chain, or they did not actually audit them, which would have been negligent to do when sourcing products from suppliers in China. Opp. at 26. This "damned if you do, damned if don't" argument exposes the cursory and implausible nature of Plaintiff's allegations here.

---

[11] Mr. Xu alleges he was subject to forced labor from February to July 2022. FAC ¶ 37. But Plaintiff also does not dispute that, as alleged, Defendants were only made aware of the allegations of forced labor in January 2023, *after* the time period of the alleged violation. *Id.* ¶ 63.

First, under Rule 12(b)(6), Plaintiff should be held to the FAC's allegations, and the FAC does allege that Defendants audited their suppliers. FAC ¶¶ 2, 100. But Plaintiff's assumptions about "recklessness" and "negligence" again boil down to nothing more than an assumption that Defendants "should have known" about forced labor in China without providing a shred of credible evidence to support a chain of constructive knowledge. Opp. at 28-31. Plaintiff unconvincingly suggests that these allegations do not just rely—as alleged in the FAC—on "generalized" knowledge that such abuses are "widely known" in the manufacturing industry. FAC ¶¶ 66-75. All Plaintiff can point to is that Defendants allegedly had "deep and unique knowledge of labor and manufacturing issues" in China, *id.* ¶¶ 76-80; *see also id* ¶¶ 126-129, and other similar allegations about Defendants' supposed "expertise" in Chinese manufacturing. Opp. at 30. Again falling back on pure assumptions, Plaintiff's only argument is that Defendants "were undoubtedly aware that outsourcing their glove manufacturing to China meant entering a heightened risk environment for forced labor," and that Defendants had particular knowledge about "specialized" manufacturing in China. Opp. at 26. These arguments are still exactly like those in *Ratha*, which the Ninth Circuit found to be "too attenuated to support an inference that [defendant] knew or should have known of the specifically alleged TVPRA violations." F.4th at 1177. Insinuation of general knowledge and evidence about "country conditions," *id.*, do not amount to "recklessness" or "negligence." Plaintiff's arguments thus concede that he has not made—and cannot make—any concrete allegations that Defendants had any reason to know of Shanghai Select's connection to the alleged incidents of forced labor specifically.

Indeed, the Opposition still conclusorily asserts just such a "generalized conditions" argument, claiming that "if TTI's public claims about the detailed audits and investigations it performs are true, it would have been aware that its Milwaukee Tool gloves were being made with

forced prison labor—or, at the very least, would have discovered red flags alerting it to a substantial risk." Opp. at 30. In making this argument, Plaintiff again relies on the claim that decades of public reporting that "in the textile and manufacturing industries especially, the use of forced labor in [Chinese] prisons" to make goods for U.S. export "is widespread." *Id.* Such arguments are indistinguishable from those in *Ratha* on the generalized conditions in the Thai fishing industry that the Ninth Circuit clearly found inadequate. *See* Mot. at 27-29.

The flipside of Plaintiff's Catch-22 argument fares no better. Plaintiff cannot dispute that numerous courts have held the TVPRA does not create an affirmative duty to police suppliers, even if no Seventh Circuit case has addressed this issue. *See, e.g.*, *A.B. v. Wyndham Hotels & Resorts, Inc.*, 532 F. Supp. 3d 1018, 1027 (D. Or. 2021); *A.B. v. Marriott Int'l, Inc.*, 455 F. Supp. 3d 171, 182 (E.D. Pa. 2020); *B.M. v. Wyndham Hotels & Resorts, Inc.*, No. 20-cv-00656-BLF, 2020 WL 4368214, at *6 (N.D. Cal. July 30, 2020); *Jensen v. U.S. Tennis Ass'n*, No. 20-2422-JWL, 2020 WL 6445117, at *6 (D. Kan. Oct. 30, 2020). But Plaintiff still argues that it would somehow have been negligence "not to audit" suppliers, given TTI's knowledge about generalized conditions in China. TVPRA cases do not apply such a lenient standard. And nothing in Plaintiff's Opposition pleads *facts* from which to infer that any Defendant was on notice of, or had reason to be on notice of, Plaintiff's claims, other than an assumption that audits of Milwaukee Tool's suppliers would certainly have discovered forced labor. Without facts to actually show that the specific Defendants knew or should have known of Plaintiff's forced labor, Plaintiff simply cannot state a claim.

### III.   CONCLUSION

For the foregoing reasons, and those in Defendants' Motions to Dismiss, the Court should deny the request for jurisdictional discovery and dismiss TTI for lack of personal jurisdiction pursuant to Rule 12(b)(2). Alternatively, the Court should dismiss TTI with prejudice because the

TVPRA's civil remedy provision (18 U.S.C. § 1595(a)) cannot apply extraterritorially and its "jurisdictional" provision (18 U.S.C. § 1596(a)(2)) does not apply to TTI, or dismiss the substantive allegations against it pursuant to Rule 12(b)(6) for failure to state a TVPRA claim.

Dated: January 13, 2025                    **MORGAN, LEWIS & BOCKIUS LLP**

By: */s/ Jason C. White*

Jason C. White
110 North Wacker Drive
Chicago, IL 60606
Telephone: +1.312.324.1775
Facsimile: +1.312.324.1001
Jason.white@morganlewis.com

Zane David Memeger
2222 Market St.
Philadelphia, PA 19103
Telephone: +1.215.963.5750
Facsimile: +1.215.963.5001
zane.memeger@morganlewis.com

Andrew DeCarlow
1301 Second Avenue, Suite 3000
Seattle, WA 98101
Telephone: +1.206.274.6400
Facsimile: +1.206.274.6401
andrew.decarlow@morganlewis.com

*Attorneys for Defendant Techtronic Industries Co. Ltd.*