## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF WISCONSIN

XU LUN,

                Plaintiff,

                                                     Case No. 24-cv-0803-bhl

     v.

MILWAUKEE ELECTRIC TOOL CORPORATION
and TECHTRONIC INDUSTRIES COMPANY LIMITED,

                Defendants.

## ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS AND DENYING PLAINTIFF'S MOTION FOR JURISDICTIONAL DISCOVERY

Plaintiff Xu Lun, a Taiwanese national who is proceeding pseudonymously, claims officials in a Chinese prison unlawfully forced him to perform labor while he was imprisoned for his political activism. (ECF No. 28.) Invoking the civil enforcement provisions in the Trafficking Victims Protection Act (the TVPA), 18 U.S.C. §§1581–1597, Xu Lun seeks to hold Defendants Milwaukee Electric Tool Corporation (Milwaukee Tool) and Techtronic Industries Company Limited (Techtronic Industries) liable, claiming they illegally benefitted from their participation in a venture that used forced labor. (*Id.* ¶9.) Both Defendants have moved to dismiss. (ECF Nos. 29 & 31.) Techtronic Industries argues that it is not subject to personal jurisdiction in this Court. (ECF No. 32 at 13–24.) It also joins Milwaukee Tool in arguing that Xu Lun's factual allegations are insufficient to state a claim under the TVPA, and, even if his allegations were sufficient, the alleged conduct occurred in China and thus falls outside the TVPA's civil enforcement provisions. (*Id.* at 24–35; ECF No. 30.)

Because the Court must first confirm its jurisdiction, *see Yassan v. J.P. Morgan Chase & Co.*, 708 F.3d 963, 967 n. 1 (7th Cir. 2013) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93 (1998)), it will begin by addressing whether it has personal jurisdiction over Techtronic Industries. On that issue, the Court agrees that there are insufficient contacts between Techtronic Industries and this forum to permit personal jurisdiction here. Accordingly, Techtronic Industries' motion to dismiss will be granted on this ground. Turning to Milwaukee Tool, the Court agrees

that under the Supreme Court's teachings on extraterritoriality in *RJR Nabisco v. European Community*, 579 U.S. 325 (2016), the TVPA's criminal provisions apply extraterritorially, but its civil remedy does not. Accordingly, Milwaukee Tool's motion to dismiss will also be granted.

## BACKGROUND ALLEGATIONS

Plaintiff Xu Lun is a Taiwanese activist who was imprisoned in Chishan Prison in China after being arrested for political activism. (ECF No. 28 ¶¶12, 36–38.) Defendant Milwaukee Tool is a power tool corporation headquartered in Wisconsin and a wholly owned subsidiary of Defendant Techtronic Industries. (*Id.* ¶20.) Techtronic Industries is a Hong Kong corporation that, among other things, contracts with Chinese manufacturers and engineers to obtain cheap goods to drive down costs for its subsidiaries. (*Id.* ¶¶13, 20–21.)

While imprisoned in China, Xu Lun and other prisoners were forced to manufacture gloves bearing the Milwaukee Tool logo. (*Id.* ¶¶37, 43.) The prisoners were subjected to long hours and poor conditions and received little to no compensation. (*Id.* ¶¶47–53.) Xu Lun regularly witnessed fellow inmates being threatened or punished if they refused to work, did not work hard enough, or did not meet their production quotas. (*Id.* ¶54.) Techtronic Trading Ltd. (Techtronic Trading), another wholly owned subsidiary of Techtronic Industries, exported the gloves made with forced labor to Milwaukee Tool for sale to consumers in the United States. (*Id.* ¶¶14, 46.)

## ANALYSIS

### I. Techtronic Industries Is Not Subject to Personal Jurisdiction in this Court.

Techtronic Industries moves to dismiss under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction. Under Rule 12(b)(2), once a defendant asserts a lack of personal jurisdiction, the plaintiff bears the burden of establishing that the jurisdictional requirements are satisfied. *N. Grain Mktg., LLC v. Greving*, 743 F.3d 487, 491 (7th Cir. 2014) (citing *Purdue Rsch. Found. v. Sanofi–Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003)). At the motion to dismiss stage, a plaintiff need only make a *prima facie* showing of jurisdiction. *Felland v. Clifton*, 682 F.3d 665, 672 (7th Cir. 2012) (citing *Purdue Rsch. Found.*, 338 F.3d at 782). The Court takes plaintiff's asserted facts as true, and any factual disputes must be resolved in the plaintiff's favor. *uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 423–24 (7th Cir. 2010).

Personal jurisdiction over a defendant in a particular forum can be established either generally or specifically. *See id.* at 425 ("Personal jurisdiction can be either general or specific, depending on the extent of the defendant's contacts with the forum state."). "In either case, the

ultimate constitutional standard is whether the defendant had 'certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). In 1993, the Rules Committee added Federal Rule of Civil Procedure 4(k)(2) as another basis for personal jurisdiction. Under Rule 4(k)(2), a court may exercise personal jurisdiction over a foreign defendant that has sufficient contacts with the United States as a whole, but whose contacts are so scattered among the various states that no individual state would have a basis to assert jurisdiction. *See Abelesz v. OTP Bank*, 692 F.3d 638, 656 n.8 (7th Cir. 2012).

Citing the allegations of the amended complaint and well-established caselaw, Techtronic Industries argues that it is not subject to general or specific personal jurisdiction in this Court. (ECF No. 32 at 13–24.) In response, Xu Lun invokes Rule 4(k)(2) and argues that Techtronic Industries has sufficient minimum contacts with the United States as a whole to satisfy the requirements for personal jurisdiction. (ECF No. 41 at 46–58.) Because Techtronic Industries lacks sufficient contacts to subject itself to personal jurisdiction in this Court, whether analyzed on general or specific personal jurisdiction grounds or under Rule 4(k)(2), its motion to dismiss will be granted.

### A. Techtronic Industries Lacks Sufficient Contacts with Wisconsin to Support General or Specific Personal Jurisdiction.

Techtronic Industries insists that its contacts with Wisconsin are insufficient to support either general or specific personal jurisdiction in this Court. (ECF No. 32 at 13–24.) With respect to *general* jurisdiction, it points out that it is incorporated in and maintains its principal place of business in Hong Kong. (*Id.* at 14–15.) It acknowledges that it is related by corporate structure to Milwaukee Tool, a Wisconsin-based company, but insists the two entities are separately incorporated and legally distinct. (*Id.* at 16–21.) It further argues that it is not subject to *specific* personal jurisdiction in this Court because it lacks sufficient minimum contacts with Wisconsin, and even the small number of contacts it has to the forum state are unrelated to this litigation. (*Id.* at 22–24.)

Xu Lun does not directly address the requirements for general or specific personal jurisdiction or Techtronic Industries' contacts with Wisconsin in his briefing. Instead, he invokes Rule 4(k)(2) and focuses his argument on Techtronic Industries' contacts with the United States as a whole. (*See* ECF No. 41 at 46–58.) By failing to address Techtronic Industries' general and

specific personal jurisdiction arguments, Xu Lun has waived any argument on these grounds and has effectively conceded that Techtronic Industries does not have sufficient minimum contacts with Wisconsin to support personal jurisdiction. *See Loc. 15, Int'l Bhd. of Elec. Workers, AFL-CIO v. Exelon Corp.*, 495 F.3d 779, 783 (7th Cir. 2007) (arguments not raised in response to a motion to dismiss are waived). Regardless, the record confirms that Techtronic Industries lacks contacts sufficient to support either general or specific jurisdiction in this Court.

General personal jurisdiction exists where the defendant's contacts with the forum state are "so continuous and systematic" as to render them "essentially at home." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (citing *Int'l Shoe*, 326 U.S. at 317). For an incorporated business entity like Techtronic Industries, general jurisdiction is appropriate in the state of the entity's incorporation and the location of its principal place of business, usually its headquarters. *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014); *see also Goodyear*, 564 U.S. at 924. There is no dispute that Techtronic Industries is incorporated in and maintains its principal place of business is in Hong Kong. Techtronic Industries' only connection to Wisconsin appears to be its relationship to its subsidiary Milwaukee Tool. But "personal jurisdiction cannot be premised on corporate affiliation or stock ownership alone where corporate formalities are substantially observed and the parent does not exercise an unusually high degree of control over the subsidiary." *Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 943 (7th Cir. 2000). The law requires allegations and evidence that the parent company exercises an "unusually high degree of control" over the subsidiary, or that the subsidiary's "corporate existence is simply a formality." *Abelesz*, 692 F.3d at 658–59 (quoting *Purdue Rsch. Found.*, 338 F.3d at 788 n. 17).

Xu Lun alleges in the amended complaint that Techtronic Industries has employees who manage supply chain for Milwaukee Tool, a Vice President of Purchasing for Milwaukee Tool, and employees with business cards bearing both company's logos. (ECF No. 28 ¶¶22–23, 26–28.) He further alleges that Milwaukee Tool accounts for 70% of Techtronic Industries' revenue, that the two companies have jointly asserted claims in other litigation, and that potential suppliers for Milwaukee Tool are routed to Techtronic Industries' website if based in Asia. (*Id.* ¶¶29; 84–89.) Even read liberally, none of these allegations support an inference that Techtronic Industries exercises an unusually high degree of control over its subsidiary. Accordingly, the Court agrees

with Techtronic Industries that there is no basis to assert general personal jurisdiction over Techtronic Industries here.

To establish specific personal jurisdiction, a plaintiff must show that its claims against the defendant "arise out of the defendant's constitutionally sufficient contacts with the state." *See uBID, Inc.*, 623 F.3d at 425. Unlike general personal jurisdiction, a finding of specific personal jurisdiction allows the suit to proceed only with respect to claims that are "sufficiently related" to the defendant's contacts with the forum state. *Id.* at 426. The Seventh Circuit has established a three-prong test for specific jurisdiction. *B.D. by & through Myers v. Samsung Sdi Co. (Samsung II),* 143 F.4th 757, 765 (7th Cir. 2025). First, the Court considers whether the defendant has purposefully availed itself of the privilege of conducting activities within the forum state. *Id.* (citing *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). Second, the plaintiff must establish an "adequate connection" between the defendant's activities in the forum state and the underlying lawsuit. *Id.* at 766. This relatedness inquiry requires that the suit "arise out of or relate to" the forum contacts. *Id.* (quoting *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco Cnty.*, 582 U.S. 255, 262 (2017)). Third, and finally, specific personal jurisdiction "must accord with notions of fairness." *Id.*

Xu Lun has not identified any basis to conclude that Techtronic Industries has any contacts with Wisconsin, aside from his allegations regarding Techtronic Industries' relationship with its subsidiary Milwaukee Tool. It is unclear how the mere presence of a subsidiary could satisfy the purposeful availment requirement. As noted above, the jurisdictional contacts of a subsidiary are not, without more, inherently imputed to the parent company. *See Purdue Rsch. Found.*, 338 F.3d at 788 n.17 (citing *Reimer Express World*, 230 F.3d at 943–44). And even if Xu Lun could show that Techtronic Industries' relationship with Milwaukee Tool constituted purposeful availment, it is unclear how Xu Lun's claims could be considered to "arise out of or relate to" these contacts with the forum state. Techtronic Industries is thus also correct that Xu Lun has not alleged a basis to assert specific jurisdiction over it in Wisconsin.

**B.**    **Xu Lun's Invocation of Rule 4(k)(2) Fails Because Techtronic Industries' Contacts with The United States Are Not Sufficiently Related to Xu Lun's Underlying TVPA Claim.**

Xu Lun asserts that Techtronic Industries is subject to personal jurisdiction in this Court based on Techtronic Industries' overall contacts with the United States under Rule 4(k)(2). (*See* ECF No. 41 at 47–55.) As noted above, Rule 4(k)(2) allows the Court to exercise personal

jurisdiction over a defendant based on its contacts with the United States as a whole, as distinct from its contacts with the forum state. *See Abelesz*, 692 F.3d at 660. To establish jurisdiction under Rule 4(k)(2), a plaintiff must show that (1) his claim is based on federal law, (2) the defendant is not subject to personal jurisdiction in any other state, and (3) the exercise of jurisdiction is consistent with the laws of the United States and with the Constitution. *Reimer Express World*, 230 F.3d at 940. The rule does not eliminate the minimum contacts requirement. *See Abelesz*, 692 F.3d at 660. Rather, Rule 4(k)(2) "permits the aggregation of contacts nationwide for the unusual situation where a defendant's contacts with any given state are not extensive enough to support that state's exercise of personal jurisdiction, but there are sufficient minimum contacts with the nation as a whole." *Id.*

The first two requirements for invoking Rule 4(k)(2) are easily shown here. Xu Lun's sole claim arises under federal law (the TVPA). And Techtronic Industries has not identified a state where Xu Lun could pursue his claims. *See ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 552 (7th Cir. 2001), *as amended* (July 2, 2001) ("A defendant who wants to preclude use of Rule 4(k)(2) has only to name some other state in which the suit could proceed."). As to the latter point, because Techtronic Industries contends that it cannot be sued in the forum state but has not identified any other state where suit is possible, the Court can deem the second requirement satisfied. *Id.* The dispositive question is therefore the third requirement: whether Techtronic Industries' contacts with the United States as a whole are constitutionally sufficient to support specific personal jurisdiction.

While Rule 4(k)(2) applies a broader geographic standard for which contacts are relevant, it does not relax the minimum contacts requirement. *Abelesz*, 692 F.3d at 660 ("[T]he *minimum* in the "minimum contacts" that are constitutionally sufficient to support general or specific jurisdiction is the same." (emphasis in original)). The Court thus applies the Seventh Circuit's three-prong test for specific jurisdiction, but instead of looking at Techtronic Industries' contacts with Wisconsin, it looks at its contacts with the United States as a whole. Accordingly, to carry his burden on the third Rule 4(k)(2) requirement, Xu Lun must make a *prima facie* showing that (1) Techtronic Industries purposefully availed itself of the privilege of conducting business in the United States, (2) his underlying TVPA claim arises out of or relates to Techtronic Industries' contacts with the United States, and (3) the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice. *See Samsung II*, 143 F.4th at 765–66.

Invoking the "stream of commerce" theory, Xu Lun asserts that Techtronic Industries has purposefully availed itself to the United States court system by supplying gloves made with forced labor to Milwaukee Tool for sale to American consumers. (ECF No. 41 at 48–50.) The Supreme Court first articulated the "stream of commerce" theory in *World-Wide Volkswagen Corp. v. Woodson*, explaining that a defendant "that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum" state has purposefully availed itself to the jurisdiction of the forum state. 444 U.S. 286, 297–98 (1980). The Seventh Circuit continues to recognize the stream of commerce theory and has confirmed that "a defendant purposefully avails itself of a forum if it 'is aware that the final product is being marketed in the forum[.]'" *Samsung II*, 143 F.4th at 767 (quoting *Asahi Metal Indus. Co. v. Superior Ct. of Cal., Solano Cnty.*, 480 U.S. 102, 117 (1987) (Brennan, J., concurring in part and concurring in the judgment)).

Application of the stream of commerce theory here is tricky. The amended complaint alleges that one of Techtronic Industries' affiliates, Techtronic Trading, a mere "company on paper" without separate facilities or operations, exported work gloves to another Techtronic Industries' affiliate, Milwaukee Tool, in the United States. (ECF No. 28 ¶¶14–17, 19, 46.) Xu Lun also proffers customs data showing that Techtronic Trading shipped gloves from China to the United States for Milwaukee Tool between 2016 and 2019. (*See* ECF No. 41-2 at 2–65.) Accordingly, Xu Lun's allegations concerning Techtronic Industries' role in placing products into the stream of commerce are all indirect. For its part, Techtronic Industries insists that it is a separate entity from Techtronic Trading, but it does not meaningfully address Xu Lun's allegations that it exercises an usually high degree of control over its affiliate. For purposes of this motion, the Court will assume that Techtronic Trading's shipping of the gloves to the United States satisfies the purposeful availment requirement as to Techtronic Industries.

Xu Lun's specific jurisdiction arguments nevertheless fail because he has not shown that Techtronic Industries' contacts with the United States are related to this litigation. Xu Lun is adamant that Techtronic Industries' shipping of gloves made with forced labor to the United States is related to his underlying TVPA claim. (ECF No. 41 at 50.) He claims that Techtronic Industries violated the TVPA by benefiting from the sale of gloves made with forced labor. (*Id.*) According to Xu Lun, because those sales could not have occurred without Techtronic Industries shipping the

gloves to the United States, the contacts are sufficiently related to his underlying claim. (*Id.*) The Court disagrees.

The Seventh Circuit has emphasized that "[w]hether specific personal jurisdiction exists turns on 'the relationship among the defendant, the forum, and the litigation.'" *Samsung II*, 143 F.4th at 765 (quoting *Walden v. Fiore*, 571 U.S. 277, 283–84 (2014)). Although "'a strict causal relationship' is not necessary," "the relatedness inquiry 'incorporates real limits' aimed at protecting foreign defendants from being haled into distant courts for claims only tangentially related to their forum contacts." *Id.* at 766 (quoting *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 362 (2021)). This relatedness requirement is why "the stream of commerce theory is typically associated only with products liability suits." *J.S.T. Corp. v. Foxconn Interconnect Tech. Ltd.*, 965 F.3d 571, 576 (7th Cir. 2020).

The Seventh Circuit's teaching in *J.S.T. Corp.* is instructive. In *J.S.T. Corp.*, an Illinois corporation sued its competitors for misappropriating trade secrets after proprietary design specifications for its 183-pin connectors (an electrical adapter used in manufacturing cars) were stolen by a third party and then sold to the defendants. *Id.* at 573–74. The defendants used the proprietary design specifications to make knockoff pin connectors and sold them at a reduced price to the third party, who went on to sell them to car manufacturers. *Id.* at 574. The defendants moved to dismiss for lack of personal jurisdiction, pointing out that their only connection to the forum was that the cars containing the knockoff pin connectors were sold in Illinois along with sales in other states, nationwide. *Id.* at 574–75. The Seventh Circuit rejected plaintiff's attempt to assert personal jurisdiction based on the stream of commerce theory, concluding that the sale of the knockoff pin connectors in the forum was not sufficiently related to the plaintiff's underlying trade secrets misappropriation claim. *Id.* at 576. The Court of Appeals noted that the stream of commerce theory typically applies only in products liability cases because in such cases, the sale to consumers in the forum is highly relevant to the relationship between the defendant, the forum, and the underlying claim. *Id.* (citing *Walden*, 571 U.S. at 283–84). It then explained that sales to consumers in the forum "will not have the same relevance to specific jurisdiction in every suit." *Id.* Because the misappropriation of trade secrets was not "intrinsically linked" to the consumer transactions in the forum, the stream of commerce theory did not support personal jurisdiction. *Id.* It further noted that any sales to Illinois consumers may have driven demand for the knockoff products but concluded that these consumers had "virtually nothing to do with" the defendants'

alleged misconduct.  *Id.* at 578.  Any damages to plaintiff's bottom line caused by downstream sales of the knockoff pin connectors were insufficiently related to the trade secrets claim.  *Id.* at 577.  Rather, the appropriate consideration was whether the defendant's *conduct* was connected with the forum.  *Id.*  (citing *Walden*, 571 U.S. at 285–86).  Although courts look to the elements of the claim at issue, this should not be a "mechanical scan for anything that courts label an 'element.'"  *Id.* at 577–78.  Instead, courts must consider the elements to see what "light … they cast on 'the relationship between the defendant, the forum, and the litigation.'"  *Id.* at 578 (quoting *Walden*, 571 U.S. at 283–84).  Because the defendants did not acquire, disclose, or use the trade secrets in Illinois, and the unauthorized acquisition, disclosure, and use by the defendants would have occurred "long before" the product reached the consumers in the forum, any link between the sales in the forum and the misappropriation of trade secrets at issue was too attenuated to establish specific jurisdiction.  *Id.* at 576–77.

The logic of *J.S.T. Corp.* requires the same outcome here.  Xu Lun alleges that Techtronic Industries shipped gloves that were manufactured using forced labor to the United States for sale to American consumers.  While Techtronic Industries' (or its affiliates') placing of the gloves into the stream of commerce would drive demand for the gloves, thus encouraging Techtronic Industries to continue buying gloves manufactured with forced labor, this is insufficient to support personal jurisdiction.  As in *J.S.T. Corp.*, the consumers of those gloves have "virtually nothing to do with" Techtronic Industries' alleged misconduct, and it is that conduct that is central to the analysis.  Like the defendants' conduct in *J.S.T. Corp.*, Techtronic Industries' placing of the gloves into the stream of commerce is not "intrinsically linked" to the underlying claim that the plaintiff is seeking to litigate.  965 F.3d at 576, 578.  Just as none of the misappropriation at issue in *J.S.T. Corp.* occurred in Illinois, none of Techtronic Industries' alleged TVPA violations occurred in the United States.  Moreover, the alleged forced labor happened "long before an offending product ever comes into contact with a consumer" in the United States.  *Id.* at 577.  The connection between Techtronic Industries' contacts with the United States and Xu Lun's claim is thus too attenuated to establish specific jurisdiction.

Xu Lun resists this conclusion, arguing that Techtronic Industries received a benefit from its participation in a venture that used forced labor, in violation of the TVPA, and because that benefit was realized in the United States, it is sufficiently related to his claim.  (ECF No. 41 at 50, 55.)  There are two problems with this argument.  First, Xu Lun has not demonstrated that

Techtronic Industries realized a benefit from the sale of the gloves in the United States. It is undisputed that Techtronic Industries is incorporated in and based in Hong Kong. Xu Lun appears to be attributing the alleged benefit derived by Milwaukee Tool here in the United States to Techtronic Industries. But as discussed above, the jurisdictional contacts of a subsidiary are not, without more, inherently imputed to the parent company. *See Purdue Rsch. Found*, 338 F.3d at 788 n.17 (citing *Reimer Express World*, 230 F.3d at 943–44). And second, this argument is foreclosed by *J.S.T. Corp.* As the Seventh Circuit explained, the Court must the examine the elements of the underlying claim in the light that they cast on the relationship between the defendant, the forum, and the litigation. *J.S.T. Corp.*, 965 F.3d at 578 (citing *Walden*, 571 U.S. at 283–84). In that inquiry, the core focus is "always on the defendants' conduct[.]" *Id*. The amended complaint alleges that Techtronic Industries benefitted from forced labor performed by Xu Lun and other prisoners in China. Techtronic Industries' alleged conduct that forms the basis of Xu Lun's lawsuit is unrelated to its contacts with the United States.

Beyond the shipping of gloves, Xu Lun further asserts that Techtronic Industries has purposefully availed itself to the United States by purchasing Milwaukee Tool, having a Chief Executive Officer based in the United States, having a "Head Quarter office" in Florida and offices throughout the United States, having United States employees, and doing business in the United States. (ECF No. 41 at 49–50.) But Xu Lun fails to make any argument as to how these contacts are related to Xu Lun's underlying TVPA claim. The mere presence of a wholly owned subsidiary, offices, or employees in the United States, without any attempt to tie those facts to the allegations of forced labor in China, does not satisfy Xu Lun's burden as plaintiff of establishing that Techtronic Industries' contacts with the United States are sufficiently related to his lawsuit.

The Seventh Circuit has warned that courts must scrutinize the relationship between forum contacts and lawsuits to police the boundary between general and specific personal jurisdiction. *Samsung II*, 143 F.4th at 771 ("The looser the connection becomes, the more an exercise of specific personal jurisdiction will start to look like one of general personal jurisdiction. And at a certain point, the core distinction between the two will collapse altogether." (internal quotations omitted)). Xu Lun has not shown that Techtronic Industries' contacts with the United States are sufficiently related to his underlying claims to support specific personal jurisdiction under Rule 4(k)(2). Because the Court does not have personal jurisdiction over Techtronic Industries, the motion to dismiss for lack of personal jurisdiction will be granted.

**C.      Xu Lun Is Not Entitled to Jurisdictional Discovery Because He Has Not Made a Colorable Showing of Personal Jurisdiction.**

Xu Lun alternatively moves for leave to conduct jurisdictional discovery.  (ECF No. 42.) Jurisdictional discovery is proper if the plaintiff establishes a "colorable" showing of personal jurisdiction.  *B.D. by & through Myer v. Samsung SDI Co., Ltd. (Samsung I)*, 91 F.4th 856, 864 (7th Cir. 2024).  The Court considers the entire record and must draw all inferences in favor of the plaintiff when considering whether to allow jurisdictional discovery.  *See Cent. States, Se. & Sw. Areas Pension Fund v. Phencorp Reinsurance Co.*, 440 F.3d 870, 878 (7th Cir. 2006).  The Seventh Circuit has cautioned that "[f]oreign nationals usually should not be subjected to extensive discovery in order to determine whether personal jurisdiction over them exists."  *Reimer Express World*, 230 F.3d at 946.

Xu Lun first argues that he has made a colorable showing of specific personal jurisdiction under Rule 4(k)(2), and requests discovery into Techtronic Industries' role in designing, manufacturing, shipping, and marketing the gloves for sale in the United States.  (ECF No. 43 at 2–3.)  He further argues that he has made a colorable showing of personal jurisdiction based on Techtronic Industries' relationship with Milwaukee Tool and seeks discovery on any agreements between them relevant to the manufacture, distribution, and sale of the gloves.  (*Id.* at 2–4.)  As discussed above, even taking Xu Lun's allegations as true, Techtronic Industries' shipping of the gloves into the United States is not sufficiently related to the underlying TVPA claim.  No amount of discovery will change that.

Xu Lun further asserts that he has made a colorable showing that Techtronic Industries has a "Head Quarter office" in Florida, which could arguably be its principal place of business, which could subject it to general jurisdiction in this Court.  (*Id.* at 4; ECF No. 41-23 at 8.)  Xu Lun is mistaken.  Were Techtronic Industries headquartered in Florida, it would be subject to general personal jurisdiction in the courts in Florida, not Wisconsin.  If that were the case, Rule 4(k)(2) would not apply.

Finally, Xu Lun requests discovery into whether Techtronic Industries has an alter-ego relationship with Milwaukee Tool, sufficient to subject it to general personal jurisdiction in Wisconsin.  (ECF No. 43 at 4–6.)  This request will be denied because Xu Lun has not made a colorable showing that Techtronic Industries exercises an unusually high degree of control over Milwaukee Tool.

For these reasons, Xu Lun's motion for jurisdictional discovery will be denied. Moreover, the Court finds that allowing for jurisdictional discovery would be futile. As discussed below, the amended complaint fails to state a claim on which relief may be granted because the TVPA's civil remedy provisions do not apply extraterritorially to Xu Lun's allegations of forced labor in China. The Court will not subject Techtronic Industries to extensive discovery in order to determine whether personal jurisdiction exists for a claim that fails as a matter of law in any event.

## II. Xu Lun Has Not Established that the TVPA's Civil Remedy Applies Extraterritorially to Allegations of Forced Labor in China.

Xu Lun brings a single claim, alleging that Defendants violated 18 U.S.C. §1589. This section of the TVPA criminalizes the use of "forced labor." Xu Lun alleges that the conditions he experienced while being forced to work as a prisoner in China violate Section 1589 and that Defendants are liable to him in a civil lawsuit under 18 U.S.C. §1595 because they knowingly benefited from participation in a venture that used forced labor. Milwaukee Tool argues that Xu Lun's TVPA claim fails as a matter of law because Section 1595 does not extend a civil remedy to allegations of illegal conduct that takes place extraterritorially. It argues that because the alleged forced labor that Xu Lun describes occurred in China, not domestically, he cannot maintain a claim under Section 1595. (ECF No. 30 at 13–17).

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint. When deciding a Rule 12(b)(6) motion to dismiss, the Court must "accept all well-pleaded facts as true and draw reasonable inferences in the plaintiffs' favor." *Roberts v. City of Chi.*, 817 F.3d 561, 564 (7th Cir. 2016) (citing *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 632 (7th Cir. 2013)). A complaint will survive if it "state[s] a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### A. The Supreme Court Has Emphasized that Federal Statutes Are Presumed Not to Apply Extraterritorially.

The Supreme Court has long recognized that federal law is presumed to apply only domestically, and that foreign conduct is generally governed by foreign law. *See Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 455 (2007); *Morrison v. Nat. Australia Bank Ltd.*, 561 U.S. 247, 255 (2010). Accordingly, courts must interpret federal laws to apply only to domestic conduct

"[a]bsent clearly expressed congressional intent to the contrary[.]" *RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325, 335 (2016) (citing *Morrison*, 561 U.S. at 255).

In *RJR Nabisco*, the Supreme Court addressed whether a group of foreign plaintiffs (members of the European Commission) could pursue civil claims for damages based on alleged violations of the Racketeer Influence and Corrupt Organizations Act (RICO), 18 U.S.C. §§1961–1968, that occurred outside the United States. *Id.* at 332–33. The district court dismissed the plaintiffs' complaint, concluding that RICO did not apply to extraterritorial conduct, but the Second Circuit reversed. *Id.* at 333–34. After granting certiorari, the Supreme Court reversed the Court of Appeals and reinstated the dismissal, concluding that RICO's civil cause of action did not reach foreign conduct. The Court highlighted the long history of the presumption against extraterritoriality and set out a two-step framework for determining whether a statute overcomes the presumption. *Id.* at 335–37. First, courts must determine "whether the statute gives a clear, affirmative indication that it applies extraterritorially." *Id.* at 337. If Congress clearly and affirmatively intended for the statute to have extraterritorial effect, the analysis is complete, subject only to any express limitations in the statutory text. *Id.* at 337–38. The second step applies only if the statute does not clearly indicate that Congress intended for its application outside the United States. In that circumstance, courts must look to the statute's "focus" to determine whether the case involves a permissible domestic application of the statute. *Id.* at 337.

The Court demonstrated how this two-step approach applies in the context of RICO, a federal statutory regime that includes both substantive criminal provisions and a separate civil remedy. With respect to RICO's criminal provisions, the Court explained that Subsections 1962(a), (b), and (c) identify a series of prohibited activities, and that Subsection 1962(d) makes it unlawful to conspire to commit any of these prohibited activities. *Id.* at 330. Each of these substantive prohibitions requires proof of a "pattern of racketeering activity," meaning the offender must have committed at least two underlying crimes included in an enumerated list in Section 1961(1)(A)–(G). *Id.* These enumerated crimes are often referred to as "predicate offenses" or "predicate acts" because they form the basis of the RICO offense. *See id.* at 329–30. The Court noted that although Section 1962 did not itself state that it applied to extraterritorial conduct, the statute defined "racketeering activity" to incorporate several underlying "predicate" offenses that "plainly apply to at least some foreign conduct." *Id.* at 338. The Court therefore concluded that RICO's criminal provisions overcame the presumption against extraterritoriality. *Id.* at 339

("Congress's incorporation of these (and other) extraterritorial predicates into RICO gives a clear, affirmative indication that §1962 applies to foreign racketeering activity—but only to the extent that the predicates alleged in a particular case themselves apply extraterritorially."). The Court concluded that the plaintiffs' complaint properly alleged violations of RICO's substantive criminal prohibitions, even if they were extraterritorial, given that the predicate offenses underlying the RICO claims themselves applied extraterritorially. *Id.* at 344–45.

The Court's extraterritoriality analysis did not end there. It then repeated its application of the two-step extraterritoriality test to plaintiffs' invocation of RICO's *civil remedy provision*. The Court noted that Section 1964(c) provides a private civil cause of action allowing "[a]ny person injured in his business or property by reason of a violation of section 1962" to sue in federal court and recover treble damages, costs, and attorney's fees. *Id.* at 346 (quoting 18 U.S.C. §1964(c)). It was this civil remedy provision that the plaintiffs invoked to recover for the defendants' alleged RICO violations. The Court was clear that its determination that RICO's criminal provisions applied to conduct outside the United States did *not* mean that the civil cause of action also necessarily applied extraterritorially. *Id.* As the Court explained, "[t]he creation of a private right of action raises issues beyond the mere consideration whether underlying primary conduct should be allowed or not, entailing, for example, a decision to permit enforcement without the check imposed by prosecutorial discretion." *Id.* (quoting *Sosa v. Alvarez–Machain*, 542 U.S. 692, 727 (2004)). Thus, irrespective of its conclusion that the presumption had been overcome with respect to RICO's substantive prohibitions, the Court concluded that courts must separately consider whether RICO's private right of action also overcame the presumption. *Id.* Considering the text of the provision, the Court concluded that "[n]othing in §1964(c) provides a clear indication that Congress intended to create a private right of action for injuries suffered outside of the United States." *Id.* at 349. The Court explained that "[i]t is not enough to say that a private right of action must reach abroad because the underlying law governs conduct in foreign countries. Something more is needed, and here it is absent." *Id.* at 350. Accordingly, the Court concluded that the plaintiffs' claims must be dismissed because they rested entirely on injuries suffered abroad.

### B. Under *RJR Nabisco*, the TVPA's Civil Remedy Does Not Apply Extraterritorially.

Congress enacted the TVPA in 2000 to "combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children [and] to ensure just

and effective punishment of traffickers, and to protect their victims." Pub. L. No. 106–386, §102, 114 Stat. 1466 (2000). As initially passed into law, the Act criminalized and provided increased penalties for various forms of human trafficking, such as sale into involuntary servitude (Section 1584), forced labor (Section 1589), forced labor trafficking (Section 1590), commercial sex trafficking (Section 1591), and unlawful concealment of the passport of another for the purpose of subjecting the person to involuntary servitude (Section 1592). Initially, the TVPA was exclusively a criminal statute and is thus found in Title 18 of the United States Code.

Three years later, Congress amended and reauthorized the TVPA through the "Trafficking Victims Protection *Reauthorization* Act of 2003." In the renewed legislation, Congress added, among other things, a civil remedy, Section 1595, which allowed victims to sue perpetrators for violations of some, but not all, of the TVPA's substantive criminal provisions. *See* Pub. L. No. 108–193, §4(a)(4)(A), 117 Stat. 2878 (2003). Under the 2003 Amendments, civil actions under Section 1595 were limited to violations of Sections 1589, 1590, and 1591. *Id.*

In 2008, Congress again amended the TVPA and again expanded its application in several significant ways. *See* Pub. L. No. 110–457, §§221–223, 122 Stat. 5067 (2008). Substantively, the 2008 amendments expanded the scope of Section 1589 to prohibit knowingly benefitting from "participation in a venture which has engaged in the providing or obtaining of labor or services" by any of the means described in Section 1589(a). *See* 18 U.S.C. §1589(b). Section 1595 was also amended. As revised, Section 1595 provides victims to sue perpetrators for violations of *any* of the TVPA's substantive criminal provisions (not just for violations of Sections 1589, 1590, or 1591). It also provides for civil liability against anyone who "knowingly benefits" from a violation of the TVPA. *See* 18 U.S.C. §1595(a).

The 2008 amendment also specifically addressed overseas application of the TVPA. Section 1596 is titled "Additional jurisdiction in certain trafficking offenses" and provides, in relevant part:

> In addition to any domestic or extra-territorial jurisdiction otherwise provided by law, the courts of the United States have extra-territorial jurisdiction over any offense (or any attempt or conspiracy to commit an offense) under section 1581, 1583, 1584, 1589, 1590, or 1591 if—
>
>> (1) an alleged offender is a national of the United States or an alien lawfully admitted for permanent residence (as those terms are defined in section 101 of the Immigration and Nationality Act (8 U.S.C. 1101)); or

(2) an alleged offender is present in the United States, irrespective of the nationality of the alleged offender.

18 U.S.C. §1596(a).

**1. Section 1596 Makes No Mention of Section 1595 or Extraterritorial Application of the TVPA's Civil Remedy.**

In support of his attempt to apply the TVPA to the conditions he faced in China, Xu Lun invokes Section 1596's grant of "extra-territorial jurisdiction" over violations of Section 1589 of the TVPA. *See* 18 U.S.C. §1596(a). According to Xu Lun, Section 1596 gives extraterritorial effect over any offense under Section 1589 so long as the offender is present in the United States. (ECF No. 41 at 57.)

The Court agrees that in enacting Section 1596, Congress clearly and affirmatively indicated that Section 1589 applies to conduct occurring outside the United States. Under this provision, if the offender is present in the United States or is either a national of the United States or an alien lawfully admitted for permanent residence, he or she can be prosecuted in the United States under Section 1589.

But, as the Supreme Court made clear in *RJR Nabisco*, the fact that the government can prosecute a *criminal violation* of the statute that takes place outside the country does not necessarily mean that a plaintiff can maintain a *civil claim* based on the same conduct. 579 U.S. at 346. Courts must "separately apply the presumption against extraterritoriality" to the civil cause of action itself, even if the presumption has already been overcome with respect to the underlying substantive provision. *Id.* While Congress has made clear that Section 1589—the underlying criminal offense that Xu Lun's claims are predicated on—applies extraterritorially, that is a different question than whether the TVPA's civil remedy provision in Section 1595(a) provides Xu Lun with a civil cause of action for Milwaukee Tool's alleged violations of Section 1589 in China. A private right of action does not reach abroad simply because the underlying substantive law governs conduct in foreign countries—something more is needed, and here, as it was in *RJR Nabisco*, it is absent.

Although the presumption against extraterritoriality has clearly been overcome with respect to the underlying substantive prohibitions on which Xu Lun bases his claims, Section 1595 itself does not overcome the presumption. Section 1595 provides that victims of violations of the TVPA may bring a civil action against the perpetrator (or those who knowingly benefit from the violation), but it says nothing regarding extraterritorial application. Section 1596(a) provides that

federal courts have "extraterritorial jurisdiction" over any "offense" under Sections 1581, 1583, 1584, 1589, 1590, or 1591 if certain conditions are met. There is no mention of Section 1595. Nor is there anything else in the statute suggesting Congress's intent to extend the TVPA's civil remedies to overseas conduct. Accordingly, as in *RJR Nabisco*, given the lack of "something more" to support extraterritoriality, the Court must conclude that Congress did not intend for the civil remedy in Section 1595 to apply to foreign conduct.

Xu Lun resists this conclusion. He first asserts that the TVPA is unlike RICO and thus *RJR Nabisco* is distinguishable. He notes that every substantive criminal provision of the TVPA applies extraterritorially, whereas the substantive provisions of RICO apply extraterritorially only to the extent that the predicate acts alleged in a particular case themselves apply extraterritorially. According to Xu Lun, because the TVPA clearly and directly incorporates only extraterritorial predicates, there is "something more" in the TVPA that RICO lacks. (ECF No. 41 at 19–23.) This misreads a central holding of *RJR Nabisco*. As the Supreme Court explained, a civil cause of action does not inherently apply extraterritorially simply because the underlying substantive provision on which the claim is based has overcome the presumption. It does not matter if every substantive criminal provision of the TVPA overcomes the presumption against extraterritoriality; the presumption applies to each section *on its own*, and each section must rebut that presumption *on its own*. As the Court explained, "providing a private civil remedy for foreign conduct creates a potential for international friction beyond that presented by merely applying U.S. substantive law to that foreign conduct." *RJR Nabisco*, 579 U.S. at 346–347. Criminal prosecutions necessarily come with various safeguards (a higher burden of proof, prosecutorial discretion, etc.) that are absent in civil cases. If Congress considered the potential international friction from giving extraterritorial application to the various criminal provisions in the TVPA, it would have done so with these safeguards in mind. Under *RJR Nabisco*, this Court must presume that the TVPA's civil cause of action applies only to conduct occurring within the United States, absent clear, affirmative indication from Congress that Section 1595 applies extraterritorially.

### 2. The TVPA's Stated Purpose Does Not Overcome the Presumption.

Xu Lun next invokes the TVPA's stated purpose—to address the problem of human trafficking "throughout the word"—as proof that Section 1595 applies to conduct occurring outside the United States. But this misstates the relevant standard. Xu Lun's argument is also inconsistent with the Supreme Court's teaching in *RJR Nabisco*.

The question is not whether "'Congress would have wanted' a statute to apply to foreign conduct 'if it had thought of the situation before the court,' but whether Congress has affirmatively and unmistakably instructed that the statute will do so." *RJR Nabisco*, 579 U.S. at 335 (quoting *Morrison*, 561 U.S. at 261). Xu Lun is correct that courts must not "interpret federal statutes to negate their own stated purposes." *Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd.*, 108 F.4th 458, 482 (7th Cir. 2024) (quoting *King v. Burwell*, 576 U.S. 473, 493 (2015)). But Congress's intent to broadly address human trafficking and forced labor does not mean the TVPA must be applied without regard to its express limits or to established doctrines like the presumption against extraterritoriality. Indeed, the same argument Xu Lun makes here could be made about RICO, a statute enacted to combat the major problem of criminal racketeering and organized crime. As *RJR Nabisco* shows, Congress's desire to attack a problem by criminalizing conduct, even conduct in foreign nations, does not mean that a corollary civil remedy must also apply to foreign conduct.

Courts must first apply the traditional tools of statutory construction to arrive at the best reading of a statute; only then may courts consider "express textual evidence of congressional purpose elsewhere in the statute to double-check their work, while keeping in mind that 'no legislation pursues its purposes at all costs.'" *Motorola Sols.,* 208 F.4th at 482 (quoting *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987)). As explained above, Section 1595 fails to overcome the presumption by itself, and Section 1596 is silent as to Section 1595's extraterritorial application. This indicates that Section 1595 does not apply extraterritorially, and the legislative history supports this conclusion. Since *RJR Nabisco*, Congress has twice amended Section 1595— once in 2018 and again in 2023. *See* Pub. L. No. 115-164 §§4, 6, 132 Stat. 1253 (2018); Pub. L. No. 117-347 §102, 136 Stat. 6199 (2023). Despite this, Congress did not add any language regarding extraterritorial application of Section 1595. *See, e.g., Merck & Co. v. Reynolds*, 559 U.S. 633, 648 (2010) (courts presume that, when Congress enacts statutes, it is aware of relevant judicial precedent). Nor has Congress amended Section 1596 since its enactment in 2008 to give extraterritorial effect to Section 1595. *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 174 (2009) ("When Congress amends one statutory provision but not another, it is presumed to have acted intentionally."). Congress's inaction appears to be a deliberate decision that while Section 1589 applies to extraterritorial conduct, thus allowing criminal prosecutions for misconduct abroad so long as the requirements of Section 1596 are met, Section 1595 applies only to domestic conduct.

### 3. The Text of Section 1596 Indicates that the "Extra-territorial Jurisdiction" Applies Only to the TVPA's Substantive Criminal Prohibitions.

The Court further notes that text of Section 1596 itself strongly suggests Congress's intention to limit Section 1596's extraterritorial application to criminal prosecutions. Section 1596(b) provides that "[n]o prosecution may be commenced against a person *under this section* if a foreign government, in accordance with jurisdiction recognized by the United States, has prosecuted or is prosecuting such person for the conduct constituting such offense." (emphasis added). Congress's use of the phrase "under this section" indicates that the extraterritorial application of the TVPA is limited to criminal prosecutions for violations of the TVPA. Other language supports this construction. Section 1596(a) provides that "the courts of the United States have extra-territorial jurisdiction over any *offense* (or any attempt or conspiracy to commit an *offense*) under section 1581, 1583, 1584, 1589, 1590, or 1591[.]" (emphasis added). The use of the word "offense" generally denotes a criminal violation.

To avoid this latter point, Xu Lun asserts that the Seventh Circuit rejected a similar argument in *Motorola Solutions*. He argues that, under *Motorola Solutions*, the word "offense" in the TVPA must be construed to encompass both criminal and civil offenses and, thus, Section 1596 should be read to encompass violations of Section 1589 both criminally prosecuted and civilly pursued via Section 1595. (ECF No. 41 at 21–22.) But Xu Luns misreads *Motorola Solutions*.

*Motorola Solutions* involved the civil remedy provision of the Defend Trade Secrets Act (DTSA) and its extraterritorial application. Like the TVPA, the DTSA primarily provides for criminal liability while also creating a private right of action for violations. *See* 18 U.S.C. §§1832, 1836(b)). The DTSA provision extending its applicability to conduct occurring outside the United States, 18 U.S.C. §1837, is substantially different than Section 1596 of the TVPA. Section 1837 is titled "Applicability to conduct outside the United States" and provides broadly that "[t]his *chapter* . . . applies to conduct occurring outside the United States" if the offender is a United States citizen, permanent resident, or an organization organized under the laws of the United States or a State, or an act in furtherance of the offense was committed in the United States." (emphasis added.) The Seventh Circuit concluded that Congress's use of the words "[t]his chapter," indicates that all of the DTSA—including the civil remedy provision—applied extraterritorially so long as the requirements of Section 1837 were met. *Motorola Sols.,* 208 F.4th at 482. While the

defendants argued that Section 1837's grant of extraterritorial application applied only to the criminal violations of the DTSA, because the word "offense" is used for criminal violations only, the Seventh Circuit rejected this argument, explaining that, in the context of the DTSA, "offense" encompasses both criminal and civil violations. *Id.* at 485. The defendants' argument relied upon the Supreme Court's decision in *Kellogg Brown & Root Services Inc. v. United States ex rel. Carter*, 575 U.S. 650, 659 (2015), which held that, while "offense" can denote a civil violation, as of 2015, the term "offense" within Title 18 had only been used to denote criminal violations. The Seventh Circuit noted that the defendants' argument "would have been persuasive" if the DTSA had not been passed in 2016, after *Kellogg Brown* was decided. *Motorola Sols.,* 108 F.4th at 485. Thus, Congress in 2016 was aware that "offense" could include civil violations, and other textual evidence indicated that Congress's use of the term "offense" in the DTSA was meant to encompass both civil and criminal violations. *Id.*

If anything, *Motorola Solutions* further demonstrates that Section 1595 does not apply extraterritorially. Unlike Section 1837 of the DTSA, which clearly and affirmatively states that "[t]his chapter" applies to conduct occurring outside the United States where certain conditions are met, Section 1596 applies only to certain, enumerated sections of the TVPA, and makes no mention of the civil remedy available via Section 1595. Moreover, Section 1596 was last amended in 2008. The use of "offense" in 2008—before the Supreme Court decided *Kellogg Brown*—must be interpreted to encompass only criminal violations, not civil ones. 575 U.S. at 659; *see also Motorola Sols.,* 108 F.4th at 485.

### 4. The Out-Of-Circuit Decisions Xu Lun Relies Upon Are Inconsistent with the Supreme Court's Instructions in *RJR Nabisco*.

Xu Lun cites two out-of-circuit decisions, *Roe v. Howard*, 917 F.3d 229 (4th Cir. 2019) and *Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184 (5th Cir. 2017), which he asserts hold that Section 1595 applies to foreign conduct. (ECF No. 41 at 20.) Neither case is binding on this Court, and both are difficult to square with the Supreme Court's teaching in *RJR Nabisco*.

In *Howard*, a plaintiff sued under Section 1595, alleging that the defendants (both State Department employees stationed at United States Embassy in Yemen) violated multiple provisions of the TVPA, including its prohibitions on forced labor and commercial sex trafficking, while she worked as their live-in housekeeper. 917 F.3d at 233–35. The defendants argued that the plaintiff impermissibly sought to apply the TVPA's civil remedy extraterritorially because the violations

alleged occurred abroad.  The Fourth Circuit disagreed, holding that the plaintiff's suit was not barred by the presumption against extraterritoriality.  *Id.* at 241.  In reaching this result, the Fourth Circuit concluded that Section 1595 evinces a "clear indication of extraterritorial effect," because it "directly incorporates predicate offenses that govern foreign conduct, providing strong textual evidence of its extraterritorial effect when applied to those predicates."  *Id.* (citing *RJR Nabisco*, 579 U.S. at 339–40).  The Fourth Circuit noted that "[l]ike §1962, the TVPA's civil remedy provision directly incorporates a set of predicate offenses 'that plainly apply to at least some foreign conduct.'"  *Id.* at 242 (quoting *RJR Nabisco*, 579 U.S. at 338).  But, contrary to the teaching in *RJR Nabisco*, the Fourth Circuit concluded that the TVPA's civil remedy provisions apply extraterritorially based on the evidence that Congress intended the TVPA's criminal provisions to apply to conduct outside the United States.  The Court's analysis failed to account for the Supreme Court's clear instruction that a civil cause of action does not inherently apply extraterritoriality merely because the predicate violation applies extraterritorially.  *See RJR Nabisco*, 579 U.S. at 350 ("It is not enough to say that a private right of action must reach abroad because the underlying law governs conduct in foreign countries.").  The Fourth Circuit applied the Supreme Court's reasoning in concluding that RICO's *substantive criminal prohibitions* applied extraterritorially— because the statute's predicate criminal offenses apply extraterritorially—to the TVPA's *civil remedy*.  This misses a key step in the Supreme Court's analysis.

*Adhikari* is similarly unpersuasive.  The plaintiffs in *Adhikari* were the families of twelve Nepali men who were allegedly trafficked by defendant corporations to perform work on a United States military base in Iraq in 2004.  845 F.3d at 190–91.  The defendants argued that the plaintiffs could not pursue their TVPA claims because the alleged conduct occurred abroad in 2004, prior to Congress's enactment of Section 1596.  *See id.* at 201–02.  The Fifth Circuit's analysis focused on whether Section 1596's grant of "extra-territorial jurisdiction" applied retroactively to the defendants' conduct.  *See id.* at 202–06 (concluding that the presumption against retroactivity prohibits applying Section 1596 to a civil claim under Section 1595 for pre-enactment conduct).  While Xu Lun is correct that the Fifth Circuit assumed, in dicta, that Section 1596 "enables federal courts to entertain a private party's civil suit that alleges extraterritorial violations of the TVPA," neither party disputed that conclusion.  *Id.* at 200.  Thus, the Fifth Circuit's analysis does not include any substantive discussion of Section 1595's extraterritorial application.

The Court finds the analysis in *Doe I v. Apple Inc.*, No. 1:19-CV-03737 (CJN), 2021 WL 5774224 (D.D.C. Nov. 2, 2021), to be more persuasive. The plaintiffs in *Apple* were sixteen former child laborers who were forced to work mining cobalt in the Democratic Republic of Congo. *Id.* at *1. The plaintiffs claimed that the defendant tech companies were liable under the TVPA for knowingly benefitting from participation in a venture that used forced and trafficked labor. Although the district court dismissed the complaint for lack of standing, it went on to conclude that Section 1595 does not apply to extraterritorial conduct. The *Apple* plaintiffs contended that, because they sought civil relief through Section 1595 for violations of Section 1589, the text of Section 1596 allows for extraterritorial application of their TVPA claims. *Id.* at *14. The district court rejected this argument. It first noted that 1596 does not mention the TVPA's civil remedy, despite explicitly granting extraterritorial application to many of the criminal provisions. *Id.* at *15. The district court further noted that, Section 1596's repeated use of the word "offense" suggests that it was focused on criminal, not civil, applications. *Id.* This Court agrees with the *Apple* court's conclusion that Congress's omission of Section 1595 from Section 1596(a) "was not mistaken, but was an intentional decision not to extend extraterritorially the reach of the statute's civil component." *Id.* at *16; *see also Mia v. Kimberly-Clark Corp.*, No. 1:22-CV-02353 (CJN), 2025 WL 752564 at *6–8 (D.D.C. Mar. 10, 2025) (applying *Apple* and rejecting the Fourth Circuit's analysis in *Howard*); *Pavlovich v. Gaiman*, No. 25-CV-78-JDP, 2025 WL 2819372, at *7–8 (W.D. Wis. Oct. 3, 2025) (rejecting the Fourth Circuit's analysis in *Howard* and noting that the TVPA's civil remedy contains no clear indication of an extraterritorial application).

### C.     The Amended Complaint Does Not Allege a Domestic Violation of the TVPA.

Because there is no clear, affirmative indication from Congress that Section 1595 applies to extraterritorial conduct, the Court must proceed to step two of the *RJR Nabisco* analysis and determine whether Xu Lun's allegations involve a permissible, domestic application of the TVPA. *See RJR Nabisco*, 579 U.S. at 337. Milwaukee Tool argues that the amended complaint must be dismissed because the alleged TVPA violation occurred in China. (ECF No. 30 at 11–12.) It contends that the focus of Section 1595 falls where the underlying forced labor, giving rise to the alleged injury, occurred. (*Id.* at 12.) Xu Lun disagrees, asserting that he permissibly alleges domestic conduct, as Milwaukee Tool benefitted from its participation in a venture that used forced

labor, in violation of Section 1589(b), and that benefit was incurred here in the United States. (ECF No. 41 at 25.)

To "determine whether the case involves a domestic application of the statute" the Court looks to the statute's "focus." *RJR Nabisco*, 579 U.S. at 337. "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad[.]" *Id.* But if the conduct relevant to the focus occurred outside the United States, "then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *Id.* In determining a statute's focus, the Court first considers the relevant statutory provision. *See WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407, 414 (2018). Based on the statutory provision, the Court will then determine what conduct is being regulated and what interests are being protected or vindicated. *See Morrison*, 561 U.S. at 267. Statutory provisions must not be analyzed in a vacuum: if the provision works in tandem with others, all provisions must be considered to determine the statute's focus. *WesternGeco*, 585 U.S. at 414. After determining what the "focus" is, the Court considers the conduct alleged to have violated the provision. *Morrison*, 561 U.S. at 266. If the conduct relevant to the "focus" of the provision occurred in the United States, then the statute is being applied domestically. *WesternGeco*, 585 U.S. at 413. "The focus of a statute is 'the object[t] of [its] solicitude,' which can include the conduct it 'seeks to regulate,' as well as the parties and interests it 'seeks to protec[t]' or vindicate." *Id.* at 413–14 (quoting *Morrison*, 561 U.S. at 267).

In *WesternGeco*, the Supreme Court considered the "focus" of the general damages remedy of the Patent Act, which provides that "the court shall award the claimant damages adequate to compensate for the infringement." *Id.* at 414 (quoting 35 U.S.C. §284). The Court reasoned that "the overriding purpose of §284 is to afford patent owners complete compensation for infringements," and "[t]he question posed by the statute is how much has the Patent Holder suffered by the infringement." *Id.* at 414–15 (internal citations omitted). Thus, the Court concluded, the act of the infringement is "plainly the focus of §284." *Id.* at 415. Because the Patent Act identifies several ways that a patent can be infringed, the Court explained that it must look to the type of infringement that occurred. The plaintiff's infringement claim was based on the defendant's alleged violation of Section 271(f)(2), which provides that a company is "liable as an infringer" if it "supplies" certain components of a patented invention "in or from the United

States" with the intent that they "will be combined outside of the United States in a manner that would infringe the patent if such combination occurred within the United States." *Id.* (quoting 35 U.S.C. §271(f)(2)). The Court explained that "the focus of §284, in a case involving infringement under §271(f)(2), is on the act of exporting components from the United States." *Id.* Considering this, the Court concluded that domestic infringement is "the object of the statute's solicitude" in that context. *Id.* (quoting *Morrison*, 561 U.S. at 267). Thus, the plaintiff's claims involved a permissible, domestic application of Section 284 of the Patent Act. *Id.* at 417.

Applying *WesternGeco*, the Court concludes that Xu Lun's claims do not involve a permissible, domestic application of the TVPA. Section 1595 provides a civil remedy allowing victims to sue perpetrators for violations of the TVPA, through which Xu Lun seeks to hold Milwaukee Tool liable for its alleged violations of Section 1589. Accordingly, the Court must look to both Section 1595, the cause of action, and Section 1589, the type of violation that occurred, to determine the "focus" of Section 1595. Section 1589(a) prohibits knowingly providing or obtaining forced labor, while Section 1589(b) prohibits knowingly benefitting from participation in a venture that has provided or obtained forced labor. It is clear from the text of Section 1589 that the underlying "focus" of the provision is to prohibit the use of forced labor. And it is undisputed that Xu Lun's allegations of forced labor occurred in China. Thus, in this context, the focus of Section 1595 is conduct occurring outside the United States.

Xu Lun argues that Section 1589 does not have one focus but two, depending on the violation, and that the violation itself must be construed as the focus. (*See* ECF No. 41 at 26–28.) He maintains that this is a domestic application of the statute, because he is suing for Milwaukee Tool's benefit from the use of forced labor, and that any benefit incurred by Milwaukee Tool was incurred here in Wisconsin. (*Id.* at 28–29.) But the Court cannot individually analyze the subsections of Section 1589 "in a vacuum." *See WesternGeco*, 585 U.S. at 414. Here, the logical conclusion is that the focus of a claim for a violation of Section 1589 is where the forced labor occurred. The amended complaint alleges that Xu Lun was subjected to forced labor in China only. Xu Lun's claims against Milwaukee Tool do not involve a permissible, domestic application of the TVPA, and therefore must be dismissed.

## CONCLUSION

The Court will grant the Defendants' motions and dismiss the amended complaint. Xu Lun's claims against Techtronic Industries fail because the Court does not have personal jurisdiction over it. Techtronic Industries is a foreign corporation not subject to general personal jurisdiction in this Court, and the litigation does not relate to any of Techtronic Industries' contacts with the United States. The claims against Milwaukee Tool must also be dismissed because Xu Lun impermissibly seeks to apply Section 1595 of the TVPA to conduct occurring abroad. Congress has not given clear, affirmative indication that Section 1595 applies extraterritorially, and Xu Lun alleges the that the forced labor occurred in China.

Accordingly,

**IT IS HEREBY ORDERED** that Techtronic Industries Company Limited's Motion to Dismiss, ECF No. 31, is **GRANTED**. Xu Lun's claims against Techtronic Industries are **DISMISSED WITHOUT PREJUDICE** for lack of personal jurisdiction.

**IT IS FURTHER ORDERED** that Xu Lun's Motion to Conduct Jurisdictional Discovery, ECF No. 42, is **DENIED**.

**IT IS FURTHER ORDERED** that Milwaukee Tool's Motion to Dismiss, ECF No. 29, is **GRANTED**. Xu Lun's claims against Milwaukee Tool are **DISMISSED WITH PREJUDICE** for failure to state a claim.

**IT IS FURTHER ORDERED** that the case is **DISMISSED**. The Clerk of Court is instructed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin on December 1, 2025.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge